Francis J. Brennan, III
FBrennan@brennanlaw.org
Attorney I.D. #57032
LAW OFFICES OF FRANCIS J. BRENNAN, III, P.C.
73 North Main Street
Cranbury, New Jersey 08512
(609) 395-5533
*Attorneys for Plaintiffs*,
Saibaba's Almighty Inc.,
Saibaba's Aashirwad Forever Inc.
Saibaba's Aashirwad Everything Inc., and
Saibaba's Protection, Inc.

### UNITED STATES DISTRICT COURT FOR
### THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAIBABA's ALMIGHTY INC., SAIBABA'S AASHIRWAD FOREVER INC., SAIBABA'S AASHIRWAD EVERYTHING INC., AND SAIBABA'S PROTECTION, INC., | : Civil Action No.: <br> : <br> : <br> : *Electronically Filed* <br> : |
| Plaintiffs, | : **COMPLAINT** <br> : |
| v. | : **JURY TRIAL DEMANDED** <br> : |
| DRAKE PETROLEUM COMPANY, INC., ALLIANCE ENERGY LLC, AND GLOBAL PARTNERS LP, | : <br> : <br> : <br> : |
| Defendants. | : <br> : |

Plaintiffs, Saibaba's Almighty Inc. ("SAI"), Saibaba's Aashirwad Forever Inc. ("SAF"),

Saibaba's Aashirwad Everything Inc. ("SAE"), and Saibaba's Protection, Inc. ("SPI"),

(collectively, "Plaintiffs"), by and through their attorneys, the Law Offices of Francis J. Brennan,

III, P.C., and by way of this Complaint against Defendants, Drake Petroleum Company, Inc.

("Drake"), Alliance Energy LLC ("Alliance"), and Global Partners LP ("Global"), (collectively,

"Defendants) states as follows:

1

## I. SUMMARY OF ACTION

1.      This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud and misrepresentation, tortious interference, and impossibility and frustration of purpose against Defendants associated with various agreements entered into between Plaintiffs and Defendants with respect to gasoline service stations, and businesses related thereto, at four (4) sites in the Commonwealth of Pennsylvania and one (1) site in the State of New York located at:

        a.      2319 Marshall Road, Lansdowne, Pennsylvania 19050 (the "Lansdowne Site");

        b.      4247 Swamp Road, also known as 4247 West Swamp Road, Doylestown, Pennsylvania 18902 (the "Doylestown Site");

        c.      1205 East Lincoln Highway, Langhorne, Pennsylvania 19047 (the "Langhorne Site");

        d.      2407 Market Street, Marcus Hook, Pennsylvania 19601 (the "Marcus Hook Site"); and,

        e.      3522 State Street, Niskayuna, New York 12304 (the "Niskayuna Site").

2.      Defendants have made a number of misrepresentations to Plaintiffs, including, but not limited to:

        a.      the per washed car amount due under the agreements for the Niskayuna Site;

        b.      the use of confidential business and customer information from the Doylestown Site;

        c.      the agreed-upon contractual arrangement among the agreements relating to the Niskayuna Site, the Langhorne Site, and the Marcus Hook Site, including, the importance of the Niskayuna Site in entering into such agreements and the timeframe within which access to the Niskayuna Site would be provided;

        d.      shortfall gallonage penalties would not be assessed against Plaintiffs during the term of the agreements, but would be added to the end of any such term; and,

e.    the holding and turnover of funds.

3.    Defendants also tortiously interfered with Plaintiffs' business by using confidential information to solicit and steal a large, important customer of the Doylestown Site from Plaintiffs.

4.    Despite knowing the importance of the Niskayuna Site to Plaintiffs, and Plaintiffs' reliance on the same in entering into agreements for the Langhorne Site and the Marcus Hook Site, Defendants failed to provide Plaintiffs with access to the Niskayuna Site for almost one (1) year.

5.    Despite the misrepresentation and the dispute regarding the per washed car amount owed for the Niskayuna Site, and while Plaintiffs' settlement offer to resolve the same was pending, Defendants breached the agreements with Plaintiffs by

a.    placing the Niskayuna Site on pre-pay only, thereby requiring pre-payment of all deliveries of gasoline products to the Niskayuna Site; and,

b.    placing delivery holds on the Lansdowne Site, the Langhorne Site, the Marcus Hook Site, and the Doylestown Site which Plaintiffs only learned of from its fuel carrier, and not from the Defendants, when trying to place a fuel order for delivery to such sites who advised that Defendants instructed them to put all four (4) sites in Pennsylvania on delivery hold, cancel any scheduled deliveries thereto, and not deliver any fuel thereto at all.

6.    Through this action, Plaintiff seeks termination of the agreements with Defendants and damages for misrepresentation, common law fraud, tortious interference, breach of contract, breach of the implied covenants of good faith and fair dealing, impossibility and frustration of purpose, and unjust enrichment arising from the actions and inactions of Defendants.

## II. **PARTIES**

7.    Plaintiff Saibaba's Almighty Inc. is a corporation organized under the laws of the State of New York with a principal place of business located at 3522 State Street, Niskayuna, New York 12304.

8.      Plaintiff Saibaba's Aashirwad Forever Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 200 West Montgomery Avenue, Ardmore, Pennsylvania 19003.

9.      Plaintiff Saibaba's Aashirwad Everything Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 200 West Montgomery Avenue, Ardmore, Pennsylvania 19003.

10.      Plaintiff Saibaba's Protection, Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 2355 Market Street, also known as 2407 Market Street, Marcus Hook, Pennsylvania 19061.

11.      Based on information and belief, Defendant Alliance Drake Petroleum Company, Inc. is a corporation organized under the laws of the State of Massachusetts with a principal place of business located at 800 South Street, Suite 500, Waltham, Massachusetts 02454.

12.      Based on information and belief, Defendant Alliance Energy LLC is a limited liability company organized under the laws of the State of Massachusetts with a principal place of business located at 800 South Street, Suite 500, Waltham, Massachusetts 02454.

13.      Based on information and belief, Defendant Global Partners LP is a limited partnership organized under the laws of the State of Massachusetts with a principal place of business located at 800 South Street, Suite 500, Waltham Massachusetts 02454.

### III. <u>VENUE AND JURISDICTION</u>

14.      This Court has original jurisdiction under 28 <u>U.S.C.</u> 1332 as the amount in controversy exceeds the amount of $75,000.00 and based on the diversity of citizenship among the parties hereto.

15.    This Court also has supplemental jurisdiction over the claims set forth herein pursuant to 28 U.S.C. §1367.

16.    All parties had or have sufficient contacts with the Commonwealth of Pennsylvania to be subject to the jurisdiction of this Court.

17.    Venue is properly laid in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391 because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims set forth herein occurred and the parties hereto have sufficient contacts with the Commonwealth of Pennsylvania.

## IV. <u>FACTS</u>

### A. <u>Agreements</u>

18.    On or about April 28, 2020, SAE and Alliance entered into a Dealer Sales Agreement ("<u>DSA</u>") and Reimbursement Agreement ("<u>RA</u>") with respect to the gasoline service station located at the Lansdowne Site.  Copies of the DSA and RA for the Lansdowne Site are attached as **Exhibit A**.

19.    On or about January 12, 2022, SAE and Alliance entered into an Amendment Agreement with respect to the DSA for the Lansdowne Site.  A copy of the Amendment Agreement is attached as **Exhibit B**.

20.    On or about June 15, 2022, SAI and Drake entered into a DSA with respect to the gasoline service station located at the Niskayuna Site.  A copy of the DSA for the Niskayuna Site is attached as **Exhibit C**.

21.    On or about June 15, 2022, SAF and Alliance entered into an Amended and Restated DSA and a RA Agreement with respect to the gasoline service setation located at the

Langhorne Site. Copies of the Amended and Restated DSA and RA for the Langhorne Site are attached as **Exhibit D**.

22.     On or about June 15, 2022, SPI and Alliance entered into a DSA and RA with respect to the gasoline service station located at the Marcus Hook Site. Copies of the DSA and RA for the Marcus Hook Site are attached as **Exhibit E**.

23.     On or about October 3, 2022, SAF and Alliance entered into a DSA and RA with respect to the gasoline service station located at the Doylestown Site. Copies of the DSA and RA for the Doylestown Site are attached as **Exhibit F**.

24.     On or about September 25, 2023, SAI and Drake entered into a Sublease Agreement ("Sublease") which assigned the prime lease between Drake and Landlord, State Street Gas Plus, Inc., ("NY Landlord") for the Niskayuna Site to SAI. A copy of the Sublease for the Niskayuna Site is attached as **Exhibit G**.

25.     Global is a beneficiary of the terms and conditions set forth in the DSAs and RAs between Plaintiffs and Defendants. **See**, **Exhibits A-F**.

26.     On or about September 25, 2023, SAI and Drake entered into a Management Services Agreement ("MSA") with respect to the car wash located at the Niskayuna Site. A copy of the Management Services Agreement is attached as **Exhibit H**.

27.     The DSAs and RAs created a franchise relationship between Plaintiffs and Defendants with respect to the Lansdowne Site, the Niskayuna Site, the Langhorne Site, the Marcus Hook Site, and the Doylestown Site. **See**, **Exhibits A-F**.

**B. Niskayuna Site**

28.     The MSA between Drake and SAI provides, in part, that SAI agrees to pay Drake, within five (5) days of receipt of the NY Landlord's monthly billing statement ("Monthly Billing

Statement"), all amounts owed under Sections 2(c) and (d) of the Car Wash Agreement, for each car washed at the Niskayuna Site car wash.  **See**, **Exhibit H** (*Section 4(c)*).

29.     At the time of entering into the MSA, the only documents provided by Drake to SAI regarding the per washed car amount to be paid were the Car Wash Agreement between Drake and the NY Landlord and a monthly car wash settlement form which identified the per washed car amount as $3.75 per washed car.  **See**, **Exhibit H**.

30.     Both the Car Wash Agreement and the monthly car wash settlement form were attached to and incorporated by reference in the MSA, including, but not limited to, in the "Entire Agreement; Amendments; Waivers" section thereof which provides:

> This Agreement (including the Exhibits and Schedules referred to herein) contain the entire understanding of the parties hereto with respect to the subject matter contained herein and there are no restrictions, promises, representations, warranties, covenants, agreements, or understandings other than those expressly set forth herein.  No amendment, supplement, modification, waiver or termination of this Agreement shall be implied or be binding (including, without limitation, any alleged waiver based on a parties' knowledge of any inaccuracy and any representation or warranty contained herein) unless it is in writing and signed by the party against which such amendment, supplement, modification, waiver or termination is asserted.

**See**, **Exhibit H** (*Section 16*).

31.     Therefore, according to Section 16 of the MSA, any changes thereto, including, but not limited to, adjustment of the amount of $3.75 per washed car, must be in writing signed by SAI.

32.     Other than the Car Wash Agreement and monthly car wash settlement form attached to the MSA, Drake did not provide SAI with any writing, including, but not limited to, the Monthly Billing Statements required to be provided under the MSA for payment, identifying any increases or adjustments to the $3.75 per washed car amount or any other amounts.

33.     Nevertheless, Drake has demanded $130,577.30 from SAI claiming that the per washed car amount has been periodically adjusted by Drake and the NY Landlord from time to time despite no notification to or writing from SAI.

34.     In fact, in an October 29, 2025 e-mail to SAI, Drake claimed that the per washed car amount that the per washed car amount owed was adjusted both prior to the MSA based on an increase to $4.95 per washed car in May 2022 and afterwards with an increase to $5.75 in December 2024.

35.     Notwithstanding the same, there are no executed written agreements memorializing the alleged upward adjustments to the per washed car amount, including, but not limited to, anything in or attached to the September 2023 MSA regarding the $3.75 per washed car amount being increased to $4.95.

36.     Further, Drake did not provide SAI with any documentation, including, but not limited to, the Monthly Statements, identifying any adjustment to the $3.75 per washed car amount, until demanding $130,577.30 from SAI.

37.     Therefore, at the time of entering into the MSA, Drake misrepresented to SAI the per washed car amount owed under the MSA because it knew, at that time, the amount was $4.95 per washed car, but the only information and documentation provided to SAI were the Car Wash Agreement and monthly car wash settlement form attached as an Exhibit to, and incorporated in, the MSA which identified the amount as $3.75 per washed car.

38.     Nevertheless, SAI attempted to resolve this per washed car dispute directly with Drake based on the agreed-upon $3.75 per washed car amount.

39.     In fact, SAI believed it had reached an agreement with Drake to resolve payment of the disputed per washed car amount, subject to approval.  But Drake refused to approve this settlement and, instead, demanded the entire amount of $130,577.30 from SAI.

40.     Shortly thereafter, Defendants placed the Niskayuna Site on pre-pay only meaning that they would only provide and deliver products if Plaintiffs paid for the same in advance.

41.     Additionally, Defendants placed all of Plaintiffs' sites in Pennsylvania (the Lansdowne Site, the Langhorne Site, the Marcus Hook Site, and the Doylestown Site) on delivery hold which Plaintiffs only learned of from the fuel carrier when trying to place an order for fuel for the Pennsylvania sites on or about December 6, 2025.

42.     In fact, the fuel carrier notified Plaintiffs, via text, that Defendants instructed them to put all of Plaintiffs' sites in Pennsylvania on delivery hold, cancel any scheduled deliveries thereto, and not deliver any fuel thereto at all.

43.     However, Defendants did not notify Plaintiffs, in writing or through any other means, that they were taking this action with respect to the Lansdowne Site, the Langhorne Site, the Marcus Hook Site, and the Doylestown Site, i.e., placing the same on delivery hold.

44.     As a result, if not for reaching out to the fuel carrier, there would have been no way for Plaintiffs to know of the delivery hold placed on the Pennsylvania sites by the Defendants until such sites ran out of fuel.

45.     Due to such actions, without notice, Defendants attempted to put Plaintiffs' operations at the Pennsylvania sites out of business by way of the delivery hold placed thereon.

46.     However, Defendants are without right to require pre-payment under the DSA for the Niskayuna Site, and placing a delivery hold on the Pennsylvania sites, based on demanding payment of the incorrect per washed car amount under the MSA.

47.    Despite the pre-pay only and the delivery hold restrictions, Defendants are, and have always been, holding Plaintiffs' funds and cards for the Niskayuna Site and the four (4) Pennsylvania sites in amounts sufficient to pay for deliveries of products in advance.

48.    Therefore, Drake's actions in improperly demanding payment of $130,577.30 from SAI, and Defendants' actions in demanding Plaintiffs pre-pay for products for the Niskayuna Site even though they are holding Plaintiffs' monies and placing delivery holds on Plaintiffs' sites in Pennsylvania, are without factual or legal bases and are in breach of the DSAs between Plaintiffs and Defendants.

### C. Doylestown Site

49.    SAF's operations of the gasoline service station at the Doylestown Site included, but was not limited to, an existing, profitable business relationship with a customer by the name of Fred Beans Auto Group.

50.    Alliance requested confidential business information from SAF regarding its customers at the Doylestown Site, including Fred Beans Auto Group, which SAF provided.

51.    Unbeknownst to SAF, Alliance used the confidential business information provided to improperly solicit and steal customers from SAF.

52.    In fact, based on SAF's confidential business information, Alliance solicited business from SAF's customer, Fred Beans Auto Group, for the Alliance-controlled site located directly across from the Doylestown Site.

53.    As a direct result, Fred Beans Auto Group transferred a portion of its business from SAF and the Doylestown Site to Alliance.

54.    Therefore, due to its misrepresentations, interference, and improper actions, Alliance breached the DSA for the Doylestown Site resulting in damages being incurred by SAF.

D. **Interrelationship of DSAs for the Niskayuna Site, Langhorne Site, and Marcus Hook Site**

55.    Plaintiffs advised Defendants that they would only enter into the DSAs and RAs for the Langhorne Site and Marcus Hook Site if they also received the Sublease and DSA for the Niskayuna Site.

56.    In response, Defendants represented to Plaintiffs that the agreements for these three (3) sites, the Langhorne Site, Marcus Hook Site, and Niskayuna Site, were interconnected and the Niskayuna Site was a material part of this interconnected business relationship.

57.    Plaintiffs relied upon such representations of Defendants and entered into the DSAs and/or RAs for the Niskayuna Site, the Langhorne Site, and the Marcus Hook Site on June 15, 2022.

58.    However, after entering into these DSAs and/or RAs, Defendants failed to provide SAI with access to the Niskayuna Site for almost a year.  In fact, it was not until September 25, 2023 that SAI and Drake entered into the Sublease for the Niskayuna Site.

59.    As a result of Defendants' failure to promptly provide access to the Niskayuna Site, Plaintiffs have incurred damages.

E. **Shortfall Penalties and Funds**

60.    Prior to commencing the current business relationships, and entering into the DSAs, with Plaintiffs, Defendants represented that they would not charge or assess any minimum gallonage penalty to Plaintiffs during the Terms of the DSAs and, instead, that any remaining gallonage in the event of a shortfall would be added to the end of the term of the Agreements.

61.    Plaintiffs relied upon such representations in entering into the DSAs and/or RAs with Defendants for the Doylestown Site, the Landsdowne Site, the Langhorne Site, the Marcus Hook Site, and the Niskayuna Site.

62. However, despite such promises, Defendants have sought gallonage shortfall penalties from Plaintiffs.

63. In addition, despite receiving funds from Plaintiff's operations at the Doylestown Site, the Lansdowne Site, the Langhorne Site, the Marcus Hook Site, and the Niskayuna Site, Defendants have failed and refused to timely turnover such monies to Plaintiffs causing damage to Plaintiffs' operations and performance under the DSAs, RAs, and/or Sublease with Defendants.

64. Given the above, Plaintiffs have incurred, and continue to incur, damages as a result of Defendants' actions and inactions, including, but not limited to, the per washed car amount owed under the MSA, use of confidential business and customer information, improper solicitation of Plaintiffs' customer(s), the interconnected business relationship among the Niskayuna Site and the Langhorne Site and the Marcus Hook Site, the assessment of shortfall penalties, retention of Plaintiffs' funds, and interference with  Plaintiffs' business relationships and operations.

65. As a result of the actions and inactions of Defendants, Plaintiffs seek damages for misrepresentation, common law fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference, frustration of purpose, and unjust enrichment.

<u>**COUNT ONE**</u>

**(Misrepresentation)**

66. Plaintiffs repeat and reiterate each and every allegation set forth in Paragraphs 1 through 65 of this Complaint as if set forth herein at length.

67. Defendants made false and misleading statements and representations to Plaintiffs in connection with:

      a.    the per washed car amount owed under the MSA for the Niskayuna Site being $3.75 per washed car;

12

       b.     the use of SAF's confidential information regarding its customers at the Doylestown Site for business purposes;

       c.     the Sublease and DSA for the Niskayuna Site being a material condition of Plaintiffs' entry into the DSAs and RAs for the Langhorne Site and the Marcus Hook Site; and,

       d.     the assessment of gallonage shortfall penalties during the term of the DSAs between Plaintiffs and Defendants.

68.     Defendants knew, or should have known, that:

       a.     the $3.75 per washed car amount identified in the Car Wash Agreement and monthly car wash settlement form attached to the MSA as an Exhibit was inaccurate and incorrect as Drake and the NY Landlord adjusted that amount upward to $4.95 per washed car prior to SAI's entry into the MSA;

       b.     Alliance's intended use of SAF's confidential customer information from the Doylestown Site was to solicit and take business from SAF's customer, Fred Beans Auto Group, and interfere with SAF's business relationship with Fred Beans Auto Group;

       c.     despite entering into the DSAs for the Niskayuna Site, the Langhorne Site, and the Marcus Hook Site in June 2022, Drake could not provide SAI with access to and/or the Sublease for the Niskayuna Site for almost a year later; and,

       d.     Defendants intended to seek shortfall gallonage penalties from Plaintiffs during the term of the DSAs.

69.     Plaintiffs relied upon these false and misleading representations and statements by Defendants in entering into the MSA for the Niskayuna Site, providing confidential customer information with respect to the Doylestown Site, and entering into the DSAs and RAs for the Niskayuna Site, the Langhorne Site, the Marcus Hook Site, the Doylestown Site, and the Lansdowne Site.

70.     As direct result of Defendants' actions and inactions, Plaintiffs have incurred damages.

## COUNT TWO

### (Common Law Fraud)

71.    Plaintiffs repeat and reiterate each and every allegation set forth in Paragraphs 1 through 70 of this Complaint as if set forth herein at length.

72.    Common law fraud prohibits deception, fraud, concealment, suppression, misrepresentation, and/or omission of information.

73.    Through the Car Wash Agreement and monthly car wash settlement form attached as an Exhibit to, and incorporated in, the MSA for the Niskayuna Site, Drake represented to SAI that the per washed car amount due thereunder was $3.75 per washed car.

74.    SAI, to its detriment, relied upon the representation of the $3.75 per washed car amount in the MSA from Drake.

75.    Drake knew that the Car Wash Agreement and monthly car wash settlement form attached to, and incorporated in, the MSA with SAI was false as Drake and the NY Landlord agreed to adjust the per washed car amount to $4.95 per washed car prior to entering into the MSA with SAI.

76.    In fact, based on the upwardly adjusted per washed car amounts, which SAI was not informed of and did not agree to, Drake has demanded payment of $130,577.30 from SAI for the per washed car amount under the MSA.

77.    In addition, Alliance represented to SAF that it required confidential business information, including customer information, relating to the Doylestown Site for business purposes.

78.    SAF, to its detriment, relied upon such representation in providing Alliance with confidential customer information related to the Doylestown Site.

79.    However, Alliance knew, or should have known, that it intended to use SAF's confidential customer information to approach and solicit business from SAF's customer, Fred Beans Auto Group, which is exactly what Alliance did.

80.    Further, Defendants represented to Plaintiffs that it understood Plaintiffs' intention to only enter into the DSAs for the Langhorne Site and the Marcus Hook Site if Plaintiffs also received the Sublease and DSA for the Niskayuna Site and that the Niskayuna Site was an integral part of entering into the DSAs for the Langhorne Site and the Marcus Hook Site.

81.    Plaintiffs, to their detriment, relied upon such representations in entering into the DSAs for the Langhorne Site, the Marcus Hook Site, and the Niskayuna Site on June 15, 2022.

82.    However, Defendants knew, or should have known, that it could not provide access to and/or the Sublease for the Niskayuna Site at that time and, in fact, the Sublease for, and access to, the Niskayuna Site was not provided until approximately a year after entry into the DSAs.

83.    Also, Plaintiffs, to their detriment, relied upon representations from Defendants that no shortfall gallonage penalties would be assessed during the term of the DSAs and, notwithstanding the same, Defendants have assessed and sought such shortfall gallonage penalties from Plaintiffs.

84.    As a result of such actions and inactions by Defendants, Plaintiffs have incurred damages.

## COUNT THREE

### (Tortious Interference)

85.    Plaintiffs repeat and reiterate each and every allegation set forth in Paragraphs 1 through 84 of this Complaint as if set forth herein at length.

86.    At the Doylestown Site, SAF had an existing, profitable relationship with its customer, Fred Beans Auto Group.

87.    Alliance knowingly requested SAF's confidential business information, including its customers, for the Doylestown Site for the improper purpose of soliciting and stealing customers from SAF.

88.    In fact, Alliance knowingly caused a breach of SAF's business relationship with Fred Beans Auto Group by taking a portion of its business away from SAF.

89.    As a result, Fred Beans Auto Group transferred a portion of its business from SAF to the Alliance-controlled station located directly across the street from the Doylestown Site.

90.    As a result of Alliance's tortious interference with SAF's business relationship with Fred Beans Auto Group, SAF has incurred damages.

## COUNT FOUR

### (Breach of Contract)

91.    Plaintiffs repeat and reiterate each and every allegation set forth in Paragraphs 1 through 90 of this Complaint as if set forth herein at length.

92.    Plaintiffs and Defendants entered into a variety of agreements related to the business operations of the Lansdowne Site, the Niskayuna Site, the Langhorne Site, the Marcus Hook Site, and the Doylestown Site.  **See**, **Exhibits A-H**.

93.    As part of such agreements, SAI and Drake entered into a MSA, which attached as an Exhibit thereto, and incorporated therein by reference, the Car Wash Agreement between Drake and the NY Landlord and a monthly car wash settlement form, with respect to the management and operations of the car wash at the Niskayuna Site which contained payment provisions, including, but not limited to, a per washed car amount.  **See**, **Exhibit H**.

94.     The only information provided to SAI with respect to the per washed car amount owed under the MSA was the Car Wash Agreement and the monthly car wash settlement form attached as an Exhibit thereto and incorporated therein by reference which identified the per washed car amount as $3.75 per washed car.  **See**, **Exhibit H**.

95.     In addition, under the MSA, SAI's agreed to pay Drake amounts owed under Sections 2(c) and (d) of the Car Wash Agreement within five (5) days of receipt of Monthly Billing Statements from the NY Landlord.  **See**, **Exhibit H**.

96.     However, despite such provisions, Drake demanded that SAI pay the total amount of $130,577.30 based on an amount higher than $3.75 per washed car, of which SAI was not notified of and did not agree to, and without providing any Monthly Billing Statements in accord with the MSA.

97.     While SAI attempted to resolve the per washed car dispute based on the agreed-upon $3.75 per washed car amount identified in the Exhibit to, and incorporated by reference in, the MSA, Drake refused alleging it is entitled to the full amount of $130,577.30 despite the terms of the MSA and not notifying SAI of any upward adjustments in the per washed car amount.

98.     As a result, Drake placed the Niskayuna Site on pre-pay only, and Defendants placed delivery holds on all four (4) Pennsylvania sites, without any advance notice to Plaintiffs.

99.     In fact, Plaintiffs did not learn of such delivery holds from Defendants, but only from the fuel carrier who advised that Defendants instructed them to place delivery holds on all of Plaintiffs' sites in Pennsylvania, cancel any scheduled deliveries thereto, and not deliver any fuel thereto at all which, in essence, is Defendants' attempt to shut down Plaintiffs' business operations at the Pennsylvania sites.

100.    Drake's failure to charge $3.75 per washed car, enter into a written modification thereof with SAI, and/or provide the Monthly Billing Statements are breaches of the MSA.

101.    Defendants' placement of the Niskayuna Site on pre-pay only and the Pennsylvania sites on delivery hold due to Plaintiffs' refusal to pay an incorrect per washed car amount are breaches of the DSAs with Plaintiffs.

102.    Such actions and inactions by Defendants are breaches of its contracts with Plaintiffs.

103.    As a result of Defendants' actions and inactions, Plaintiffs have incurred damages.

## COUNT FIVE

### (Breach of Implied Covenants of Good Faith and Fair Dealing)

104.    Plaintiffs repeat and reiterate each and every allegation set forth in Paragraphs 1 through 103 of this Complaint as if set forth herein at length.

105.    The DSAs, RAs, Sublease, and/or MSA between Plaintiffs and Defendants contain implied covenants of good faith and fair dealing.

106.    By demanding that SAI pay an amount other than agreed-upon $3.75 per washed car without any written agreement from SAI or written modification to the MSA and failing to provide Monthly Billing Statements prior to demanding such payment, Drake has breached the MSA, including, without limitation, the implied covenants of good faith and fair dealing contained therein.

107.    In addition, by placing the Niskayuna Site on pre-pay only and deliver holds on the Pennsylvania sites due to Plaintiffs' refusal to pay an incorrect and improper per washed car amount, Defendants have breached the DSAs and the implied covenants of good faith and fair dealing contained therein.

108.     The pattern of conduct enumerated in this Complaint constitutes breaches of the covenants of good faith and fair dealing on the part of Defendants.

109.     Defendants' conduct was and is undertaken solely to recover monies from Plaintiffs which are not due and owing and to hinder, interfere with, and attempt to shut down Plaintiffs' business operations at the Niskayuna Site, the Lansdowne Site, the Langhorne Site, the Marcus Hook Site, and the Doylestown Site.

110.     As a result of Defendants' breaches of the implied covenants of good faith and fair dealing, Plaintiffs have incurred damages.

### COUNT SIX

**(Impossibility / Frustration of Purpose)**

111.     Plaintiffs repeat and reiterate each and every allegation set forth in Paragraphs 1 through 110 of this Complaint as if set forth herein at length.

112.     After entering into the DSAs for the Langhorne Site, the Marcus Hook Site, and the Niskayuna Site on June 15, 2022, Plaintiffs' performance thereunder became impossible and/or was frustrated by circumstances beyond their control in that Defendants could not provide access to the Niskayuna Site, and the Sublease was not entered into, until approximately a year later.

113.     In addition, Defendants' placement of the Niskayuna Site on pre-pay and the four (4) Pennsylvania sites on delivery holds based on Plaintiffs' refusal to pay an excessive and inflated per washed car amount has rendered Plaintiffs' performance thereunder impossible and/or has frustrated the purpose of the DSAs, RAs, Sublease, and MSA entered into by Plaintiffs and Defendants.

114.     Further, Defendants' refusal to not assess gallonage shortfall penalties during the terms of the DSAs, solicitation and stealing a portion of Fred Beans Auto Group's business from

SAF, and refusal to turnover monies from the sites all render Plaintiffs' performance under the DSAs, RAs, Sublease, and MSA extremely difficult, if not impossible, and also frustrated the purposes of the same.

115.    Due to Defendants' actions and inactions, Defendants have frustrated the purpose for which the DSAs, RAs, Sublease, and MSA were entered into and made Plaintiffs' performance thereunder impossible.

116.    As a result, Plaintiffs have incurred damages.

## COUNT SEVEN

### (Unjust Enrichment)

117.    Plaintiffs repeat and reiterate each and every allegation set forth in Paragraphs 1 through 116 of this Complaint as if set forth herein at length.

118.    As a result of Plaintiffs' operations at the Lansdowne Site, the Langhorne Site, the Marcus Hook Site, the Doylestown Site, and the Niskayuna Site under the DSAs, RAs, Sublease, and MSA, Defendants have received monies which are required to be turned over to Plaintiffs.

119.    Despite receiving such monies, Defendants have failed and refused to timely turnover such monies to Plaintiffs causing damage to Plaintiffs' business operations and performance under the DSAs RAs, Sublease, and/or MSA with Defendants.

120.    In addition, despite placing the Niskayuna Site on pre-pay and the four (4) Pennsylvania sites on delivery holds, Defendants are currently holding cards and funds of Plaintiffs therefrom.

121.    Due to holding and refusing to turn over funds due Plaintiffs, Defendants have been unjustly enriched.

122.    As a result, Plaintiffs have incurred damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, Saibaba's Almighty Inc., Saibaba's Aashirwad Forever Inc., Saibaba's Aashirwad Everything Inc., and Saibaba's Protection, Inc., demand Judgment against Defendants, Drake Petroleum Company, Inc. Alliance Energy LLC, and Global Partners LP, as follows:

    **A.**    With respect to Counts One through Seven, a judgment and order for:

        **i.**    termination of the DSAs and RAs for the Lansdowne Site, the Langhorne Site, the Marcus Hook Site, and the Doylestown Site;

        **ii.**    termination of the DSA, Sublease, and MSA for the Niskayuna Site;

        **iii.**    compensatory damages in accord with proofs at trial;

        **iv.**    punitive or exemplary damages, if applicable;

        **v.**    pre- and post-judgment interest;

        **vi.**    attorneys' fees and costs of suit; and,

        **vii.**    for such other and further relief that the Court deems equitable and just.

## JURY TRIAL DEMAND

Plaintiffs, Saibaba's Almighty Inc., Saibaba's Aashirwad Forever Inc., Saibaba's Aashirwad Everything Inc., and Saibaba's Protection, Inc., demand a trial by jury on all issues so triable.

Respectfully submitted,

LAW OFFICES OF
FRANCIS J. BRENNAN, III, P.C.

_____
**DATED:**    December 9, 2025        Francis J. Brennan, III
            Cranbury, New Jersey       *Attorneys for Plaintiffs*,
                                        Saibaba's Almighty Inc.,
                                        Saibaba's Aashirwad Forever Inc.,
                                        Saibaba's Aashirwad Everything Inc., and
                                        Saibaba's Protection, Inc.

## VERIFICATION

I, Chirag Dewan, I am the President of Plaintiffs, Saibaba's Almighty Inc., Saibaba's Aashirwad Forever Inc., Saibaba's Aashirwad Everything Inc., and Saibaba's Protection, Inc., and, as such, I am familiar with the facts of this matter and am authorized to make this verification. I have personal knowledge of Plaintiffs, Saibaba's Almighty Inc., Saibaba's Aashirwad Forever Inc., Saibaba's Aashirwad Everything Inc., and Saibaba's Protection, Inc., and their actions, activities, and intentions, including, but not limited to, those set forth in the foregoing Complaint, and, if called upon to testify, I would competently testify as to the matters stated herein.

Given the above, and under penalty of perjury, I certify that the factual statements in this Complaint concerning Plaintiffs, Saibaba's Almighty Inc., Saibaba's Aashirwad Forever Inc., Saibaba's Aashirwad Everything Inc., and Saibaba's Protection, Inc., are true and accurate. 28 U.S.C. 1746.

**PLAINTIFFS**
Saibaba's Almighty Inc.,
Saibaba's Aashirwad Forever Inc.,
Saibaba's Aashirwad Everything Inc., and
Saibaba's Protection, Inc.

Dated: December 9, 2025

_____
Chirag Dewan, President

# EXHIBIT A

**DEALER SALES AGREEMENT**

Dealer Sales Agreement ("Agreement"), made as of the __28____ day of _____April_____, 2020, by and between Alliance Energy LLC, a Massachusetts limited liability company with a principal place of business located at 800 South Street, Suite 500, Waltham, MA 02453 ("Company"), and Saibaba's Aashirwad Everything Inc., a Pennsylvania corporation ("Dealer") with a principal place of business located at 200 W. Montgomery Avenue, Ardmore, PA 19003.

WHEREAS, Company and Dealer desire to provide for Dealer's purchase from Company of gasoline and diesel fuel ("Product" or "Products") for resale by Dealer at its station located at **2319 Marshall Road, Lansdowne, PA 19050** ("Premises") under the trademark and brand identification of Mobil, or under such other trademark and identification as selected by Company from time to time (the current provider of the trademark and brand identification, or any successor provider thereof, is hereinafter referred to as the "Supplier"); and

WHEREAS, Company and Dealer intend by this Agreement to create a "franchise relationship" within the meaning of the Petroleum Marketing Practices Act.

NOW, THEREFORE, Company and Dealer agree as follows:

**WITNESSETH**

1. <u>PRODUCTS AND QUANTITIES:</u> Company agrees to sell and deliver to Dealer, and Dealer agrees to purchase and receive in relatively equal deliveries from Company, the minimum annual gallons ("Minimum Annual Gallons") and minimum semi-annual gallons ("Minimum Semi-Annual Gallons") of Products set forth below (and subject to adjustment as provided herein):

| Minimum<br>Semi-Annual Gallons | Minimum<br>Annual Gallons |
|:---:|:---:|
| 350,000 gal. | 700,000 gal. |

At the end of each six (6) and twelve (12) month period of the Term (as defined hereunder), the Company shall calculate the quantity of Product received and paid for by Dealer from Company during said prior six (6) month or twelve (12) month period, as the case may be for purposes of determining Dealer's compliance with the Minimum Semi-Annual Gallons and Minimum Annual Gallons. Dealer shall not sell any Product at the Premises during the Term of this Agreement (including any extensions hereof), except for those Products supplied by Company.

Dealer hereby acknowledges and agrees that the Minimum Semi-Annual Gallons and Minimum Annual Gallons as provided for herein, are reasonable, important and of material significance to this Agreement and the franchise relationship between the parties. In the event that the Minimum Annual Gallons are not purchased and paid for by Dealer during any twelve (12) month period, at the sole election of Company and in addition to and not exclusive of any other

remedy the Company may choose to exercise under this Agreement or at law, the following twelve (12) month period's Minimum Annual Gallons shall be automatically increased by the previous period's shortfall. For example, if the Minimum Annual Gallons are 700,000 gallons, and during the first year of the Term the Dealer purchases only 690,000 gallons of Product, then the Minimum Annual Gallons for the following year may (at Company's election, without necessity of notice) be increased to 710,000 gallons.

2.      DELIVERIES:  Company shall deliver Product to Dealer free on board ("F.O.B.") the terminal designated by Company from time to time. Dealer shall bear and discharge all shipping and delivery costs, and title and risk of loss for all Products shall pass to Dealer, upon delivery by Company to the transporting carrier. All Products to be sold and delivered hereunder shall be delivered in such minimum quantities as Company may, in its sole discretion, from time to time determine. Verification of product quantity and quality shall be the sole responsibility of Dealer. Any claim for defect or variance in quality or quantity of Product furnished hereunder shall be made in writing directed to Company as herein provided within five (5) days after discovery of the defect or variance. Dealer shall promptly furnish to Company samples adequate to test the Product claimed to be defective and shall provide Company access to the Premises to take its own samples. Company shall also have the right, but not the obligation, to take meter readings on any product dispensing equipment on the Premises.

3.      TERM:  Unless validly terminated or non-renewed as provided for in the Petroleum Marketing Practices Act, the term of this Agreement ("Term") shall be for an initial period from ___June___1_____, 2020 to _____May___31_____, 2030, and automatically continuing from year to year thereafter on the same terms and conditions, including, but not limited to, the Minimum Semi-Annual Gallons and Minimum Annual Gallons (as adjusted pursuant to the terms hereof), unless terminated by either party at the end of the initial Term or any subsequent extended term by giving to the other party not less than ninety (90) days prior written notice thereof (Dealer's failure to provide such written notice at least ninety (90) days prior to the end of the initial Term, or any extended Term, shall be deemed a waiver of any such rights, and the Term hereof shall then be deemed extended accordingly). Notwithstanding the above, Dealer shall not be entitled to exercise any such termination rights if Dealer has failed to purchase all gallons of Product required to be purchased hereunder (or if Dealer is otherwise in default).

4.      PRICES:  The price for each of the Products shall be the applicable Supplier rack price at the time of loading of the delivery vehicle, plus $0.0025 per gallon, for each respective grade of Product, plus all taxes, environmental fees, surcharges, and freight charges.

5.      TAXES:  Dealer shall pay or reimburse Company, as the case may be, for all taxes including, without limitation, any gasoline taxes, diesel or special fuel excise taxes, sales taxes, use taxes, retailer's occupation taxes, inspection fees, gross receipts taxes, or any similar imposts levied by any federal, state, or local authority upon the transactions covered hereby or measured in any manner by the sales prices to be charged hereunder.

6.      TERMS OF PAYMENT:  Payment for Product shall be made by electronic funds transfer ("EFT") from Dealer's bank account within four (4) days after the date of each delivery. Dealer shall execute and deliver all such forms and documents as Company may require in order to implement and continue such EFT payments. Company reserves the right, at its sole discretion,

to withdraw any such extension of credit at any time without notice, and demand cash payment on delivery (or to modify payment terms). Failure of Dealer to make payment in cash or according to authorized credit terms shall entitle Company to suspend deliveries as long as Dealer's account remains overdue, without prejudice to any rights of Company to terminate this Agreement for such breach. At Company's sole election from time to time, receipts from Dealer's credit card, debit card, or electronic payment transactions (for any purposes) may be applied by Company to amounts due from Dealer (whether or not said amounts are then past due), and Dealer hereby irrevocably assigns to Company all of Dealer's right, title, and interest in and to the proceeds of all debit card, credit card, and electronic payment transactions occurring at the Premises (company shall also retain a security interest in any such proceeds not applied to payments due). All unpaid accounts owing to Company by Dealer shall bear interest from the due date until paid at the interest rate which is the lower of: (a) one and one-half (1½%) percent per month; or (b) the maximum rate allowed by law. Payment for Product shall be due unconditionally; Dealer shall have no right of deduction or set-off. Company may withhold, setoff, or recoup any amounts due and owing to Dealer, or held by Company on behalf of Dealer under this Agreement, any related or supplemental agreements, or any other agreements between the parties, to be applied to or against any amounts owed by Dealer to Company, or its affiliates.

7.    FORCE MAJEURE: Company shall be excused for delay or non-performance hereunder if Company shall be unable to meet the demand for its Products with supplies from its normal and usual sources, or if any other contingency, of any nature whatsoever, beyond Company's reasonable control shall occur, including, without limitation, failure or delay of transportation, natural disaster, adverse weather conditions, labor difficulties of any nature, or compliance with any governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary). In the event of any such contingency, Company shall have the right to curtail deliveries or allocate its available supply of product for sale among its customers in any manner which Company determines, in its sole discretion, is fair, reasonable or required under the circumstances, and Dealer shall not hold Company responsible in any manner for any losses or damages which Dealer may claim as a result of any such curtailment or allocation by Company. Company shall not be required to make-up any Product not so delivered. In no event shall any force majeure condition affect Dealer's obligation to pay for Product when due.

8.    TRADEMARKS:

(a)    All Products purchased hereunder shall be resold by Dealer at the Premises under the Supplier's identifying marks. Dealer shall display such identifying marks including, without limitation, identification signs, trademarks, tradenames and colors, logos, brand identification, product and service advertising, credit cards, product names and service marks, all in accordance with the Supplier's and Company's approved standards. Dealer shall maintain at its sole cost all such identifying marks and shall repair or replace the same as directed by Company in its sole discretion. As used herein, Company's identifying marks include any marks of which Company is licensee or franchisee. Company reserves the right to change such identifying marks or standards at any time.

(b)    Dealer shall not employ such identifying mark as a part of a corporate, limited liability company, or partnership name. Dealer shall not sell any Products under Supplier's identifying marks except as authorized by Company, and Dealer shall not mix, blend, dilute, adulterate,

substitute, or contaminate any Products. Dealer shall not change or alter by any means whatsoever the nature, quality or appearance of any of the Products purchased hereunder. Company shall have the right at all times to inspect and take samples of Products in Dealer's possession to determine quantities or adherence to quality standards and trademark authorizations.

(c)    Upon the expiration, non-renewal or termination of this Agreement for any reason whatsoever, Dealer's authorization to use Supplier's identifying marks, as set forth above, shall expire, and Dealer immediately shall return to Company, at Dealer's expense, all signs, lights, equipment, structures, poles, decals, and other promotional materials carrying such authorized identifying marks; it being understood that all of the same shall be and remain the exclusive property of Company (if Dealer shall fail to return same as required, Company and its agents may enter the Premises and remove same without notice and without liability).

(d)    Dealer does not, and shall not have any claim, right, ownership or other proprietary interest in any brand identification, loyalty program, and/or payment card system that may be utilized in accordance with the terms hereof, or in any equipment or property which may be provided by Company. Dealer agrees to obtain written acknowledgment on forms satisfactory to Company from the owner of said Premises, of Company's exclusive right to said signs, lights, poles, equipment, and identification items and of the right of Company or their agents to remove same from the Premises at any time. Dealer shall provide Company with evidence of insurance sufficient to cover the repair and/or replacement value of all said signs, lights, equipment, poles and identification items. Company shall have exclusive discretion regarding the display or non-display of its authorized identifying marks on pole signs, buildings, and similar prominent places on the Premises.

(e)    Company reserves the right to discontinue or change the grade, specifications, and/or any identifying mark of any Product covered hereby. Dealer acknowledges and agrees that any changes by the Company in the brand identification of the Product sold hereunder will require a change in the price of the Product to reflect the new brand's rack price (for example, if the brand is changed, the price listed in Section 4 would be changed from the original supplier's rack price plus (x) to the new supplier's rack price plus (x)). Dealer agrees to promptly sign all documents required by Company to memorialize any such brand and price change. Dealer further acknowledges and agrees that any discounts, incentives, rebates, or other benefits provided by Supplier to Company shall be and remain the sole property of the Company.

9.    <u>MINIMUM STANDARDS:</u>  Dealer shall, at its sole cost and expense, operate or cause to operate its retail facility at the Premises in a clean, neat, safe and healthful manner including all buildings, equipment, underground storage tanks, restrooms, and driveways, and in full compliance with all applicable laws, regulations, and Supplier requirements.

10.    <u>PAYMENT CARDS/ELECTRONIC PAYMENTS:</u>  Dealer shall accept payment cards and other forms of electronic payment which may from time to time be offered through Company for purposes of making retail sales to Dealer's customers for Products sold by Company to Dealer (and for other purposes approved by Company and the payment card issuer or payment processor). All payment card and electronic payment sales at the Premises (including the processing of such sales) must be made in compliance with instructions and regulations supplied by or through Company, or otherwise promulgated by the payment processor, and Dealer acknowledges receipt

thereof. Company, issuer, or processor may, from time to time, amend or supplement said regulations and instructions, or cease to accept one or more types of transactions, without having any liability to Dealer. Company may refuse to accept any sales or payments not submitted in accordance with the requirements of Company, card issuer, or processor. Dealer's personal cards shall not be used for any purchase of any Products sold hereunder. All processing charges associated with the administration of such transactions, and all user fees, POS fees, and satellite connection charges for each terminal or processing equipment utilized, provided, or made available to Dealer by Company, shall be paid by Dealer.

Dealer represents to Company that all payment card or electronic submissions represent actual sales of Product to Dealer's customers in the manner and to the extent set forth therein. Dealer agrees that all payment submissions shall be in conformity with applicable regulations and that any submissions not conforming to said instructions may be rejected or charged back by the card issuer or processor. Dealer agrees that upon such rejection or charge back, the value of the payments which were rejected or charged back (and any associated charges) shall become immediately due and owing from Dealer to Company. All such payments shall be transmitted by such means, to such place(s), and at such time intervals, as Company may designate from time to time. Notwithstanding same, Dealer acknowledges that Company is not the provider or operator of any payment card or other payment systems, and has no liability for same.

Dealer shall be solely responsible for compliance with all federal, state, and local statutes, rules, and regulations regarding the handling and transmission of customer payment card and electronic payment data, and all rules, regulations, instructions, and guidelines of the issuer, processor, and payment card industry relating thereto, including, but not limited to, the PCI Data Security Standard (available at www.pcisecuritystandards.org). Dealer's obligations shall include, but not be limited to, installation and/or upgrading of all equipment, hardware, and software necessary to timely comply with issuer, processor, and industry standards and requirements for customer PIN and data entry devices (including Triple Data Encryption Standard usage). Dealer shall release, indemnify, defend (with counsel acceptable to Company), and hold Company harmless from any and all claims, expenses, liabilities, fines, or obligations (including attorney's fees) in the event of Dealer's failure to properly comply with its obligations under this Section, and in connection with any payment card or electronic sales, including, but not limited to, any claims, demands and actions brought by Dealer's customers for alleged losses and damages relating to any privacy or security breach. Dealer further agrees to: (i) implement any policies and procedures required by Company or the payment card issuer, in their sole judgment, with regard to acceptance and processing of such transactions; (ii) participate in (and cause its employees to participate in) any training programs required or established from time to time by Company; and (iii) allow Company, its agents, contractors, and representatives, unrestricted access to all records of credit and debit card transactions, receipts, and transmissions (and as may be necessary to allow a complete audit of such transactions), all at such times as Company shall request (none of the foregoing shall impose any obligation on Company with regard to the handling of payment card and electronic transactions).

Company may suspend its acceptance of payment card and electronic sales in addition to all other rights provided by law and by this Agreement, without liability to Dealer, when Company has reason to believe that any instructions or requirements are not being complied with by Dealer.

11.     INSURANCE:  Dealer shall carry and maintain, solely at Dealer's expense, the following insurance with insurers satisfactory to Company:

(a)     Garage Liability Insurance or Commercial General Liability Insurance with Garage Liability endorsements.  The insurance shall include, but not be limited to, coverage for the Premises, operations, Products, completed operations and operation, of vehicles owned, non-owned or hired with at least a combined single limit of $1,000,000 per occurrence for bodily injury and/or property damage and $2,000,000 aggregate;

(b)     Property insurance, including coverage for all goods, equipment, and improvements at the Premises which have been financed and/or secured by Company pursuant to the Reimbursement Agreement delivered by Dealer, if applicable, keeping same insured (for at least their full replacement value) against all risk of loss, including by fire, casualty, theft, and vandalism;

(c)     Workers compensation and employees liability insurance (for statutory limits) where required by law;

(d)     Business auto liability coverage or operation of vehicles hired, owned or non-owned with a minimum combined single limit of $1,000,000 providing coverage for injury, death, or property damage resulting from each occurrence; and

(e)     Underground Storage Tank Insurance with minimum limits of $1,000,000 dedicated policy limit for underground storage tanks.  Dealer can satisfy this requirement by remaining eligible to participate in a state tank fund program as to the Premises.

Policies must be written on a primary and non-contributory basis.  Each such policy of insurance shall name Company, Global Partners LP, their subsidiaries, affiliates, successors, and assigns, and such other parties as Company shall designate, as additional insured parties thereunder.  All such insurance shall contain such endorsements as the Company shall require and shall provide at least thirty (30) days prior written notice to Company in the event of cancellation.  Dealer shall deliver certificates of such insurance to the Company upon execution of this Agreement and thereafter upon Company's request(s) therefor, provided, however, that neither the review, nor failure to review, such certificates or any accompanying endorsements shall constitute acceptance of any modification of, nor waive, alter, or diminish, Company's rights, and Dealer's obligations, under this Section.  Company shall be entitled to receive, and Dealer shall be required to maintain, the insurance coverages specified hereinabove, notwithstanding any discrepancies in such certificates.  All policies must be provided by a carrier with minimum ratings of A-/VII or better according to A.M. Best, and contain a waiver of subrogation in favor of Company.

12.     COMPLIANCE WITH LAW:  Dealer agrees that in purchasing, receiving, storing, handling, offering for sale, selling, delivering for use or using the Products purchased from Company under this Agreement (and in conducting any business on the Premises), Dealer shall comply and instruct its employees to comply with all applicable federal, state, and local laws, ordinances, regulations, rules, orders and permits, including, without limitation, any of the same governing:  (a) pollution, disposal of waste materials generated at the Premises, lead content,

pricing, product containers, brand adulteration, commingling and underground tank gauging requirements; and (b) sales of illegal, prohibited, restricted, or regulated goods or items.

Dealer agrees to pay when due any and all tank fees required to render the Premises eligible for participation in any available underground storage tank cleanup fund or other applicable state tank registration program and to provide Company, on an annual basis, with certifications thereof, and of full compliance of the Premises with any applicable statutes and regulations.

13.    <u>INDEMNITY</u>:  Dealer hereby releases and agrees to indemnify, defend (with counsel acceptable to Company), and hold Company, Supplier, Global Partners LP, and their parents, subsidiaries, affiliates, agents, servants, employees, successors, and assigns harmless from and against any and all claims, suits, obligations, liabilities, and damages (including attorney's fees) arising out of, or directly or indirectly relating to:  (a) any failure by Dealer to perform, fulfill, or observe any obligation or liability of Dealer set forth herein, or in any other agreement with Company (or any of its affiliates); (b) any act or omission by Dealer, its agents, servants, employees, contractors, invitees, successors, and assigns, or any persons or entities under the control or direction of Dealer; (c) operation of Dealer's business including, but not limited to, Dealer's occupancy of the Premises and any personal injury or property damage occurring thereon; (d) violation of any law, ordinance or regulation by, or caused by, Dealer, its agents, servants, employees, contractors, invitees, successors, and assigns, or any persons or entities under the control or direction of Dealer; (e) use of any equipment; (f) any release, seepage, or leakage of petroleum products (including Product) or any other substance, or any fire or explosion at the Premises including, but not limited to, at or from any storage tanks, piping, and pumps; and (g) any failure of Dealer, its agents, servants, employees, invitees, contractors, successors, or assigns to comply with the Comprehensive Environmental Response Compensation and Liability Act of 1980 (herein "CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), or any other federal, state, or local environmental statute, regulation, rule, or ordinance.

All amounts due Company by Dealer by reason of the indemnities and obligations imposed upon Dealer by this Agreement shall become due and payable by Dealer to Company upon demand as a part of Dealer's account to Company.  The provisions of this Section shall survive any termination, expiration, or non-renewal of this Agreement.

14.    <u>ASSIGNMENT OF CONTRACT</u>:  This Agreement shall not be assigned by Dealer (a "Transfer"), in whole or in part, without the prior written consent of Company (transfer of a controlling interest in the Dealer shall be deemed to be a Transfer requiring Company's consent). Prior to any Transfer, Dealer shall pay to Company a non-refundable administrative fee in connection with each requested Transfer in an amount to be specified by Company.  Company reserves the right to waive all or a portion of the administrative fee in its sole and absolute discretion.  Dealer shall also pay to Company administrative fees from time to time imposed by Company in connection with changes in Dealer's operations, name, or business structure, which result in administrative costs or expenses to Company, and in an amount determined by Company to recoup those costs and expenses.  Company shall have the right to sell or assign its right, title or interest in this Agreement, and any related agreements, in whole or in part, without the consent of Dealer.

15.    <u>RIGHT OF FIRST REFUSAL</u>:  Dealer shall not sell, grant an option in respect of, nor lease, transfer, or otherwise dispose of by equity transfer, asset sale or otherwise, Dealer's business, or any rights in the Premises, or any assets or properties used in connection with Dealer's business, without first giving Company a sixty (60) day option within which to purchase or otherwise acquire said business and the Premises (or its rights therein) on the same terms and conditions as Dealer is willing to make such disposition to any other third party.  Dealer shall give Company prompt written notice of said terms and conditions and shall submit a copy of:  (a) any offer which Dealer is willing to accept; and (b) the signed Purchase and Sale Agreement.  Such sixty (60) day period shall not commence until Dealer has complied with all of the requirements of this Section 15.  An offer by a third party to exchange other property interests owned or to be acquired by it for any interest of Dealer covered by this Section shall be deemed to constitute an offer to purchase for a price equal to the fair market value of the property offered in exchange. Company shall be given access during said sixty (60) day period to Dealer's books and records. If Company exercises its option, it shall do so in writing within sixty (60) days after receipt of such notice and all documents and information required by Company.  The closing shall take place not later than sixty (60) days after exercise of such option by Company.  In the event that the terms and conditions of an offer are changed or modified in any respect, Dealer shall give Company prompt written notice thereof, and Company shall be provided an additional sixty (60) days after receipt of said notice and all documents and information required by Company within which to exercise its rights pursuant to this Section.  At the closing, Dealer shall, in the case of a sale, deliver to Company a deed, assignment, or bill of sale, as the case may be, conveying a good, marketable and clear title subject only to the liens and encumbrances which are specifically outlined in the proposed terms and conditions of the offer or, in the case of any other disposition, deliver to Company an instrument or instruments in form and substance satisfactory to Company and sufficient to transfer the interest proposed to be transferred.  Failure to exercise this option:  (a) on one or more occasions shall not affect this right of first refusal on other occasions thereafter arising whether involving the same or other property; and (b) shall in no event be deemed a consent by Company to an assignment of this Agreement.

16.    <u>INDEPENDENT DEALER RELATIONSHIP</u>:  Dealer is not an employee, agent or representative of Company, and does not have the authority to act in any such capacity on behalf of Company.  Any action or representation on behalf of Dealer to the contrary shall constitute fraud.  Dealer is an independent business person and is solely responsible for the hiring, discharge, compensation, management, control and work rules of all personnel used or employed by or on behalf of Dealer in connection with its business.  Dealer is solely responsible for the quality of service performed for Dealer's customers.  Dealer is solely responsible for proper handling and satisfactory resolution of claims and complaints by Dealer's customers respecting services performed by Dealer and Dealer's personnel.

17.    <u>TERMINATION AND NON-RENEWAL</u>:  Company may terminate or non-renew this Agreement, the franchise, and the franchise relationship between Company and Dealer, upon any of the following grounds:

        a.    In accordance with the applicable provisions of the Petroleum Marketing Practices Act ("PMPA"), if the PMPA then applies to this Agreement;

b.   Dealer's failure to purchase the Minimum Semi-Annual Gallons and/or Minimum Annual Gallons;

c.   Breach by Dealer (or any guarantor) of any provision of this Agreement or of any other agreement delivered to Company (or any affiliate);

d.   Death or dissolution of Dealer, or of any guarantor (only to the extent permitted by, and in accordance with the provision of, applicable statutes);

e.   Closing of Dealer's business at the Premises or abandonment of the Premises (or failure by Dealer to commence and/or continue the sale of Products hereunder);

f.   The institution by or against Dealer (or any guarantor) of any bankruptcy, reorganization, insolvency, liquidation, or related proceeding or the making of any assignment for the benefit of creditors; or

g.   Dealer's violation of, or failure to comply with, any applicable state, federal, or local law or regulation, including, but not limited to those related to: (a) handling, storage, and/or containment of petroleum products; (b) sale of drugs, narcotics, tobacco, alcohol, or other prohibited or restricted goods or items; or (c) fraud or moral turpitude.

Regardless of whether Company exercises its rights to terminate or non-renew, Company shall also have the right to set-off any amounts, credits, or deposits which it may hold or receive for the benefit of Dealer against any indebtedness of Dealer, and to suspend all deliveries of Product to Dealer until all breaches of the terms hereof are cured (without prejudice to any other rights of Company).

Upon any termination, expiration, or non-renewal of this Agreement, Dealer shall comply with the provisions of Section 8 hereof and with Company's normal post-termination procedures as determined by Company from time to time, and will pay any costs in connection therewith (including any fees, costs, penalties, or amounts due to Supplier as a result thereof). Dealer has no right to terminate this Agreement, except as expressly provided in Section 3.

18.   REMEDIES: In the event of breach or default, Company shall have the right to: (i) terminate or non-renew this Agreement as provided in Section 17 above; (ii) seek any or all legal and equitable remedies and damages available under applicable laws and under any agreements or instruments delivered to the Company; (iii) be paid for any outstanding accounts receivable; (iv) be paid by Dealer for Company's lost profits for any unfulfilled portion of the Term and any unfulfilled purchase obligations under this Agreement; (v) be repaid for any amounts due to Supplier as a result of such default; and (vi) recover Company's costs of collection, including reasonable attorney's fees.

19.   SATISFACTION OF REIMBURSEMENT AGREEMENT: Dealer's obligations under this Agreement (including all Product purchase obligations) shall survive and continue in effect

notwithstanding the expiration, termination, or satisfaction of Dealer's obligations under the Reimbursement Agreement executed herewith (if applicable).

20.    <u>WAIVER:</u>  No waiver by Company of any default of Dealer hereunder shall operate as a waiver of any future default whether of a like or different character.  No delay or omission of Company in exercising or enforcing any right or power accruing upon any breach of this Agreement by Dealer shall impair any such right or power, or shall be construed to be a waiver of any breach of this Agreement, or any acquiescence therein.

21.    <u>NOTICES:</u>  All notices provided for herein shall be considered as properly given if delivered in writing personally, by certified mail (return receipt requested), or by overnight delivery service, as follows (or to the Premises, in the event of notice to the Dealer):

| | |
|---|---|
| If to Company: | Alliance Energy LLC |
| | 800 South Street, Suite 500 |
| | Waltham, MA 02453 |
| | Attention:  Executive Vice President |
| | |
| with a copy to: | Alliance Energy LLC |
| | 800 South Street, Suite 500 |
| | Waltham, MA 02453 |
| | Attention:  Deputy General Counsel |
| | |
| If to Dealer: | Saibaba's Aashirwad Everything Inc. |
| | 2319 Marshall Road |
| | Lansdowne, PA 19050 |

22.    <u>PRIOR AGREEMENTS:</u>    This Agreement supersedes all prior agreements and understandings between the parties pertaining to the matters set forth herein and there are no other agreements of any nature, written or oral, between the parties pertaining to the subject matter hereof.  Except as expressly provided in this Agreement, all amendments or modifications hereto must be in writing and signed by a duly authorized representative of Company.

23.    <u>SEVERABILITY:</u>  If any term or provision of this Agreement or the application hereof shall to any extent be invalid or unenforceable, the remainder shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.  If, at the time of execution of this Agreement (or any other documents delivered herewith), any term or date is inadvertently omitted or left blank, then Dealer hereby authorizes Company to insert and/or complete same.

24.    <u>REPRESENTATIONS OF DEALER:</u>  Dealer warrants and represents the following to Company:

(a)    Dealer is entering into and signing this Agreement upon Dealer's own free will and choice, and is not acting under the influence of any threat or coercion of Company or its representatives.

(b)    There have been no promises, claims or representations made to Dealer by Company or its representatives of any kind which are not contained in this Agreement or in another written document signed by and furnished to Dealer by Company as a part of this relationship.

**(c)    Dealer acknowledges that Company does not make, and specifically disclaims, any warranties as to merchantability or fitness for a particular purpose of any Products sold and delivered hereunder, and further that Company shall not, under any circumstances, be liable for any claims for loss of profits or consequential damages.**

(d)    Dealer is owner of the Premises (or is lessee by reason of a valid lease agreement with the record owner of the Premises, a copy of which shall be made available to Company, and which has a present term at least equal in duration to the initial Term of this Agreement) and has all permits and licenses necessary to occupy and use the Premises as contemplated by this Agreement.

(e)    The execution, delivery and performance by Dealer of this Agreement will not violate any agreement or other instrument to which Dealer is a party or by which it or any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement, or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets.  Dealer is not currently under agreement with any other supplier of Products and has properly terminated (or completed the Term of) any such prior supply agreement.

(f)    The Premises will be constructed, operated, and maintained in compliance with Supplier's and Company's guidelines and specifications, as same may be modified from time to time, and in compliance with all of Supplier's standards and appearance manuals, at all times during the Term hereof.  Dealer shall participate and comply with (and pay and be responsible for all costs, fees, and penalties in connection with) any "mystery shopper", customer loyalty, or similar programs implemented by Supplier from time to time, and shall pay any "help desk" fees or other service charges received from Supplier in connection with the operation of any systems or equipment on the Premises.

(g)    Dealer agrees not to sell any goods or items which are prohibited by Supplier as a condition of the use of such brand and identifying marks at the Premises.

(h)    NOTHING IN THE AGREEMENT IS CONSTRUED TO PROHIBIT COMPANY FROM SUGGESTING PRICES AND COUNSELING WITH DEALER CONCERNING PRICES.  PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED.  DEALER MAY SELL ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE WHICH IT ALONE MAY DECIDE.

25.    SECURITY:  As security for the payment and performance of any and all liabilities, indebtedness, and obligations (direct or indirect, absolute or contingent, sole, joint or joint and

several, secured or unsecured, now existing or hereafter arising or any other type, nature, or description) of Dealer to Company (the "Obligations"), Dealer hereby pledges, assigns, and transfers to Company a continuing security interest in: (a) any unsold Products at the Premises; and (b) the proceeds of any payment card or electronic sales transactions (collectively, the "Collateral"). Dealer shall, upon Company's request, execute and deliver Form UCC-1 Financing Statements covering the Collateral, in form suitable for recording with the Secretary of State's office. Dealer further irrevocably constitutes and appoints Company as Dealer's true and lawful attorney for the purpose of signing, filing, and recording, on behalf of Dealer (and/or for filing without signature, if permitted by law), any financing statement or other instrument in order to perfect, protect, or continue Company's interest in the Collateral. Upon the occurrence of an Event of Default by Dealer, and at any time thereafter, Company shall have, in addition to any other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code.

26.    <u>APPLICABLE LAW:</u>  This Agreement shall be governed by and construed in accordance with the Petroleum Marketing Practices Act and the applicable laws of the Commonwealth of Massachusetts, and Dealer hereby irrevocably consents to the jurisdiction of the state and federal courts located in Massachusetts (should Company elect to proceed in such forum), without regard to any provisions regarding conflicts of law. Company has the right to enforce and require specific performance of all provisions of this Agreement including, but not limited to, Company's right to seek injunctive relief and any other right or remedies available to Company. Dealer acknowledges receipt of a written summary of the provisions of the Petroleum Marketing Practices Act.

27.    <u>ATTORNEYS' FEES:</u>  In the event that any litigation or legal proceeding is brought to enforce or interpret the terms of this Agreement, the prevailing party in such proceeding shall be entitled to recover all its costs, including its reasonable attorneys' fees, paralegals' fees and legal assistants' fees (whether for services incurred in collection, litigation, bankruptcy proceedings, appeals, or otherwise), and all other fees and costs incurred in connection therewith.

28.    <u>DISCLOSURE REQUIREMENTS:</u>  The following information is set forth herein, to the extent applicable, in compliance with applicable law:

a.    The gallonage volume history, if any, of the location under negotiation for and during the three year period immediately past or for the entire period which the location has been supplied by Company, whichever is shorter:
    N/A

b.    The name and last known address of the previous dealers for the last three years, or for the entire period during which the location has been supplied by Company, whichever is shorter, and the reason for the termination of each dealer's agreement:
    N/A

c.    Any legally binding commitments for the sale, demolition or other disposition of the location:
    None

    d.      The training programs, if any, and the specific goods and services the Company will provide without cost to the Dealer:

> None, except for any signage or branding materials loaned to Dealer hereunder.

    e.      Full disclosure of any and all obligations which will be required of the Dealer, including, but not limited to, any obligation to exclusively deal in any of the Products of the Company, its subsidiaries or any other company or any advertising and promotional items that the Dealer must accept:

> As provided for in this Agreement.

    f.      Full disclosure of all restrictions on the sale, transfer, renewal and termination of the agreement.

> As provided for in this Agreement.

29.    <u>TRIAL BY JURY WAIVER:</u>  To the fullest extent permitted by law, Dealer and Company hereby waive trial by jury in any court and in any suit, action, or proceeding on any matter arising in connection with or in any way related to the commercial transaction of which this Agreement is a part and/or the enforcement of any of Company's or Dealer's rights and remedies. Dealer and Company acknowledge that they make this waiver knowingly, voluntarily and only after extensive consideration of the ramifications of this waiver.

30.    <u>CLAIMS/RELEASE:</u>  Company and Dealer agree that prompt investigation and resolution of any claim by Dealer is to the benefit of both parties. For that reason, and in consideration of the other benefits conferred upon Dealer by this Agreement, Dealer agrees that any claim by Dealer of any kind against Company arising out of this Agreement or otherwise, shall be waived and barred unless: (a) Company is given written notice thereof within thirty (30) days after the event, action, or inaction to which such claim relates, and (b) suit is commenced against Company in a court of competent jurisdiction within twelve (12) months after the event, action, or inaction to which such claim relates. Notwithstanding the foregoing, any claim against Company by Dealer for defect or variance in quality or quantity of Product furnished by Company under this Agreement shall be waived and barred unless Dealer provides Company with written notice thereof within five (5) days after discovery of the defect or variance. Dealer acknowledges that it has no outstanding claims against Company as of the date of this Agreement. As used herein, the terms "Dealer" and "Company" shall be deemed to include their respective successors and assigns.

31.    <u>OFAC CERTIFICATION.</u>  Dealer certifies that it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or by the U.S. Treasury Department as a terrorist, Specially Designated National and Blocked Person, or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control.

32.  <u>SURVIVAL.</u>   The applicable provisions of Sections 6, 8, 10, 13, 18, 20, 21, 22, 23, 24, 25, 26, 27, 29, and 30 shall survive any termination or non-renewal of this Agreement, in addition to any other right or obligation which has accrued prior thereto.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF the parties hereto have executed this Agreement as an instrument under seal effective as of the date and year first above written.

Company:

ALLIANCE ENERGY LLC

By: _____

Witness
Name: _SEAN T. GEARY_____,
(please print)

Title: _____

Dealer:

SAIBABA'S AASHIRWAD EVERYTHING INC.

By: _____
Chirag Dewan, President

Witness
Name: _Mark R. Monckton___
(please print)

## ADDENDUM TO DEALER SALES AGREEMENT

Alliance Energy LLC ("Company") agrees to credit Saibaba's Aashirwad Everything Inc. ("Dealer") with a Mobil rebate in the amount of $0.01 per gallon, for gasoline purchased and paid for pursuant to the foregoing Dealer Sales Agreement ("Agreement"), <u>expressly provided</u> that: (i) said Mobil rebate is actually received by Company; and (ii) Dealer is not then in default of any of its obligations to Company. Dealer acknowledges that Mobil rebates shall not apply to any purchases of diesel fuel, and shall apply only during the initial ten (10) year term of the Agreement.

Subject to the foregoing express conditions, said rebates shall be credited by Company to Dealer on a quarterly basis, in arrears.

In the event of Dealer's breach or default, or if the Agreement is terminated prior to expiration of the initial term thereof, then the Dealer shall be required to repay Company, in addition to any other amounts which may be due, all rebates which it has received pursuant to this Addendum.

Dealer's Initials: _C. D._          Company's Initials: _____

## REIMBURSEMENT AGREEMENT

Agreement made as of the _____ day of _____, 2020 by and between Alliance Energy LLC, 800 South Street, Suite 500, Waltham, MA 02453 ("Company") and Saibaba's Aashirwad Everything Inc. ("Dealer"), with a place of business located at 2319 Marshall Road, Lansdowne, PA 19050 (the "Premises").

WHEREAS, Dealer and Company have entered into a Dealer Sales Agreement executed herewith (the "Dealer Sales Agreement"); and

WHEREAS, the parties have agreed that the upgrading and refurbishing of the Premises would substantially enhance Dealer's business;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto do mutually agree as follows:

1.    <u>FUND ADVANCE; REIMBURSEMENT</u>:  In order to facilitate the upgrading of the Premises, Company agrees to provide in one lump sum payment of Two Hundred Thirty Thousand and 00/100 ($230,000.00) Dollars available to Dealer less fees for such purposes as Dealer and Company have agreed.  No funds shall be advanced if Dealer is in breach of any of its obligations or agreements with Company.

**Dealer acknowledges that Company makes no warranties, express or implied, as to any of the Dealer Improvements provided, paid for, or reimbursed hereunder (Company specifically disclaims any warranties of merchantability or fitness for a particular purpose).**

<u>DEALER IMPROVEMENTS</u>:

| | | |
|---|---|---|
| (i) | 3 MPD's | _____ |
| (ii) | Brand re-imaging | _____ |
| (iii) | POS and LED price sign | _____ |
| (iv) | _____ | _____ |
| (v) | _____ | _____ |

MAXIMUM ADVANCE:            $230,000.00

Dealer acknowledges and agrees that the obtaining of any permits required in connection with the upgrading of the Premises shall be the sole responsibility of the Dealer, and Company makes no representations as to the availability thereof.  Dealer further acknowledges that no loan advances may be requested until such time as a Mortgage and Security Agreement covering the Premises, in form and substance acceptable to Company, is executed and delivered to Company, and a satisfactory recording is made thereof (also subject to Company's review and approval of the adequacy of the Premises and title thereto as collateral for said loan).  Advances of funds by Company shall be subject to Dealer's full compliance with any and all governmental orders, statutes, and regulations concerning the Premises.  Disbursement of any funds to be advanced

pursuant to the terms of this Agreement must be requested by Dealer within six (6) months of the date hereof; Company's obligations hereunder shall otherwise become null and void.

2.     REPAYMENT/AMORTIZATION:  The funds referenced in Section 1 hereinabove will be amortized at the rate of $0.0328 per gallon ("Amortization Rate") for Products purchased and paid for under the Dealer Sales Agreement.  Dealer shall have no right of pre-payment under this Agreement.

3.     BREACH; EVENTS OF DEFAULT:    Dealer agrees that the following shall be considered events of default hereunder ("Events of Default"):

A.     Failure by Dealer to comply with any term or provision of this Agreement, the Dealer Sales Agreement, or of any other document or instrument;

B.     Termination of the Dealer Sales Agreement;

C.     Death or dissolution of the Dealer or of any guarantor hereof;

D.     Closing of Dealer's business at the Premises or abandonment of the Premises;

E.     The institution by or against Dealer (or any guarantor) of any bankruptcy, reorganization, insolvency, liquidation, or related proceeding or the making of any assignment for the benefit of creditors; or

F.     Dealer's failure to comply with any applicable state or federal law and/or regulation relating to the handling, storage and/or containment of petroleum products.

If Dealer fails, during any year of the Term of the Dealer Sales Agreement to purchase Product from Company in an amount equal to or greater than Dealer's Minimum Annual Gallons requirements (as defined therein), Company shall have the right (in addition to and not in lieu of Company's rights upon default as provided hereunder) to demand payment from Dealer, as a cure of Dealer's default under this Agreement for such failure (the "Cure Payment"), in an amount calculated by subtracting (x) the gallons purchased and paid for by Dealer from Company for such year of the Term of the Dealer Sales Agreement during which said Event of Default occurred, from (y) the Minimum Annual Gallons, and multiplying the difference by $0.0378 per gallon (consisting of the Amortization Rate, plus $0.005 per gallon for Company's costs and other damages under this Agreement).  Said Cure Payment shall be made by Dealer within fifteen (15) days of notice from Company (payment thereof shall not reduce or satisfy any purchase obligations under the Dealer Sales Agreement).  Failure to pay such Cure Payment shall constitute an Event of Default under this Agreement.

If any Event of Default shall occur, Company shall be entitled to:  (i) be paid by Dealer (in addition to any other amounts which may be due) an amount calculated by subtracting (x) the gallons of Product purchased and paid for by Dealer from Company under the terms of the Dealer Sales Agreement as of the date of such notice, from (y) 7,000,000 gallons, and multiplying the difference by $0.0378 per gallon (consisting of the Amortization Rate, plus

$0.005 per gallon for Company's costs and other damages under this Agreement); and (ii) seek any or all other legal and equitable remedies and damages available by law or under the Dealer Sales Agreement or any other agreements or instruments. Company shall not be required to demand a Cure Payment before exercising its rights upon occurrence of an Event of Default.

Dealer and Company agree that the foregoing Cure Payment and damages provisions are fair and reasonable estimates of certain actual damages which would be incurred by Company due to Dealer's default under this Agreement, and do not constitute a penalty.

4.    INDEMNITY: Dealer hereby releases and agrees to indemnify and hold Company, its affiliates, agents, servants, employees, successors, and assigns, harmless from and against any and all claims, suits, obligations, liabilities, and damages (including attorney's fees) arising out of, or directly or indirectly relating to: (a) any failure by Dealer to perform, fulfill, or observe any obligation or liability of Dealer set forth herein, or in any other agreement with Company; (b) any act or omission by Dealer, its agents, servants, employees, invitees, successors, and assigns; (c) operation of Dealer's business including, but not limited to, Dealer's occupancy of the Premises and any personal injury or property damage occurring thereon; (d) violation of any law, ordinance or regulation by, or caused by, Dealer, its agents, servants, employees, invitees, successors, and assigns; (e) purchase, installation, construction, or use of any Dealer Improvements or any equipment; (f) any release, seepage, or leakage of petroleum products or any fire or explosion at the Premises including, but not limited to, at or from any storage tanks, piping, and pumps; and (g) the Comprehensive Environmental Response Compensation and Liability Act of 1980 (herein "CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), or any other federal, state, or local environmental statute, regulation, rule, or ordinance. The provisions of this Section shall survive any termination or satisfaction of this Agreement.

5.    ASSIGNMENT OF CONTRACT: This Agreement shall not be assigned by Dealer without the prior written consent of Company (transfer of a controlling interest in the Dealer shall be deemed to be an assignment requiring Company's consent hereunder).

6.    NOTICES: All notices provided for herein shall be considered as properly given if delivered in writing personally or by overnight delivery service, as follows (or to the Premises, in the event of notice to the Dealer):

| | |
|---|---|
| If to Company: | Alliance Energy LLC<br>800 South Street<br>Suite 500, Waltham, MA 02453<br>Attention: Executive Vice President |
| with a copy to: | Alliance Energy LLC<br>800 South Street, Suite 500<br>Waltham, MA 02453<br>Attention: General Counsel |
| If to Dealer: | Saibaba's Aashirwad Everything Inc.<br>2319 Marshall Road |

Lansdowne, PA 19050

7.      WAIVER:  No waiver by Company of any default of Dealer hereunder shall operate as a waiver of any future default whether of a like or different character.

8.      SEVERABILITY:  If any term or provision of this Agreement or the application hereof shall, to any extent, be invalid or unenforceable, the remainder shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the maximum and fullest extent permitted by law.

9.      APPLICABLE LAW:  This Agreement shall take effect as a sealed instrument and shall be governed by the laws of the Commonwealth of Massachusetts, and Dealer irrevocably consents to the jurisdiction of the state and federal courts located in Massachusetts (should Company elect to proceed in such forum).

10.     SATISFACTION OF REIMBURSEMENT AGREEMENT:  This Agreement and the obligations of Dealer hereunder shall not be satisfied until such time as Dealer has also complied in full with the terms and conditions of the Dealer Sales Agreement (including satisfaction of all product purchase requirements), and provided that all amounts payable hereunder have been paid in full.

11.     ATTORNEYS' FEES:  In the event that any litigation or legal proceeding is brought to enforce or interpret the terms of this Agreement, the prevailing party in such proceeding shall be entitled to recover all its costs, including its reasonable attorneys' fees, paralegals' fees and legal assistants' fees (whether for services incurred in collection, litigation, bankruptcy proceedings, appeals, or otherwise), and all other costs incurred in connection therewith.  All amounts due from Dealer hereunder shall bear interest at the rate of one and one-half (1½%) percent per month.

12.     SECURITY - GRANT:  As security for the payment and performance of any and all liabilities, indebtedness, and obligations (direct or indirect, absolute or contingent, sole, joint or joint and several, secured or unsecured, now existing or hereafter arising or any other type, nature, or description) of Dealer to Company (the "Obligations"), Dealer hereby pledges, assigns, and transfers to Company and hereby grants to Company a continuing security interest in the Collateral, as defined in Exhibit "A" attached hereto and made part hereof, and all proceeds thereof.  Dealer shall execute and deliver Form UCC-1 Financing Statements covering the Collateral, in form suitable for recording with the Secretary of State's office.  Dealer further irrevocably constitutes and appoints Company as Dealer's true and lawful attorney for the purpose of signing, filing, and recording, on behalf of Dealer (and/or for filing without signature, if permitted by law), any financing statement or other instrument in order to perfect, protect, or continue Company's interest in the Collateral.

Upon the occurrence of an Event of Default by Dealer (under this Agreement, the Dealer Sales Agreement, or any other document), and at any time thereafter, Company shall have, in addition to the rights and remedies provided herein or in any other instrument or document executed by Dealer, the rights and remedies of a secured party under the Uniform Commercial Code including, without limitation, the rights to take possession of the Collateral and to sell and

dispose of the same. Dealer hereby agrees to pay on demand all costs and expenses (including reasonable attorney's fees) incurred or paid by Company in enforcing the Obligations on default or collecting amounts outstanding thereunder. After deducting all costs and expenses of collection, storage, custody, sale or other disposition and delivery (including legal costs and reasonable attorney's fees) and all charges against the Collateral, the residue of the proceeds of any such sale or other disposition shall be applied to the payment of the Obligations, in such order of preference as Company may determine, and Dealer shall remain liable to Company for any deficiency.

Dealer agrees to pay and be responsible for any and all of Company's costs incurred in connection with filing, recording, perfecting, continuing, and enforcing Company's security interest in all collateral and pursuant to any other security instruments, including, but not limited to, the costs of title examinations, recording and filing fees, and mortgage taxes or levies thereon (which amounts may be deducted from the funds to be advanced hereunder).

13.    <u>PRIOR AGREEMENTS</u>:    This Agreement supersedes all prior agreements and understandings between the parties pertaining to the matters set forth herein and there are no other agreements of any nature, written or oral, between the parties pertaining to the subject matter hereof. Except as expressly provided in this Agreement, all amendments or modifications hereto must be in writing and signed by a duly authorized representative of Company.

14.    <u>TRIAL BY JURY WAIVER</u>:    To the fullest extent permitted by law, Dealer and Company hereby waive trial by jury in any court and in any suit, action, or proceeding on any matter arising in connection with or in any way related to the commercial transaction of which this Agreement is a part and/or the enforcement of any of Company's or Dealer's rights and remedies. Dealer and Company acknowledge that they make this waiver knowingly, voluntarily and only after extensive consideration of the ramifications of this waiver. Dealer also acknowledges that Company has not represented to Dealer that the provisions of this Section will not be fully enforced.

15.    <u>CLAIMS/RELEASE</u>:    Company and Dealer agree that prompt investigation and resolution of any claim by Dealer is to the benefit of both parties. For that reason, and in consideration of the other benefits conferred upon Dealer by this Agreement, Dealer agrees that any claim by Dealer of any kind against Company arising out of this Agreement or otherwise, shall be waived and barred unless: (a) Company is given written notice thereof within thirty (30) days after the event, action, or inaction to which such claim relates, and (b) suit is commenced against Company in a court of competent jurisdiction within twelve (12) months after the event, action, or inaction to which such claim relates. Dealer acknowledges that it has no outstanding claims against Company as of the date of this Agreement. As used herein, the terms "Dealer" and "Company" shall be deemed to include their respective successors and assigns.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF the parties hereto have executed this Agreement as an instrument under seal effective as of the date and year first above written.

DEALER:

SAIBABA'S AASHIRWAD EVERYTHING

INC.

Witness
Name: _____
(please print) Mark R. Monckton

By: _____
Chirag Dewan, President

ALLIANCE ENERGY LLC, Company

Witness
Name: _____ SEAN T. GEARY
(please print)

By: _____
_____,
Title: _____

## EXHIBIT "A"

### "Collateral"

Any and all tangible and intangible real and personal property, assets, and rights of the Dealer, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof: all personal property and fixtures of every kind and nature including all goods (including inventory, equipment, and any accessories thereto), instruments (including promissory notes), documents (including, if applicable, electronic documents), accounts, leases, subleases, chattel paper (whether tangible or electronic), deposit accounts, accounts receivable and proceeds thereof, letter-of-credit rights (whether or not the letter of credit is evidenced by writing), commercial tort claims, securities (including all stockholder, membership, and partnership interests in the Dealer and any other entities, and all certificates thereof), and all other investment property, supporting obligations, and any other contract rights or rights to the payment of money, including claims and proceeds, and all general intangibles (including all payment intangibles), and all goodwill and rights (including franchise rights) under any contracts and agreements.

# EXHIBIT B

**AMENDMENT AGREEMENT**

Amendment Agreement ("Amendment") entered into _January 12, 2021_ and effective as of the _12_ day of _January_, 20_21_ by and between **Alliance Energy LLC**, a Massachusetts limited liability company with a principal place of business located at 800 South Street, Suite 500, Waltham, Massachusetts 02453 ("Company"), and **Saibaba's Aashirwad Everything Inc.**, a Pennsylvania corporation ("Dealer") with a place of business located at 2319 Marshall Road, Lansdowne, PA 19050 ("Premises").

WHEREAS, Company and Dealer have entered into that certain Dealer Sales Agreement dated April 28, 2020 regarding the purchase and resale of gasoline and diesel fuel at the Premises (the "Agreement"); and

WHEREAS, Company and Dealer have agreed to amend the Agreement upon the terms set forth hereunder.

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Company and Dealer agree to amend the "initial period" of the Agreement, as set forth in Section 3 thereof, to "January 26, 2021 to January 25, 2031."

All other terms of the Agreement shall remain in full force and effect (except as specifically modified pursuant to this Amendment), and are hereby adopted, ratified and confirmed by the parties hereto. Any prior references to the Agreement shall now be deemed to refer to the Agreement, as modified and extended by this Amendment. Dealer warrants and represents that it is not in default under the Agreement and acknowledges that Company is in full compliance with all terms thereof.

*SIGNATURE PAGE TO FOLLOW*

IN WITNESS WHEREOF, the parties hereto have set their respective hands and seals as of the date and year first above written.

Company:

ALLIANCE ENERGY LLC

By: _____

Witness
Name: _____     Title: _____
     (please print)

Dealer

SAIBABA'S AASHRIWAD
EVERYTHING INC.

By: _____

Witness
Name: _____        Chirag Dewan, President
     (please print)                         (duly authorized)

**RATIFICATION OF GUARANTY**

For valuable consideration, the receipt and adequacy of which is hereby acknowledged, the undersigned guaranty to **Alliance Energy LLC** ("Company") all of the obligations of **Saibaba's Aashirwad Everything Inc.** ("Dealer"), as set forth in the foregoing Amendment Agreement, in accordance with the terms of that certain Guaranty Agreement dated April 21, 2020. I hereby ratify and confirm that said Guaranty Agreement remains in full force and effect as to all obligations of Dealer to Company.

EXECUTED AS AN INSTRUMENT UNDER SEAL AS OF THE **5** DAY OF **January**, 202**3**

Witness
Name: *Mark R Moncton*
(please print)

GUARANTOR:

Chirag Dewan
an individual residing at:
8019 Morseshoe Cottage Circle
Lorton, VA 22079

# EXHIBIT C

**DEALER SALES AGREEMENT**

Dealer Sales Agreement ("Agreement"), made as of the _____ day of _____, 2022, by and between Alliance Energy LLC, a Massachusetts limited liability company with a principal place of business located at 800 South Street, Suite 500, Waltham, MA 02453 ("Company"), and Saibaba's Almighty Inc., a New York corporation ("Dealer") with a principal place of business located at 3522 State Street, Niskayuna, NY 12304.

WHEREAS, Company and Dealer desire to provide for Dealer's purchase from Company of gasoline and diesel fuel ("Product" or "Products") for resale by Dealer at its station located at 3522 State Street, Niskayuna, NY 12304 ("Premises") under the trademark and brand identification of SUNOCO, or under such other trademark and identification as selected by Company from time to time (the current provider of the trademark and brand identification, or any successor provider thereof, is hereinafter referred to as the "Supplier"); and

WHEREAS, Company and Dealer intend by this Agreement to create a "franchise relationship" within the meaning of the Petroleum Marketing Practices Act.

NOW, THEREFORE, Company and Dealer agree as follows:

**WITNESSETH**

1.    PRODUCTS AND QUANTITIES: Company agrees to sell and deliver to Dealer, and Dealer agrees to purchase and receive in relatively equal deliveries from Company, the minimum annual gallons ("Minimum Annual Gallons") and minimum semi-annual gallons ("Minimum Semi-Annual Gallons") of Products set forth below (and subject to adjustment as provided herein):

| Minimum Semi-Annual Gallons | Minimum Annual Gallons |
|---|---|
| 520,000 gal. | 1,040,000 gal. |

At the end of each six (6) and twelve (12) month period of the Term (as defined hereunder), the Company shall calculate the quantity of Product received and paid for by Dealer from Company during said prior six (6) month or twelve (12) month period, as the case may be for purposes of determining Dealer's compliance with the Minimum Semi-Annual Gallons and Minimum Annual Gallons. Dealer shall not sell Product at the Premises during the Term of this Agreement (including any extensions hereof), except for those Products supplied by Company.

Dealer hereby acknowledges and agrees that the Minimum Semi-Annual Gallons and Minimum Annual Gallons as provided for herein, are reasonable, important and of material significance to this Agreement and the franchise relationship between the parties. In the event that the Minimum Annual Gallons are not purchased and paid for by Dealer during any twelve (12) month period, at the sole election of Company and in addition to and not exclusive of any other remedy the Company may choose to exercise under this Agreement or at law, the following twelve (12) month period's Minimum Annual Gallons shall be automatically increased by the previous

period's shortfall.  For example, if the Minimum Annual Gallons are 1,040,000 gallons, and during the first year of the Term the Dealer purchases only 1,000,000 gallons of Product, then the Minimum Annual Gallons for the following year may (at Company's election, without necessity of notice) be increased to 1,080,000 gallons.

2.      DELIVERIES:  Company shall deliver Product to Dealer free on board ("F.O.B.") the terminal designated by Company from time to time.  Dealer shall bear and discharge all shipping and delivery costs, and title and risk of loss for all Products shall pass to Dealer, upon delivery by Company to the transporting carrier.  All Products to be sold and delivered hereunder shall be delivered in such minimum quantities as Company may, in its sole discretion, from time to time determine.  Verification of product quantity and quality shall be the sole responsibility of Dealer.  Any claim for defect or variance in quality or quantity of Product furnished hereunder shall be made in writing directed to Company as herein provided within five (5) days after discovery of the defect or variance.  Dealer shall promptly furnish to Company samples adequate to test the Product claimed to be defective and shall provide Company access to the Premises to take its own samples.  Company shall also have the right, but not the obligation, to take meter readings on any product dispensing equipment on the Premises.

3.      TERM:  Unless validly terminated or non-renewed as provided for in the Petroleum Marketing Practices Act, the term of this Agreement shall be for an initial period, commencing on the date that the first transaction for the sale of the Products under this Agreement are processed on the Supplier's credit card network ("Commencement Date"),  and ending on the last day of the one hundred and twentieth (120th) month thereafter ("Initial Term"), and automatically continuing thereafter on a month to month basis on the same terms and conditions (excluding the Minimum Semi-Annual Gallons and Minimum Annual Gallons), unless terminated by either party at the end of the Initial Term or any subsequent extended term by giving to the other party not less than ninety (90) days prior written notice thereof (Dealer's failure to provide such written notice at least ninety (90) days prior to the end of the Initial Term, or any extended term, shall be deemed a waiver of any such rights, and the Term hereof shall then be deemed extended accordingly). Notwithstanding the above, Dealer shall not be entitled to exercise any such termination rights if Dealer has failed to purchase and pay all for all the gallons of Product (10,400,000 gallons) required to be purchased hereunder during the Initial Term ("Total Product Minimum"), or if Dealer is otherwise in default.  Dealer agrees to execute an acknowledgment of the Commencement Date Agreement, upon determination by Company thereof, provided, however, that if such acknowledgment is not signed and delivered by the Dealer prior to _____, 2022, the Commencement Date shall be automatically deemed to be _____, 2022, without the necessity of further action or execution of any documents by either party.

If, at the time of the expiration of the Initial Term, the Dealer has purchased and paid for at least ninety percent (90%) of the Total Product Minimum (9,360,000 gallons) and is not otherwise in breach or default of this Agreement, Company shall not declare Dealer in default as a result of any shortfall to purchase and pay for the Total Minimum Product, but this Agreement shall be extended through such date as Dealer has purchased and paid for the Total Product Minimum and has provided Company at least ninety (90) days prior written notice of its intent to terminate upon satisfaction of the Total Product Minimum (and otherwise remaining subject to all the terms and provisions hereof). Dealer shall make all good faith efforts to timely purchase and pay for the remaining ten percent (10%) of the Total Product Minimum. If at the expiration of the Initial Term

the Dealer has failed to purchase and pay for ninety percent (90%) of the Total Product Minimum, the term of this Agreement shall renew pursuant to the terms and subject to the termination rights for the Company and Dealer, respectively, outlined above.

4.    PRICES:  For Products and/or other motor fuels, Sunoco's posted distributor Albany, NY or closest available Sunoco supplied terminal's gross rack price, plus \$.03 per gallon, for each respective grade of Product and/or other motor fuels, plus all taxes, environmental fees, surcharges, and freight charges.

5.    TAXES:  Dealer shall pay or reimburse Company, as the case may be, for all taxes including, without limitation, any gasoline taxes, diesel or special fuel excise taxes, sales taxes, use taxes, retailer's occupation taxes, inspection fees, gross receipts taxes, or any similar imposts levied by any federal, state, or local authority upon the transactions covered hereby or measured in any manner by the sales prices to be charged hereunder.

6.    TERMS OF PAYMENT:  Payment for Product shall be made by electronic funds transfer ("EFT") from Dealer's bank account within five (5) days after the date of each delivery.  Dealer shall execute and deliver all such forms and documents as Company may require in order to implement and continue such EFT payments.  Company reserves the right, at its sole discretion, to withdraw any such extension of credit at any time without notice, and demand cash payment on delivery (or to modify payment terms).  Failure of Dealer to make payment in cash or according to authorized credit terms shall entitle Company to suspend deliveries as long as Dealer's account remains overdue, without prejudice to any rights of Company to terminate this Agreement for such breach.  At Company's sole election from time to time, receipts from Dealer's credit card, debit card, or electronic payment transactions (for any purposes) may be applied by Company to amounts due from Dealer (whether or not said amounts are then past due), and Dealer hereby irrevocably assigns to Company all of Dealer's right, title, and interest in and to the proceeds of all debit card, credit card, and electronic payment transactions occurring at the Premises (company shall also retain a security interest in any such proceeds not applied to payments due).  All unpaid accounts owing to Company by Dealer shall bear interest from the due date until paid at the interest rate which is the lower of:  (a) one and one-half (1½%) percent per month; or (b) the maximum rate allowed by law.  Payment for Product shall be due unconditionally; Dealer shall have no right of deduction or set-off.  Company may withhold, setoff, or recoup any amounts due and owing to Dealer, or held by Company on behalf of Dealer under this Agreement, any related or supplemental agreements, or any other agreements between the parties, to be applied to or against any amounts owed by Dealer to Company, or its affiliates.

7.    FORCE MAJEURE:  Company shall be excused for delay or non-performance hereunder if Company shall be unable to meet the demand for its Products with supplies from its normal and usual sources, or if any other contingency, of any nature whatsoever, beyond Company's reasonable control shall occur, including, without limitation, failure or delay of transportation, natural disaster, adverse weather conditions, labor difficulties of any nature, or compliance with any governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary).  In the event of any such contingency, Company shall have the right to curtail deliveries or allocate its available supply of product for sale among its customers in any manner which Company determines, in its sole discretion, is fair, reasonable or required under the circumstances, and Dealer shall not hold Company responsible in any manner for any losses or

damages which Dealer may claim as a result of any such curtailment or allocation by Company. Company shall not be required to make-up any Product not so delivered. In no event shall any force majeure condition affect Dealer's obligation to pay for Product when due.

8.    TRADEMARKS:

(a)    All Products purchased hereunder shall be resold by Dealer at the Premises under the Supplier's identifying marks. Dealer shall display such identifying marks including, without limitation, identification signs, trademarks, tradenames and colors, logos, brand identification, product and service advertising, credit cards, product names and service marks, all in accordance with the Supplier's and Company's approved standards. Dealer shall maintain at its sole cost all such identifying marks and shall repair or replace the same as directed by Company in its sole discretion. As used herein, Company's identifying marks include any marks of which Company is licensee or franchisee. Company reserves the right to change such identifying marks or standards at any time.

(b)    Dealer shall not employ such identifying mark as a part of a corporate, limited liability company, or partnership name. Dealer shall not sell any Products under Supplier's identifying marks except as authorized by Company, and Dealer shall not mix, blend, dilute, adulterate, substitute, or contaminate any Products. Dealer shall not change or alter by any means whatsoever the nature, quality or appearance of any of the Products purchased hereunder. Company shall have the right at all times to inspect and take samples of Products in Dealer's possession to determine quantities or adherence to quality standards and trademark authorizations.

(c)    Upon the expiration, non-renewal or termination of this Agreement for any reason whatsoever, Dealer's authorization to use Supplier's identifying marks, as set forth above, shall expire, and Dealer immediately shall return to Company, at Dealer's expense, all signs, lights, equipment, structures, poles, decals, and other promotional materials carrying such authorized identifying marks; it being understood that all of the same shall be and remain the exclusive property of Company (if Dealer shall fail to return same as required, Company and its agents may enter the Premises and remove same without notice and without liability).

(d)    Dealer does not, and shall not have any claim, right, ownership or other proprietary interest in any brand identification, loyalty program, and/or payment card system that may be utilized in accordance with the terms hereof, or in any equipment or property which may be provided by Company. Dealer agrees to obtain written acknowledgment on forms satisfactory to Company from the owner of said Premises, of Company's exclusive right to said signs, lights, poles, equipment, and identification items and of the right of Company or their agents to remove same from the Premises at any time. Dealer shall provide Company with evidence of insurance sufficient to cover the repair and/or replacement value of all said signs, lights, equipment, poles and identification items. Company shall have exclusive discretion regarding the display or non-display of its authorized identifying marks on pole signs, buildings, and similar prominent places on the Premises.

(e)    Company reserves the right to discontinue or change the grade, specifications, and/or any identifying mark of any Product covered hereby. Dealer acknowledges and agrees that any changes by the Company in the brand identification of the Product sold hereunder will require a

change in the price of the Product to reflect the new brand's rack price (for example, if the brand is changed, the price listed in Section 4 would be changed from the Sunoco's posted distributor Albany, NY or closest available Sunoco supplied terminal's gross rack price, plus X per gallon to the new supplier's posted distributor or closest new supplier supplied terminal's gross rack price, plus X per gallon). Dealer agrees to promptly sign all documents required by Company to memorialize any such brand and price change, if applicable. Dealer further acknowledges and agrees that any discounts, incentives, rebates, or other benefits provided by Supplier to Company shall be and remain the sole property of the Company.

9.      MINIMUM STANDARDS: Dealer shall, at its sole cost and expense, operate or cause to operate its retail facility at the Premises in a clean, neat, safe and healthful manner including all buildings, equipment, underground storage tanks, restrooms, and driveways, and in full compliance with all applicable laws, regulations, and Supplier requirements.

10.     PAYMENT CARDS/ELECTRONIC PAYMENTS: Dealer shall accept payment cards and other forms of electronic payment which may from time to time be offered through Company for purposes of making retail sales to Dealer's customers for Products sold by Company to Dealer (and for other purposes approved by Company and the payment card issuer or payment processor). All payment card and electronic payment sales at the Premises (including the processing of such sales) must be made in compliance with instructions and regulations supplied by or through Company, or otherwise promulgated by the payment processor, and Dealer acknowledges receipt thereof. Company, issuer, or processor may, from time to time, amend or supplement said regulations and instructions, or cease to accept one or more types of transactions, without having any liability to Dealer. Company may refuse to accept any sales or payments not submitted in accordance with the requirements of Company, card issuer, or processor. Dealer's personal cards shall not be used for any purchase of any Products sold hereunder. All processing charges associated with the administration of such transactions, and all user fees, POS fees, and satellite connection charges for each terminal or processing equipment utilized, provided, or made available to Dealer by Company, shall be paid by Dealer.

        Dealer represents to Company that all payment card or electronic submissions represent actual sales of Product to Dealer's customers in the manner and to the extent set forth therein. Dealer agrees that all payment submissions shall be in conformity with applicable regulations and that any submissions not conforming to said instructions may be rejected or charged back by the card issuer or processor. Dealer agrees that upon such rejection or charge back, the value of the payments which were rejected or charged back (and any associated charges) shall become immediately due and owing from Dealer to Company. All such payments shall be transmitted by such means, to such place(s), and at such time intervals, as Company may designate from time to time. Notwithstanding same, Dealer acknowledges that Company is not the provider or operator of any payment card or other payment systems, and has no liability for same.

        Dealer shall be solely responsible for compliance with all federal, state, and local statutes, rules, and regulations regarding the handling and transmission of customer payment card and electronic payment data, and all rules, regulations, instructions, and guidelines of the issuer, processor, and payment card industry relating thereto, including, but not limited to, the PCI Data Security Standard (available at www.pcisecuritystandards.org). Dealer's obligations shall include, but not be limited to, installation and/or upgrading of all equipment, hardware, and software

necessary to timely comply with issuer, processor, and industry standards and requirements for customer PIN and data entry devices (including Triple Data Encryption Standard usage). Dealer shall release, indemnify, defend (with counsel acceptable to Company), and hold Company harmless from any and all claims, expenses, liabilities, fines, or obligations (including attorney's fees) in the event of Dealer's failure to properly comply with its obligations under this Section, and in connection with any payment card or electronic sales, including, but not limited to, any claims, demands and actions brought by Dealer's customers for alleged losses and damages relating to any privacy or security breach. Dealer further agrees to: (i) implement any policies and procedures required by Company or the payment card issuer, in their sole judgment, with regard to acceptance and processing of such transactions; (ii) participate in (and cause its employees to participate in) any training programs required or established from time to time by Company; and (iii) allow Company, its agents, contractors, and representatives, unrestricted access to all records of credit and debit card transactions, receipts, and transmissions (and as may be necessary to allow a complete audit of such transactions), all at such times as Company shall request (none of the foregoing shall impose any obligation on Company with regard to the handling of payment card and electronic transactions).

Company may suspend its acceptance of payment card and electronic sales in addition to all other rights provided by law and by this Agreement, without liability to Dealer, when Company has reason to believe that any instructions or requirements are not being complied with by Dealer.

11.    INSURANCE: Dealer shall carry and maintain, solely at Dealer's expense, the following insurance with insurers satisfactory to Company:

(a)    Garage Liability Insurance or Commercial General Liability Insurance with Garage Liability endorsements. The insurance shall include, but not be limited to, coverage for the Premises, operations, Products, completed operations and operation, of vehicles owned, non-owned or hired with at least a combined single limit of $1,000,000 per occurrence for bodily injury and/or property damage and $2,000,000 aggregate;

(b)    Property insurance, including coverage for all goods, equipment, and improvements at the Premises which have been financed and/or secured by Company pursuant to the Reimbursement Agreement delivered by Dealer, if applicable, keeping same insured (for at least their full replacement value) against all risk of loss, including by fire, casualty, theft, and vandalism;

(c)    Workers compensation and employee's liability insurance (for statutory limits) where required by law;

(d)    Business auto liability coverage or operation of vehicles hired, owned or non-owned with a minimum combined single limit of $1,000,000 providing coverage for injury, death, or property damage resulting from each occurrence; and

(e)    Underground Storage Tank Insurance with minimum limits of $1,000,000 dedicated policy limit for underground storage tanks. Dealer can satisfy this requirement by remaining eligible to participate in a state tank fund program as to the Premises.

Policies must be written on a primary and non-contributory basis. Each such policy of insurance shall name Company, Global Partners LP, their subsidiaries, affiliates, successors, and assigns, and such other parties as Company shall designate, as additional insured parties thereunder. All such insurance shall contain such endorsements as the Company shall require and shall provide at least thirty (30) days prior written notice to Company in the event of cancellation. Dealer shall deliver certificates of such insurance to the Company upon execution of this Agreement and thereafter upon Company's request(s) therefor, provided, however, that neither the review, nor failure to review, such certificates or any accompanying endorsements shall constitute acceptance of any modification of, nor waive, alter, or diminish, Company's rights, and Dealer's obligations, under this Section. Company shall be entitled to receive, and Dealer shall be required to maintain, the insurance coverages specified hereinabove, notwithstanding any discrepancies in such certificates. All policies must be provided by a carrier with minimum ratings of A-/VII or better according to A.M. Best, and contain a waiver of subrogation in favor of Company.

12.     <u>COMPLIANCE WITH LAW</u>: Dealer agrees that in purchasing, receiving, storing, handling, offering for sale, selling, delivering for use or using the Products purchased from Company under this Agreement (and in conducting any business on the Premises), Dealer shall comply and instruct its employees to comply with all applicable federal, state, and local laws, ordinances, regulations, rules, orders and permits, including, without limitation, any of the same governing: (a) pollution, disposal of waste materials generated at the Premises, lead content, pricing, product containers, brand adulteration, commingling and underground tank gauging requirements; and (b) sales of illegal, prohibited, restricted, or regulated goods or items.

Dealer agrees to pay when due any and all tank fees required to render the Premises eligible for participation in any available underground storage tank cleanup fund or other applicable state tank registration program and to provide Company, on an annual basis, with certifications thereof, and of full compliance of the Premises with any applicable statutes and regulations.

13.     <u>INDEMNITY</u>: Dealer hereby releases and agrees to indemnify, defend (with counsel acceptable to Company), and hold Company, Supplier, Global Partners LP, and their parents, subsidiaries, affiliates, agents, servants, employees, successors, and assigns harmless from and against any and all claims, suits, obligations, liabilities, and damages (including attorney's fees) arising out of, or directly or indirectly relating to: (a) any failure by Dealer to perform, fulfill, or observe any obligation or liability of Dealer set forth herein, or in any other agreement with Company (or any of its affiliates); (b) any act or omission by Dealer, its agents, servants, employees, contractors, invitees, successors, and assigns, or any persons or entities under the control or direction of Dealer; (c) operation of Dealer's business including, but not limited to, Dealer's occupancy of the Premises and any personal injury or property damage occurring thereon; (d) violation of any law, ordinance or regulation by, or caused by, Dealer, its agents, servants, employees, contractors, invitees, successors, and assigns, or any persons or entities under the control or direction of Dealer; (e) use of any equipment; (f) any release, seepage, or leakage of petroleum products (including Product) or any other substance, or any fire or explosion at the Premises including, but not limited to, at or from any storage tanks, piping, and pumps; and (g) any failure of Dealer, its agents, servants, employees, invitees, contractors, successors, or assigns to comply with the Comprehensive Environmental Response Compensation and Liability Act of 1980 (herein "CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), or any other federal, state, or local environmental statute, regulation, rule, or ordinance.

All amounts due Company by Dealer by reason of the indemnities and obligations imposed upon Dealer by this Agreement shall become due and payable by Dealer to Company upon demand as a part of Dealer's account to Company. The provisions of this Section shall survive any termination, expiration, or non-renewal of this Agreement.

14.    ASSIGNMENT OF CONTRACT: This Agreement shall not be assigned by Dealer (a "Transfer"), in whole or in part, without the prior written consent of Company (transfer of a controlling interest in the Dealer shall be deemed to be a Transfer requiring Company's consent). Prior to any Transfer, Dealer shall pay to Company a non-refundable administrative fee in connection with each requested Transfer in an amount to be specified by Company. Company reserves the right to waive all or a portion of the administrative fee in its sole and absolute discretion. Dealer shall also pay to Company administrative fees from time to time imposed by Company in connection with changes in Dealer's operations, name, or business structure, which result in administrative costs or expenses to Company, and in an amount determined by Company to recoup those costs and expenses. Company shall have the right to sell or assign its right, title or interest in this Agreement, and any related agreements, in whole or in part, without the consent of Dealer.

15.    RIGHT OF FIRST REFUSAL: Dealer shall not sell, grant an option in respect of, nor lease, transfer, or otherwise dispose of by equity transfer, asset sale or otherwise, Dealer's business, or any rights in the Premises, or any assets or properties used in connection with Dealer's business, without first giving Company a sixty (60) day option within which to purchase or otherwise acquire said business and the Premises (or its rights therein) on the same terms and conditions as Dealer is willing to make such disposition to any other third party. Dealer shall give Company prompt written notice of said terms and conditions and shall submit a copy of: (a) any offer which Dealer is willing to accept; and (b) the signed Purchase and Sale Agreement. Such sixty (60) day period shall not commence until Dealer has complied with all of the requirements of this Section 15. An offer by a third party to exchange other property interests owned or to be acquired by it for any interest of Dealer covered by this Section shall be deemed to constitute an offer to purchase for a price equal to the fair market value of the property offered in exchange. Company shall be given access during said sixty (60) day period to Dealer's books and records. If Company exercises its option, it shall do so in writing within sixty (60) days after receipt of such notice and all documents and information required by Company. The closing shall take place not later than sixty (60) days after exercise of such option by Company. In the event that the terms and conditions of an offer are changed or modified in any respect, Dealer shall give Company prompt written notice thereof, and Company shall be provided an additional sixty (60) days after receipt of said notice and all documents and information required by Company within which to exercise its rights pursuant to this Section. At the closing, Dealer shall, in the case of a sale, deliver to Company a deed, assignment, or bill of sale, as the case may be, conveying a good, marketable and clear title subject only to the liens and encumbrances which are specifically outlined in the proposed terms and conditions of the offer or, in the case of any other disposition, deliver to Company an instrument or instruments in form and substance satisfactory to Company and sufficient to transfer the interest proposed to be transferred. Failure to exercise this option: (a) on one or more occasions shall not affect this right of first refusal on other occasions thereafter arising whether involving the same or other property; and (b) shall in no event be deemed a consent by Company to an assignment of this Agreement.

16.    INDEPENDENT DEALER RELATIONSHIP:  Dealer is not an employee, agent or representative of Company, and does not have the authority to act in any such capacity on behalf of Company.  Any action or representation on behalf of Dealer to the contrary shall constitute fraud.  Dealer is an independent business person and is solely responsible for the hiring, discharge, compensation, management, control and work rules of all personnel used or employed by or on behalf of Dealer in connection with its business.  Dealer is solely responsible for the quality of service performed for Dealer's customers.  Dealer is solely responsible for proper handling and satisfactory resolution of claims and complaints by Dealer's customers respecting services performed by Dealer and Dealer's personnel.

17.    TERMINATION AND NON-RENEWAL:  Company may terminate or non-renew this Agreement, the franchise, and the franchise relationship between Company and Dealer, upon any of the following grounds (each, an "Event of Default"):

a.    In accordance with the applicable provisions of the Petroleum Marketing Practices Act ("PMPA"), if the PMPA then applies to this Agreement;

b.    Dealer's failure to purchase the Minimum Semi-Annual Gallons and/or Minimum Annual Gallons;

c.    Breach by Dealer (or any guarantor) of any provision of this Agreement or of any other agreement delivered to Company (or any affiliate);

d.    Death or dissolution of Dealer, or of any guarantor (only to the extent permitted by, and in accordance with the provision of, applicable statutes);

e.    Closing of Dealer's business at the Premises or abandonment of the Premises (or failure by Dealer to commence and/or continue the sale of Products hereunder);

f.    The institution by or against Dealer (or any guarantor) of any bankruptcy, reorganization, insolvency, liquidation, or related proceeding or the making of any assignment for the benefit of creditors; or

g.    Dealer's violation of, or failure to comply with, any applicable state, federal, or local law or regulation, including, but not limited to:  (a) handling, storage, and/or containment of petroleum products; (b) sale of drugs, narcotics, tobacco, alcohol, or other prohibited or restricted goods or items; or (c) fraud or moral turpitude.

Regardless of whether Company exercises its rights to terminate or non-renew, Company shall also have the right to set-off any amounts, credits, or deposits which it may hold or receive for the benefit of Dealer against any indebtedness of Dealer, and to suspend all deliveries of Product to Dealer until all breaches of the terms hereof are cured (without prejudice to any other rights of Company).

Upon any termination, expiration, or non-renewal of this Agreement, Dealer shall comply with the provisions of Section 8 hereof and with Company's normal post-termination procedures as determined by Company from time to time, and will pay any costs in connection therewith (including any fees, costs, penalties, or amounts due to Supplier as a result thereof). Dealer has no right to terminate this Agreement, except as expressly provided in Section 3.

18.    CURE PAYMENT: In the event Dealer fails to purchase the Minimum Annual Gallons during any contract year, Company shall have the right (in addition to and not in lieu of Company's rights upon such an Event of Default as provided hereunder) to demand payment from Dealer, as a cure of such default ("Cure Payment"), in an amount calculated by subtracting (x) the gallons purchased and paid for by Dealer from Company for such year of the Term of this Agreement during which said Event of Default occurred, from (y) the Minimum Annual Gallons, and multiplying the difference by $.06 per gallon. Said Cure Payment shall be made by Dealer within fifteen (15) days of notice from Company. Failure to pay such Cure Payment shall constitute an Event of Default under this Agreement. In no event shall the payment of any Cure Payment hereunder satisfy or reduce Dealer's obligation to purchase and pay for all required gallons of Products under the Dealer Sales Agreement. Company shall not be required to demand a Cure Payment pursuant to the preceding paragraph before exercising its rights upon occurrence of an Event of Default. Dealer and Company agree that the foregoing Cure Payment and damages provisions are fair and reasonable estimates of certain actual damages which would be incurred by Company due to Dealer's default under this Agreement, and do not constitute a penalty.

19.    REMEDIES:  Upon the occurrence of an Event of Default, Company shall have the right to: (i) terminate or non-renew this Agreement as provided in Section 17 above; (ii) seek any or all legal and equitable remedies and damages available under applicable laws and under any agreements or instruments delivered to the Company; (iii) be paid for any outstanding accounts receivable; (iv) be paid by Dealer for liquidated damages as described in Section 20 hereunder; (v) be paid for any amounts due to Supplier as a result of such default; and (vi) recover Company's costs of collection, including reasonable attorney's fees.

20.    LIQUIDATED DAMAGES:

(a)    It is understood that Company is relying on sales to Dealer of the minimum Product quantities set forth in Section 1 hereof, and that any breach or repudiation of this Agreement, or other failure of Dealer to purchase those minimum Product quantities by Dealer will result in losses to Company. The liquidated damages under this Section are intended to compensate Company for losses that result from lost sales due to the occurrence of any of the events described below. Dealer and Company acknowledge that the amount of those losses is and will be difficult to determine. Therefore, Dealer shall pay to Company, as liquidated damages to compensate Company for such losses, the amount specified in subparagraph (b) below upon any:

      i.    breach of Dealer's obligations under the Agreement that results in termination of the Agreement;

      ii.    act or failure to act by the Dealer that results in Company's termination of the Agreement under the PMPA; or

     iii.    repudiation of the Agreement by Dealer.

(b)     The amount of liquidated damages due from Dealer under this Agreement is calculated by subtracting (x) the total gallons of Product purchased and paid for by Dealer from Company under the terms of this Agreement from (y) the total gallons of Product required to be purchased under this Agreement, and multiplying the difference by $0.06 per gallon. Said damages are not a penalty but are a fair and reasonable estimate of certain actual damages which would be incurred by Company upon Dealer's breaches and are payable in addition to any amounts or damages due hereunder or under any separate agreement executed by the parties.

(c)     The provisions of this section do not affect any other rights and remedies Company may have under this Agreement, any other agreement or document, and/or under applicable law including, but not limited to, the PMPA and the Uniform Commercial Code. Failure to pay liquidated damages upon demand by Company constitutes a breach by Dealer of an obligation under the Agreement for purposes of the indemnification provisions set forth in Section 13.

21.     SATISFACTION OF REIMBURSEMENT AGREEMENT: Dealer's obligations under this Agreement (including all Product purchase obligations) shall survive and continue in effect notwithstanding the expiration, termination, or satisfaction of Dealer's obligations under the Reimbursement Agreement executed herewith (if applicable).

22.     WAIVER: No waiver by Company of any default of Dealer hereunder shall operate as a waiver of any future default whether of a like or different character. No delay or omission of Company in exercising or enforcing any right or power accruing upon any breach of this Agreement by Dealer shall impair any such right or power, or shall be construed to be a waiver of any breach of this Agreement, or any acquiescence therein.

23.     NOTICES: All notices provided for herein shall be considered as properly given if delivered in writing personally, by certified mail (return receipt requested), or by overnight delivery service, as follows (or to the Premises, in the event of notice to the Dealer):

> If to Company:        Alliance Energy LLC
>                       800 South Street, Suite 500
>                       Waltham, MA 02453
>                       Attention:  Executive Vice President
>
> with a copy to:       Alliance Energy LLC
>                       800 South Street, Suite 500
>                       Waltham, MA 02453
>                       Attention:  Deputy General Counsel
>
> If to Dealer:         Saibaba's Almighty, Inc.
>                       3522 State Street
>                       Niskayuna, NY 12304

24.     PRIOR AGREEMENTS: This Agreement supersedes all prior agreements and understandings between the parties pertaining to the matters set forth herein and there are no other agreements of any nature, written or oral, between the parties pertaining to the subject matter

hereof. Except as expressly provided in this Agreement, all amendments or modifications hereto must be in writing and signed by a duly authorized representative of Company.

25.    SEVERABILITY: If any term or provision of this Agreement or the application hereof shall to any extent be invalid or unenforceable, the remainder shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. If, at the time of execution of this Agreement (or any other documents delivered herewith), any term or date is inadvertently omitted or left blank, then Dealer hereby authorizes Company to insert and/or complete same.

26.    REPRESENTATIONS OF DEALER: Dealer warrants and represents the following to Company:

(a)    Dealer is entering into and signing this Agreement upon Dealer's own free will and choice, and is not acting under the influence of any threat or coercion of Company or its representatives.

(b)    There have been no promises, claims or representations made to Dealer by Company or its representatives of any kind which are not contained in this Agreement or in another written document signed by and furnished to Dealer by Company as a part of this relationship.

**(c)    Dealer acknowledges that Company does not make, and specifically disclaims, any warranties as to merchantability or fitness for a particular purpose of any Products sold and delivered hereunder, and further that Company shall not, under any circumstances, be liable for any claims for loss of profits or consequential damages.**

(d)    Dealer is owner of the Premises (or is lessee by reason of a valid lease agreement with the record owner of the Premises, a copy of which shall be made available to Company, and which has a present term at least equal in duration to the initial Term of this Agreement) and has all permits and licenses necessary to occupy and use the Premises as contemplated by this Agreement.

(e)    The execution, delivery and performance by Dealer of this Agreement will not violate any agreement or other instrument to which Dealer is a party or by which it or any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement, or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets. Dealer is not currently under agreement with any other supplier of Products and has properly terminated (or completed the Term of) any such prior supply agreement.

(f)    The Premises will be constructed, operated, and maintained in compliance with Supplier's and Company's guidelines and specifications, as same may be modified from time to time, and in compliance with all of Supplier's standards and appearance manuals, at all times during the Term hereof. Dealer shall participate and comply with (and pay and

be responsible for all costs, fees, and penalties in connection with) any "mystery shopper", customer loyalty, or similar programs implemented by Supplier from time to time, and shall pay any "help desk" fees or other service charges received from Supplier in connection with the operation of any systems or equipment on the Premises.

(g)     Dealer agrees not to sell any goods or items which are prohibited by Supplier as a condition of the use of such brand and identifying marks at the Premises.

(h)     NOTHING IN THE AGREEMENT IS CONSTRUED TO PROHIBIT COMPANY FROM SUGGESTING PRICES AND COUNSELING WITH DEALER CONCERNING PRICES. PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED. DEALER MAY SELL ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE WHICH IT ALONE MAY DECIDE.

27.    SECURITY: As security for the payment and performance of any and all liabilities, indebtedness, and obligations (direct or indirect, absolute or contingent, sole, joint or joint and several, secured or unsecured, now existing or hereafter arising or any other type, nature, or description) of Dealer to Company (the "Obligations"), Dealer hereby pledges, assigns, and transfers to Company a continuing security interest in: (a) any unsold Products at the Premises; and (b) the proceeds of any payment card or electronic sales transactions (collectively, the "Collateral"). Dealer shall, upon Company's request, execute and deliver Form UCC-1 Financing Statements covering the Collateral, in form suitable for recording with the Secretary of State's office. Dealer further irrevocably constitutes and appoints Company as Dealer's true and lawful attorney for the purpose of signing, filing, and recording, on behalf of Dealer (and/or for filing without signature, if permitted by law), any financing statement or other instrument in order to perfect, protect, or continue Company's interest in the Collateral (and as notice of, and to secure, any and all rights of first refusal granted to Company or Dealer, and their respective affiliates, as applicable). Upon the occurrence of an Event of Default by Dealer, and at any time thereafter, Company shall have, in addition to any other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code.

28.    APPLICABLE LAW: This Agreement shall be governed by and construed in accordance with the Petroleum Marketing Practices Act and the applicable laws of the Commonwealth of Massachusetts, and Dealer hereby irrevocably consents to the jurisdiction of the state and federal courts located in Massachusetts (should Company elect to proceed in such forum), without regard to any provisions regarding conflicts of law. Company has the right to enforce and require specific performance of all provisions of this Agreement including, but not limited to, Company's right to seek injunctive relief and any other right or remedies available to Company. Dealer acknowledges receipt of a written summary of the provisions of the Petroleum Marketing Practices Act.

29.    ATTORNEYS' FEES: In the event that any litigation or legal proceeding is brought to enforce or interpret the terms of this Agreement, the prevailing party in such proceeding shall be entitled to recover all its costs, including its reasonable attorneys' fees, paralegals' fees and legal assistants' fees (whether for services incurred in collection, litigation, bankruptcy proceedings, appeals, or otherwise), and all other fees and costs incurred in connection therewith.

30.    DISCLOSURE REQUIREMENTS:  The following information is set forth herein, to the extent applicable, in compliance with applicable law:

a.    The gallonage volume history, if any, of the location under negotiation for and during the three year period immediately past or for the entire period which the location has been supplied by Company, whichever is shorter:
Operated by Company.
1/1/21 -  1/1/22 -858,186 gal, 1/1/20 – 1/1/21 – 824,051 gal., 1/1/19 – 1/1/20 – 1,207,266 gal.

b.    The name and last known address of the previous dealers for the last three years, or for the entire period during which the location has been supplied by Company, whichever is shorter, and the reason for the termination of each dealer's agreement:
Operated by Company.

c.    Any legally binding commitments for the sale, demolition or other disposition of the location:
None

d.    The training programs, if any, and the specific goods and services the Company will provide without cost to the Dealer:
None, except for any signage or branding materials loaned to Dealer hereunder.

e.    Full disclosure of any and all obligations which will be required of the Dealer, including, but not limited to, any obligation to exclusively deal in any of the Products of the Company, its subsidiaries or any other company or any advertising and promotional items that the Dealer must accept:
As provided for in this Agreement.

f.    Full disclosure of all restrictions on the sale, transfer, renewal and termination of the agreement.
As provided for in this Agreement.

31.    TRIAL BY JURY WAIVER:  To the fullest extent permitted by law, Dealer and Company hereby waive trial by jury in any court and in any suit, action, or proceeding on any matter arising in connection with or in any way related to the commercial transaction of which this Agreement is a part and/or the enforcement of any of Company's or Dealer's rights and remedies.  Dealer and Company acknowledge that they make this waiver knowingly, voluntarily and only after extensive consideration of the ramifications of this waiver.

32.    CLAIMS/RELEASE:  Company and Dealer agree that prompt investigation and resolution of any claim by Dealer is to the benefit of both parties.  For that reason, and in consideration of

the other benefits conferred upon Dealer by this Agreement, Dealer agrees that any claim by Dealer of any kind against Company arising out of this Agreement or otherwise, shall be waived and barred unless: (a) Company is given written notice thereof within thirty (30) days after the event, action, or inaction to which such claim relates, and (b) suit is commenced against Company in a court of competent jurisdiction within twelve (12) months after the event, action, or inaction to which such claim relates. Notwithstanding the foregoing, any claim against Company by Dealer for defect or variance in quality or quantity of Product furnished by Company under this Agreement shall be waived and barred unless Dealer provides Company with written notice thereof within five (5) days after discovery of the defect or variance. Dealer acknowledges that it has no outstanding claims against Company as of the date of this Agreement. As used herein, the terms "Dealer" and "Company" shall be deemed to include their respective successors and assigns.

33.    OFAC CERTIFICATION.    Dealer certifies that it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or by the U.S. Treasury Department as a terrorist, Specially Designated National and Blocked Person, or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control.

34.    SURVIVAL.    The applicable provisions of Sections 6, 8, 10, 13, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 31, and 32 shall survive any termination or non-renewal of this Agreement, in addition to any other right or obligation which has accrued prior thereto.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF the parties hereto have executed this Agreement as an instrument under seal effective as of the date and year first above written.

Company:

ALLIANCE ENERGY LLC

By: _____

Witness
Name: Adriana Gioumbenis

(please print)

Name: MAX BSEUER
Title: SR VP

Dealer:

SAIBABA'S ALMIGHTY INC.

By: _____

Witness
Name: Mark R Monckton

(please print)

Name: CHIRAG DEWAN
Title: PRESIDENT

# EXHIBIT D

## AMENDED AND RESTATED DEALER SALES AGREEMENT

Amended and Restated Dealer Sales Agreement ("Agreement"), made as of the _15_ day of ___June___, 2022, by and between Alliance Energy LLC, a Massachusetts limited liability company with a principal place of business located at 800 South Street, Suite 500, Waltham, MA 02453 ("Company"), and Saibaba's Aashirwad Forever Inc., a Pennsylvania corporation ("Dealer") with a principal place of business located at 1205 East Lincoln Highway, Langhorne, PA 19047.

WHEREAS, Company and Dealer (successor in interest to Langhorne Petroleum LLC) are parties to that certain Dealer Sales Agreement dated approximately October 2007 and an Assignment, Assumption, and Amendment Agreement dated January 14, 2022 ("Prior Agreements"), as amended, which Prior Agreements are superseded and replaced by the terms of this Agreement, effective upon the Commencement Date, as herein after defined;

WHEREAS, Company and Dealer desire to provide for Dealer's purchase from Company of gasoline and diesel fuel ("Product" or "Products") for resale by Dealer at its station located at 1205 East Lincoln Highway, Langhorne, PA 19047 ("Premises") under the trademark and brand identification of SHELL, or under such other trademark and identification as selected by Company from time to time (the current provider of the trademark and brand identification, or any successor provider thereof, is hereinafter referred to as the "Supplier"); and

WHEREAS, Company and Dealer intend by this Agreement to create a "franchise relationship" within the meaning of the Petroleum Marketing Practices Act.

NOW, THEREFORE, Company and Dealer agree as follows:

## WITNESSETH

1.    PRODUCTS AND QUANTITIES:  Company agrees to sell and deliver to Dealer, and Dealer agrees to purchase and receive in relatively equal deliveries from Company, the minimum annual gallons ("Minimum Annual Gallons") and minimum semi-annual gallons ("Minimum Semi-Annual Gallons") of Products set forth below (and subject to adjustment as provided herein):

| Minimum Semi-Annual Gallons | Minimum Annual Gallons |
|---|---|
| 1,260,000 gal. | 2,520,000 gal. |

At the end of each six (6) and twelve (12) month period of the Term (as defined hereunder), the Company shall calculate the quantity of Product received and paid for by Dealer from Company during said prior six (6) month or twelve (12) month period, as the case may be for purposes of determining Dealer's compliance with the Minimum Semi-Annual Gallons and Minimum Annual Gallons.  Dealer shall not sell Product at the Premises during the Term of this Agreement (including any extensions hereof), except for those Products supplied by Company.

Dealer hereby acknowledges and agrees that the Minimum Semi-Annual Gallons and Minimum Annual Gallons as provided for herein, are reasonable, important and of material significance to this Agreement and the franchise relationship between the parties. In the event that the Minimum Annual Gallons are not purchased and paid for by Dealer during any twelve (12) month period, at the sole election of Company and in addition to and not exclusive of any other remedy the Company may choose to exercise under this Agreement or at law, the following twelve (12) month period's Minimum Annual Gallons shall be automatically increased by the previous period's shortfall. For example, if the Minimum Annual Gallons are 2,520,000 gallons, and during the first year of the Term the Dealer purchases only 2,500,000 gallons of Product, then the Minimum Annual Gallons for the following year may (at Company's election, without necessity of notice) be increased to 2,540,000 gallons.

2.      DELIVERIES:  Company shall deliver Product to Dealer free on board ("F.O.B.") the terminal designated by Company from time to time. Dealer shall bear and discharge all shipping and delivery costs, and title and risk of loss for all Products shall pass to Dealer, upon delivery by Company to the transporting carrier. All Products to be sold and delivered hereunder shall be delivered in such minimum quantities as Company may, in its sole discretion, from time to time determine. Verification of product quantity and quality shall be the sole responsibility of Dealer. Any claim for defect or variance in quality or quantity of Product furnished hereunder shall be made in writing directed to Company as herein provided within five (5) days after discovery of the defect or variance. Dealer shall promptly furnish to Company samples adequate to test the Product claimed to be defective and shall provide Company access to the Premises to take its own samples. Company shall also have the right, but not the obligation, to take meter readings on any product dispensing equipment on the Premises.

3.      TERM:  Unless validly terminated or non-renewed as provided for in the Petroleum Marketing Practices Act, the term of this Agreement shall be for an initial period, commencing on the date that the first transaction for the sale of the Products under this Agreement are processed on the Supplier's credit card network ("Commencement Date"),  and ending on the last day of the one hundred and twentieth (120th) month thereafter ("Initial Term"), and automatically continuing thereafter on a month to month basis on the same terms and conditions (excluding the Minimum Semi-Annual Gallons and Minimum Annual Gallons), unless terminated by either party at the end of the Initial Term or any subsequent extended term by giving to the other party not less than ninety (90) days prior written notice thereof (Dealer's failure to provide such written notice at least ninety (90) days prior to the end of the Initial Term, or any extended term, shall be deemed a waiver of any such rights, and the Term hereof shall then be deemed extended accordingly). Notwithstanding the above, Dealer shall not be entitled to exercise any such termination right if Dealer has failed to purchase and pay all for all the gallons of Product (25,200,000 gallons) required to be purchased hereunder during the Initial Term ("Total Product Minimum"), or if Dealer is otherwise in default. Dealer agrees to execute an acknowledgment of the Commencement Date Agreement, upon determination by Company thereof, provided, however, that if such acknowledgment is not signed and delivered by the Dealer prior to _____, 2022, the Commencement Date shall be automatically deemed to be _____, 2022, without the necessity of further action or execution of any documents by either party.

If, at the time of the expiration of the Initial Term, the Dealer has purchased and paid for at least ninety percent (90%) of the Total Product Minimum (22,680,000 gallons) and is not otherwise in

breach or default of this Agreement, Company shall not declare Dealer in default as a result of any shortfall to purchase and pay for the Total Minimum Product, but this Agreement shall be extended through such date as Dealer has purchased and paid for the Total Product Minimum and has provided Company at least ninety (90) days prior written notice of its intent to terminate upon satisfaction of the Total Product Minimum (and otherwise remaining subject to all the terms and provisions hereof). Dealer shall make all good faith efforts to timely purchase and pay for the remaining ten percent (10%) of the Total Product Minimum. If at the expiration of the Initial Term the Dealer has failed to purchase and pay for ninety percent (90%) of the Total Product Minimum, the term of this Agreement shall renew pursuant to the terms and subject to the termination rights for the Company and Dealer, respectively, outlined above.

4.    PRICES:  For Products and/or other motor fuels, Shell's posted distributor Philadelphia, PA or closest available Shell supplied terminal's gross rack price, minus $.05 per gallon, for each respective grade of Product and/or other motor fuels, plus all taxes, environmental fees, surcharges, and freight charges.

5.    TAXES:  Dealer shall pay or reimburse Company, as the case may be, for all taxes including, without limitation, any gasoline taxes, diesel or special fuel excise taxes, sales taxes, use taxes, retailer's occupation taxes, inspection fees, gross receipts taxes, or any similar imposts levied by any federal, state, or local authority upon the transactions covered hereby or measured in any manner by the sales prices to be charged hereunder.

6.    TERMS OF PAYMENT:  Payment for Product shall be made by electronic funds transfer ("EFT") from Dealer's bank account within five (5) days after the date of each delivery.  Dealer shall execute and deliver all such forms and documents as Company may require in order to implement and continue such EFT payments.  Company reserves the right, at its sole discretion, to withdraw any such extension of credit at any time without notice, and demand cash payment on delivery (or to modify payment terms).  Failure of Dealer to make payment in cash or according to authorized credit terms shall entitle Company to suspend deliveries as long as Dealer's account remains overdue, without prejudice to any rights of Company to terminate this Agreement for such breach.  At Company's sole election from time to time, receipts from Dealer's credit card, debit card, or electronic payment transactions (for any purposes) may be applied by Company to amounts due from Dealer (whether or not said amounts are then past due), and Dealer hereby irrevocably assigns to Company all of Dealer's right, title, and interest in and to the proceeds of all debit card, credit card, and electronic payment transactions occurring at the Premises (company shall also retain a security interest in any such proceeds not applied to payments due).  All unpaid accounts owing to Company by Dealer shall bear interest from the due date until paid at the interest rate which is the lower of:  (a) one and one-half (1½%) percent per month; or (b) the maximum rate allowed by law.  Payment for Product shall be due unconditionally; Dealer shall have no right of deduction or set-off.  Company may withhold, setoff, or recoup any amounts due and owing to Dealer, or held by Company on behalf of Dealer under this Agreement, any related or supplemental agreements, or any other agreements between the parties, to be applied to or against any amounts owed by Dealer to Company, or its affiliates.

7.    FORCE MAJEURE:  Company shall be excused for delay or non-performance hereunder if Company shall be unable to meet the demand for its Products with supplies from its normal and usual sources, or if any other contingency, of any nature whatsoever, beyond Company's

reasonable control shall occur, including, without limitation, failure or delay of transportation, natural disaster, adverse weather conditions, labor difficulties of any nature, or compliance with any governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary). In the event of any such contingency, Company shall have the right to curtail deliveries or allocate its available supply of product for sale among its customers in any manner which Company determines, in its sole discretion, is fair, reasonable or required under the circumstances, and Dealer shall not hold Company responsible in any manner for any losses or damages which Dealer may claim as a result of any such curtailment or allocation by Company. Company shall not be required to make-up any Product not so delivered. In no event shall any force majeure condition affect Dealer's obligation to pay for Product when due.

8.    TRADEMARKS:

(a)    All Products purchased hereunder shall be resold by Dealer at the Premises under the Supplier's identifying marks. Dealer shall display such identifying marks including, without limitation, identification signs, trademarks, tradenames and colors, logos, brand identification, product and service advertising, credit cards, product names and service marks, all in accordance with the Supplier's and Company's approved standards. Dealer shall maintain at its sole cost all such identifying marks and shall repair or replace the same as directed by Company in its sole discretion. As used herein, Company's identifying marks include any marks of which Company is licensee or franchisee. Company reserves the right to change such identifying marks or standards at any time.

(b)    Dealer shall not employ such identifying mark as a part of a corporate, limited liability company, or partnership name. Dealer shall not sell any Products under Supplier's identifying marks except as authorized by Company, and Dealer shall not mix, blend, dilute, adulterate, substitute, or contaminate any Products. Dealer shall not change or alter by any means whatsoever the nature, quality or appearance of any of the Products purchased hereunder. Company shall have the right at all times to inspect and take samples of Products in Dealer's possession to determine quantities or adherence to quality standards and trademark authorizations.

(c)    Upon the expiration, non-renewal or termination of this Agreement for any reason whatsoever, Dealer's authorization to use Supplier's identifying marks, as set forth above, shall expire, and Dealer immediately shall return to Company, at Dealer's expense, all signs, lights, equipment, structures, poles, decals, and other promotional materials carrying such authorized identifying marks; it being understood that all of the same shall be and remain the exclusive property of Company (if Dealer shall fail to return same as required, Company and its agents may enter the Premises and remove same without notice and without liability).

(d)    Dealer does not, and shall not have any claim, right, ownership or other proprietary interest in any brand identification, loyalty program, and/or payment card system that may be utilized in accordance with the terms hereof, or in any equipment or property which may be provided by Company. Dealer agrees to obtain written acknowledgment on forms satisfactory to Company from the owner of said Premises, of Company's exclusive right to said signs, lights, poles, equipment, and identification items and of the right of Company or their agents to remove same from the Premises at any time. Dealer shall provide Company with evidence of insurance sufficient to cover the repair and/or replacement value of all said signs, lights, equipment, poles

and identification items.  Company shall have exclusive discretion regarding the display or non-display of its authorized identifying marks on pole signs, buildings, and similar prominent places on the Premises.

(e)    Company reserves the right to discontinue or change the grade, specifications, and/or any identifying mark of any Product covered hereby.  Dealer acknowledges and agrees that any changes by the Company in the brand identification of the Product sold hereunder will require a change in the price of the Product to reflect the new brand's rack price (for example, if the brand is changed, the price listed in Section 4 would be changed from the Shell's posted distributor Philadelphia, PA or closest available Shell supplied terminal's gross rack price, plus/minus X per gallon to the new supplier's posted distributor or closest new supplier supplied terminal's gross rack price, plus/minus X per gallon). Dealer agrees to promptly sign all documents required by Company to memorialize any such brand and price change, if any. Dealer further acknowledges and agrees that any discounts, incentives, rebates, or other benefits provided by Supplier to Company shall be and remain the sole property of the Company.

9.    <u>MINIMUM STANDARDS</u>:  Dealer shall, at its sole cost and expense, operate or cause to operate its retail facility at the Premises in a clean, neat, safe and healthful manner including all buildings, equipment, underground storage tanks, restrooms, and driveways, and in full compliance with all applicable laws, regulations, and Supplier requirements.

10.    <u>PAYMENT CARDS/ELECTRONIC PAYMENTS</u>:  Dealer shall accept payment cards and other forms of electronic payment which may from time to time be offered through Company for purposes of making retail sales to Dealer's customers for Products sold by Company to Dealer (and for other purposes approved by Company and the payment card issuer or payment processor). All payment card and electronic payment sales at the Premises (including the processing of such sales) must be made in compliance with instructions and regulations supplied by or through Company, or otherwise promulgated by the payment processor, and Dealer acknowledges receipt thereof.  Company, issuer, or processor may, from time to time, amend or supplement said regulations and instructions, or cease to accept one or more types of transactions, without having any liability to Dealer.  Company may refuse to accept any sales or payments not submitted in accordance with the requirements of Company, card issuer, or processor.  Dealer's personal cards shall not be used for any purchase of any Products sold hereunder.  All processing charges associated with the administration of such transactions, and all user fees, POS fees, and satellite connection charges for each terminal or processing equipment utilized, provided, or made available to Dealer by Company, shall be paid by Dealer.

Dealer represents to Company that all payment card or electronic submissions represent actual sales of Product to Dealer's customers in the manner and to the extent set forth therein. Dealer agrees that all payment submissions shall be in conformity with applicable regulations and that any submissions not conforming to said instructions may be rejected or charged back by the card issuer or processor.  Dealer agrees that upon such rejection or charge back, the value of the payments which were rejected or charged back (and any associated charges) shall become immediately due and owing from Dealer to Company. All such payments shall be transmitted by such means, to such place(s), and at such time intervals, as Company may designate from time to time. Notwithstanding same, Dealer acknowledges that Company is not the provider or operator of any payment card or other payment systems, and has no liability for same.

Dealer shall be solely responsible for compliance with all federal, state, and local statutes, rules, and regulations regarding the handling and transmission of customer payment card and electronic payment data, and all rules, regulations, instructions, and guidelines of the issuer, processor, and payment card industry relating thereto, including, but not limited to, the PCI Data Security Standard (available at www.pcisecuritystandards.org). Dealer's obligations shall include, but not be limited to, installation and/or upgrading of all equipment, hardware, and software necessary to timely comply with issuer, processor, and industry standards and requirements for customer PIN and data entry devices (including Triple Data Encryption Standard usage). Dealer shall release, indemnify, defend (with counsel acceptable to Company), and hold Company harmless from any and all claims, expenses, liabilities, fines, or obligations (including attorney's fees) in the event of Dealer's failure to properly comply with its obligations under this Section, and in connection with any payment card or electronic sales, including, but not limited to, any claims, demands and actions brought by Dealer's customers for alleged losses and damages relating to any privacy or security breach. Dealer further agrees to: (i) implement any policies and procedures required by Company or the payment card issuer, in their sole judgment, with regard to acceptance and processing of such transactions; (ii) participate in (and cause its employees to participate in) any training programs required or established from time to time by Company; and (iii) allow Company, its agents, contractors, and representatives, unrestricted access to all records of credit and debit card transactions, receipts, and transmissions (and as may be necessary to allow a complete audit of such transactions), all at such times as Company shall request (none of the foregoing shall impose any obligation on Company with regard to the handling of payment card and electronic transactions).

Company may suspend its acceptance of payment card and electronic sales in addition to all other rights provided by law and by this Agreement, without liability to Dealer, when Company has reason to believe that any instructions or requirements are not being complied with by Dealer.

11.     INSURANCE:  Dealer shall carry and maintain, solely at Dealer's expense, the following insurance with insurers satisfactory to Company:

(a)     Garage Liability Insurance or Commercial General Liability Insurance with Garage Liability endorsements.  The insurance shall include, but not be limited to, coverage for the Premises, operations, Products, completed operations and operation, of vehicles owned, non-owned or hired with at least a combined single limit of $1,000,000 per occurrence for bodily injury and/or property damage and $2,000,000 aggregate;

(b)     Property insurance, including coverage for all goods, equipment, and improvements at the Premises which have been financed and/or secured by Company pursuant to the Reimbursement Agreement delivered by Dealer herewith, keeping same insured (for at least their full replacement value) against all risk of loss, including by fire, casualty, theft, and vandalism;

(c)     Workers compensation and employee's liability insurance (for statutory limits) where required by law;

(d)     Business auto liability coverage or operation of vehicles hired, owned or non-owned with a minimum combined single limit of $1,000,000 providing coverage for injury, death, or property damage resulting from each occurrence; and

(e)     Underground Storage Tank Insurance with minimum limits of $1,000,000 dedicated policy limit for underground storage tanks.  Dealer can satisfy this requirement by remaining eligible to participate in a state tank fund program as to the Premises.

Policies must be written on a primary and non-contributory basis.  Each such policy of insurance shall name Company, Global Partners LP, their subsidiaries, affiliates, successors, and assigns, and such other parties as Company shall designate, as additional insured parties thereunder.  All such insurance shall contain such endorsements as the Company shall require and shall provide at least thirty (30) days prior written notice to Company in the event of cancellation.  Dealer shall deliver certificates of such insurance to the Company upon execution of this Agreement and thereafter upon Company's request(s) therefor, provided, however, that neither the review, nor failure to review, such certificates or any accompanying endorsements shall constitute acceptance of any modification of, nor waive, alter, or diminish, Company's rights, and Dealer's obligations, under this Section.  Company shall be entitled to receive, and Dealer shall be required to maintain, the insurance coverages specified hereinabove, notwithstanding any discrepancies in such certificates.  All policies must be provided by a carrier with minimum ratings of A-/VII or better according to A.M. Best, and contain a waiver of subrogation in favor of Company.

12.     COMPLIANCE WITH LAW:  Dealer agrees that in purchasing, receiving, storing, handling, offering for sale, selling, delivering for use or using the Products purchased from Company under this Agreement (and in conducting any business on the Premises), Dealer shall comply and instruct its employees to comply with all applicable federal, state, and local laws, ordinances, regulations, rules, orders and permits, including, without limitation, any of the same governing:  (a) pollution, disposal of waste materials generated at the Premises, lead content, pricing, product containers, brand adulteration, commingling and underground tank gauging requirements; and (b) sales of illegal, prohibited, restricted, or regulated goods or items.

Dealer agrees to pay when due any and all tank fees required to render the Premises eligible for participation in any available underground storage tank cleanup fund or other applicable state tank registration program and to provide Company, on an annual basis, with certifications thereof, and of full compliance of the Premises with any applicable statutes and regulations.

13.     INDEMNITY:  Dealer hereby releases and agrees to indemnify, defend (with counsel acceptable to Company), and hold Company, Supplier, Global Partners LP, and their parents, subsidiaries, affiliates, agents, servants, employees, successors, and assigns harmless from and against any and all claims, suits, obligations, liabilities, and damages (including attorney's fees) arising out of, or directly or indirectly relating to:  (a) any failure by Dealer to perform, fulfill, or observe any obligation or liability of Dealer set forth herein, or in any other agreement with Company (or any of its affiliates); (b) any act or omission by Dealer, its agents, servants, employees, contractors, invitees, successors, and assigns, or any persons or entities under the control or direction of Dealer; (c) operation of Dealer's business including, but not limited to, Dealer's occupancy of the Premises and any personal injury or property damage occurring thereon; (d) violation of any law, ordinance or regulation by, or caused by, Dealer, its agents, servants,

employees, contractors, invitees, successors, and assigns, or any persons or entities under the control or direction of Dealer; (e) use of any equipment; (f) any release, seepage, or leakage of petroleum products (including Product) or any other substance, or any fire or explosion at the Premises including, but not limited to, at or from any storage tanks, piping, and pumps; and (g) any failure of Dealer, its agents, servants, employees, invitees, contractors, successors, or assigns to comply with the Comprehensive Environmental Response Compensation and Liability Act of 1980 (herein "CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), or any other federal, state, or local environmental statute, regulation, rule, or ordinance.

All amounts due Company by Dealer by reason of the indemnities and obligations imposed upon Dealer by this Agreement shall become due and payable by Dealer to Company upon demand as a part of Dealer's account to Company. The provisions of this Section shall survive any termination, expiration, or non-renewal of this Agreement.

14.    <u>ASSIGNMENT OF CONTRACT</u>:  This Agreement shall not be assigned by Dealer (a "Transfer"), in whole or in part, without the prior written consent of Company (transfer of a controlling interest in the Dealer shall be deemed to be a Transfer requiring Company's consent). Prior to any Transfer, Dealer shall pay to Company a non-refundable administrative fee in connection with each requested Transfer in an amount to be specified by Company. Company reserves the right to waive all or a portion of the administrative fee in its sole and absolute discretion. Dealer shall also pay to Company administrative fees from time to time imposed by Company in connection with changes in Dealer's operations, name, or business structure, which result in administrative costs or expenses to Company, and in an amount determined by Company to recoup those costs and expenses. Company shall have the right to sell or assign its right, title or interest in this Agreement, and any related agreements, in whole or in part, without the consent of Dealer.

15.    <u>RIGHT OF FIRST REFUSAL</u>:  Dealer shall not sell, grant an option in respect of, nor lease, transfer, or otherwise dispose of by equity transfer, asset sale or otherwise, Dealer's business, or any rights in the Premises, or any assets or properties used in connection with Dealer's business, without first giving Company a sixty (60) day option within which to purchase or otherwise acquire said business and the Premises (or its rights therein) on the same terms and conditions as Dealer is willing to make such disposition to any other third party. Dealer shall give Company prompt written notice of said terms and conditions and shall submit a copy of: (a) any offer which Dealer is willing to accept; and (b) the signed Purchase and Sale Agreement. Such sixty (60) day period shall not commence until Dealer has complied with all of the requirements of this Section 15. An offer by a third party to exchange other property interests owned or to be acquired by it for any interest of Dealer covered by this Section shall be deemed to constitute an offer to purchase for a price equal to the fair market value of the property offered in exchange. Company shall be given access during said sixty (60) day period to Dealer's books and records. If Company exercises its option, it shall do so in writing within sixty (60) days after receipt of such notice and all documents and information required by Company. The closing shall take place not later than sixty (60) days after exercise of such option by Company. In the event that the terms and conditions of an offer are changed or modified in any respect, Dealer shall give Company prompt written notice thereof, and Company shall be provided an additional sixty (60) days after receipt of said notice and all documents and information required by Company within which to exercise its rights pursuant to this Section. At the closing, Dealer shall, in the case of a sale, deliver

to Company a deed, assignment, or bill of sale, as the case may be, conveying a good, marketable and clear title subject only to the liens and encumbrances which are specifically outlined in the proposed terms and conditions of the offer or, in the case of any other disposition, deliver to Company an instrument or instruments in form and substance satisfactory to Company and sufficient to transfer the interest proposed to be transferred. Failure to exercise this option: (a) on one or more occasions shall not affect this right of first refusal on other occasions thereafter arising whether involving the same or other property; and (b) shall in no event be deemed a consent by Company to an assignment of this Agreement.

16.    INDEPENDENT DEALER RELATIONSHIP:  Dealer is not an employee, agent or representative of Company, and does not have the authority to act in any such capacity on behalf of Company.  Any action or representation on behalf of Dealer to the contrary shall constitute fraud. Dealer is an independent business person and is solely responsible for the hiring, discharge, compensation, management, control and work rules of all personnel used or employed by or on behalf of Dealer in connection with its business.  Dealer is solely responsible for the quality of service performed for Dealer's customers.  Dealer is solely responsible for proper handling and satisfactory resolution of claims and complaints by Dealer's customers respecting services performed by Dealer and Dealer's personnel.

17.    TERMINATION AND NON-RENEWAL:  Company may terminate or non-renew this Agreement, the franchise, and the franchise relationship between Company and Dealer, upon any of the following grounds (each, an "Event of Default"):

      a.    In accordance with the applicable provisions of the Petroleum Marketing Practices Act ("PMPA"), if the PMPA then applies to this Agreement;

      b.    Dealer's failure to purchase the Minimum Semi-Annual Gallons and/or Minimum Annual Gallons;

      c.    Breach by Dealer (or any guarantor) of any provision of this Agreement or of any other agreement delivered to Company (or any affiliate);

      d.    Death or dissolution of Dealer, or of any guarantor (only to the extent permitted by, and in accordance with the provision of, applicable statutes);

      e.    Closing of Dealer's business at the Premises or abandonment of the Premises (or failure by Dealer to commence and/or continue the sale of Products hereunder);

      f.    The institution by or against Dealer (or any guarantor) of any bankruptcy, reorganization, insolvency, liquidation, or related proceeding or the making of any assignment for the benefit of creditors; or

      g.    Dealer's violation of, or failure to comply with, any applicable state, federal, or local law or regulation, including, but not limited to those related to:  (a) handling, storage, and/or containment of petroleum products; (b) sale of drugs, narcotics, tobacco, alcohol, or other prohibited or restricted goods or items; or (c) fraud or moral turpitude.

Regardless of whether Company exercises its rights to terminate or non-renew, Company shall also have the right to set-off any amounts, credits, or deposits which it may hold or receive for the benefit of Dealer against any indebtedness of Dealer, and to suspend all deliveries of Product to Dealer until all breaches of the terms hereof are cured (without prejudice to any other rights of Company).

Upon any termination, expiration, or non-renewal of this Agreement, Dealer shall comply with the provisions of Section 8 hereof and with Company's normal post-termination procedures as determined by Company from time to time, and will pay any costs in connection therewith (including any fees, costs, penalties, or amounts due to Supplier as a result thereof). Dealer has no right to terminate this Agreement, except as expressly provided in Section 3.

18.    INTENTIONALLY DELETED.

19.    REMEDIES: Upon the occurrence of any Event of Default, Company shall have the right to: (i) terminate or non-renew this Agreement as provided in Section 17 above; (ii) seek any or all legal and equitable remedies and damages available under applicable laws and under any agreements or instruments delivered to the Company; (iii) be paid for any outstanding accounts receivable; (iv) be paid by Dealer for Company's lost profits for any unfulfilled portion of the Term and any unfulfilled purchase obligations under this Agreement; (v) be repaid for any amounts due to Supplier as a result of such default; and (vi) recover Company's costs of collection, including reasonable attorney's fees.

20.    INTENTIONALLY DELETED.

21.    SATISFACTION OF REIMBURSEMENT AGREEMENT: Dealer's obligations under this Agreement (including all Product purchase obligations) shall survive and continue in effect notwithstanding the expiration, termination, or satisfaction of Dealer's obligations under the Reimbursement Agreement executed herewith.

22.    WAIVER: No waiver by Company of any default of Dealer hereunder shall operate as a waiver of any future default whether of a like or different character. No delay or omission of Company in exercising or enforcing any right or power accruing upon any breach of this Agreement by Dealer shall impair any such right or power, or shall be construed to be a waiver of any breach of this Agreement, or any acquiescence therein.

23.    NOTICES: All notices provided for herein shall be considered as properly given if delivered in writing personally, by certified mail (return receipt requested), or by overnight delivery service, as follows (or to the Premises, in the event of notice to the Dealer):

                    If to Company:        Alliance Energy LLC
                                          800 South Street, Suite 500
                                          Waltham, MA 02453
                                          Attention: Executive Vice President

with a copy to:        Alliance Energy LLC
                          800 South Street, Suite 500
                          Waltham, MA 02453
                          Attention:  Deputy General Counsel

If to Dealer:          Saibaba's Aashirwad Forever Inc.
                          1205 East Lincoln Highway
                          Langhorne, PA 19047

24.    PRIOR AGREEMENTS:   This Agreement supersedes all prior agreements and understandings between the parties pertaining to the matters set forth herein and there are no other agreements of any nature, written or oral, between the parties pertaining to the subject matter hereof.  Except as expressly provided in this Agreement, all amendments or modifications hereto must be in writing and signed by a duly authorized representative of Company.

25.    SEVERABILITY:  If any term or provision of this Agreement or the application hereof shall to any extent be invalid or unenforceable, the remainder shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.  If, at the time of execution of this Agreement (or any other documents delivered herewith), any term or date is inadvertently omitted or left blank, then Dealer hereby authorizes Company to insert and/or complete same.

26.    REPRESENTATIONS OF DEALER:  Dealer warrants and represents the following to Company:

    (a)    Dealer is entering into and signing this Agreement upon Dealer's own free will and choice, and is not acting under the influence of any threat or coercion of Company or its representatives.

    (b)    There have been no promises, claims or representations made to Dealer by Company or its representatives of any kind which are not contained in this Agreement or in another written document signed by and furnished to Dealer by Company as a part of this relationship.

    **(c)    Dealer acknowledges that Company does not make, and specifically disclaims, any warranties as to merchantability or fitness for a particular purpose of any Products sold and delivered hereunder, and further that Company shall not, under any circumstances, be liable for any claims for loss of profits or consequential damages.**

    (d)    Dealer is owner of the Premises (or is lessee by reason of a valid lease agreement with the record owner of the Premises, a copy of which shall be made available to Company, and which has a present term at least equal in duration to the initial Term of this Agreement) and has all permits and licenses necessary to occupy and use the Premises as contemplated by this Agreement.

(e)    The execution, delivery and performance by Dealer of this Agreement will not violate any agreement or other instrument to which Dealer is a party or by which it or any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement, or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets.  Dealer is not currently under agreement with any other supplier of Products and has properly terminated (or completed the Term of) any such prior supply agreement.

(f)    The Premises will be constructed, operated, and maintained in compliance with Supplier's and Company's guidelines and specifications, as same may be modified from time to time, and in compliance with all of Supplier's standards and appearance manuals, at all times during the Term hereof.  Dealer shall participate and comply with (and pay and be responsible for all costs, fees, and penalties in connection with) any "mystery shopper", customer loyalty, or similar programs implemented by Supplier from time to time, and shall pay any "help desk" fees or other service charges received from Supplier in connection with the operation of any systems or equipment on the Premises.

(g)    Dealer agrees not to sell any goods or items which are prohibited by Supplier as a condition of the use of such brand and identifying marks at the Premises.

(h)    NOTHING IN THE AGREEMENT IS CONSTRUED TO PROHIBIT COMPANY FROM SUGGESTING PRICES AND COUNSELING WITH DEALER CONCERNING PRICES.  PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED.  DEALER MAY SELL ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE WHICH IT ALONE MAY DECIDE.

27.    SECURITY:  As security for the payment and performance of any and all liabilities, indebtedness, and obligations (direct or indirect, absolute or contingent, sole, joint or joint and several, secured or unsecured, now existing or hereafter arising or any other type, nature, or description) of Dealer to Company (the "Obligations"), Dealer hereby pledges, assigns, and transfers to Company a continuing security interest in:  (a) any unsold Products at the Premises; and (b) the proceeds of any payment card or electronic sales transactions (collectively, the "Collateral").  Dealer shall, upon Company's request, execute and deliver Form UCC-1 Financing Statements covering the Collateral, in form suitable for recording with the Secretary of State's office.  Dealer further irrevocably constitutes and appoints Company as Dealer's true and lawful attorney for the purpose of signing, filing, and recording, on behalf of Dealer (and/or for filing without signature, if permitted by law), any financing statement or other instrument in order to perfect, protect, or continue Company's interest in the Collateral (and as notice of, and to secure any and all rights of first refusal granted to Company or Dealer, and their respective, and their respective affiliates, as applicable).  Upon the occurrence of an Event of Default by Dealer, and at any time thereafter, Company shall have, in addition to any other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code.

28.    APPLICABLE LAW:  This Agreement shall be governed by and construed in accordance with the Petroleum Marketing Practices Act and the applicable laws of the Commonwealth of

Massachusetts, and Dealer hereby irrevocably consents to the jurisdiction of the state and federal courts located in Massachusetts (should Company elect to proceed in such forum), without regard to any provisions regarding conflicts of law. Company has the right to enforce and require specific performance of all provisions of this Agreement including, but not limited to, Company's right to seek injunctive relief and any other right or remedies available to Company. Dealer acknowledges receipt of a written summary of the provisions of the Petroleum Marketing Practices Act.

29.  ATTORNEYS' FEES:  In the event that any litigation or legal proceeding is brought to enforce or interpret the terms of this Agreement, the prevailing party in such proceeding shall be entitled to recover all its costs, including its reasonable attorneys' fees, paralegals' fees and legal assistants' fees (whether for services incurred in collection, litigation, bankruptcy proceedings, appeals, or otherwise), and all other fees and costs incurred in connection therewith.

30.  DISCLOSURE REQUIREMENTS:  The following information is set forth herein, to the extent applicable, in compliance with applicable law:

a.  The gallonage volume history, if any, of the location under negotiation for and during the three year period immediately past or for the entire period which the location has been supplied by Company, whichever is shorter:
Dealer operated since January 2022.
Company previously supplied for portion of 2021, partial year through 1/1/22 – 2,278,253 gal.

b.  The name and last known address of the previous dealers for the last three years, or for the entire period during which the location has been supplied by Company, whichever is shorter, and the reason for the termination of each dealer's agreement:
Same Dealer.

c.  Any legally binding commitments for the sale, demolition or other disposition of the location:
None

d.  The training programs, if any, and the specific goods and services the Company will provide without cost to the Dealer:
None, except for any signage or branding materials loaned to Dealer hereunder.

e.  Full disclosure of any and all obligations which will be required of the Dealer, including, but not limited to, any obligation to exclusively deal in any of the Products of the Company, its subsidiaries or any other company or any advertising and promotional items that the Dealer must accept:
As provided for in this Agreement.

f.  Full disclosure of all restrictions on the sale, transfer, renewal and termination of the agreement.

As provided for in this Agreement.

31.    TRIAL BY JURY WAIVER: To the fullest extent permitted by law, Dealer and Company hereby waive trial by jury in any court and in any suit, action, or proceeding on any matter arising in connection with or in any way related to the commercial transaction of which this Agreement is a part and/or the enforcement of any of Company's or Dealer's rights and remedies. Dealer and Company acknowledge that they make this waiver knowingly, voluntarily and only after extensive consideration of the ramifications of this waiver.

32.    CLAIMS/RELEASE: Company and Dealer agree that prompt investigation and resolution of any claim by Dealer is to the benefit of both parties. For that reason, and in consideration of the other benefits conferred upon Dealer by this Agreement, Dealer agrees that any claim by Dealer of any kind against Company arising out of this Agreement or otherwise, shall be waived and barred unless: (a) Company is given written notice thereof within thirty (30) days after the event, action, or inaction to which such claim relates, and (b) suit is commenced against Company in a court of competent jurisdiction within twelve (12) months after the event, action, or inaction to which such claim relates. Notwithstanding the foregoing, any claim against Company by Dealer for defect or variance in quality or quantity of Product furnished by Company under this Agreement shall be waived and barred unless Dealer provides Company with written notice thereof within five (5) days after discovery of the defect or variance. Dealer acknowledges that it has no outstanding claims against Company as of the date of this Agreement. As used herein, the terms "Dealer" and "Company" shall be deemed to include their respective successors and assigns.

33.    OFAC CERTIFICATION.  Dealer certifies that it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or by the U.S. Treasury Department as a terrorist, Specially Designated National and Blocked Person, or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control.

34.    SURVIVAL.  The applicable provisions of Sections 6, 8, 10, 13, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 31, and 32 shall survive any termination or non-renewal of this Agreement, in addition to any other right or obligation which has accrued prior thereto.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF the parties hereto have executed this Agreement as an instrument under seal effective as of the date and year first above written.

Company:

ALLIANCE ENERGY LLC

By: _____

Witness

Name: _____
(please print)

Name: _____

Title: _____

Dealer:

SAIBABA'S AASHIRWAD FOREVER INC.

By: _____

Witness

Name: _____
(please print)

Name: CHIRAG DEWAN

Title: PRESIDENT

## RATIFICATION OF PERSONAL GUARANTY

For valuable consideration, the receipt and adequacy of which is hereby acknowledged, the undersigned, personally guaranty to Alliance Energy LLC ("Alliance") all of the obligations of Saibaba's Aashirwad Forever Inc. ("Dealer"), as set forth in that certain:

(a)   foregoing Amended and Restated Dealer Sales Agreement;
(b)   Conditional Assignment and Recognition Agreement; and
(c)   Reimbursement Agreement executed herewith.

in accordance with the terms of that certain Guaranty Agreement dated January 5, 2022. I hereby ratify and confirm that said Guaranty Agreement remains in full force and effect as to all obligations of the Dealer to Alliance.

EXECUTED AS AN INSTRUMENT UNDER SEAL AS OF THE _10th_ DAY OF _____MAY_____, 2022.

GUARANTOR:

Witness
Name:_____
(please print)

_____
Chirag Dewan, an individual residing at:
101 CARLTON DRIVE, CHADDS FORD
PENNSYLVANIA, 19317

## REIMBURSEMENT AGREEMENT

| | |
|---|---|
| **Company** | **Alliance Energy LLC**, a Massachusetts limited liability company |
| **Company's Notice Address** | 800 South Street, Suite 500, Waltham, MA 02453, Attn: Senior Vice President, GDSO, with a copy to Attn: General Counsel |
| **Dealer (and Notice Address)** | **Saibaba's Aashirwad Forever, Inc.**, 1205 East Lincoln Highway, Langhorne, PA 19047. |
| **Premises** | That certain parcel of land owned or leased by Dealer together with the improvements located thereon known as and numbered 1205 East Lincoln Highway, Langhorne, PA 19047. |
| **Amended and Restated Dealer Sales Agreement** | That certain Amended and Restated Dealer Sales Agreement dated as of the date hereof by and between Company and Dealer with respect to the supply of Products to the Premises, as amended from time to time. ***Capitalized terms not otherwise defined herein shall have the meaning set forth in the Amended and Restated Dealer Sales Agreement*** |
| **Minimum Annual Gallons** | **2,520,000** gallons per each year of the term of the Amended and Restated Dealer Sales Agreement |
| **Total Aggregate Gallons** | **25,200,000** gallons per the entire term of the Amended and Restated Dealer Sales Agreement |
| **Maximum Advance** | Up to **$250,000.00** to be made available by the Company to Dealer in either cash, equipment or services in order to facilitate the upgrading of the Premises by completing the Dealer Improvements. |
| **Dealer Improvements Disbursements** | The Maximum Advance of $250,000.00 shall be disbursed to Dealer upon confirmation from Shell Oil Company that the branding requirements for the Premises have been completed and are in good and satisfactory condition. |
| **Amortization Rate** | **$.0099** per gallon |
| **Payment Rate** | Amortization Rate + $.005/gallon |

This Reimbursement Agreement dated effective as of the date Company countersigns the signature page hereto (the "**Agreement**"), is executed by and between the Company and Dealer in connection with the parties' agreement that the upgrading and refurbishing of the Premises consistent with the terms hereof will substantially enhance Dealer's business. In consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto do mutually agree as follows:

1.    FUND ADVANCE; REIMBURSEMENT:  In order to facilitate the upgrading of the Premises, Company agrees to make up to the Maximum Advance available to Dealer for the purpose of completing the Dealer Improvements. The Maximum Advance shall be disbursed and used in accordance with the Terms and Conditions (as defined below). **Dealer acknowledges that Company makes no warranties, express or implied, as to any of the Dealer Improvements provided, paid for, or reimbursed hereunder (Company specifically disclaims any warranties of merchantability or fitness for a particular purpose).**

2.    REPAYMENT/AMORTIZATION:  The amounts of the Maximum Advance disbursed pursuant to the Terms and conditions of Section 1 hereinabove will be amortized at the Amortization Rate for Products purchased and paid for under the Amended and Restated Dealer Sales Agreement. Dealer shall have no right of pre-payment under this Agreement.

3.    BREACH; EVENTS OF DEFAULT:  Dealer agrees that the following shall be considered events of default hereunder ("*Events of Default*"), which Events of Defaults shall be subject to the Terms and Conditions hereof:

      A.    Failure by Dealer to comply with any term or provision of this Agreement, the Amended and Restated Dealer Sales Agreement, or of any other document or instrument executed by Dealer for the benefit of Company;

      B.    Termination of the Amended and Restated Dealer Sales Agreement;

      C.    Failure by any guarantor of Dealer's obligations to Company to comply with any term or provision of their guaranty;

      D.    Death or dissolution of the Dealer or of any guarantor hereof;

      E.    Closing of Dealer's business at the Premises or abandonment of the Premises;

      F.    The institution by or against Dealer (or any guarantor) of any bankruptcy, reorganization, insolvency, liquidation, or related proceeding or the making of any assignment for the benefit of creditors;

      G.    Dealer's failure to comply with any applicable state or federal law and/or regulation relating to the handling, storage and/or containment of petroleum products; or

      H.    Dealer's failure, during any year of the Term of the Amended and Restated Dealer Sales Agreement to purchase Products from Company in an amount equal to or greater than the Dealer's Minimum Annual Gallons requirements (as defined therein).

4.    TERMS AND CONDITIONS: The parties acknowledge and agree that this Agreement is subject to the terms and conditions (the "*Terms and Conditions*" attached hereto as Exhibit A and incorporated herein by reference, which Terms and Conditions constitute material provisions of this Agreement.

5.    REPRESENTATIONS AND AUTHORITY: In the event that Dealer is a limited liability company, corporation or other type of entity, the individual(s) executing this Agreement on behalf of Dealer hereby certifies, represents and warrants to Company: (a) Dealer is duly formed, validly existing and in good standing under the laws of its state of formation, (b) the execution and delivery of this Agreement and any other documents executed by Dealer for the benefit of Company have been duly approved and authorized by all required members, managers, shareholders, directors or other equity holders of Dealer, (c) the execution and delivery of this Agreement does not violate the provisions of any of the Dealer's governing documents nor any other agreement, contract or obligation to which Dealer is a party, and (d) the individual(s) executing this Agreement on behalf of Dealer are duly authorized representatives and signatories of Dealer and are fully vested with all power and authority, each acting singly, to enter into any all agreements with Company on behalf of Dealer.

6.    SATISFACTION OF REIMBURSEMENT AGREEMENT:  This Agreement and the obligations of Dealer hereunder shall not be satisfied until such time as Dealer has also complied in full with the terms and conditions of the Amended and Restated Dealer Sales Agreement (including satisfaction of all product purchase requirements), and provided that all amounts payable hereunder have been paid in full.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as an instrument under seal effective as of the date and year written below.

SAIBABA'S AASHIRWAD FOREVER INC., Dealer

Witness
Name:_____
(please print)

By:_____
Name: Chirag Dewan
Title:   President
Dated:  05/10/2022

ALLIANCE ENERGY LLC, Company

Witness
Name:_____
(please print)

By:_____
Title:_____
Dated:_____

**EXHIBIT A – Terms and Conditions**

**Maximum Advance**: The Maximum Advance shall, at the sole election and discretion of Company, be disbursed as follows: (i) portions of the Maximum Advance may be paid directly to suppliers, vendors and contractors engaged either directly by Dealer or by Company on Dealer's behalf for services, equipment and/or materials related to the Dealer Improvements; and/or (ii) portions of the Maximum Advance may be reimbursed to Dealer by Company for payments made by Dealer to its suppliers, vendors and contractors upon presentation of documents satisfactory to Company evidencing such payments for services, equipment and/or materials related to the Dealer Improvements; and/or (iii) in lieu of disbursement of cash, Company and/or Supplier (as defined in the Amended and Restated Dealer Sales Agreement) may provide equipment, materials and/or installation services related to the Dealer Improvements, the value of which shall be included as part of the Maximum Advance; and/or (iv) such other method of disbursement as Dealer and Company may agree to in writing.

No portion of the Maximum Advance shall be disbursed if Dealer is in breach of any of its obligations or agreements with Company at the time such disbursement is requested. To the extent any portion of the Maximum Advance is being funded by the Supplier, Company's obligation to disburse such portion of the Maximum Advance is expressly conditioned on (i) Company's actual receipt of such amounts from the Supplier and (ii) Dealer's compliance with all requirements or conditions of Supplier relating to such funding.

No portion of the Maximum Advance may be used for any purpose other than the specific Dealer Improvements identified above unless otherwise approved in writing by Company. Dealer acknowledges and agrees that the obtaining of any permits required in connection with completing the Dealer Improvements shall be the sole responsibility of the Dealer, and Company makes no representations as to the availability thereof. Dealer further acknowledges that no portion of the Maximum Advance shall be disbursed until such time as either (a) a Mortgage and Security Agreement covering the Premises (if required by the Company) or (b) a Conditional Assignment of Dealer's lease for the Premises (if required by the Company), each in form and substance acceptable to Company, is executed and delivered to Company, and a satisfactory recording is made thereof (also subject to Company's review and approval of the adequacy of the Premises and title thereto as collateral for said advances), unless such requirement is otherwise waived by Company in its sole discretion. Any disbursement of any portion of the Maximum Advance by Company shall be subject to Dealer's full compliance with any and all governmental orders, statutes, and regulations concerning the Premises. Disbursement of any portion of the Maximum Advance pursuant to the terms of this Agreement must be requested by Dealer within six (6) months of the date hereof; Company's obligations to make any further disbursements of any portion of the Maximum Advance after such date shall be null and void unless Company otherwise agrees to extend such date in writing.

In the event the total amount required to complete the Dealer Improvements exceeds the Maximum Advance (a "*Shortfall*"), Dealer shall be solely responsible for payment of any such Shortfall unless the Company and Dealer otherwise mutually agree as evidenced by a written amendment to this Agreement. In the event Company disburses funds relating to the Dealer Improvements in excess of the Maximum Advance (an "*Over-advance*"), Dealer shall promptly reimburse Company for the total amount of such Over-advance within 10 days of Company's request for such reimbursement unless the Company and Dealer otherwise mutually agree as evidenced by a written amendment to this Agreement. No oral representation by any employee of Company relating to any Shortfall or any Over-advance shall be binding on the Company until evidenced by a written amendment to this Agreement executed by both Company and Dealer.

**Events of Default**. Upon an Event of Default identified in Section 3(H) of this Agreement, Company shall have the right (in addition to and not in lieu of Company's rights upon default as provided hereunder or under the Amended and Restated Dealer Sales Agreement) to demand payment from Dealer, as a cure of such default (the "*Cure Payment*"), in an amount calculated by subtracting (x) the gallons purchased and paid for by Dealer from Company for such year of the Term of the Amended and Restated Dealer Sales Agreement during which said Event of Default occurred, from (y) the Minimum Annual Gallons, and multiplying the difference by the Payment Rate. Said Cure Payment shall be made by Dealer within fifteen (15) days of notice from Company. Failure to pay such Cure Payment shall constitute an Event of Default under this Agreement. In no event shall the payment of any Cure Payment hereunder satisfy or reduce Dealer's obligation to purchase and pay for all required gallons of Products under the Amended and Restated Dealer Sales Agreement.

If any Event of Default shall occur, Company shall be entitled to: (i) be paid by Dealer (in addition to any other amounts which may be due hereunder or under the Amended and Restated Dealer Sales Agreement) an amount calculated by subtracting (x) the gallons of Product purchased and paid for by Dealer from Company under the terms of the Amended and Restated Dealer Sales Agreement as of the date of such notice, from (y) the Total Aggregate Gallons, and multiplying the difference by the Payment Rate; (ii) be paid by Dealer for any amounts due to Company's supplier as a result of such Event of Default and/or debranding of the Premises; and (iii) seek any or all other legal and equitable remedies and damages available by law or under the Amended and Restated Dealer

Sales Agreement or any other agreements or instruments.  Company shall not be required to demand a Cure Payment pursuant to the preceding paragraph before exercising its rights upon occurrence of an Event of Default.

Dealer and Company agree that the foregoing Cure Payment and damages provisions are fair and reasonable estimates of certain actual damages which would be incurred by Company due to Dealer's default under this Agreement, and do not constitute a penalty.

**Security - Grant**:  As security for the payment and performance of any and all liabilities, indebtedness, and obligations (direct or indirect, absolute or contingent, sole, joint or joint and several, secured or unsecured, now existing or hereafter arising or any other type, nature, or description) of Dealer to Company (the "*Obligations*"), Dealer hereby pledges, assigns, and transfers to Company and hereby grants to Company a continuing security interest in the Collateral, as defined below, and all proceeds thereof.  Dealer authorizes Company to file Form UCC-1 Financing Statements with the applicable Secretary of State's office.  Dealer further irrevocably constitutes and appoints Company as Dealer's true and lawful attorney for the purpose of signing, filing, and recording, on behalf of Dealer (and/or for filing without signature, if permitted by law), any financing statement or other instrument in order to perfect, protect, or continue Company's interest in the Collateral.  Upon the occurrence of an Event of Default by Dealer (under this Agreement, the Dealer Sales Agreement, or any other document), and at any time thereafter, Company shall have, in addition to the rights and remedies provided herein or in any other instrument or document executed by Dealer, the rights and remedies of a secured party under the Uniform Commercial Code including, without limitation, the rights to take possession of the Collateral and to sell and dispose of the same.  Dealer hereby agrees to pay on demand all costs and expenses (including reasonable attorney's fees) incurred or paid by Company in enforcing the Obligations on default or collecting amounts outstanding thereunder.  After deducting all costs and expenses of collection, storage, custody, sale or other disposition and delivery (including legal costs and reasonable attorney's fees) and all charges against the Collateral, the residue of the proceeds of any such sale or other disposition shall be applied to the payment of the Obligations, in such order of preference as Company may determine, and Dealer shall remain liable to Company for any deficiency.

Dealer agrees to pay and be responsible for any and all of Company's costs incurred in connection with filing, recording, perfecting, continuing, and enforcing Company's security interest in all collateral and pursuant to any other security instruments, including, but not limited to, the costs of title examinations, recording and filing fees, and mortgage taxes or levies thereon (which amounts may be deducted from the funds to be advanced hereunder).

As used herein, "Collateral" shall mean: *any and all tangible and intangible real and personal property, assets, and rights of the Dealer, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof:  all personal property and fixtures of every kind and nature including all goods (including inventory, equipment, and any accessories thereto), instruments (including promissory notes), documents (including, if applicable, electronic documents), accounts, leases, subleases, chattel paper (whether tangible or electronic), deposit accounts, accounts receivable and proceeds thereof, letter-of-credit rights (whether or not the letter of credit is evidenced by writing), commercial tort claims, securities (including all stockholder, membership, and partnership interests in the Dealer and any other entities, and all certificates thereof), and all other investment property, supporting obligations, and any other contract rights or rights to the payment of money, including claims and proceeds, and all general intangibles (including all payment intangibles), and all goodwill and rights (including franchise rights) under any contracts and agreements.*

**Indemnity**:  Dealer hereby releases and agrees to indemnify and hold Company, its affiliates, agents, servants, employees, successors, and assigns, harmless from and against any and all claims, suits, obligations, liabilities, and damages (including attorney's fees) arising out of, or directly or indirectly relating to:  (a) any failure by Dealer to perform, fulfill, or observe any obligation or liability of Dealer set forth herein, or in any other agreement with Company; (b) any act or omission by Dealer, its agents, servants, employees, invitees, successors, and assigns; (c) operation of Dealer's business including, but not limited to, Dealer's occupancy of the Premises and any personal injury or property damage occurring thereon; (d) violation of any law, ordinance or regulation by, or caused by, Dealer, its agents, servants, employees, invitees, successors, and assigns; (e) purchase, installation, construction, or use of any Dealer Improvements or any equipment; (f) any release, seepage, or leakage of petroleum products or any fire or explosion at the Premises including, but not limited to, at or from any storage tanks, piping, and pumps; and (g) the Comprehensive Environmental Response Compensation and Liability Act of 1980 (herein "*CERCLA*"), the Resource Conservation and Recovery Act of 1976, as amended ("*RCRA*"), or any other federal, state, or local environmental statute, regulation, rule, or ordinance.  The provisions of this Section shall survive any termination or satisfaction of this Agreement.

**Assignment**:  This Agreement shall not be assigned by Dealer without the prior written consent of Company (transfer of a controlling interest in the Dealer shall be deemed to be an assignment requiring Company's consent hereunder).

**Notices**: All notices provided for herein shall be given in accordance with the terms of the Amended and Restated Dealer Sales Agreement.

**Waiver**: No waiver by Company of any default of Dealer hereunder shall operate as a waiver of any future default whether of a like or different character.

**Severability**: If any term or provision of this Agreement or the application hereof shall, to any extent, be invalid or unenforceable, the remainder shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the maximum and fullest extent permitted by law.

**Applicable Law:** This Agreement shall take effect as a sealed instrument and shall be governed by the laws of the Commonwealth of Massachusetts, and Dealer irrevocably consents to the jurisdiction of the state and federal courts located in Massachusetts (should Company elect to proceed in such forum).

**Attorney's Fees**: In the event that any litigation or legal proceeding is brought to enforce or interpret the terms of this Agreement, the prevailing party in such proceeding shall be entitled to recover all its costs, including its reasonable attorneys' fees, paralegals' fees and legal assistants' fees (whether for services incurred in collection, litigation, bankruptcy proceedings, appeals, or otherwise), and all other costs incurred in connection therewith. All amounts due from Dealer hereunder shall bear interest at the rate of one and one-half (1½%) percent per month.

**Prior Agreements**: This Agreement supersedes all prior agreements and understandings between the parties pertaining to the matters set forth herein and there are no other agreements of any nature, written or oral, between the parties pertaining to the subject matter hereof. Except as expressly provided in this Agreement, all amendments or modifications hereto must be in writing and signed by a duly authorized representative of Company.

**Trial by Jury Waiver**: To the fullest extent permitted by law, Dealer and Company hereby waive trial by jury in any court and in any suit, action, or proceeding on any matter arising in connection with or in any way related to the commercial transaction of which this Agreement is a part and/or the enforcement of any of Company's or Dealer's rights and remedies. Dealer and Company acknowledge that they make this waiver knowingly, voluntarily and only after extensive consideration of the ramifications of this waiver. Dealer also acknowledges that Company has not represented to Dealer that the provisions of this Section will not be fully enforced.

**Claims/Release**: Company and Dealer agree that prompt investigation and resolution of any claim by Dealer is to the benefit of both parties. For that reason, and in consideration of the other benefits conferred upon Dealer by this Agreement, Dealer agrees that any claim by Dealer of any kind against Company arising out of this Agreement or otherwise, shall be waived and barred unless: (a) Company is given written notice thereof within thirty (30) days after the event, action, or inaction to which such claim relates, and (b) suit is commenced against Company in a court of competent jurisdiction within twelve (12) months after the event, action, or inaction to which such claim relates. Dealer acknowledges that it has no outstanding claims against Company as of the date of this Agreement. As used herein, the terms "Dealer" and "Company" shall be deemed to include their respective successors and assigns.

# EXHIBIT E



## DEALER SALES AGREEMENT

Dealer Sales Agreement ("Agreement"), made as of the _15_ day of _June_, 2022, by and between Alliance Energy LLC, a Massachusetts limited liability company with a principal place of business located at 800 South Street, Suite 500, Waltham, MA 02453 ("Company"), and Saibaba's Protection Inc., a Pennsylvania corporation ("Dealer") with a principal place of business located at 2355 Market Street (a/k/a 2407 Market Street), Marcus Hook, PA 19061.

WHEREAS, Company and Dealer desire to provide for Dealer's purchase from Company of gasoline and diesel fuel ("Product" or "Products") for resale by Dealer at its station located at 2355 Market Street (a/k/a 2407 Market Street), Marcus Hook, PA 19601 ("Premises") under the trademark and brand identification of EXXON, or under such other trademark and identification as selected by Company from time to time (the current provider of the trademark and brand identification, or any successor provider thereof, is hereinafter referred to as the "Supplier"); and

WHEREAS, Company and Dealer intend by this Agreement to create a "franchise relationship" within the meaning of the Petroleum Marketing Practices Act.

NOW, THEREFORE, Company and Dealer agree as follows:

## WITNESSETH

1.    <u>PRODUCTS AND QUANTITIES</u>:  Company agrees to sell and deliver to Dealer, and Dealer agrees to purchase and receive in relatively equal deliveries from Company, the minimum annual gallons ("Minimum Annual Gallons") and minimum semi-annual gallons ("Minimum Semi-Annual Gallons") of Products set forth below (and subject to adjustment as provided herein):

| Minimum<br>Semi-Annual Gallons | Minimum<br>Annual Gallons |
|---|---|
| 450,000 gal. | 900,000 gal. |

At the end of each six (6) and twelve (12) month period of the Term (as defined hereunder), the Company shall calculate the quantity of Product received and paid for by Dealer from Company during said prior six (6) month or twelve (12) month period, as the case may be for purposes of determining Dealer's compliance with the Minimum Semi-Annual Gallons and Minimum Annual Gallons.  Dealer shall not sell Product at the Premises during the Term of this Agreement (including any extensions hereof), except for those Products supplied by Company.

Dealer hereby acknowledges and agrees that the Minimum Semi-Annual Gallons and Minimum Annual Gallons as provided for herein, are reasonable, important and of material significance to this Agreement and the franchise relationship between the parties.  In the event that the Minimum Annual Gallons are not purchased and paid for by Dealer during any twelve (12) month period, at the sole election of Company and in addition to and not exclusive of any other remedy the Company may choose to exercise under this Agreement or at law, the following twelve (12) month period's Minimum Annual Gallons shall be automatically increased by the previous

period's shortfall. For example, if the Minimum Annual Gallons are 900,000 gallons, and during the first year of the Term the Dealer purchases only 850,000 gallons of Product, then the Minimum Annual Gallons for the following year may (at Company's election, without necessity of notice) be increased to 950,000 gallons.

2.    DELIVERIES:  Company shall deliver Product to Dealer free on board ("F.O.B.") the terminal designated by Company from time to time. Dealer shall bear and discharge all shipping and delivery costs, and title and risk of loss for all Products shall pass to Dealer, upon delivery by Company to the transporting carrier. All Products to be sold and delivered hereunder shall be delivered in such minimum quantities as Company may, in its sole discretion, from time to time determine. Verification of product quantity and quality shall be the sole responsibility of Dealer. Any claim for defect or variance in quality or quantity of Product furnished hereunder shall be made in writing directed to Company as herein provided within five (5) days after discovery of the defect or variance. Dealer shall promptly furnish to Company samples adequate to test the Product claimed to be defective and shall provide Company access to the Premises to take its own samples. Company shall also have the right, but not the obligation, to take meter readings on any product dispensing equipment on the Premises.

3.    TERM:  Unless validly terminated or non-renewed as provided for in the Petroleum Marketing Practices Act, the term of this Agreement shall be for an initial period, commencing on the date that the first transaction for the sale of the Products under this Agreement are processed on the Supplier's credit card network ("Commencement Date"),  and ending on the last day of the one hundred and twentieth (120th) month thereafter ("Initial Term"), and automatically continuing thereafter on a month to month basis on the same terms and conditions (excluding the Minimum Semi-Annual Gallons and Minimum Annual Gallons), unless terminated by either party at the end of the Initial Term or any subsequent extended term by giving to the other party not less than ninety (90) days prior written notice thereof (Dealer's failure to provide such written notice at least ninety (90) days prior to the end of the Initial Term, or any extended term, shall be deemed a waiver of any such rights, and the Term hereof shall then be deemed extended accordingly). Notwithstanding the above, Dealer shall not be entitled to exercise any such termination rights if Dealer has failed to purchase and pay all for all the gallons of Product (9,000,000 gallons) required to be purchased hereunder during the Initial Term ("Total Product Minimum"), or if Dealer is otherwise in default. Dealer agrees to execute an acknowledgment of the Commencement Date Agreement, upon determination by Company thereof, provided, however, that if such acknowledgment is not signed and delivered by the Dealer prior to _____, **2022**, the Commencement Date shall be automatically deemed to be _____, **2022**, without the necessity of further action or execution of any documents by either party.

If, at the time of the expiration of the Initial Term, the Dealer has purchased and paid for at least ninety percent (90%) of the Total Product Minimum (8,100,000 gallons) and is not otherwise in breach or default of this Agreement, Company shall not declare Dealer in default as a result of any shortfall to purchase and pay for the Total Minimum Product, but this Agreement shall be extended through such date as Dealer has purchased and paid for the Total Product Minimum and has provided Company at least ninety (90) days prior written notice of its intent to terminate upon satisfaction of the Total Product Minimum (and otherwise remaining subject to all the terms and provisions hereof). Dealer shall make all good faith efforts to timely purchase and pay for the remaining ten percent (10%) of the Total Product Minimum. If at the expiration of the Initial Term

the Dealer has failed to purchase and pay for ninety percent (90%) of the Total Product Minimum, the term of this Agreement shall renew pursuant to the terms and subject to the termination rights for the Company and Dealer, respectively, outlined above.

4.    PRICES:   For Products and/or other motor fuels, ExxonMobil's posted distributor Philadelphia, PA or closest available ExxonMobil supplied terminal's gross rack price, minus $.04 per gallon, for each respective grade of Product and/or other motor fuels, plus all taxes, environmental fees, surcharges, and freight charges.

5.    TAXES:   Dealer shall pay or reimburse Company, as the case may be, for all taxes including, without limitation, any gasoline taxes, diesel or special fuel excise taxes, sales taxes, use taxes, retailer's occupation taxes, inspection fees, gross receipts taxes, or any similar imposts levied by any federal, state, or local authority upon the transactions covered hereby or measured in any manner by the sales prices to be charged hereunder.

6.    TERMS OF PAYMENT:   Payment for Product shall be made by electronic funds transfer ("EFT") from Dealer's bank account within five (5) days after the date of each delivery.  Dealer shall execute and deliver all such forms and documents as Company may require in order to implement and continue such EFT payments.  Company reserves the right, at its sole discretion, to withdraw any such extension of credit at any time without notice, and demand cash payment on delivery (or to modify payment terms).  Failure of Dealer to make payment in cash or according to authorized credit terms shall entitle Company to suspend deliveries as long as Dealer's account remains overdue, without prejudice to any rights of Company to terminate this Agreement for such breach.  At Company's sole election from time to time, receipts from Dealer's credit card, debit card, or electronic payment transactions (for any purposes) may be applied by Company to amounts due from Dealer (whether or not said amounts are then past due), and Dealer hereby irrevocably assigns to Company all of Dealer's right, title, and interest in and to the proceeds of all debit card, credit card, and electronic payment transactions occurring at the Premises (company shall also retain a security interest in any such proceeds not applied to payments due).  All unpaid accounts owing to Company by Dealer shall bear interest from the due date until paid at the interest rate which is the lower of:  (a) one and one-half (1½%) percent per month; or (b) the maximum rate allowed by law.  Payment for Product shall be due unconditionally; Dealer shall have no right of deduction or set-off.  Company may withhold, setoff, or recoup any amounts due and owing to Dealer, or held by Company on behalf of Dealer under this Agreement, any related or supplemental agreements, or any other agreements between the parties, to be applied to or against any amounts owed by Dealer to Company, or its affiliates.

7.    FORCE MAJEURE:   Company shall be excused for delay or non-performance hereunder if Company shall be unable to meet the demand for its Products with supplies from its normal and usual sources, or if any other contingency, of any nature whatsoever, beyond Company's reasonable control shall occur, including, without limitation, failure or delay of transportation, natural disaster, adverse weather conditions, labor difficulties of any nature, or compliance with any governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary).  In the event of any such contingency, Company shall have the right to curtail deliveries or allocate its available supply of product for sale among its customers in any manner which Company determines, in its sole discretion, is fair, reasonable or required under the circumstances, and Dealer shall not hold Company responsible in any manner for any losses or

damages which Dealer may claim as a result of any such curtailment or allocation by Company. Company shall not be required to make-up any Product not so delivered. In no event shall any force majeure condition affect Dealer's obligation to pay for Product when due.

8.    TRADEMARKS:

(a)    All Products purchased hereunder shall be resold by Dealer at the Premises under the Supplier's identifying marks. Dealer shall display such identifying marks including, without limitation, identification signs, trademarks, tradenames and colors, logos, brand identification, product and service advertising, credit cards, product names and service marks, all in accordance with the Supplier's and Company's approved standards. Dealer shall maintain at its sole cost all such identifying marks and shall repair or replace the same as directed by Company in its sole discretion. As used herein, Company's identifying marks include any marks of which Company is licensee or franchisee. Company reserves the right to change such identifying marks or standards at any time.

(b)    Dealer shall not employ such identifying mark as a part of a corporate, limited liability company, or partnership name. Dealer shall not sell any Products under Supplier's identifying marks except as authorized by Company, and Dealer shall not mix, blend, dilute, adulterate, substitute, or contaminate any Products. Dealer shall not change or alter by any means whatsoever the nature, quality or appearance of any of the Products purchased hereunder. Company shall have the right at all times to inspect and take samples of Products in Dealer's possession to determine quantities or adherence to quality standards and trademark authorizations.

(c)    Upon the expiration, non-renewal or termination of this Agreement for any reason whatsoever, Dealer's authorization to use Supplier's identifying marks, as set forth above, shall expire, and Dealer immediately shall return to Company, at Dealer's expense, all signs, lights, equipment, structures, poles, decals, and other promotional materials carrying such authorized identifying marks; it being understood that all of the same shall be and remain the exclusive property of Company (if Dealer shall fail to return same as required, Company and its agents may enter the Premises and remove same without notice and without liability).

(d)    Dealer does not, and shall not have any claim, right, ownership or other proprietary interest in any brand identification, loyalty program, and/or payment card system that may be utilized in accordance with the terms hereof, or in any equipment or property which may be provided by Company. Dealer agrees to obtain written acknowledgment on forms satisfactory to Company from the owner of said Premises, of Company's exclusive right to said signs, lights, poles, equipment, and identification items and of the right of Company or their agents to remove same from the Premises at any time. Dealer shall provide Company with evidence of insurance sufficient to cover the repair and/or replacement value of all said signs, lights, equipment, poles and identification items. Company shall have exclusive discretion regarding the display or non-display of its authorized identifying marks on pole signs, buildings, and similar prominent places on the Premises.

(e)    Company reserves the right to discontinue or change the grade, specifications, and/or any identifying mark of any Product covered hereby. Dealer acknowledges and agrees that any changes by the Company in the brand identification of the Product sold hereunder will require a

change in the price of the Product to reflect the new brand's rack price (for example, if the brand is changed, the price listed in Section 4 would be changed from the ExxonMobil's posted distributor Philadelphia, PA or closest available ExxonMobil supplied terminal's gross rack price, plus/minus X per gallon to the new supplier's posted distributor or closest new supplier supplied terminal's gross rack price, plus/minus X per gallon). Dealer agrees to promptly sign all documents required by Company to memorialize any such brand and price change. Dealer further acknowledges and agrees that any discounts, incentives, rebates, or other benefits provided by Supplier to Company shall be and remain the sole property of the Company.

9.     MINIMUM STANDARDS:  Dealer shall, at its sole cost and expense, operate or cause to operate its retail facility at the Premises in a clean, neat, safe and healthful manner including all buildings, equipment, underground storage tanks, restrooms, and driveways, and in full compliance with all applicable laws, regulations, and Supplier requirements.

10.    PAYMENT CARDS/ELECTRONIC PAYMENTS:  Dealer shall accept payment cards and other forms of electronic payment which may from time to time be offered through Company for purposes of making retail sales to Dealer's customers for Products sold by Company to Dealer (and for other purposes approved by Company and the payment card issuer or payment processor). All payment card and electronic payment sales at the Premises (including the processing of such sales) must be made in compliance with instructions and regulations supplied by or through Company, or otherwise promulgated by the payment processor, and Dealer acknowledges receipt thereof.  Company, issuer, or processor may, from time to time, amend or supplement said regulations and instructions, or cease to accept one or more types of transactions, without having any liability to Dealer.  Company may refuse to accept any sales or payments not submitted in accordance with the requirements of Company, card issuer, or processor.  Dealer's personal cards shall not be used for any purchase of any Products sold hereunder.  All processing charges associated with the administration of such transactions, and all user fees, POS fees, and satellite connection charges for each terminal or processing equipment utilized, provided, or made available to Dealer by Company, shall be paid by Dealer.

Dealer represents to Company that all payment card or electronic submissions represent actual sales of Product to Dealer's customers in the manner and to the extent set forth therein. Dealer agrees that all payment submissions shall be in conformity with applicable regulations and that any submissions not conforming to said instructions may be rejected or charged back by the card issuer or processor. Dealer agrees that upon such rejection or charge back, the value of the payments which were rejected or charged back (and any associated charges) shall become immediately due and owing from Dealer to Company. All such payments shall be transmitted by such means, to such place(s), and at such time intervals, as Company may designate from time to time. Notwithstanding same, Dealer acknowledges that Company is not the provider or operator of any payment card or other payment systems, and has no liability for same.

Dealer shall be solely responsible for compliance with all federal, state, and local statutes, rules, and regulations regarding the handling and transmission of customer payment card and electronic payment data, and all rules, regulations, instructions, and guidelines of the issuer, processor, and payment card industry relating thereto, including, but not limited to, the PCI Data Security Standard (available at www.pcisecuritystandards.org).  Dealer's obligations shall include, but not be limited to, installation and/or upgrading of all equipment, hardware, and software

necessary to timely comply with issuer, processor, and industry standards and requirements for customer PIN and data entry devices (including Triple Data Encryption Standard usage). Dealer shall release, indemnify, defend (with counsel acceptable to Company), and hold Company harmless from any and all claims, expenses, liabilities, fines, or obligations (including attorney's fees) in the event of Dealer's failure to properly comply with its obligations under this Section, and in connection with any payment card or electronic sales, including, but not limited to, any claims, demands and actions brought by Dealer's customers for alleged losses and damages relating to any privacy or security breach. Dealer further agrees to: (i) implement any policies and procedures required by Company or the payment card issuer, in their sole judgment, with regard to acceptance and processing of such transactions; (ii) participate in (and cause its employees to participate in) any training programs required or established from time to time by Company; and (iii) allow Company, its agents, contractors, and representatives, unrestricted access to all records of credit and debit card transactions, receipts, and transmissions (and as may be necessary to allow a complete audit of such transactions), all at such times as Company shall request (none of the foregoing shall impose any obligation on Company with regard to the handling of payment card and electronic transactions).

Company may suspend its acceptance of payment card and electronic sales in addition to all other rights provided by law and by this Agreement, without liability to Dealer, when Company has reason to believe that any instructions or requirements are not being complied with by Dealer.

11.    INSURANCE: Dealer shall carry and maintain, solely at Dealer's expense, the following insurance with insurers satisfactory to Company:

(a)    Garage Liability Insurance or Commercial General Liability Insurance with Garage Liability endorsements. The insurance shall include, but not be limited to, coverage for the Premises, operations, Products, completed operations and operation, of vehicles owned, non-owned or hired with at least a combined single limit of $1,000,000 per occurrence for bodily injury and/or property damage and $2,000,000 aggregate;

(b)    Property insurance, including coverage for all goods, equipment, and improvements at the Premises which have been financed and/or secured by Company pursuant to the Reimbursement Agreement delivered by Dealer, herewith, keeping same insured (for at least their full replacement value) against all risk of loss, including by fire, casualty, theft, and vandalism;

(c)    Workers compensation and employees liability insurance (for statutory limits) where required by law;

(d)    Business auto liability coverage or operation of vehicles hired, owned or non-owned with a minimum combined single limit of $1,000,000 providing coverage for injury, death, or property damage resulting from each occurrence; and

(e)    Underground Storage Tank Insurance with minimum limits of $1,000,000 dedicated policy limit for underground storage tanks. Dealer can satisfy this requirement by remaining eligible to participate in a state tank fund program as to the Premises.

Policies must be written on a primary and non-contributory basis. Each such policy of insurance shall name Company, Global Partners LP, their subsidiaries, affiliates, successors, and assigns, and such other parties as Company shall designate, as additional insured parties thereunder. All such insurance shall contain such endorsements as the Company shall require and shall provide at least thirty (30) days prior written notice to Company in the event of cancellation. Dealer shall deliver certificates of such insurance to the Company upon execution of this Agreement and thereafter upon Company's request(s) therefor, provided, however, that neither the review, nor failure to review, such certificates or any accompanying endorsements shall constitute acceptance of any modification of, nor waive, alter, or diminish, Company's rights, and Dealer's obligations, under this Section. Company shall be entitled to receive, and Dealer shall be required to maintain, the insurance coverages specified hereinabove, notwithstanding any discrepancies in such certificates. All policies must be provided by a carrier with minimum ratings of A-/VII or better according to A.M. Best, and contain a waiver of subrogation in favor of Company.

12.    COMPLIANCE WITH LAW:  Dealer agrees that in purchasing, receiving, storing, handling, offering for sale, selling, delivering for use or using the Products purchased from Company under this Agreement (and in conducting any business on the Premises), Dealer shall comply and instruct its employees to comply with all applicable federal, state, and local laws, ordinances, regulations, rules, orders and permits, including, without limitation, any of the same governing:  (a) pollution, disposal of waste materials generated at the Premises, lead content, pricing, product containers, brand adulteration, commingling and underground tank gauging requirements; and (b) sales of illegal, prohibited, restricted, or regulated goods or items.

Dealer agrees to pay when due any and all tank fees required to render the Premises eligible for participation in any available underground storage tank cleanup fund or other applicable state tank registration program and to provide Company, on an annual basis, with certifications thereof, and of full compliance of the Premises with any applicable statutes and regulations.

13.    INDEMNITY:  Dealer hereby releases and agrees to indemnify, defend (with counsel acceptable to Company), and hold Company, Supplier, Global Partners LP, and their parents, subsidiaries, affiliates, agents, servants, employees, successors, and assigns harmless from and against any and all claims, suits, obligations, liabilities, and damages (including attorney's fees) arising out of, or directly or indirectly relating to:  (a) any failure by Dealer to perform, fulfill, or observe any obligation or liability of Dealer set forth herein, or in any other agreement with Company (or any of its affiliates); (b) any act or omission by Dealer, its agents, servants, employees, contractors, invitees, successors, and assigns, or any persons or entities under the control or direction of Dealer; (c) operation of Dealer's business including, but not limited to, Dealer's occupancy of the Premises and any personal injury or property damage occurring thereon; (d) violation of any law, ordinance or regulation by, or caused by, Dealer, its agents, servants, employees, contractors, invitees, successors, and assigns, or any persons or entities under the control or direction of Dealer; (e) use of any equipment; (f) any release, seepage, or leakage of petroleum products (including Product) or any other substance, or any fire or explosion at the Premises including, but not limited to, at or from any storage tanks, piping, and pumps; and (g) any failure of Dealer, its agents, servants, employees, invitees, contractors, successors, or assigns to comply with the Comprehensive Environmental Response Compensation and Liability Act of 1980 (herein "CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), or any other federal, state, or local environmental statute, regulation, rule, or ordinance.

All amounts due Company by Dealer by reason of the indemnities and obligations imposed upon Dealer by this Agreement shall become due and payable by Dealer to Company upon demand as a part of Dealer's account to Company. The provisions of this Section shall survive any termination, expiration, or non-renewal of this Agreement.

14.    UNDERLINE ASSIGNMENT OF CONTRACT: This Agreement shall not be assigned by Dealer (a "Transfer"), in whole or in part, without the prior written consent of Company (transfer of a controlling interest in the Dealer shall be deemed to be a Transfer requiring Company's consent). Prior to any Transfer, Dealer shall pay to Company a non-refundable administrative fee in connection with each requested Transfer in an amount to be specified by Company. Company reserves the right to waive all or a portion of the administrative fee in its sole and absolute discretion. Dealer shall also pay to Company administrative fees from time to time imposed by Company in connection with changes in Dealer's operations, name, or business structure, which result in administrative costs or expenses to Company, and in an amount determined by Company to recoup those costs and expenses. Company shall have the right to sell or assign its right, title or interest in this Agreement, and any related agreements, in whole or in part, without the consent of Dealer.

15.    RIGHT OF FIRST REFUSAL: Dealer shall not sell, grant an option in respect of, nor lease, transfer, or otherwise dispose of by equity transfer, asset sale or otherwise, Dealer's business, or any rights in the Premises, or any assets or properties used in connection with Dealer's business, without first giving Company a sixty (60) day option within which to purchase or otherwise acquire said business and the Premises (or its rights therein) on the same terms and conditions as Dealer is willing to make such disposition to any other third party. Dealer shall give Company prompt written notice of said terms and conditions and shall submit a copy of: (a) any offer which Dealer is willing to accept; and (b) the signed Purchase and Sale Agreement. Such sixty (60) day period shall not commence until Dealer has complied with all of the requirements of this Section 15. An offer by a third party to exchange other property interests owned or to be acquired by it for any interest of Dealer covered by this Section shall be deemed to constitute an offer to purchase for a price equal to the fair market value of the property offered in exchange. Company shall be given access during said sixty (60) day period to Dealer's books and records. If Company exercises its option, it shall do so in writing within sixty (60) days after receipt of such notice and all documents and information required by Company. The closing shall take place not later than sixty (60) days after exercise of such option by Company. In the event that the terms and conditions of an offer are changed or modified in any respect, Dealer shall give Company prompt written notice thereof, and Company shall be provided an additional sixty (60) days after receipt of said notice and all documents and information required by Company within which to exercise its rights pursuant to this Section. At the closing, Dealer shall, in the case of a sale, deliver to Company a deed, assignment, or bill of sale, as the case may be, conveying a good, marketable and clear title subject only to the liens and encumbrances which are specifically outlined in the proposed terms and conditions of the offer or, in the case of any other disposition, deliver to Company an instrument or instruments in form and substance satisfactory to Company and sufficient to transfer the interest proposed to be transferred. Failure to exercise this option: (a) on one or more occasions shall not affect this right of first refusal on other occasions thereafter arising whether involving the same or other property; and (b) shall in no event be deemed a consent by Company to an assignment of this Agreement.

16.    INDEPENDENT DEALER RELATIONSHIP: Dealer is not an employee, agent or representative of Company, and does not have the authority to act in any such capacity on behalf of Company. Any action or representation on behalf of Dealer to the contrary shall constitute fraud. Dealer is an independent business person and is solely responsible for the hiring, discharge, compensation, management, control and work rules of all personnel used or employed by or on behalf of Dealer in connection with its business. Dealer is solely responsible for the quality of service performed for Dealer's customers. Dealer is solely responsible for proper handling and satisfactory resolution of claims and complaints by Dealer's customers respecting services performed by Dealer and Dealer's personnel.

17.    TERMINATION AND NON-RENEWAL: Company may terminate or non-renew this Agreement, the franchise, and the franchise relationship between Company and Dealer, upon any of the following grounds (each, an "Event of Default"):

a.    In accordance with the applicable provisions of the Petroleum Marketing Practices Act ("PMPA"), if the PMPA then applies to this Agreement;

b.    Dealer's failure to purchase the Minimum Semi-Annual Gallons and/or Minimum Annual Gallons;

c.    Breach by Dealer (or any guarantor) of any provision of this Agreement or of any other agreement delivered to Company (or any affiliate);

d.    Death or dissolution of Dealer, or of any guarantor (only to the extent permitted by, and in accordance with the provision of, applicable statutes);

e.    Closing of Dealer's business at the Premises or abandonment of the Premises (or failure by Dealer to commence and/or continue the sale of Products hereunder);

f.    The institution by or against Dealer (or any guarantor) of any bankruptcy, reorganization, insolvency, liquidation, or related proceeding or the making of any assignment for the benefit of creditors; or

g.    Dealer's violation of, or failure to comply with, any applicable state, federal, or local law or regulation, including, but not limited to: (a) handling, storage, and/or containment of petroleum products; (b) sale of drugs, narcotics, tobacco, alcohol, or other prohibited or restricted goods or items; or (c) fraud or moral turpitude.

Regardless of whether Company exercises its rights to terminate or non-renew, Company shall also have the right to set-off any amounts, credits, or deposits which it may hold or receive for the benefit of Dealer against any indebtedness of Dealer, and to suspend all deliveries of Product to Dealer until all breaches of the terms hereof are cured (without prejudice to any other rights of Company).

Upon any termination, expiration, or non-renewal of this Agreement, Dealer shall comply with the provisions of Section 8 hereof and with Company's normal post-termination procedures as determined by Company from time to time, and will pay any costs in connection therewith (including any fees, costs, penalties, or amounts due to Supplier as a result thereof). Dealer has no right to terminate this Agreement, except as expressly provided in Section 3.

18.    INTENTIONALLY DELETED.

19.    REMEDIES:  Upon the occurrence of any Event of Default, Company shall have the right to: (i) terminate or non-renew this Agreement as provided in Section 17 above; (ii) seek any or all legal and equitable remedies and damages available under applicable laws and under any agreements or instruments delivered to the Company; (iii) be paid for any outstanding accounts receivable; (iv) be paid by Dealer for Company's lost profits for any unfulfilled portion of the Term and any unfulfilled purchase obligations under this Agreement; (v) be repaid for any amounts due to Supplier as a result of such default; and (vi) recover Company's costs of collection, including reasonable attorney's fees.

20.    INTENTIONALLY DELETED.

21.    SATISFACTION OF REIMBURSEMENT AGREEMENT:  Dealer's obligations under this Agreement (including all Product purchase obligations) shall survive and continue in effect notwithstanding the expiration, termination, or satisfaction of Dealer's obligations under the Reimbursement Agreement executed herewith.

22.    WAIVER:  No waiver by Company of any default of Dealer hereunder shall operate as a waiver of any future default whether of a like or different character.  No delay or omission of Company in exercising or enforcing any right or power accruing upon any breach of this Agreement by Dealer shall impair any such right or power, or shall be construed to be a waiver of any breach of this Agreement, or any acquiescence therein.

23.    NOTICES:  All notices provided for herein shall be considered as properly given if delivered in writing personally, by certified mail (return receipt requested), or by overnight delivery service, as follows (or to the Premises, in the event of notice to the Dealer):

| If to Company: | Alliance Energy LLC<br>800 South Street, Suite 500<br>Waltham, MA 02453<br>Attention:  Executive Vice President |
| --- | --- |
| with a copy to: | Alliance Energy LLC<br>800 South Street, Suite 500<br>Waltham, MA 02453<br>Attention:  Deputy General Counsel |
| If to Dealer: | Saibaba's Protection Inc.<br>2355 Market Street<br>Marcus Hook, PA 19061 |

24.    PRIOR AGREEMENTS:    This Agreement supersedes all prior agreements and understandings between the parties pertaining to the matters set forth herein and there are no other agreements of any nature, written or oral, between the parties pertaining to the subject matter hereof. Except as expressly provided in this Agreement, all amendments or modifications hereto must be in writing and signed by a duly authorized representative of Company.

25.    SEVERABILITY:    If any term or provision of this Agreement or the application hereof shall to any extent be invalid or unenforceable, the remainder shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. If, at the time of execution of this Agreement (or any other documents delivered herewith), any term or date is inadvertently omitted or left blank, then Dealer hereby authorizes Company to insert and/or complete same.

26.    REPRESENTATIONS OF DEALER:    Dealer warrants and represents the following to Company:

(a)    Dealer is entering into and signing this Agreement upon Dealer's own free will and choice, and is not acting under the influence of any threat or coercion of Company or its representatives.

(b)    There have been no promises, claims or representations made to Dealer by Company or its representatives of any kind which are not contained in this Agreement or in another written document signed by and furnished to Dealer by Company as a part of this relationship.

**(c)    Dealer acknowledges that Company does not make, and specifically disclaims, any warranties as to merchantability or fitness for a particular purpose of any Products sold and delivered hereunder, and further that Company shall not, under any circumstances, be liable for any claims for loss of profits or consequential damages.**

(d)    Dealer is owner of the Premises (or is lessee by reason of a valid lease agreement with the record owner of the Premises, a copy of which shall be made available to Company, and which has a present term at least equal in duration to the initial Term of this Agreement) and has all permits and licenses necessary to occupy and use the Premises as contemplated by this Agreement.

(e)    The execution, delivery and performance by Dealer of this Agreement will not violate any agreement or other instrument to which Dealer is a party or by which it or any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement, or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets. Dealer is not currently under agreement with any other supplier of Products and has properly terminated (or completed the Term of) any such prior supply agreement.

(f)    The Premises will be constructed, operated, and maintained in compliance with Supplier's and Company's guidelines and specifications, as same may be modified from time to time, and in compliance with all of Supplier's standards and appearance manuals, at all times during the Term hereof. Dealer shall participate and comply with (and pay and be responsible for all costs, fees, and penalties in connection with) any "mystery shopper", customer loyalty, or similar programs implemented by Supplier from time to time, and shall pay any "help desk" fees or other service charges received from Supplier in connection with the operation of any systems or equipment on the Premises.

(g)    Dealer agrees not to sell any goods or items which are prohibited by Supplier as a condition of the use of such brand and identifying marks at the Premises.

(h)    NOTHING IN THE AGREEMENT IS CONSTRUED TO PROHIBIT COMPANY FROM SUGGESTING PRICES AND COUNSELING WITH DEALER CONCERNING PRICES. PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED. DEALER MAY SELL ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE WHICH IT ALONE MAY DECIDE.

27.    SECURITY:  As security for the payment and performance of any and all liabilities, indebtedness, and obligations (direct or indirect, absolute or contingent, sole, joint or joint and several, secured or unsecured, now existing or hereafter arising or any other type, nature, or description) of Dealer to Company (the "Obligations"), Dealer hereby pledges, assigns, and transfers to Company a continuing security interest in:  (a) any unsold Products at the Premises; and (b) the proceeds of any payment card or electronic sales transactions (collectively, the "Collateral"). Dealer shall, upon Company's request, execute and deliver Form UCC-1 Financing Statements covering the Collateral, in form suitable for recording with the Secretary of State's office. Dealer further irrevocably constitutes and appoints Company as Dealer's true and lawful attorney for the purpose of signing, filing, and recording, on behalf of Dealer (and/or for filing without signature, if permitted by law), any financing statement or other instrument in order to perfect, protect, or continue Company's interest in the Collateral (and as notice of, and to secure any and all rights of first refusal granted to Company or Dealer, and their respective, and their respective affiliates, as applicable). Upon the occurrence of an Event of Default by Dealer, and at any time thereafter, Company shall have, in addition to any other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code.

28.    APPLICABLE LAW:  This Agreement shall be governed by and construed in accordance with the Petroleum Marketing Practices Act and the applicable laws of the Commonwealth of Massachusetts, and Dealer hereby irrevocably consents to the jurisdiction of the state and federal courts located in Massachusetts (should Company elect to proceed in such forum), without regard to any provisions regarding conflicts of law. Company has the right to enforce and require specific performance of all provisions of this Agreement including, but not limited to, Company's right to seek injunctive relief and any other right or remedies available to Company. Dealer acknowledges receipt of a written summary of the provisions of the Petroleum Marketing Practices Act.

29.    ATTORNEYS' FEES:  In the event that any litigation or legal proceeding is brought to enforce or interpret the terms of this Agreement, the prevailing party in such proceeding shall be

entitled to recover all its costs, including its reasonable attorneys' fees, paralegals' fees and legal assistants' fees (whether for services incurred in collection, litigation, bankruptcy proceedings, appeals, or otherwise), and all other fees and costs incurred in connection therewith.

30.    DISCLOSURE REQUIREMENTS:  The following information is set forth herein, to the extent applicable, in compliance with applicable law:

a.    The gallonage volume history, if any, of the location under negotiation for and during the three year period immediately past or for the entire period which the location has been supplied by Company, whichever is shorter:
        Not applicable

b.    The name and last known address of the previous dealers for the last three years, or for the entire period during which the location has been supplied by Company, whichever is shorter, and the reason for the termination of each dealer's agreement:
        Not applicable

c.    Any legally binding commitments for the sale, demolition or other disposition of the location:
        None

d.    The training programs, if any, and the specific goods and services the Company will provide without cost to the Dealer:
        None, except for any signage or branding materials loaned to Dealer hereunder.

e.    Full disclosure of any and all obligations which will be required of the Dealer, including, but not limited to, any obligation to exclusively deal in any of the Products of the Company, its subsidiaries or any other company or any advertising and promotional items that the Dealer must accept:
        As provided for in this Agreement.

f.    Full disclosure of all restrictions on the sale, transfer, renewal and termination of the agreement.
        As provided for in this Agreement.

31.    TRIAL BY JURY WAIVER:  To the fullest extent permitted by law, Dealer and Company hereby waive trial by jury in any court and in any suit, action, or proceeding on any matter arising in connection with or in any way related to the commercial transaction of which this Agreement is a part and/or the enforcement of any of Company's or Dealer's rights and remedies.  Dealer and

Company acknowledge that they make this waiver knowingly, voluntarily and only after extensive consideration of the ramifications of this waiver.

32.    CLAIMS/RELEASE:  Company and Dealer agree that prompt investigation and resolution of any claim by Dealer is to the benefit of both parties.  For that reason, and in consideration of the other benefits conferred upon Dealer by this Agreement, Dealer agrees that any claim by Dealer of any kind against Company arising out of this Agreement or otherwise, shall be waived and barred unless:  (a) Company is given written notice thereof within thirty (30) days after the event, action, or inaction to which such claim relates, and (b) suit is commenced against Company in a court of competent jurisdiction within twelve (12) months after the event, action, or inaction to which such claim relates.  Notwithstanding the foregoing, any claim against Company by Dealer for defect or variance in quality or quantity of Product furnished by Company under this Agreement shall be waived and barred unless Dealer provides Company with written notice thereof within five (5) days after discovery of the defect or variance.  Dealer acknowledges that it has no outstanding claims against Company as of the date of this Agreement.  As used herein, the terms "Dealer" and "Company" shall be deemed to include their respective successors and assigns.

33.    OFAC CERTIFICATION.  Dealer certifies that it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or by the U.S. Treasury Department as a terrorist, Specially Designated National and Blocked Person, or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control.

34.    SURVIVAL.  The applicable provisions of Sections 6, 8, 10, 13, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 31, and 32 shall survive any termination or non-renewal of this Agreement, in addition to any other right or obligation which has accrued prior thereto.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF the parties hereto have executed this Agreement as an instrument under seal effective as of the date and year first above written.

Company:

ALLIANCE ENERGY LLC

By: _____

Witness

Name: _____

(please print)

Name: MARK COSENZA

Title: SR VP

Dealer:

SAIBABA'S PROTECTION INC.

By: _____

Witness

Name: _____

(please print)

Name: CHIRAG DEWAN

Title: PRESIDENT

## REIMBURSEMENT AGREEMENT

| Company | Alliance Energy LLC, a Massachusetts limited liability company |
|---|---|
| **Company's Notice Address** | 800 South Street, Suite 500, Waltham, MA 02453, Attn: Senior Vice President, GDSO, with a copy to Attn: General Counsel |
| **Dealer (and Notice Address)** | Saibaba's Protection, Inc., 2355 Market Street, Marcus Hook, PA 19061. |
| **Premises** | That certain parcel of land owned or leased by Dealer together with the improvements located thereon known as and numbered 2355 Market Street, Marcus Hook, PA 19061. |
| **Dealer Sales Agreement** | That certain Dealer Sales Agreement dated as of the date hereof by and between Company and Dealer with respect to the supply of Products to the Premises, as amended from time to time. *Capitalized terms not otherwise defined herein shall have the meaning set forth in the Dealer Sales Agreement* |
| **Minimum Annual Gallons** | 900,000 gallons per each year of the term of the Dealer Sales Agreement |
| **Total Aggregate Gallons** | 9,000,000 gallons per the entire term of the Dealer Sales Agreement |
| **Maximum Advance** | Up to $165,000.00 to be made available by the Company to Dealer in either cash, equipment or services in order to facilitate the upgrading of the Premises by completing the Dealer Improvements. |
| **Dealer Improvements Disbursements** | Brand conversion, installation of EV Chargers, and other site/store improvements, as follows: (a) up to $100,000.00 upon execution and recording (where applicable) of all required documents; and (b) up to $65,000.00 to be disbursed upon completion of the branding upgrades. |
| **Amortization Rate** | $.0183 per gallon |
| **Payment Rate** | Amortization Rate + $.005/gallon |

This Reimbursement Agreement dated effective as of the date Company countersigns the signature page hereto (the "**Agreement**"), is executed by and between the Company and Dealer in connection with the parties' agreement that the upgrading and refurbishing of the Premises consistent with the terms hereof will substantially enhance Dealer's business. In consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto do mutually agree as follows:

1.      FUND ADVANCE; REIMBURSEMENT:  In order to facilitate the upgrading of the Premises, Company agrees to make up to the Maximum Advance available to Dealer for the purpose of completing the Dealer Improvements. The Maximum Advance shall be disbursed and used in accordance with the Terms and Conditions (as defined below). **Dealer acknowledges that Company makes no warranties, express or implied, as to any of the Dealer Improvements provided, paid for, or reimbursed hereunder (Company specifically disclaims any warranties of merchantability or fitness for a particular purpose).**

2.      REPAYMENT/AMORTIZATION:  The amounts of the Maximum Advance disbursed pursuant to the Terms and conditions of Section 1 hereinabove will be amortized at the Amortization Rate for Products purchased and paid for under the Dealer Sales Agreement.  Dealer shall have no right of pre-payment under this Agreement.

3.      BREACH; EVENTS OF DEFAULT:  Dealer agrees that the following shall be considered events of default hereunder ("*Events of Default*"), which Events of Defaults shall be subject to the Terms and Conditions hereof:

A.      Failure by Dealer to comply with any term or provision of this Agreement, the Dealer Sales Agreement, or of any other document or instrument executed by Dealer for the benefit of Company;

B.      Termination of the Dealer Sales Agreement;

C.      Failure by any guarantor of Dealer's obligations to Company to comply with any term or provision of their guaranty;

D.      Death or dissolution of the Dealer or of any guarantor hereof;

E.      Closing of Dealer's business at the Premises or abandonment of the Premises;

F.      The institution by or against Dealer (or any guarantor) of any bankruptcy, reorganization, insolvency, liquidation, or related proceeding or the making of any assignment for the benefit of creditors;

G.      Dealer's failure to comply with any applicable state or federal law and/or regulation relating to the handling, storage and/or containment of petroleum products; or

H.      Dealer's failure, during any year of the Term of the Dealer Sales Agreement to purchase Products from Company in an amount equal to or greater than the Dealer's Minimum Annual Gallons requirements (as defined therein).

4.    TERMS AND CONDITIONS: The parties acknowledge and agree that this Agreement is subject to the terms and conditions (the "*Terms and Conditions*" attached hereto as Exhibit A and incorporated herein by reference, which Terms and Conditions constitute material provisions of this Agreement.

5.    REPRESENTATIONS AND AUTHORITY: In the event that Dealer is a limited liability company, corporation or other type of entity, the individual(s) executing this Agreement on behalf of Dealer hereby certifies, represents and warrants to Company: (a) Dealer is duly formed, validly existing and in good standing under the laws of its state of formation, (b) the execution and delivery of this Agreement and any other documents executed by Dealer for the benefit of Company have been duly approved and authorized by all required members, managers, shareholders, directors or other equity holders of Dealer, (c) the execution and delivery of this Agreement does not violate the provisions of any of the Dealer's governing documents nor any other agreement, contract or obligation to which Dealer is a party, and (d) the individual(s) executing this Agreement on behalf of Dealer are duly authorized representatives and signatories of Dealer and are fully vested with all power and authority, each acting singly, to enter into any all agreements with Company on behalf of Dealer.

6.    SATISFACTION OF REIMBURSEMENT AGREEMENT:  This Agreement and the obligations of Dealer hereunder shall not be satisfied until such time as Dealer has also complied in full with the terms and conditions of the Dealer Sales Agreement (including satisfaction of all product purchase requirements), and provided that all amounts payable hereunder have been paid in full.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as an instrument under seal effective as of the date and year written below.

Witness
Name: _____
(please print)

Witness
Name: _____
(please print)

SAIBABA'S PROTECTION INC., Dealer

By: _____
Name: Chirag Dewan
Title:    President
Dated:  05/10/2022

ALLIANCE ENERGY LLC, Company

By: _____
Title: _____
Dated: _____

**EXHIBIT A – Terms and Conditions**

**Maximum Advance**: The Maximum Advance shall, at the sole election and discretion of Company, be disbursed as follows: (i) portions of the Maximum Advance may be paid directly to suppliers, vendors and contractors engaged either directly by Dealer or by Company on Dealer's behalf for services, equipment and/or materials related to the Dealer Improvements; and/or (ii) portions of the Maximum Advance may be reimbursed to Dealer by Company for payments made by Dealer to its suppliers, vendors and contractors upon presentation of documents satisfactory to Company evidencing such payments for services, equipment and/or materials related to the Dealer Improvements; and/or (iii) in lieu of disbursement of cash, Company and/or Supplier (as defined in the Dealer Sales Agreement) may provide equipment, materials and/or installation services related to the Dealer Improvements, the value of which shall be included as part of the Maximum Advance; and/or (iv) such other method of disbursement as Dealer and Company may agree to in writing.

No portion of the Maximum Advance shall be disbursed if Dealer is in breach of any of its obligations or agreements with Company at the time such disbursement is requested. To the extent any portion of the Maximum Advance is being funded by the Supplier, Company's obligation to disburse such portion of the Maximum Advance is expressly conditioned on (i) Company's actual receipt of such amounts from the Supplier and (ii) Dealer's compliance with all requirements or conditions of Supplier relating to such funding.

No portion of the Maximum Advance may be used for any purpose other than the specific Dealer Improvements identified above unless otherwise approved in writing by Company. Dealer acknowledges and agrees that the obtaining of any permits required in connection with completing the Dealer Improvements shall be the sole responsibility of the Dealer, and Company makes no representations as to the availability thereof.   Dealer further acknowledges that no portion of the Maximum Advance shall be disbursed until such time as either (a) a Mortgage and Security Agreement covering the Premises (if required by the Company) or (b) a Conditional Assignment of Dealer's lease for the Premises (if required by the Company), each in form and substance acceptable to Company, is executed and delivered to Company, and a satisfactory recording is made thereof (also subject to Company's review and approval of the adequacy of the Premises and title thereto as collateral for said advances), unless such requirement is otherwise waived by Company in its sole discretion.  Any disbursement of any portion of the Maximum Advance by Company shall be subject to Dealer's full compliance with any and all governmental orders, statutes, and regulations concerning the Premises.  Disbursement of any portion of the Maximum Advance pursuant to the terms of this Agreement must be requested by Dealer within six (6) months of the date hereof; Company's obligations to make any further disbursements of any portion of the Maximum Advance after such date shall  be null and void unless Company otherwise agrees to extend such date in writing.

In the event the total amount required to complete the Dealer Improvements exceeds the Maximum Advance (a "*Shortfall*"), Dealer shall be solely responsible for payment of any such Shortfall unless the Company and Dealer otherwise mutually agree as evidenced by a written amendment to this Agreement. In the event Company disburses funds relating to the Dealer Improvements in excess of the Maximum Advance (an "*Over-advance*"), Dealer shall promptly reimburse Company for the total amount of such Over-advance within 10 days of Company's request for such reimbursement unless the Company and Dealer otherwise mutually agree as evidenced by a written amendment to this Agreement.  No oral representation by any employee of Company relating to any Shortfall or any Over-advance shall be binding on the Company until evidenced by a written amendment to this Agreement executed by both Company and Dealer.

**Events of Default**. Upon an Event of Default identified in Section 3(H) of this Agreement, Company shall have the right (in addition to and not in lieu of Company's rights upon default as provided hereunder or under the Dealer Sales Agreement) to demand payment from Dealer, as a cure of such default (the "*Cure Payment*"), in an amount calculated by subtracting (x) the gallons purchased and paid for by Dealer from Company for such year of the Term of the Dealer Sales Agreement during which said Event of Default occurred, from (y) the Minimum Annual Gallons, and multiplying the difference by the Payment Rate.  Said Cure Payment shall be made by Dealer within fifteen (15) days of notice from Company.  Failure to pay such Cure Payment shall constitute an Event of Default under this Agreement. In no event shall the payment of any Cure Payment hereunder satisfy or reduce Dealer's obligation to purchase and pay for all required gallons of Products under the Dealer Sales Agreement.

If any Event of Default shall occur, Company shall be entitled to:  (i) be paid by Dealer (in addition to any other amounts which may be due hereunder or under the Dealer Sales Agreement) an amount calculated by subtracting (x) the gallons of Product purchased and paid for by Dealer from Company under the terms of the Dealer Sales Agreement as of the date of such notice, from (y) the Total Aggregate Gallons, and multiplying the difference by the Payment Rate; (ii) be paid by Dealer for any amounts due to Company's supplier as a result of such Event of Default and/or debranding of the Premises; and (iii) seek any or all other legal and equitable remedies and damages available by law or under the Dealer Sales Agreement or any other agreements or instruments. Company shall not be required to demand a Cure Payment pursuant to the preceding paragraph before exercising its rights upon occurrence of an Event of Default.

Dealer and Company agree that the foregoing Cure Payment and damages provisions are fair and reasonable estimates of certain actual damages which would be incurred by Company due to Dealer's default under this Agreement, and do not constitute a penalty.

**Security - Grant**:  As security for the payment and performance of any and all liabilities, indebtedness, and obligations (direct or indirect, absolute or contingent, sole, joint or joint and several, secured or unsecured, now existing or hereafter arising or any other type, nature, or description) of Dealer to Company (the "*Obligations*"), Dealer hereby pledges, assigns, and transfers to Company and hereby grants to Company a continuing security interest in the Collateral, as defined below, and all proceeds thereof.  Dealer authorizes Company to file Form UCC-1 Financing Statements with the applicable Secretary of State's office.  Dealer further irrevocably constitutes and appoints Company as Dealer's true and lawful attorney for the purpose of signing, filing, and recording, on behalf of Dealer (and/or for filing without signature, if permitted by law), any financing statement or other instrument in order to perfect, protect, or continue Company's interest in the Collateral.  Upon the occurrence of an Event of Default by Dealer (under this Agreement, the Dealer Sales Agreement, or any other document), and at any time thereafter, Company shall have, in addition to the rights and remedies provided herein or in any other instrument or document executed by Dealer, the rights and remedies of a secured party under the Uniform Commercial Code including, without limitation, the rights to take possession of the Collateral and to sell and dispose of the same.  Dealer hereby agrees to pay on demand all costs and expenses (including reasonable attorney's fees) incurred or paid by Company in enforcing the Obligations on default or collecting amounts outstanding thereunder.  After deducting all costs and expenses of collection, storage, custody, sale or other disposition and delivery (including legal costs and reasonable attorney's fees) and all charges against the Collateral, the residue of the proceeds of any such sale or other disposition shall be applied to the payment of the Obligations, in such order of preference as Company may determine, and Dealer shall remain liable to Company for any deficiency.

Dealer agrees to pay and be responsible for any and all of Company's costs incurred in connection with filing, recording, perfecting, continuing, and enforcing Company's security interest in all collateral and pursuant to any other security instruments, including, but not limited to, the costs of title examinations, recording and filing fees, and mortgage taxes or levies thereon (which amounts may be deducted from the funds to be advanced hereunder).

As used herein, "Collateral" shall mean: *any and all tangible and intangible real and personal property, assets, and rights of the Dealer, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof:  all personal property and fixtures of every kind and nature including all goods (including inventory, equipment, and any accessories thereto), instruments (including promissory notes), documents (including, if applicable, electronic documents), accounts, leases, subleases, chattel paper (whether tangible or electronic), deposit accounts, accounts receivable and proceeds thereof, letter-of-credit rights (whether or not the letter of credit is evidenced by writing), commercial tort claims, securities (including all stockholder, membership, and partnership interests in the Dealer and any other entities, and all certificates thereof), and all other investment property, supporting obligations, and any other contract rights or rights to the payment of money, including claims and proceeds, and all general intangibles (including all payment intangibles), and all goodwill and rights (including franchise rights) under any contracts and agreements.*

**Indemnity**:  Dealer hereby releases and agrees to indemnify and hold Company, its affiliates, agents, servants, employees, successors, and assigns, harmless from and against any and all claims, suits, obligations, liabilities, and damages (including attorney's fees) arising out of, or directly or indirectly relating to:  (a) any failure by Dealer to perform, fulfill, or observe any obligation or liability of Dealer set forth herein, or in any other agreement with Company; (b) any act or omission by Dealer, its agents, servants, employees, invitees, successors, and assigns; (c) operation of Dealer's business including, but not limited to, Dealer's occupancy of the Premises and any personal injury or property damage occurring thereon; (d) violation of any law, ordinance or regulation by, or caused by, Dealer, its agents, servants, employees, invitees, successors, and assigns; (e) purchase, installation, construction, or use of any Dealer Improvements or any equipment; (f) any release, seepage, or leakage of petroleum products or any fire or explosion at the Premises including, but not limited to, at or from any storage tanks, piping, and pumps; and (g) the Comprehensive Environmental Response Compensation and Liability Act of 1980 (herein "*CERCLA*"), the Resource Conservation and Recovery Act of 1976, as amended ("*RCRA*"), or any other federal, state, or local environmental statute, regulation, rule, or ordinance.  The provisions of this Section shall survive any termination or satisfaction of this Agreement.

**Assignment**:  This Agreement shall not be assigned by Dealer without the prior written consent of Company (transfer of a controlling interest in the Dealer shall be deemed to be an assignment requiring Company's consent hereunder).

**Notices**:  All notices provided for herein shall be given in accordance with the terms of the Dealer Sales Contract.

**Waiver**: No waiver by Company of any default of Dealer hereunder shall operate as a waiver of any future default whether of a like or different character.

**Severability**: If any term or provision of this Agreement or the application hereof shall, to any extent, be invalid or unenforceable, the remainder shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the maximum and fullest extent permitted by law.

**Applicable Law**: This Agreement shall take effect as a sealed instrument and shall be governed by the laws of the Commonwealth of Massachusetts, and Dealer irrevocably consents to the jurisdiction of the state and federal courts located in Massachusetts (should Company elect to proceed in such forum).

**Attorney's Fees**: In the event that any litigation or legal proceeding is brought to enforce or interpret the terms of this Agreement, the prevailing party in such proceeding shall be entitled to recover all its costs, including its reasonable attorneys' fees, paralegals' fees and legal assistants' fees (whether for services incurred in collection, litigation, bankruptcy proceedings, appeals, or otherwise), and all other costs incurred in connection therewith. All amounts due from Dealer hereunder shall bear interest at the rate of one and one-half (1½%) percent per month.

**Prior Agreements**: This Agreement supersedes all prior agreements and understandings between the parties pertaining to the matters set forth herein and there are no other agreements of any nature, written or oral, between the parties pertaining to the subject matter hereof. Except as expressly provided in this Agreement, all amendments or modifications hereto must be in writing and signed by a duly authorized representative of Company.

**Trial by Jury Waiver**: To the fullest extent permitted by law, Dealer and Company hereby waive trial by jury in any court and in any suit, action, or proceeding of any matter arising in connection with or in any way related to the commercial transaction of which this Agreement is a part and/or the enforcement of any of Company's or Dealer's rights and remedies. Dealer and Company acknowledge that they make this waiver knowingly, voluntarily and only after extensive consideration of the ramifications of this waiver. Dealer also acknowledges that Company has not represented to Dealer that the provisions of this Section will not be fully enforced.

**Claims/Release**: Company and Dealer agree that prompt investigation and resolution of any claim by Dealer is to the benefit of both parties. For that reason, and in consideration of the other benefits conferred upon Dealer by this Agreement, Dealer agrees that any claim by Dealer of any kind against Company arising out of this Agreement or otherwise, shall be waived and barred unless: (a) Company is given written notice thereof within thirty (30) days after the event, action, or inaction to which such claim relates, and (b) suit is commenced against Company in a court of competent jurisdiction within twelve (12) months after the event, action, or inaction to which such claim relates. Dealer acknowledges that it has no outstanding claims against Company as of the date of this Agreement. As used herein, the terms "Dealer" and "Company" shall be deemed to include their respective successors and assigns.

# EXHIBIT F

## DEALER SALES AGREEMENT

Dealer Sales Agreement ("Agreement"), made as of the **3rd** day of **October**, 2022, by and between Alliance Energy LLC, a Massachusetts limited liability company with a principal place of business located at 800 South Street, Suite 500, Waltham, MA 02453 ("Company"), and Saibaba's Aashirwad Forever Inc., a Pennsylvania corporation ("Dealer") with a principal place of business located at 200 West Montgomery Avenue, Ardmore, Pennsylvania 19003.

WHEREAS, Company and Dealer desire to provide for Dealer's purchase from Company of gasoline and diesel fuel ("Product" or "Products") for resale by Dealer at its station located at 4247 Swamp Road (a/k/a 4247 West Swamp Road), Doylestown, Pennsylvania 18902 ("Premises") under the trademark and brand identification of SHELL, or under such other trademark and identification as selected by Company from time to time (the current provider of the trademark and brand identification, or any successor provider thereof, is hereinafter referred to as the "Supplier"); and

WHEREAS, Company and Dealer intend by this Agreement to create a "franchise relationship" within the meaning of the Petroleum Marketing Practices Act.

NOW, THEREFORE, Company and Dealer agree as follows:

## WITNESSETH

1.   <u>PRODUCTS AND QUANTITIES</u>:  Company agrees to sell and deliver to Dealer, and Dealer agrees to purchase and receive in relatively equal deliveries from Company, the minimum annual gallons ("Minimum Annual Gallons") and minimum semi-annual gallons ("Minimum Semi-Annual Gallons") of Products set forth below (and subject to adjustment as provided herein):

| Minimum<br>Semi-Annual Gallons | Minimum<br>Annual Gallons |
|---|---|
| 560,000 gal. | 1,120,000 gal. |

At the end of each six (6) and twelve (12) month period of the Term (as defined hereunder), the Company shall calculate the quantity of Product received and paid for by Dealer from Company during said prior six (6) month or twelve (12) month period, as the case may be for purposes of determining Dealer's compliance with the Minimum Semi-Annual Gallons and Minimum Annual Gallons. Dealer shall not sell Product at the Premises during the Term of this Agreement (including any extensions hereof), except for those Products supplied by Company.

Dealer hereby acknowledges and agrees that the Minimum Semi-Annual Gallons and Minimum Annual Gallons as provided for herein, are reasonable, important and of material significance to this Agreement and the franchise relationship between the parties. In the event that the Minimum Annual Gallons are not purchased and paid for by Dealer during any twelve (12) month period, at the sole election of Company and in addition to and not exclusive of any other

remedy the Company may choose to exercise under this Agreement or at law, the following twelve (12) month period's Minimum Annual Gallons shall be automatically increased by the previous period's shortfall. For example, if the Minimum Annual Gallons are 1,120,000 gallons, and during the first year of the Term the Dealer purchases only 1,000,000 gallons of Product, then the Minimum Annual Gallons for the following year may (at Company's election, without necessity of notice) be increased to 1,240,000 gallons.

2.    DELIVERIES:  Company shall deliver Product to Dealer free on board ("F.O.B.") the terminal designated by Company from time to time. Dealer shall bear and discharge all shipping and delivery costs, and title and risk of loss for all Products shall pass to Dealer, upon delivery by Company to the transporting carrier. All Products to be sold and delivered hereunder shall be delivered in such minimum quantities as Company may, in its sole discretion, from time to time determine. Verification of product quantity and quality shall be the sole responsibility of Dealer. Any claim for defect or variance in quality or quantity of Product furnished hereunder shall be made in writing directed to Company as herein provided within five (5) days after discovery of the defect or variance. Dealer shall promptly furnish to Company samples adequate to test the Product claimed to be defective and shall provide Company access to the Premises to take its own samples. Company shall also have the right, but not the obligation, to take meter readings on any product dispensing equipment on the Premises.

3.    TERM:  Unless validly terminated or non-renewed as provided for in the Petroleum Marketing Practices Act, the term of this Agreement shall be for an initial period, commencing on the execution of the Mutual Termination Agreement executed simultaneously herewith by and between Cross Keys Petroleum LLC (the preceding Dealer at the Premises whose contract with the Company expires as of October 31, 2022) and the Company ("Commencement Date"), and ending on the last day of the one hundred and twentieth (120th) month thereafter ("Initial Term"), and automatically continuing thereafter on a month to month basis on the same terms and conditions (excluding the Minimum Semi-Annual Gallons and Minimum Annual Gallons), unless terminated by either party at the end of the Initial Term or any subsequent extended term by giving to the other party not less than ninety (90) days prior written notice thereof (Dealer's failure to provide such written notice at least ninety (90) days prior to the end of the Initial Term, or any extended term, shall be deemed a waiver of any such rights, and the Term hereof shall then be deemed extended accordingly). Notwithstanding the above, Dealer shall not be entitled to exercise any such termination right if Dealer has failed to purchase and pay all for all the gallons of Product (11,200,000 gallons) required to be purchased hereunder during the Initial Term ("Total Product Minimum"), or if Dealer is otherwise in default. Dealer agrees to execute an acknowledgment of the Commencement Date Agreement, upon determination by Company thereof, provided, however, that if such acknowledgment is not signed and delivered by the Dealer prior to **November 1, 2022**, the Commencement Date shall be automatically deemed to be **November 1, 2022**, without the necessity of further action or execution of any documents by either party.

If, at the time of the expiration of the Initial Term, the Dealer has purchased and paid for at least ninety percent (90%) of the Total Product Minimum (10,080,000 gallons) and is not otherwise in breach or default of this Agreement, Company shall not declare Dealer in default as a result of any shortfall to purchase and pay for the Total Minimum Product, but this Agreement shall be extended through such date as Dealer has purchased and paid for the Total Product Minimum and has provided Company at least ninety (90) days prior written notice of its intent to terminate upon

satisfaction of the Total Product Minimum (and otherwise remaining subject to all the terms and provisions hereof). Dealer shall make all good faith efforts to timely purchase and pay for the remaining ten percent (10%) of the Total Product Minimum. If at the expiration of the Initial Term the Dealer has failed to purchase and pay for ninety percent (90%) of the Total Product Minimum, the term of this Agreement shall renew pursuant to the terms and subject to the termination rights for the Company and Dealer, respectively, outlined above.

4.      PRICES:  For Products and/or other motor fuels, Shell's posted distributor Philadelphia, PA or closest available Shell supplied terminal's rack price: (i) minus $.055 per gallon, for each respective grade of Product and/or other motor fuels, (ii) less a discount equal to one (1%) percent of said rack price (provided that said discount is actually received by Company from its supplier), and (iii) plus all taxes, environmental fees, surcharges, and freight charges.

5.      TAXES:  Dealer shall pay or reimburse Company, as the case may be, for all taxes including, without limitation, any gasoline taxes, diesel or special fuel excise taxes, sales taxes, use taxes, retailer's occupation taxes, inspection fees, gross receipts taxes, or any similar imposts levied by any federal, state, or local authority upon the transactions covered hereby or measured in any manner by the sales prices to be charged hereunder.

6.      TERMS OF PAYMENT:  Payment for Product shall be made by electronic funds transfer ("EFT") from Dealer's bank account within five (5) days after the date of each delivery.  Dealer shall execute and deliver all such forms and documents as Company may require in order to implement and continue such EFT payments.  Company reserves the right, at its sole discretion, to withdraw any such extension of credit at any time without notice, and demand cash payment on delivery (or to modify payment terms).  Failure of Dealer to make payment in cash or according to authorized credit terms shall entitle Company to suspend deliveries as long as Dealer's account remains overdue, without prejudice to any rights of Company to terminate this Agreement for such breach.  At Company's sole election from time to time, receipts from Dealer's credit card, debit card, or electronic payment transactions (for any purposes) may be applied by Company to amounts due from Dealer (whether or not said amounts are then past due), and Dealer hereby irrevocably assigns to Company all of Dealer's right, title, and interest in and to the proceeds of all debit card, credit card, and electronic payment transactions occurring at the Premises (company shall also retain a security interest in any such proceeds not applied to payments due).  All unpaid accounts owing to Company by Dealer shall bear interest from the due date until paid at the interest rate which is the lower of:  (a) one and one-half (1½%) percent per month; or (b) the maximum rate allowed by law.  Payment for Product shall be due unconditionally; Dealer shall have no right of deduction or set-off.  Company may withhold, setoff, or recoup any amounts due and owing to Dealer, or held by Company on behalf of Dealer under this Agreement, any related or supplemental agreements, or any other agreements between the parties, to be applied to or against any amounts owed by Dealer to Company, or its affiliates.

7.      FORCE MAJEURE:  Company shall be excused for delay or non-performance hereunder if Company shall be unable to meet the demand for its Products with supplies from its normal and usual sources, or if any other contingency, of any nature whatsoever, beyond Company's reasonable control shall occur, including, without limitation, failure or delay of transportation, natural disaster, adverse weather conditions, labor difficulties of any nature, or compliance with any governmental order, regulation, recommendation, request or allocation program (whether

voluntary or involuntary). In the event of any such contingency, Company shall have the right to curtail deliveries or allocate its available supply of product for sale among its customers in any manner which Company determines, in its sole discretion, is fair, reasonable or required under the circumstances, and Dealer shall not hold Company responsible in any manner for any losses or damages which Dealer may claim as a result of any such curtailment or allocation by Company. Company shall not be required to make-up any Product not so delivered. In no event shall any force majeure condition affect Dealer's obligation to pay for Product when due.

8.    TRADEMARKS:

(a)    All Products purchased hereunder shall be resold by Dealer at the Premises under the Supplier's identifying marks. Dealer shall display such identifying marks including, without limitation, identification signs, trademarks, tradenames and colors, logos, brand identification, product and service advertising, credit cards, product names and service marks, all in accordance with the Supplier's and Company's approved standards. Dealer shall maintain at its sole cost all such identifying marks and shall repair or replace the same as directed by Company in its sole discretion. As used herein, Company's identifying marks include any marks of which Company is licensee or franchisee. Company reserves the right to change such identifying marks or standards at any time.

(b)    Dealer shall not employ such identifying mark as a part of a corporate, limited liability company, or partnership name. Dealer shall not sell any Products under Supplier's identifying marks except as authorized by Company, and Dealer shall not mix, blend, dilute, adulterate, substitute, or contaminate any Products. Dealer shall not change or alter by any means whatsoever the nature, quality or appearance of any of the Products purchased hereunder. Company shall have the right at all times to inspect and take samples of Products in Dealer's possession to determine quantities or adherence to quality standards and trademark authorizations.

(c)    Upon the expiration, non-renewal or termination of this Agreement for any reason whatsoever, Dealer's authorization to use Supplier's identifying marks, as set forth above, shall expire, and Dealer immediately shall return to Company, at Dealer's expense, all signs, lights, equipment, structures, poles, decals, and other promotional materials carrying such authorized identifying marks; it being understood that all of the same shall be and remain the exclusive property of Company (if Dealer shall fail to return same as required, Company and its agents may enter the Premises and remove same without notice and without liability).

(d)    Dealer does not, and shall not have any claim, right, ownership or other proprietary interest in any brand identification, loyalty program, and/or payment card system that may be utilized in accordance with the terms hereof, or in any equipment or property which may be provided by Company. Dealer agrees to obtain written acknowledgment on forms satisfactory to Company from the owner of said Premises, of Company's exclusive right to said signs, lights, poles, equipment, and identification items and of the right of Company or their agents to remove same from the Premises at any time. Dealer shall provide Company with evidence of insurance sufficient to cover the repair and/or replacement value of all said signs, lights, equipment, poles and identification items. Company shall have exclusive discretion regarding the display or non-display of its authorized identifying marks on pole signs, buildings, and similar prominent places on the Premises.

(e)     Company reserves the right to discontinue or change the grade, specifications, and/or any identifying mark of any Product covered hereby. Dealer acknowledges and agrees that any changes by the Company in the brand identification of the Product sold hereunder will require a change in the price of the Product to reflect the new brand's rack price (for example, if the brand is changed, the price listed in Section 4 would be changed from the Shell's posted distributor Philadelphia, PA or closest available Shell supplied terminal's gross rack price, plus/minus X per gallon to the new supplier's posted distributor or closest new supplier supplied terminal's gross rack price, plus/minus X per gallon). Dealer agrees to promptly sign all documents required by Company to memorialize any such brand and price change, if any. Dealer further acknowledges and agrees that any discounts, incentives, rebates, or other benefits provided by Supplier to Company shall be and remain the sole property of the Company.

9.     <u>MINIMUM STANDARDS</u>: Dealer shall, at its sole cost and expense, operate or cause to operate its retail facility at the Premises in a clean, neat, safe and healthful manner including all buildings, equipment, underground storage tanks, restrooms, and driveways, and in full compliance with all applicable laws, regulations, and Supplier requirements.

10.     <u>PAYMENT CARDS/ELECTRONIC PAYMENTS</u>: Dealer shall accept payment cards and other forms of electronic payment which may from time to time be offered through Company for purposes of making retail sales to Dealer's customers for Products sold by Company to Dealer (and for other purposes approved by Company and the payment card issuer or payment processor). All payment card and electronic payment sales at the Premises (including the processing of such sales) must be made in compliance with instructions and regulations supplied by or through Company, or otherwise promulgated by the payment processor, and Dealer acknowledges receipt thereof. Company, issuer, or processor may, from time to time, amend or supplement said regulations and instructions, or cease to accept one or more types of transactions, without having any liability to Dealer. Company may refuse to accept any sales or payments not submitted in accordance with the requirements of Company, card issuer, or processor. Dealer's personal cards shall not be used for any purchase of any Products sold hereunder. All processing charges associated with the administration of such transactions, and all user fees, POS fees, and satellite connection charges for each terminal or processing equipment utilized, provided, or made available to Dealer by Company, shall be paid by Dealer.

Dealer represents to Company that all payment card or electronic submissions represent actual sales of Product to Dealer's customers in the manner and to the extent set forth therein. Dealer agrees that all payment submissions shall be in conformity with applicable regulations and that any submissions not conforming to said instructions may be rejected or charged back by the card issuer or processor. Dealer agrees that upon such rejection or charge back, the value of the payments which were rejected or charged back (and any associated charges) shall become immediately due and owing from Dealer to Company. All such payments shall be transmitted by such means, to such place(s), and at such time intervals, as Company may designate from time to time. Notwithstanding same, Dealer acknowledges that Company is not the provider or operator of any payment card or other payment systems, and has no liability for same.

Dealer shall be solely responsible for compliance with all federal, state, and local statutes, rules, and regulations regarding the handling and transmission of customer payment card and electronic payment data, and all rules, regulations, instructions, and guidelines of the issuer,

processor, and payment card industry relating thereto, including, but not limited to, the PCI Data Security Standard (available at www.pcisecuritystandards.org). Dealer's obligations shall include, but not be limited to, installation and/or upgrading of all equipment, hardware, and software necessary to timely comply with issuer, processor, and industry standards and requirements for customer PIN and data entry devices (including Triple Data Encryption Standard usage). Dealer shall release, indemnify, defend (with counsel acceptable to Company), and hold Company harmless from any and all claims, expenses, liabilities, fines, or obligations (including attorney's fees) in the event of Dealer's failure to properly comply with its obligations under this Section, and in connection with any payment card or electronic sales, including, but not limited to, any claims, demands and actions brought by Dealer's customers for alleged losses and damages relating to any privacy or security breach. Dealer further agrees to: (i) implement any policies and procedures required by Company or the payment card issuer, in their sole judgment, with regard to acceptance and processing of such transactions; (ii) participate in (and cause its employees to participate in) any training programs required or established from time to time by Company; and (iii) allow Company, its agents, contractors, and representatives, unrestricted access to all records of credit and debit card transactions, receipts, and transmissions (and as may be necessary to allow a complete audit of such transactions), all at such times as Company shall request (none of the foregoing shall impose any obligation on Company with regard to the handling of payment card and electronic transactions).

Company may suspend its acceptance of payment card and electronic sales in addition to all other rights provided by law and by this Agreement, without liability to Dealer, when Company has reason to believe that any instructions or requirements are not being complied with by Dealer.

11.    INSURANCE:  Dealer shall carry and maintain, solely at Dealer's expense, the following insurance with insurers satisfactory to Company:

(a)    Garage Liability Insurance or Commercial General Liability Insurance with Garage Liability endorsements. The insurance shall include, but not be limited to, coverage for the Premises, operations, Products, completed operations and operation, of vehicles owned, non-owned or hired with at least a combined single limit of $1,000,000 per occurrence for bodily injury and/or property damage and $2,000,000 aggregate;

(b)    Property insurance, including coverage for all goods, equipment, and improvements at the Premises which have been financed and/or secured by Company pursuant to the Reimbursement Agreement delivered by Dealer herewith, keeping same insured (for at least their full replacement value) against all risk of loss, including by fire, casualty, theft, and vandalism;

(c)    Workers compensation and employee's liability insurance (for statutory limits) where required by law;

(d)    Business auto liability coverage or operation of vehicles hired, owned or non-owned with a minimum combined single limit of $1,000,000 providing coverage for injury, death, or property damage resulting from each occurrence; and

(e)    Underground Storage Tank Insurance with minimum limits of $1,000,000 dedicated policy limit for underground storage tanks.  Dealer can satisfy this requirement by remaining eligible to participate in a state tank fund program as to the Premises.

Policies must be written on a primary and non-contributory basis.  Each such policy of insurance shall name Company, Global Partners LP, their subsidiaries, affiliates, successors, and assigns, and such other parties as Company shall designate, as additional insured parties thereunder.  All such insurance shall contain such endorsements as the Company shall require and shall provide at least thirty (30) days prior written notice to Company in the event of cancellation. Dealer shall deliver certificates of such insurance to the Company upon execution of this Agreement and thereafter upon Company's request(s) therefor, provided, however, that neither the review, nor failure to review, such certificates or any accompanying endorsements shall constitute acceptance of any modification of, nor waive, alter, or diminish, Company's rights, and Dealer's obligations, under this Section.  Company shall be entitled to receive, and Dealer shall be required to maintain, the insurance coverages specified hereinabove, notwithstanding any discrepancies in such certificates.  All policies must be provided by a carrier with minimum ratings of A-/VII or better according to A.M. Best, and contain a waiver of subrogation in favor of Company.

12.    COMPLIANCE WITH LAW:  Dealer agrees that in purchasing, receiving, storing, handling, offering for sale, selling, delivering for use or using the Products purchased from Company under this Agreement (and in conducting any business on the Premises), Dealer shall comply and instruct its employees to comply with all applicable federal, state, and local laws, ordinances, regulations, rules, orders and permits, including, without limitation, any of the same governing:  (a) pollution, disposal of waste materials generated at the Premises, lead content, pricing, product containers, brand adulteration, commingling and underground tank gauging requirements; and (b) sales of illegal, prohibited, restricted, or regulated goods or items.

Dealer agrees to pay when due any and all tank fees required to render the Premises eligible for participation in any available underground storage tank cleanup fund or other applicable state tank registration program and to provide Company, on an annual basis, with certifications thereof, and of full compliance of the Premises with any applicable statutes and regulations.

13.    INDEMNITY:  Dealer hereby releases and agrees to indemnify, defend (with counsel acceptable to Company), and hold Company, Supplier, Global Partners LP, and their parents, subsidiaries, affiliates, agents, servants, employees, successors, and assigns harmless from and against any and all claims, suits, obligations, liabilities, and damages (including attorney's fees) arising out of, or directly or indirectly relating to:  (a) any failure by Dealer to perform, fulfill, or observe any obligation or liability of Dealer set forth herein, or in any other agreement with Company (or any of its affiliates); (b) any act or omission by Dealer, its agents, servants, employees, contractors, invitees, successors, and assigns, or any persons or entities under the control or direction of Dealer; (c) operation of Dealer's business including, but not limited to, Dealer's occupancy of the Premises and any personal injury or property damage occurring thereon; (d) violation of any law, ordinance or regulation by, or caused by, Dealer, its agents, servants, employees, contractors, invitees, successors, and assigns, or any persons or entities under the control or direction of Dealer; (e) use of any equipment; (f) any release, seepage, or leakage of petroleum products (including Product) or any other substance, or any fire or explosion at the Premises including, but not limited to, at or from any storage tanks, piping, and pumps; and (g)

any failure of Dealer, its agents, servants, employees, invitees, contractors, successors, or assigns to comply with the Comprehensive Environmental Response Compensation and Liability Act of 1980 (herein "CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), or any other federal, state, or local environmental statute, regulation, rule, or ordinance.

All amounts due Company by Dealer by reason of the indemnities and obligations imposed upon Dealer by this Agreement shall become due and payable by Dealer to Company upon demand as a part of Dealer's account to Company. The provisions of this Section shall survive any termination, expiration, or non-renewal of this Agreement.

14.    ASSIGNMENT OF CONTRACT:    This Agreement shall not be assigned by Dealer (a "Transfer"), in whole or in part, without the prior written consent of Company (transfer of a controlling interest in the Dealer shall be deemed to be a Transfer requiring Company's consent). Prior to any Transfer, Dealer shall pay to Company a non-refundable administrative fee in connection with each requested Transfer in an amount to be specified by Company. Company reserves the right to waive all or a portion of the administrative fee in its sole and absolute discretion. Dealer shall also pay to Company administrative fees from time to time imposed by Company in connection with changes in Dealer's operations, name, or business structure, which result in administrative costs or expenses to Company, and in an amount determined by Company to recoup those costs and expenses. Company shall have the right to sell or assign its right, title or interest in this Agreement, and any related agreements, in whole or in part, without the consent of Dealer.

15.    RIGHT OF FIRST REFUSAL:    Dealer shall not sell, grant an option in respect of, nor lease, transfer, or otherwise dispose of by equity transfer, asset sale or otherwise, Dealer's business, or any rights in the Premises, or any assets or properties used in connection with Dealer's business, without first giving Company a sixty (60) day option within which to purchase or otherwise acquire said business and the Premises (or its rights therein) on the same terms and conditions as Dealer is willing to make such disposition to any other third party. Dealer shall give Company prompt written notice of said terms and conditions and shall submit a copy of: (a) any offer which Dealer is willing to accept; and (b) the signed Purchase and Sale Agreement. Such sixty (60) day period shall not commence until Dealer has complied with all of the requirements of this Section 15. An offer by a third party to exchange other property interests owned or to be acquired by it for any interest of Dealer covered by this Section shall be deemed to constitute an offer to purchase for a price equal to the fair market value of the property offered in exchange. Company shall be given access during said sixty (60) day period to Dealer's books and records. If Company exercises its option, it shall do so in writing within sixty (60) days after receipt of such notice and all documents and information required by Company. The closing shall take place not later than sixty (60) days after exercise of such option by Company. In the event that the terms and conditions of an offer are changed or modified in any respect, Dealer shall give Company prompt written notice thereof, and Company shall be provided an additional sixty (60) days after receipt of said notice and all documents and information required by Company within which to exercise its rights pursuant to this Section. At the closing, Dealer shall, in the case of a sale, deliver to Company a deed, assignment, or bill of sale, as the case may be, conveying a good, marketable and clear title subject only to the liens and encumbrances which are specifically outlined in the proposed terms and conditions of the offer or, in the case of any other disposition, deliver to Company an instrument or instruments in form and substance satisfactory to Company and

sufficient to transfer the interest proposed to be transferred. Failure to exercise this option: (a) on one or more occasions shall not affect this right of first refusal on other occasions thereafter arising whether involving the same or other property; and (b) shall in no event be deemed a consent by Company to an assignment of this Agreement.

16.    INDEPENDENT DEALER RELATIONSHIP:  Dealer is not an employee, agent or representative of Company, and does not have the authority to act in any such capacity on behalf of Company.  Any action or representation on behalf of Dealer to the contrary shall constitute fraud.  Dealer is an independent business person and is solely responsible for the hiring, discharge, compensation, management, control and work rules of all personnel used or employed by or on behalf of Dealer in connection with its business.  Dealer is solely responsible for the quality of service performed for Dealer's customers.  Dealer is solely responsible for proper handling and satisfactory resolution of claims and complaints by Dealer's customers respecting services performed by Dealer and Dealer's personnel.

17.    TERMINATION AND NON-RENEWAL:  Company may terminate or non-renew this Agreement, the franchise, and the franchise relationship between Company and Dealer, upon any of the following grounds (each, an "Event of Default"):

   a.    In accordance with the applicable provisions of the Petroleum Marketing Practices Act ("PMPA"), if the PMPA then applies to this Agreement;

   b.    Dealer's failure to purchase the Minimum Semi-Annual Gallons and/or Minimum Annual Gallons;

   c.    Breach by Dealer (or any guarantor) of any provision of this Agreement or of any other agreement delivered to Company (or any affiliate);

   d.    Death or dissolution of Dealer, or of any guarantor (only to the extent permitted by, and in accordance with the provision of, applicable statutes);

   e.    Closing of Dealer's business at the Premises or abandonment of the Premises (or failure by Dealer to commence and/or continue the sale of Products hereunder);

   f.    The institution by or against Dealer (or any guarantor) of any bankruptcy, reorganization, insolvency, liquidation, or related proceeding or the making of any assignment for the benefit of creditors; or

   g.    Dealer's violation of, or failure to comply with, any applicable state, federal, or local law or regulation, including, but not limited to those related to:  (a) handling, storage, and/or containment of petroleum products; (b) sale of drugs, narcotics, tobacco, alcohol, or other prohibited or restricted goods or items; or (c) fraud or moral turpitude.

Regardless of whether Company exercises its rights to terminate or non-renew, Company shall also have the right to set-off any amounts, credits, or deposits which it may hold or receive for the benefit of Dealer against any indebtedness of Dealer, and to suspend all deliveries of Product to

Dealer until all breaches of the terms hereof are cured (without prejudice to any other rights of Company).

Upon any termination, expiration, or non-renewal of this Agreement, Dealer shall comply with the provisions of Section 8 hereof and with Company's normal post-termination procedures as determined by Company from time to time, and will pay any costs in connection therewith (including any fees, costs, penalties, or amounts due to Supplier as a result thereof). Dealer has no right to terminate this Agreement, except as expressly provided in Section 3.

18.    REMEDIES:  Upon the occurrence of any Event of Default, Company shall have the right to: (i) terminate or non-renew this Agreement as provided in Section 17 above; (ii) seek any or all legal and equitable remedies and damages available under applicable laws and under any agreements or instruments delivered to the Company; (iii) be paid for any outstanding accounts receivable; (iv) be paid by Dealer for Company's lost profits for any unfulfilled portion of the Term and any unfulfilled purchase obligations under this Agreement; (v) be repaid for any amounts due to Supplier as a result of such default; and (vi) recover Company's costs of collection, including reasonable attorney's fees.

19.    INTENTIONALLY DELETED.

20.    SATISFACTION OF REIMBURSEMENT AGREEMENT:  Dealer's obligations under this Agreement (including all Product purchase obligations) shall survive and continue in effect notwithstanding the expiration, termination, or satisfaction of Dealer's obligations under the Reimbursement Agreement executed herewith.

21.    WAIVER:  No waiver by Company of any default of Dealer hereunder shall operate as a waiver of any future default whether of a like or different character.  No delay or omission of Company in exercising or enforcing any right or power accruing upon any breach of this Agreement by Dealer shall impair any such right or power, or shall be construed to be a waiver of any breach of this Agreement, or any acquiescence therein.

22.    NOTICES:  All notices provided for herein shall be considered as properly given if delivered in writing personally, by certified mail (return receipt requested), or by overnight delivery service, as follows (or to the Premises, in the event of notice to the Dealer):

|  |  |
|---|---|
| If to Company: | Alliance Energy LLC |
|  | 800 South Street, Suite 500 |
|  | Waltham, MA 02453 |
|  | Attention:  Executive Vice President |
|  |  |
| with a copy to: | Alliance Energy LLC |
|  | 800 South Street, Suite 500 |
|  | Waltham, MA 02453 |
|  | Attention:  Deputy General Counsel |

If to Dealer:   Saibaba's Aashirwad Forever Inc.
       4247 Swamp Road
       Doylestown, PA 18902

23. **PRIOR AGREEMENTS:** This Agreement supersedes all prior agreements and understandings between the parties pertaining to the matters set forth herein and there are no other agreements of any nature, written or oral, between the parties pertaining to the subject matter hereof. Except as expressly provided in this Agreement, all amendments or modifications hereto must be in writing and signed by a duly authorized representative of Company.

24. **SEVERABILITY:** If any term or provision of this Agreement or the application hereof shall to any extent be invalid or unenforceable, the remainder shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. If, at the time of execution of this Agreement (or any other documents delivered herewith), any term or date is inadvertently omitted or left blank, then Dealer hereby authorizes Company to insert and/or complete same.

25. **REPRESENTATIONS OF DEALER:** Dealer warrants and represents the following to Company:

(a) Dealer is entering into and signing this Agreement upon Dealer's own free will and choice, and is not acting under the influence of any threat or coercion of Company or its representatives.

(b) There have been no promises, claims or representations made to Dealer by Company or its representatives of any kind which are not contained in this Agreement or in another written document signed by and furnished to Dealer by Company as a part of this relationship.

(c) **Dealer acknowledges that Company does not make, and specifically disclaims, any warranties as to merchantability or fitness for a particular purpose of any Products sold and delivered hereunder, and further that Company shall not, under any circumstances, be liable for any claims for loss of profits or consequential damages.**

(d) Dealer is owner of the Premises (or is lessee by reason of a valid lease agreement with the record owner of the Premises, a copy of which shall be made available to Company, and which has a present term at least equal in duration to the initial Term of this Agreement) and has all permits and licenses necessary to occupy and use the Premises as contemplated by this Agreement.

(e) The execution, delivery and performance by Dealer of this Agreement will not violate any agreement or other instrument to which Dealer is a party or by which it or any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement, or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets. Dealer is not currently under

agreement with any other supplier of Products and has properly terminated (or completed the Term of) any such prior supply agreement.

(f)    The Premises will be constructed, operated, and maintained in compliance with Supplier's and Company's guidelines and specifications, as same may be modified from time to time, and in compliance with all of Supplier's standards and appearance manuals, at all times during the Term hereof. Dealer shall participate and comply with (and pay and be responsible for all costs, fees, and penalties in connection with) any "mystery shopper", customer loyalty, or similar programs implemented by Supplier from time to time, and shall pay any "help desk" fees or other service charges received from Supplier in connection with the operation of any systems or equipment on the Premises.

(g)    Dealer agrees not to sell any goods or items which are prohibited by Supplier as a condition of the use of such brand and identifying marks at the Premises.

(h)    NOTHING IN THE AGREEMENT IS CONSTRUED TO PROHIBIT COMPANY FROM SUGGESTING PRICES AND COUNSELING WITH DEALER CONCERNING PRICES. PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED. DEALER MAY SELL ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE WHICH IT ALONE MAY DECIDE.

26.    SECURITY:  As security for the payment and performance of any and all liabilities, indebtedness, and obligations (direct or indirect, absolute or contingent, sole, joint or joint and several, secured or unsecured, now existing or hereafter arising or any other type, nature, or description) of Dealer to Company (the "Obligations"), Dealer hereby pledges, assigns, and transfers to Company a continuing security interest in:  (a) any unsold Products at the Premises; and (b) the proceeds of any payment card or electronic sales transactions (collectively, the "Collateral"). Dealer shall, upon Company's request, execute and deliver Form UCC-1 Financing Statements covering the Collateral, in form suitable for recording with the Secretary of State's office. Dealer further irrevocably constitutes and appoints Company as Dealer's true and lawful attorney for the purpose of signing, filing, and recording, on behalf of Dealer (and/or for filing without signature, if permitted by law), any financing statement or other instrument in order to perfect, protect, or continue Company's interest in the Collateral (and as notice of, and to secure any and all rights of first refusal granted to Company or Dealer, and their respective, and their respective affiliates, as applicable). Upon the occurrence of an Event of Default by Dealer, and at any time thereafter, Company shall have, in addition to any other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code.

27.    APPLICABLE LAW:  This Agreement shall be governed by and construed in accordance with the Petroleum Marketing Practices Act and the applicable laws of the Commonwealth of Massachusetts, and Dealer hereby irrevocably consents to the jurisdiction of the state and federal courts located in Massachusetts (should Company elect to proceed in such forum), without regard to any provisions regarding conflicts of law. Company has the right to enforce and require specific performance of all provisions of this Agreement including, but not limited to, Company's right to seek injunctive relief and any other right or remedies available to Company. Dealer acknowledges receipt of a written summary of the provisions of the Petroleum Marketing Practices Act.

28.    ATTORNEYS' FEES:  In the event that any litigation or legal proceeding is brought to enforce or interpret the terms of this Agreement, the prevailing party in such proceeding shall be entitled to recover all its costs, including its reasonable attorneys' fees, paralegals' fees and legal assistants' fees (whether for services incurred in collection, litigation, bankruptcy proceedings, appeals, or otherwise), and all other fees and costs incurred in connection therewith.

29.    DISCLOSURE REQUIREMENTS:  The following information is set forth herein, to the extent applicable, in compliance with applicable law:

      a.      The gallonage volume history, if any, of the location under negotiation for and during the three year period immediately past or for the entire period which the location has been supplied by Company, whichever is shorter:
Company previously supplied for a portion of 2021 through 2022.
Through July 2021: 806,131 gallons, Through July 2022: 1,414,5523 gallons.

      b.      The name and last known address of the previous dealers for the last three years, or for the entire period during which the location has been supplied by Company, whichever is shorter, and the reason for the termination of each dealer's agreement:
Cross Keys Petroleum LLC – 4247 Swamp Road, Doylestown, PA

      c.      Any legally binding commitments for the sale, demolition or other disposition of the location:
Dealer a party to a transaction with fee owner of the Premises.

      d.      The training programs, if any, and the specific goods and services the Company will provide without cost to the Dealer:
None, except for any signage or branding materials loaned to Dealer hereunder.

      e.      Full disclosure of any and all obligations which will be required of the Dealer, including, but not limited to, any obligation to exclusively deal in any of the Products of the Company, its subsidiaries or any other company or any advertising and promotional items that the Dealer must accept:
As provided for in this Agreement.

      f.      Full disclosure of all restrictions on the sale, transfer, renewal and termination of the agreement.
As provided for in this Agreement.

30.    TRIAL BY JURY WAIVER:  To the fullest extent permitted by law, Dealer and Company hereby waive trial by jury in any court and in any suit, action, or proceeding on any matter arising in connection with or in any way related to the commercial transaction of which this Agreement

is a part and/or the enforcement of any of Company's or Dealer's rights and remedies. Dealer and Company acknowledge that they make this waiver knowingly, voluntarily and only after extensive consideration of the ramifications of this waiver.

31.    CLAIMS/RELEASE: Company and Dealer agree that prompt investigation and resolution of any claim by Dealer is to the benefit of both parties. For that reason, and in consideration of the other benefits conferred upon Dealer by this Agreement, Dealer agrees that any claim by Dealer of any kind against Company arising out of this Agreement or otherwise, shall be waived and barred unless: (a) Company is given written notice thereof within thirty (30) days after the event, action, or inaction to which such claim relates, and (b) suit is commenced against Company in a court of competent jurisdiction within twelve (12) months after the event, action, or inaction to which such claim relates. Notwithstanding the foregoing, any claim against Company by Dealer for defect or variance in quality or quantity of Product furnished by Company under this Agreement shall be waived and barred unless Dealer provides Company with written notice thereof within five (5) days after discovery of the defect or variance. Dealer acknowledges that it has no outstanding claims against Company as of the date of this Agreement. As used herein, the terms "Dealer" and "Company" shall be deemed to include their respective successors and assigns.

32.    OFAC CERTIFICATION.    Dealer certifies that it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or by the U.S. Treasury Department as a terrorist, Specially Designated National and Blocked Person, or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control.

33.    SURVIVAL.    The applicable provisions of Sections 6, 8, 10, 13, 18, 20, 21, 22, 23, 24, 25, 26, 27, 29, and 30 shall survive any termination or non-renewal of this Agreement, in addition to any other right or obligation which has accrued prior thereto.


[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF the parties hereto have executed this Agreement as an instrument under seal effective as of the date and year first above written.

Company:

ALLIANCE ENERGY LLC

By: _____

Witness
Name: _Luciana Costa_
    (please print)

Name: _Mark Cosenza_
Title: _Senior Vice President_

Dealer:

SAIBABA'S AASHIRWAD FOREVER INC.

By: _____

Witness
Name: _Mark R Menlove_
    (please print)

Name: _Chirag Dewan_
Title: _President_

## REIMBURSEMENT AGREEMENT

| Company | Alliance Energy LLC, a Massachusetts limited liability company |
|---|---|
| **Company's Notice Address** | 800 South Street, Suite 500, Waltham, MA 02453, Attn: Senior Vice President, GDSO, with a copy to Attn: General Counsel |
| **Dealer (and Notice Address)** | Saibaba's Aashirwad Forever Inc, 200 West Montgomery Avenue, Ardmore PA 19003. |
| **Premises** | That certain parcel of land owned or leased by Dealer together with the improvements located thereon known as and numbered 4247 Swamp Road, Doylestown, PA 18902. |
| **Amended and Restated Dealer Sales Agreement** | That certain Amended and Restated Dealer Sales Agreement dated as of the date hereof by and between Company and Dealer with respect to the supply of Products to the Premises, as amended from time to time. *Capitalized terms not otherwise defined herein shall have the meaning set forth in the Amended and Restated Dealer Sales Agreement* |
| **Minimum Annual Gallons** | 1,120,000 gallons per each year of the term of the Amended and Restated Dealer Sales Agreement |
| **Total Aggregate Gallons** | 11,200,000 gallons per the entire term of the Amended and Restated Dealer Sales Agreement |
| **Maximum Advance** | Up to $100,000.00 to be made available by the Company to Dealer in either cash, equipment or services in order to facilitate the upgrading of the Premises by completing the Dealer Improvements. |
| **Dealer Improvements Disbursements** | The Maximum Advance of $100,000.00 shall be disbursed to Dealer upon confirmation from Shell Oil Company that the minor imaging compliance matters on the dispensers at the Premises have been completed and are in good and satisfactory condition. All invoices for any imaging work and site improvements shall be paid directly by Dealer. |
| **Amortization Rate** | $.009 per gallon |
| **Payment Rate** | Amortization Rate + $.005/gallon |

This Reimbursement Agreement dated effective as of the date Company countersigns the signature page hereto (the "**Agreement**"), is executed by and between the Company and Dealer in connection with the parties' agreement that the upgrading and refurbishing of the Premises consistent with the terms hereof will substantially enhance Dealer's business. In consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto do mutually agree as follows:

1.      FUND ADVANCE; REIMBURSEMENT: In order to facilitate the upgrading of the Premises, Company agrees to make up to the Maximum Advance available to Dealer for the purpose of completing the Dealer Improvements. The Maximum Advance shall be disbursed and used in accordance with the Terms and Conditions (as defined below). **Dealer acknowledges that Company makes no warranties, express or implied, as to any of the Dealer Improvements provided, paid for, or reimbursed hereunder (Company specifically disclaims any warranties of merchantability or fitness for a particular purpose).**

2.      REPAYMENT/AMORTIZATION: The amounts of the Maximum Advance disbursed pursuant to the Terms and conditions of Section 1 hereinabove will be amortized at the Amortization Rate for Products purchased and paid for under the Amended and Restated Dealer Sales Agreement. Dealer shall have no right of pre-payment under this Agreement.

3.      BREACH; EVENTS OF DEFAULT: Dealer agrees that the following shall be considered events of default hereunder ("*Events of Default*"), which Events of Defaults shall be subject to the Terms and Conditions hereof:

A.      Failure by Dealer to comply with any term or provision of this Agreement, the Amended and Restated Dealer Sales Agreement, or of any other document or instrument executed by Dealer for the benefit of Company;

B.      Termination of the Amended and Restated Dealer Sales Agreement;

C.      Failure by any guarantor of Dealer's obligations to Company to comply with any term or provision of their guaranty;

D.      Death or dissolution of the Dealer or of any guarantor hereof;

E.      Closing of Dealer's business at the Premises or abandonment of the Premises;

F.      The institution by or against Dealer (or any guarantor) of any bankruptcy, reorganization, insolvency, liquidation, or related proceeding or the making of any assignment for the benefit of creditors;

G.      Dealer's failure to comply with any applicable state or federal law and/or regulation relating to the handling, storage and/or containment of petroleum products; or

H.      Dealer's failure, during any year of the Term of the Amended and Restated Dealer Sales Agreement to purchase Products from Company in an amount equal to or greater than the Dealer's Minimum Annual Gallons requirements (as defined therein).

1 of 5

4.    TERMS AND CONDITIONS: The parties acknowledge and agree that this Agreement is subject to the terms and conditions (the "*Terms and Conditions*" attached hereto as Exhibit A and incorporated herein by reference, which Terms and Conditions constitute material provisions of this Agreement.

5.    REPRESENTATIONS AND AUTHORITY: In the event that Dealer is a limited liability company, corporation or other type of entity, the individual(s) executing this Agreement on behalf of Dealer hereby certifies, represents and warrants to Company: (a) Dealer is duly formed, validly existing and in good standing under the laws of its state of formation, (b) the execution and delivery of this Agreement and any other documents executed by Dealer for the benefit of Company have been duly approved and authorized by all required members, managers, shareholders, directors or other equity holders of Dealer, (c) the execution and delivery of this Agreement does not violate the provisions of any of the Dealer's governing documents nor any other agreement, contract or obligation to which Dealer is a party, and (d) the individual(s) executing this Agreement on behalf of Dealer are duly authorized representatives and signatories of Dealer and are fully vested with all power and authority, each acting singly, to enter into any all agreements with Company on behalf of Dealer.

6.    SATISFACTION OF REIMBURSEMENT AGREEMENT: This Agreement and the obligations of Dealer hereunder shall not be satisfied until such time as Dealer has also complied in full with the terms and conditions of the Amended and Restated Dealer Sales Agreement (including satisfaction of all product purchase requirements), and provided that all amounts payable hereunder have been paid in full.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as an instrument under seal effective as of the date and year written below.

SAIBABA'S AASHIRWAD FOREVER INC, Dealer

Witness
Name: _____
(please print)

By: _____
   Name: Chirag Dewan
   Title:  President
   Dated:  09 / 23 / 2022

ALLIANCE ENERGY LLC, Company

Witness
Name: Luciana Costa
(please print)

By: _____
   Title: Mark Cosenza
   Dated: _____

**EXHIBIT A – Terms and Conditions**

**Maximum Advance**: The Maximum Advance shall, at the sole election and discretion of Company, be disbursed as follows: (i) portions of the Maximum Advance may be paid directly to suppliers, vendors and contractors engaged either directly by Dealer or by Company on Dealer's behalf for services, equipment and/or materials related to the Dealer Improvements; and/or (ii) portions of the Maximum Advance may be reimbursed to Dealer by Company for payments made by Dealer to its suppliers, vendors and contractors upon presentation of documents satisfactory to Company evidencing such payments for services, equipment and/or materials related to the Dealer Improvements; and/or (iii) in lieu of disbursement of cash, Company and/or Supplier (as defined in the Amended and Restated Dealer Sales Agreement) may provide equipment, materials and/or installation services related to the Dealer Improvements, the value of which shall be included as part of the Maximum Advance; and/or (iv) such other method of disbursement as Dealer and Company may agree to in writing.

No portion of the Maximum Advance shall be disbursed if Dealer is in breach of any of its obligations or agreements with Company at the time such disbursement is requested. To the extent any portion of the Maximum Advance is being funded by the Supplier, Company's obligation to disburse such portion of the Maximum Advance is expressly conditioned on (i) Company's actual receipt of such amounts from the Supplier and (ii) Dealer's compliance with all requirements or conditions of Supplier relating to such funding.

No portion of the Maximum Advance may be used for any purpose other than the specific Dealer Improvements identified above unless otherwise approved in writing by Company. Dealer acknowledges and agrees that the obtaining of any permits required in connection with completing the Dealer Improvements shall be the sole responsibility of the Dealer, and Company makes no representations as to the availability thereof. Dealer further acknowledges that no portion of the Maximum Advance shall be disbursed until such time as either (a) a Mortgage and Security Agreement covering the Premises (if required by the Company) or (b) a Conditional Assignment of Dealer's lease for the Premises (if required by the Company), each in form and substance acceptable to Company, is executed and delivered to Company, and a satisfactory recording is made thereof (also subject to Company's review and approval of the adequacy of the Premises and title thereto as collateral for said advances), unless such requirement is otherwise waived by Company in its sole discretion. Any disbursement of any portion of the Maximum Advance by Company shall be subject to Dealer's full compliance with any and all governmental orders, statutes, and regulations concerning the Premises. Disbursement of any portion of the Maximum Advance pursuant to the terms of this Agreement must be requested by Dealer within six (6) months of the date hereof; Company's obligations to make any further disbursements of any portion of the Maximum Advance after such date shall be null and void unless Company otherwise agrees to extend such date in writing.

In the event the total amount required to complete the Dealer Improvements exceeds the Maximum Advance (a "*Shortfall*"), Dealer shall be solely responsible for payment of any such Shortfall unless the Company and Dealer otherwise mutually agree as evidenced by a written amendment to this Agreement. In the event Company disburses funds relating to the Dealer Improvements in excess of the Maximum Advance (an "*Over-advance*"), Dealer shall promptly reimburse Company for the total amount of such Over-advance within 10 days of Company's request for such reimbursement unless the Company and Dealer otherwise mutually agree as evidenced by a written amendment to this Agreement.  No oral representation by any employee of Company relating to any Shortfall or any Over-advance shall be binding on the Company until evidenced by a written amendment to this Agreement executed by both Company and Dealer.

**Events of Default**. Upon an Event of Default identified in Section 3(H) of this Agreement, Company shall have the right (in addition to and not in lieu of Company's rights upon default as provided hereunder or under the Amended and Restated Dealer Sales Agreement) to demand payment from Dealer, as a cure of such default (the "*Cure Payment*"), in an amount calculated by subtracting (x) the gallons purchased and paid for by Dealer from Company for such year of the Term of the Amended and Restated Dealer Sales Agreement during which said Event of Default occurred, from (y) the Minimum Annual Gallons, and multiplying the difference by the Payment Rate.  Said Cure Payment shall be made by Dealer within fifteen (15) days of notice from Company. Failure to pay such Cure Payment shall constitute an Event of Default under this Agreement. In no event shall the payment of any Cure Payment hereunder satisfy or reduce Dealer's obligation to purchase and pay for all required gallons of Products under the Amended and Restated Dealer Sales Agreement.

If any Event of Default shall occur, Company shall be entitled to:  (i) be paid by Dealer (in addition to any other amounts which may be due hereunder or under the Amended and Restated Dealer Sales Agreement) an amount calculated by subtracting (x) the gallons of Product purchased and paid for by Dealer from Company under the terms of the Amended and Restated Dealer Sales Agreement as of the date of such notice, from (y) the Total Aggregate Gallons, and multiplying the difference by the Payment Rate; (ii) be paid by Dealer for any amounts due to Company's supplier as a result of such Event of Default and/or debranding of the Premises; and (iii) seek any or all other legal and equitable remedies and damages available by law or under the Amended and Restated Dealer

Sales Agreement or any other agreements or instruments. Company shall not be required to demand a Cure Payment pursuant to the preceding paragraph before exercising its rights upon occurrence of an Event of Default.

Dealer and Company agree that the foregoing Cure Payment and damages provisions are fair and reasonable estimates of certain actual damages which would be incurred by Company due to Dealer's default under this Agreement, and do not constitute a penalty.

**Security - Grant**: As security for the payment and performance of any and all liabilities, indebtedness, and obligations (direct or indirect, absolute or contingent, sole, joint or joint and several, secured or unsecured, now existing or hereafter arising or any other type, nature, or description) of Dealer to Company (the "*Obligations*"), Dealer hereby pledges, assigns, and transfers to Company and hereby grants to Company a continuing security interest in the Collateral, as defined below, and all proceeds thereof. Dealer authorizes Company to file Form UCC-1 Financing Statements with the applicable Secretary of State's office. Dealer further irrevocably constitutes and appoints Company as Dealer's true and lawful attorney for the purpose of signing, filing, and recording, on behalf of Dealer (and/or for filing without signature, if permitted by law), any financing statement or other instrument in order to perfect, protect, or continue Company's interest in the Collateral. Upon the occurrence of an Event of Default by Dealer (under this Agreement, the Dealer Sales Agreement, or any other document), and at any time thereafter, Company shall have, in addition to the rights and remedies provided herein or in any other instrument or document executed by Dealer, the rights and remedies of a secured party under the Uniform Commercial Code including, without limitation, the rights to take possession of the Collateral and to sell and dispose of the same. Dealer hereby agrees to pay on demand all costs and expenses (including reasonable attorney's fees) incurred or paid by Company in enforcing the Obligations on default or collecting amounts outstanding thereunder. After deducting all costs and expenses of collection, storage, custody, sale or other disposition and delivery (including legal costs and reasonable attorney's fees) and all charges against the Collateral, the residue of the proceeds of any such sale or other disposition shall be applied to the payment of the Obligations, in such order of preference as Company may determine, and Dealer shall remain liable to Company for any deficiency.

Dealer agrees to pay and be responsible for any and all of Company's costs incurred in connection with filing, recording, perfecting, continuing, and enforcing Company's security interest in all collateral and pursuant to any other security instruments, including, but not limited to, the costs of title examinations, recording and filing fees, and mortgage taxes or levies thereon (which amounts may be deducted from the funds to be advanced hereunder).

As used herein, "Collateral" shall mean: *any and all tangible and intangible real and personal property, assets, and rights of the Dealer, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof: all personal property and fixtures of every kind and nature including all goods (including inventory, equipment, and any accessories thereto), instruments (including promissory notes), documents (including, if applicable, electronic documents), accounts, leases, subleases, chattel paper (whether tangible or electronic), deposit accounts, accounts receivable and proceeds thereof, letter-of-credit rights (whether or not the letter of credit is evidenced by writing), commercial tort claims, securities (including all stockholder, membership, and partnership interests in the Dealer and any other entities, and all certificates thereof), and all other investment property, supporting obligations, and any other contract rights or rights to the payment of money, including claims and proceeds, and all general intangibles (including all payment intangibles), and all goodwill and rights (including franchise rights) under any contracts and agreements.*

**Indemnity**: Dealer hereby releases and agrees to indemnify and hold Company, its affiliates, agents, servants, employees, successors, and assigns, harmless from and against any and all claims, suits, obligations, liabilities, and damages (including attorney's fees) arising out of, or directly or indirectly relating to: (a) any failure by Dealer to perform, fulfill, or observe any obligation or liability of Dealer set forth herein, or in any other agreement with Company; (b) any act or omission by Dealer, its agents, servants, employees, invitees, successors, and assigns; (c) operation of Dealer's business including, but not limited to, Dealer's occupancy of the Premises and any personal injury or property damage occurring thereon; (d) violation of any law, ordinance or regulation by, or caused by, Dealer, its agents, servants, employees, invitees, successors, and assigns; (e) purchase, installation, construction, or use of any Dealer Improvements or any equipment; (f) any release, seepage, or leakage of petroleum products or any fire or explosion at the Premises including, but not limited to, at or from any storage tanks, piping, and pumps; and (g) the Comprehensive Environmental Response Compensation and Liability Act of 1980 (herein "*CERCLA*"), the Resource Conservation and Recovery Act of 1976, as amended ("*RCRA*"), or any other federal, state, or local environmental statute, regulation, rule, or ordinance. The provisions of this Section shall survive any termination or satisfaction of this Agreement.

**Assignment**: This Agreement shall not be assigned by Dealer without the prior written consent of Company (transfer of a controlling interest in the Dealer shall be deemed to be an assignment requiring Company's consent hereunder).

**Notices**:  All notices provided for herein shall be given in accordance with the terms of the Amended and Restated Dealer Sales Agreement.

**Waiver**:  No waiver by Company of any default of Dealer hereunder shall operate as a waiver of any future default whether of a like or different character.

**Severability**:  If any term or provision of this Agreement or the application hereof shall, to any extent, be invalid or unenforceable, the remainder shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the maximum and fullest extent permitted by law.

**Applicable Law**:  This Agreement shall take effect as a sealed instrument and shall be governed by the laws of the Commonwealth of Massachusetts, and Dealer irrevocably consents to the jurisdiction of the state and federal courts located in Massachusetts (should Company elect to proceed in such forum).

**Attorney's Fees**:  In the event that any litigation or legal proceeding is brought to enforce or interpret the terms of this Agreement, the prevailing party in such proceeding shall be entitled to recover all its costs, including its reasonable attorneys' fees, paralegals' fees and legal assistants' fees (whether for services incurred in collection, litigation, bankruptcy proceedings, appeals, or otherwise), and all other costs incurred in connection therewith.  All amounts due from Dealer hereunder shall bear interest at the rate of one and one-half (1½%) percent per month.

**Prior Agreements**:  This Agreement supersedes all prior agreements and understandings between the parties pertaining to the matters set forth herein and there are no other agreements of any nature, written or oral, between the parties pertaining to the subject matter hereof.  Except as expressly provided in this Agreement, all amendments or modifications hereto must be in writing and signed by a duly authorized representative of Company.

**Trial by Jury Waiver**:  To the fullest extent permitted by law, Dealer and Company hereby waive trial by jury in any court and in any suit, action, or proceeding on any matter arising in connection with or in any way related to the commercial transaction of which this Agreement is a part and/or the enforcement of any of Company's or Dealer's rights and remedies.  Dealer and Company acknowledge that they make this waiver knowingly, voluntarily and only after extensive consideration of the ramifications of this waiver.  Dealer also acknowledges that Company has not represented to Dealer that the provisions of this Section will not be fully enforced.

**Claims/Release**:  Company and Dealer agree that prompt investigation and resolution of any claim by Dealer is to the benefit of both parties.  For that reason, and in consideration of the other benefits conferred upon Dealer by this Agreement, Dealer agrees that any claim by Dealer of any kind against Company arising out of this Agreement or otherwise, shall be waived and barred unless:  (a) Company is given written notice thereof within thirty (30) days after the event, action, or inaction to which such claim relates, and (b) suit is commenced against Company in a court of competent jurisdiction within twelve (12) months after the event, action, or inaction to which such claim relates.  Dealer acknowledges that it has no outstanding claims against Company as of the date of this Agreement.  As used herein, the terms "Dealer" and "Company" shall be deemed to include their respective successors and assigns.

# EXHIBIT G

## SUBLEASE AGREEMENT

This SUBLEASE AGREEMENT (this "Sublease") is entered into effective as of September 25, 2023 (the "Effective Date"), by and between DRAKE PETROLEUM COMPANY, INC., a Massachusetts corporation ("Sublandlord"), and SAIBABA'S ALMIGHTY, INC., a New York corporation ("Subtenant").

### RECITALS:

A.    Sublandlord is leasing that certain real property located at 3522 State Street, Niskayuna, New York 12304, as more particularly set forth in Exhibit A attached hereto and incorporated herein for all purposes (the "Subleased Premises") pursuant to that certain Lease dated August 22, 2011, as amended by that certain First Amendment to Lease dated January 9, 2020, and renewed pursuant to that certain Renewal Letter dated October 27, 2020, copies of which are attached as Exhibit B (the "Prime Lease") between State Street Gas Plus, Inc., a New York corporation (the "Landlord"), as lessor, and Sublandlord, as lessee. Capitalized terms used but not defined in this Sublease have the meanings given such terms in the Prime Lease.

B.    Alliance Energy LLC and Subtenant have entered into a Dealer Sales Agreement between (the "DSA") with respect to the Subleased Premises, the term of which shall commence on October 16, 2023.

C.    In connection with the DSA, Sublandlord and Subtenant have agreed to assign the Prime Lease to Subtenant, but have not yet obtained the consent of the Landlord to such assignment.

D.    Subtenant desires to sublease the Subleased Premises from Landlord, and Sublandlord has agreed to sublease the same to Subtenant, on the terms and conditions set forth in this Sublease, until such time as Sublandlord and Subtenant obtain Landlord's consent to the assignment of the Prime Lease to Subtenant.

E.    Concurrently with the execution of this Agreement, Sublandlord and Subtenant have entered into a Management Services Agreement pursuant to which Subtenant provides certain management services to Sublandlord with respect to the car wash located on a portion of the Subleased Premises (the "Management Agreement").

### AGREEMENTS:

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, and for other good and valuable consideration paid by each party hereto to the other, Sublandlord and Subtenant agree as follows:

1.    **Sublease Grant; Use**.

   (a)    **Subleased Premises**. Subject to Section 1(c) below, Sublandlord subleases to Subtenant, and Subtenant subleases from Sublandlord the Subleased Premises in accordance with and subject to the terms, conditions and provisions of this Sublease and the Prime Lease. Sublandlord and Subtenant agree that the Subleased Premises as described herein is correct.

(b) **Appurtenant Rights**. Subtenant shall have the non-exclusive right to use any exterior common areas, driveways, and the parking areas adjacent to the Subleased Premises for ingress and egress to and from the Subleased Premises and parking to the same extent Sublandlord is permitted to use the same under the Prime Lease, but such rights shall be subject to the terms and conditions of the Prime Lease, the rules and regulations from time to time established by Landlord, and any rights of Landlord under the Prime Lease to designate and change from time to time the areas and facilities to be so used.

(c) **Use of Subleased Premises**. Subtenant shall use and occupy the Subleased Premises for the purposes permitted under Section 3 of the Prime Lease and for no other purpose. In no event shall Subtenant (or any permitted assignee, sub-subtenant or other occupant of the Subleased Premises) use or permit the Subleased Premises to be used for any use prohibited by the Prime Lease.

2. **Sublease Term; Delivery of Possession**.

(a) The term of this Sublease (the "Sublease Term") shall commence on October 16, 2023 and shall expire on the earlier of (i) delivery by Sublandlord of a landlord consent from State Street Gas Plus, Inc., for the assignment to Subtenant of the Prime Lease and the execution of an Assignment of Lease from Sublandlord to Subtenant, or (ii) the expiration date of the Prime Lease. This Sublease will be binding on the parties hereto upon the execution and delivery hereof by Sublandlord and Subtenant.

(b) Sublandlord agrees to timely exercise any remaining extensions options under the Prime Lease.

(c) Sublandlord agrees to use commercially reasonable efforts from and after the Effective Date to obtain and deliver Landlord's consent to assign the Prime Lease to Subtenant. Subtenant agrees to cooperate with Sublandlord and provide Landlord with all information and documentation required under Section 24(b) of the Prime Lease.

(d) Notwithstanding anything to the contrary, an Event of Default under the Sublease or DSA shall be considered an Event of Default under both the Sublease and DSA; such Event of Default, if not cured after any applicable notice and cure period, shall be grounds for termination for both the Sublease and DSA.

3. **Rent**.

(a) **Sublease Base Rent**. The Sublandlord is responsible for all monetary obligations described in Section 5 under the Prime Lease. Subtenant agrees to pay to Sublandlord, or as directed by Sublandlord, commencing on the Effective Date, without offset, abatement, deduction or demand, as base rent (the "Sublease Base Rent") for the Subleased Premises, the following amounts for the following periods of time:

| Time Period | Option Period | Monthly Sublease Base Rent |
|---|---|---|
| Effective Date – October 31, 2026 | First Extended Term | $14,923.33 |
| November 1, 2026 – October 31, 2031 | Second Extended Term | $16,415.66 |
| November 1, 2031 – October 31, 2036 | Third Extended Term | $18,057.16 |
| November 1, 2036 – October 31, 2041 | Fourth Extended Term | $19,862.83 |

(b)    **Additional Charges**. Additional Charges ("<u>Additional Charges</u>") are actual charges due under Sections 5(f) and 13 of the Prime Lease, which the Sublandlord is obligated to pay and for which Sublandlord shall recharge back to Subtenant.  Subtenant shall pay to Sublandlord, or as directed by Sublandlord, the amounts required with respect to Additional Charges within 20 days after receipt of Sublandlord's invoice therefor.

(c)    **Payments**. Monthly installments of Sublease Base Rent shall be payable in advance, on or before the first (1st) day of each month commencing upon the Commencement Date. In the event that any monthly installment of the Base Rent is received by Landlord more than ten (10) days after the 1st day of the month, Tenant shall pay Landlord an additional amount equal to five percent (5%) of the amount due for the privilege of paying the Base Rent after its due date, provided that the foregoing shall neither constitute Landlord's permission for any such late payment, nor any future late payment, nor a waiver by Landlord of its remedies in the event of a violation of this Lease by virtue of Tenant's failure to comply with its obligation to make timely payments in accordance with the terms hereof.

Sublease Base Rent and Additional Charges shall be paid by such method as Sublandlord may elect, from time to time, at its sole discretion, which may include, but is not limited to electronic funds transfer ("EFT") from Subtenant's bank account (Subtenant agrees to execute and deliver all forms and authorizations required by Sublandlord, or the banking institution, to implement and/or continue such EFT Payments).

(d)    **Proration for Partial Months**. Sublease Base Rent for any partial month shall be prorated on a daily basis.

(e)    **Delinquent Payment**. All past due payments required of Subtenant hereunder shall bear interest from the due date until paid at the lesser of eighteen percent (18%) per annum or the maximum lawful rate of interest.  All late charges and interest imposed pursuant to this Section 3(c) and (e) shall be considered Additional Charges due from Subtenant to Sublandlord under the terms of this Sublease. In no event, however, shall the charges permitted under this Section or elsewhere in this Sublease, to the extent they are considered to be interest under applicable law, exceed the maximum lawful rate of interest.

4.     **Condition**. SUBTENANT AGREES THAT IT HAS INSPECTED THE SUBLEASED PREMISES AND THAT THE SUBLEASED PREMISES IS SUITABLE FOR ITS PURPOSE. SUBTENANT ACCEPTS THE SUBLEASED PREMISES IN ITS "AS IS" CONDITION. SUBTENANT WAIVES ANY AND ALL CLAIMS BY SUBTENANT BASED ON THE CONDITION OF THE SUBLEASED PREMISES AS OF THE DATE OF THIS SUBLEASE, THE POSSESSION DATE, OR THE EFFECTIVE DATE. THE PROVISIONS OF THIS SECTION ARE A MATERIAL PART OF THE CONSIDERATION FOR SUBLANDLORD ENTERING INTO THIS SUBLEASE.

5.     **Subtenant's Performance of Tenant's Obligations Under Prime Lease**. Except for the obligation to pay Rent to Landlord pursuant to the Prime Lease, Subtenant assumes and agrees to perform, comply with and be bound by the terms, provisions, obligations, covenants and conditions of the Prime Lease with respect to the Subleased Premises and Subtenant's reasonable use of and activities within the Subleased Premises that are to be performed, complied with or observed during the Sublease Term by the "Tenant" under the Prime Lease, including the rules and regulations applicable to the Subleased Premises. Subtenant agrees not to do or permit anything to be done which would, with the passage of time or giving of notice (or both), result in an Event of Default under the Prime Lease or cause the Prime Lease or Sublandlord's right to possession of the Subleased Premises to be terminated. Subtenant covenants and agrees to timely perform its obligations under this Sublease and to indemnify, defend and hold Sublandlord harmless from any and all costs, expenses, liabilities or damages which Sublandlord may incur as a consequence of Subtenant's failure to perform any such obligations.

6.     **Landlord's Obligations under Prime Lease**.

(a)     **Sublandlord Not Liable**. Subtenant acknowledges that Sublandlord is not the owner of the Subleased Premises and is not in the position to perform any of the obligations required of Landlord by the terms of the Prime Lease, and Sublandlord shall not be required to provide or to perform the same hereunder. Subtenant acknowledges that Landlord shall be solely responsible for providing or performing any of Landlord's obligations under the Prime Lease, and in the event Subtenant has any complaints concerning any obligations required to be provided or performed by Landlord under the Prime Lease to the Subleased Premises, or has any other matters which would normally be discussed with a landlord, Subtenant agrees to first contact Landlord directly to handle such matters. Sublandlord shall not be in default under this Sublease for any failure by Landlord to perform any such obligations or for any failure by Landlord to respond to any communication directly from Subtenant.

(b)     **Enforcement of Landlord Obligations**. Provided that no Subtenant Default exists (and no event has occurred or circumstance exists that, with the giving of notice or passage of time or both, would constitute a Subtenant Default), Sublandlord agrees to use reasonable efforts to enforce performance of all obligations of Landlord under the Prime Lease; provided, however, that Sublandlord shall have no obligation to do so unless and until Sublandlord receives written notice from Subtenant specifying the nature of Landlord's failure to perform. The term "reasonable efforts" (1) may include Sublandlord bringing a legal action against Landlord, in Sublandlord's sole discretion, for its failure to perform and (2) shall not include or require Sublandlord to exercise any self-help remedies that may be available to Sublandlord under the Prime Lease. In enforcing performance of such obligations of Landlord, Sublandlord shall upon

4

Subtenant's written request, promptly notify Landlord of its non-performance under the Prime Lease and request that Landlord perform its obligations under the Prime Lease. For purposes of this Subsection 6(b), an email from Subtenant to Sublandlord is permitted written notice.

(c)    **Communications with or from Landlord**. In addition, to the extent the Landlord requires that any communications or requests be made through Sublandlord, Sublandlord agrees to promptly forward to Landlord any communications or requests received from Subtenant that require some action on Landlord's part or require Landlord's review, compliance or consent. In any case, Sublandlord and Subtenant shall promptly provide the other party with any notices received from Landlord which affect the Subleased Premises, or the common areas or parking areas of the Subleased Premises.

7.    **Improvements and Alterations**.    Subtenant shall not make any alterations, additions or improvements to the Subleased Premises ("Alterations") without the prior written consent of and approval of plans and specifications therefor by (a) Landlord, provided that (1) no Subtenant Default exists, and (2) the Alterations in question comply with the terms and conditions of the Prime Lease. Sublandlord agrees to submit to Landlord any request for Landlord consent and approval of plans and specifications and to reasonably cooperate with Subtenant, at no cost to Sublandlord, in obtaining any such consent from Landlord. Any Alterations to the Subleased Premises shall be undertaken in accordance with Sections 11 and 12 of the Prime Lease. Subtenant shall indemnify, defend and hold harmless Sublandlord for any claims of Landlord or any third parties (including, without limitation, lien claims) arising out of any Alterations made by or by third parties on behalf of Subtenant (or its permitted sub-subtenants or assignees). Any costs or expenses required to be paid pursuant to the Prime Lease relating to any request for consent from Landlord in connection with any such Alterations (including, without limitation, costs and expenses relating to Landlord's review of space plans and working drawings) or otherwise relating to such Alterations (including, without limitation, any administrative fee or construction management fee required to be paid pursuant to the Prime Lease and any additional real estate taxes resulting from such Alterations) shall be paid by Subtenant within the time period set forth in the Prime Lease for payment of such costs or expenses.

(a)    **Consent Required to Assign.** Subtenant shall not, directly or indirectly, whether voluntarily, involuntarily or by operation of law, assign this Sublease, without first obtaining the prior written consent of the Sublandlord, which shall not be unreasonably withheld, conditioned or delayed, and (2) Landlord if Landlord's consent is required under the Prime Lease. In no event may Subtenant encumber or hypothecate this Sublease or the Subleased Premises. Any assignment, sublease, use or occupancy by any party other than Subtenant, encumbrance or hypothecation shall constitute a "Transfer" for purposes hereof. Sublandlord may withhold consent based on Landlord's disapproval of a proposed assignment or other Transfer. Any assignment, subletting or other Transfer by Subtenant in violation of this Section 7 shall be null and void and constitute a Subtenant Default. Subtenant acknowledges it will be required to fulfill all notice and consent requirements of the Tenant to the Landlord under the Prime Lease. Sublandlord acknowledges that it may not condition approval of an assignment of the Sublease on a new Dealer Sales Agreement, following the Initial Term of the DSA. If Subtenant requests that Sublandlord consent to the assignment of the Sublease and the Management Agreement to the same assignee, Drake agrees to process both assignments simultaneously.

(b)    **Compliance with Prime Lease; Payment of Costs.** . Any proposed assignment, sublease or other Transfer shall be subject to the terms of the Prime Lease, including, without limitation, the obligation to provide notices and documentation regarding the proposed assignee, subtenant or transferee (which notices and documentation shall be provided to both Sublandlord and Landlord) and to obtain the consent of Landlord to any such assignment, sublease or Transfer to the extent required under the Prime Lease. Upon request, Subtenant and the proposed assignee, sub-subtenant or transferee shall execute and deliver Sublandlord's and Landlord's standard forms of consent documents and such other instruments and documents (e.g., estoppel certificates) as Sublandlord or Landlord may reasonably require.

(c)    **Continuing    Liability;    Enforcement    Against    Transferees**. Notwithstanding any assignment, sublease or other Transfer by Subtenant, Subtenant shall remain directly and primarily liable for all covenants, duties and obligations of Subtenant hereunder and shall continue to make all Rent payments that become due and payable hereunder to Sublandlord in a timely manner. Sublandlord shall have the right to enforce the provisions of Section 7(c) against Subtenant or any assignee, sub-subtenant or transferee without demand upon or proceeding in any way against any other Person. In connection with any assignment or other transfer, Sublandlord may require the assignee or transferee to provide an additional security deposit or other form of security acceptable to Sublandlord.

(d)    **Assignment by Sublandlord**. Sublandlord may not assign this Sublease or the Prime Lease, except that Sublandlord may assign the Prime Lease to Subtenant or any other party approved in writing by Subtenant.

8.    **Default; Remedies**.

(a)    **Subtenant Default**. Any one or more of the following events will constitute an event of default by Subtenant (a "<u>Subtenant Default</u>") under this Sublease:

(1)    failure by Subtenant to timely pay any installment of Sublease Base Rent, any Additional Charges, or any other amount required to be paid by Subtenant to Sublandlord, and if such failure shall continue for five (5) days after written notice from Sublandlord to Subtenant that such payment was not received when due; or

(2)    failure or refusal by Subtenant to perform, comply with or observe any other non-monetary term, covenant or provision of this Sublease or the Prime Lease required to be performed, complied with or observed by Subtenant, and such failure continues for fifteen (15) days after written notice to Subtenant from Sublandlord or Landlord of such failure or refusal; (provided, further, however, if the Prime Lease provides that no notice or cure period would be provided to Sublandlord under the Prime Lease if Sublandlord breached the term, condition, covenant or provision of the Prime Lease that Subtenant has failed to perform, comply with or observe, no notice or cure period shall be provided to Subtenant hereunder); or

(3)    the filing of a petition by or against Subtenant (A) in any bankruptcy or other insolvency proceeding; (B) seeking any relief under any state or federal debtor relief Law; (C) for the appointment of a liquidator or receiver for all or substantially all of

Subtenant's property or for Subtenant's interest in this Sublease; or (D) for the reorganization or modification of Subtenant's capital structure; however, if such a petition is filed against (rather than by) Subtenant, then such filing shall not be a Subtenant Default unless Subtenant fails to have the proceedings initiated by such petition dismissed within 60 days after the filing thereof; or

(4)    Subtenant shall make a general assignment for the benefit of creditors; or

(5)    Subtenant dissolves, liquidates or otherwise ceases to exist; or

(6)    the performance or non-performance of any other obligation hereunder or the occurrence of any other event which, if it remains uncured, would result in an Event of Default under the Prime Lease, if such performance, non-performance or event is not cured at least 7 days in advance of the time as required (if any) for a cure thereof under the Prime Lease.

(b)    **Remedies**. At any time after a Subtenant Default has occurred, Sublandlord may (1) terminate this Sublease, (2) terminate Subtenant's right to possession of the Subleased Premises without terminating this Sublease, (3) exercise any and all of the same rights and remedies as provided to Landlord under the Prime Lease for an Event of Default of "Tenant" thereunder, or (4) exercise any and all rights and remedies available hereunder, at law or in equity. Without limiting the foregoing, and after applicable notice, Sublandlord may immediately or at any time after the expiration of applicable cure period of a Subtenant Default and while such Subtenant Default remains uncured re-enter the Subleased Premises and remove all persons therefrom with or without legal process, and without prejudice to any of its other legal rights, and Subtenant expressly waives all claims for damages by reason of such re-entry, as well as all claims for damages by reason of any eviction proceedings or proceedings by way of sequestration or any other legal proceedings which Sublandlord may employ all remedies allowed by law to recover unpaid rents or possession of the Subleased Premises. Taking of possession by Sublandlord, or Sublandlord's service of any eviction demand shall not constitute an election to terminate this Sublease, unless expressly so stated in writing. In addition, without limiting the foregoing, in the event Sublandlord reasonably believes that Subtenant's failure to cure a breach under Section 8(a)(2) or Section 8(a)(6) above could cause an Event of Default to occur under the Prime Lease, Sublandlord may, upon giving Subtenant not less than two (2) business days prior written notice thereof (even if prior to expiration of the cure period set forth therein), attempt to cure such breach, in which case Subtenant shall reimburse Sublandlord for all expenses incurred by Sublandlord in connection therewith upon demand.

(c)    **Damages if Sublandlord Reoccupies**. If Sublandlord elects to reoccupy all or any portion of the Subleased Premises at any time after this Sublease is terminated or Subtenant's right to possession of the Subleased Premises has terminated as a result of a Subtenant Default, then Sublandlord may (but shall not be obligated to) elect to collect from Subtenant, in lieu of any other damages and in lieu of the recovery by Sublandlord of all other sums payable hereunder, by notice to Subtenant, and Subtenant shall thereupon pay, as liquidated damages, an amount equal to the sum of (A) the Sublease Base Rent that would have been payable for the lesser of (1) the twelve (12) months immediately following such termination if this Sublease had not been terminated and

7

(2) the number of full months that would have been remaining in the Sublease Term if this Sublease had not been terminated (provided, however, the amounts set forth above in (A) (1) and (2) shall be offset by the fair market rental value of the Subleased Premises) plus (B) the amount of Rent of any kind accrued and unpaid at the time of such election plus any and all expenses which Sublandlord may have incurred for and with respect to the collection of any of such rent.

(d)    **Sublandlord's Default and Remedies.** Sublandlord will be in Default of this Sublease, if Sublandlord is in default under the Prime Lease after any notice and cure period under the Prime Lease, provided Subtenant did not cause Sublandlord's Prime Lease default. Sublandlord will notify Subtenant if it receives written notice of default from Landlord and provide to Subtenant a copy of such notice within seven (7) days of its receipt. If Subtenant asserts that Sublandlord is in default under this Sublease, then Subtenant will provide Sublandlord written notice of such default, including any assertion of a material default, and a twenty (20) day period to cure such default under this Sublease.  If Sublandlord defaults on this Sublease after any notice and cure period and does not cure such default, then Subtenant may exercise its remedies, as allowed by New York state law.  Subtenant's remedies are limited to the same rights and remedies, if any, which are provided to Tenant under the Prime Lease for an Event of Default of "Landlord" thereunder.  Notwithstanding the above, if such default cannot be cured within such twenty (20) day cure period, it shall not constitute a default if Sublandlord commences to cure within such period and diligently pursues same.

(e)    **Cumulative Rights**. All rights and remedies of Sublandlord and Subtenant under this Sublease shall be cumulative and none shall exclude any other right or remedy allowed by law or in equity, and such rights and remedies may be exercised and enforced concurrently and whenever and as often as occasion therefor arises.

(f)    **Assertion of Landlord and Sublandlord Material Default**.  In the event Subtenant asserts or claims that either Landlord or Sublandlord is in material default under this Sublease, Subtenant must provide Landlord and Sublandlord with written notice of such material default and a twenty (20) day period to cure such default.  Notwithstanding the above, if such default cannot be cured within such twenty (20) day cure period, it shall not constitute a default if Landlord or Sublandlord commence to cure within such period and diligently pursue same.

9.    **Waiver of Consequential Damages**. WITHOUT AFFECTING THE RIGHTS OF SUBLANDLORD OR SUBTENANT TO RECOVER ACTUAL, DIRECT DAMAGES, EXCEPT AS EXPRESSLY SET FORTH IN THIS SUBLEASE, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE, EXEMPLARY OR SPECIAL DAMAGES OR LOST PROFITS (COLLECTIVELY, "CONSEQUENTIAL DAMAGES") RESULTING FROM ANY CAUSE WHATSOEVER, WHETHER ARISING IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, INDEMNITY OR OTHERWISE. THE PROVISIONS OF THIS SECTION SHALL EXPRESSLY SURVIVE THE EXPIRATION OR TERMINATION OF THIS SUBLEASE. Subtenant agrees, however, that any costs, expenses, liabilities or damages incurred or payable by Sublandlord to Landlord or any third party pursuant to the Prime Lease or otherwise as a result of Subtenant's failure to perform its obligations under this Sublease shall be considered actual direct damages for all purposes under this Sublease, and Subtenant waives and releases any claims that the same are Consequential

Damages. In addition, no partner, member, shareholder, director or officer of Sublandlord or Subtenant shall have personal liability for or with respect to any of the obligations of Sublandlord or Subtenant under this Sublease.

10.    **Holding Over**.  If Subtenant remains in possession of or fails to fully vacate the Subleased Premises or any portion thereof after the expiration or earlier termination of this Sublease, then Subtenant shall be deemed to be holding over and occupying the Subleased Premises as a tenant at sufferance at a daily rental equal to 100% of the monthly Sublease Base Rental for the Subleased Premises in effect prior to expiration or termination and shall otherwise remain subject to all the conditions, provisions and obligations of this Sublease insofar as the same are applicable to a tenancy at sufferance, including without limitation, the payment of all Additional Charges and other amounts payable hereunder.  No holding over by Subtenant after the expiration or termination of this Sublease shall be construed to extend or renew the Sublease Term or in any other manner be construed as permission by Sublandlord to holdover.  In addition to the holdover rent payable by Subtenant as provided above, Subtenant shall indemnify and hold Sublandlord harmless from and against, and shall pay to Sublandlord within five (5) business days of demand, any and all holdover rent, damages, losses, costs and expenses, including reasonable attorneys' fees, incurred by Sublandlord arising out of or in any way attributable to such holding over.  Subtenant agrees that any holdover rent, damages, costs, expenses, indemnity or other obligations or liabilities that Sublandlord incurs under the Prime Lease arising out of or in any way attributable to any holding over by Subtenant shall be deemed actual damages under the preceding sentence, and Subtenant waives and releases any claims that the same are Consequential Damages.

11.    **Surrender.**  Subtenant agrees that, at the expiration or earlier termination of this Sublease, Subtenant shall (a) surrender the Subleased Premises to Sublandlord broom clean and in good condition and state of repair, reasonable wear and tear only excepted, and otherwise in the condition in which Sublandlord is required to surrender the Subleased Premises under the Prime Lease upon expiration of the Prime Lease, (b) remove all of Subtenant's personal property and any Alterations to the Subleased Premises installed by Subtenant and (c) repair any damage caused by such removal.

12.    **Incorporation of Prime Lease Terms**.  This Sublease is expressly subordinate and subject to the terms of the Prime Lease.  The terms, provisions, covenants and conditions of the Prime Lease are hereby incorporated into this Sublease by reference as fully as if completely reproduced herein; provided, however, for purposes of the Prime Lease provisions so incorporated into this Sublease:

(a)    the term "Landlord" as used in the Prime Lease (but not when used in this Sublease) shall refer to Sublandlord and its successors and assigns; the term "Tenant" as used in the Prime Lease (but not when used in this Sublease) shall refer to Subtenant; the term "Base Rental" as used in the Prime Lease shall refer to Sublease Base Rent; the term "Leased Premises" as used in the Prime Lease shall refer to the Subleased Premises; the term "Lease" as used in the Prime Lease shall refer to this Sublease; the term "Term" as used in the Prime Lease shall refer to the "Sublease Term"; the term "Effective Date" as used in the Prime Lease shall refer to the Effective Date under this Sublease; and the term "Event of Default" as used in the Prime Lease may refer to either a Subtenant Default or a Sublandlord Default;

9

(b)    in any case where Landlord reserves the right to enter or access the Subleased Premises, such right shall inure to the benefit of both Sublandlord and Landlord;

(c)    in any instance in which the consent, approval, permission, authorization or acceptance of Landlord is required under the Prime Lease, either the Sublandlord and/or the Subtenant (whichever party is the appropriate party) shall be required to obtain the consent, approval, permission, authorization or acceptance of Landlord and Sublandlord;

(d)    in any instance in which Subtenant is required to give notice to Sublandlord pursuant to any of the provisions of the Prime Lease, as incorporated herein, Subtenant shall also provide such notice to Landlord;

(e)    from and after the earlier of the Effective Date or any entry into the Subleased Premises by Subtenant, Subtenant shall (1) maintain all insurance required to be maintained by the "Tenant" under the Prime Lease in the amounts stated in the Prime Lease (however, with regard to the property insurance required to be carried by Subtenant on leasehold improvements, only the leasehold improvements in the Subleased Premises must be insured by Subtenant, and Sublandlord shall insure all other leasehold improvements), with Sublandlord and Landlord (and any other parties required under the Prime Lease and Sublandlord to be so named) named as additional insureds with contractual liability coverage in those instances in which the Prime Lease requires Landlord to be named as an additional insured, and (2) furnish to Sublandlord and Landlord, on or before any entry into the Subleased Premises and at any time thereafter upon request or as otherwise required under the Prime Lease, certificates of such insurance and other evidence satisfactory to Sublandlord and Landlord of the maintenance of all insurance coverage required hereunder;

(f)    all indemnity obligations of Subtenant regarding the Subleased Premises or use of or activities in other portions of the Subleased Premises by any of Subtenant, any subtenant of Subtenant, all present and future owners and managers of the leasehold estate in the Subleased Premises or any portion hereof, its and their respective partners, members, and affiliates, and the officers, directors, employees, agents, representatives, shareholders, managers, members, lessees, visitors, invitees and contractors of any of the foregoing, and the heirs, legal representatives, successors and assigns of any of the foregoing (collectively, the "Subtenant Parties") under the Prime Lease, as incorporated herein, and all waivers, releases, and exculpatory provisions under the Prime Lease for the benefit of (1) Landlord shall be for the benefit of Sublandlord and Landlord, or (2) any Landlord Related Party shall be for the benefit of any Landlord Related Party and Sublandlord's officers, directors, shareholders, employees, partners, members, managers, representatives, agents, successors and assigns (the "Sublandlord Parties");

(g)    in no event shall Subtenant be entitled to exercise any self-help rights or rights to cancel or terminate the Prime Lease available to Sublandlord as "Tenant" under the Prime Lease, or exercise any of Sublandlord's options or elections permitted or authorized under the Prime Lease (including without limitation, any renewal or extension option, expansion right, right of first offer or right of first refusal, or any other similar right);

(h)    Sublandlord shall not be obligated to perform, comply with or observe any obligations, covenants, conditions, terms or provisions required to be performed, complied with or

10

observed by Landlord under the Prime Lease with respect to providing services or utilities, making improvements or alterations to the Subleased Premises or the Subleased Premises, repair or restoration of the Subleased Premises or any portion of the Subleased Premises or the remainder of the Subleased Premises following a casualty or condemnation, or the investigation, clean up or remediation of any Pollutants in the Subleased Premises not caused by Sublandlord;

(i)    this Sublease shall be subordinate to any mortgage, deed of trust and related security instruments now or hereafter covering all or any portion of the Subleased Premises, and Sublandlord shall use commercially reasonable efforts to obtain a subordination, non-disturbance and attornment agreement for the benefit of Subtenant from Landlord;

(j)    no representations or warranties made by Landlord or Sublandlord under the Prime Lease, if any, are incorporated herein (and in no event shall Sublandlord be deemed to have made any such representations or warranties to Subtenant or shall Subtenant be deemed to have made any such representations or warranties to Sublandlord);

(k)    in no event shall Sublandlord be liable for any acts or omissions of Landlord or any Landlord Related Party or any failure of Landlord or any Landlord Related Party to comply with the terms of the Prime Lease; and, without relieving Sublandlord of its obligations under Section 6(b) above no such acts, omissions or failure shall constitute a default by Sublandlord hereunder;

(l)    Sublandlord may not exercise any termination rights of Landlord under the Prime Lease in the event of a casualty or condemnation (however, Sublandlord may exercise any termination rights of Sublandlord as "Tenant" under the Prime Lease, and Subtenant may terminate this Sublease in the event of any casualty or condemnation if Sublandlord as "Tenant" under the Prime Lease would be entitled to terminate the Prime Lease either in its entirety or as to the Subleased Premises, unless such termination right accrued as a result of the negligence or willful misconduct of Subtenant or any of the Subtenant Parties); and

(m)    Sublandlord shall have no obligation to indemnify, defend or hold harmless Subtenant under any circumstances.

**13.    <u>Indemnity</u>**. In addition to any waivers and indemnity obligations set forth in the Prime Lease, as incorporated herein,   Subtenant on behalf of itself and all Subtenant Parties hereby waives and releases all claims and causes of action against any Sublandlord Parties and Landlord, and agrees to indemnify, defend and hold harmless all Sublandlord Parties and Landlord and their respective agents from and against any and all  liabilities, obligations, fines procedures, damages, claims, suits, losses, causes of action, liens, judgments, costs and expenses (including, without limitation, reasonable court costs, reasonable attorneys' fees and costs of investigation) of any kind, nature or description suffered or incurred by, or asserted against, any of the Sublandlord Parties or Landlord arising out of the activities of any Subtenant Parties relating in any way to the Subleased Premises or the use thereof, or the exercise or performance by any Subtenant Parties of any rights or obligations hereunder, including without limitation arising out of:

(a)    any act or omission of Subtenant or any of the other Subtenant Parties;

11

(b)     the use of the Sublease Premises, or any activities in any way relating to the use or occupancy of the Sublease Premises;

(c)     a breach, violation, or non-performance by Subtenant or any of the other Subtenant Parties of any law, rule, regulation or ordinance relating to the use of Sublease Premises, or any provision of this Sublease, or the operations of Subtenant or the other Subtenant Parties relating to the use by any of the Subtenant Parties of the Subleased Premises; or

(d)     injuries to or death of any person or any damage to property resulting from any of the foregoing clauses (a) through (c) (collectively, the "**Claims**"), EVEN IF SUCH CLAIMS ARE CAUSED BY OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, THE STRICT LIABILITY OR THE CONCURRENT OR JOINT OR CONTRIBUTORY NEGLIGENCE OF SUBLANDLORD, LANDLORD OR ANY OF THE OTHER SUBLANDLORD PARTIES, SUBJECT TO THIS SECTION 13.  If any such Claim is made against Sublandlord, Landlord or any of the other Sublandlord Parties, Subtenant shall, at its sole cost and expense, defend such Claim.  "**Defend**" means to oppose on behalf of Sublandlord, Landlord, and the other Sublandlord Parties a Claim in litigation, arbitration, mediation or other proceeding and to pay all costs associated with the preparation and prosecution of such defense.  In resolving or settling any Claim, Subtenant shall obtain a full and final release of such Claim made against Sublandlord, Landlord or the other Sublandlord Parties.  The indemnity obligations of Subtenant are in addition to and cumulative of Subtenant's obligations to obtain and maintain insurance as otherwise provided in this Sublease.  Subtenant's indemnity covers all Claims referred to herein (i) arising from and after the Commencement Date of this Sublease or after the expiration of the term of this Sublease to the extent caused by the acts or omissions of Subtenant or any employee, officer, contractor, agent, subtenant, subtenant, guest, licensee or invitee of Subtenant, and (ii) during the term of this Sublease.  THE FOREGOING INDEMNITY IS INTENDED TO INDEMNIFY SUBLANDLORD, LANDLORD AND THE OTHER SUBLANDLORD PARTIES AGAINST THE CONSEQUENCES OF THEIR CONTRIBUTORY NEGLIGENCE OR FAULT AND AGAINST THE CONSEQUENCES OF THEIR NEGLIGENCE OR FAULT OCCURRING JOINTLY OR CONCURRENTLY WITH THE NEGLIGENCE OR FAULT OF SUBTENANT OR OF SUBTENANT'S AGENTS, EMPLOYEES, OFFICERS, SUBTENANTS, LICENSEES, GUESTS, INVITEES OR CONTRACTORS, OR THEIR RESPECTIVE AGENTS, EMPLOYEES OR CONTRACTORS, BUT NOT FOR ANY CLAIM CAUSED BY SUBLANDLORD, LANDLORD OR THE OTHER SUBLANDLORD PARTIES' SOLE NEGLIGENCE OR SOLE WILLFUL MISCONDUCT.

DESPITE ANYTHING CONTAINED IN THIS SUBLEASE TO THE CONTRARY, IF THE FINAL NON-APPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION ESTABLISHES, UNDER THE PRINCIPLES OF COMPARATIVE NEGLIGENCE IN THE STATE OF NEW YORK, THAT THE SOLE NEGLIGENCE OR SOLE WILLFUL MISCONDUCT OF SUBLANDLORD, LANDLORD OR ANY OTHER SUBLANDLORD PARTY PROXIMATELY CAUSED ALL OF THE DAMAGE SUFFERED BY THE APPLICABLE INJURED PARTY, THEN, ANY SUCH INDEMNIFICATION OF SUBLANDLORD, LANDLORD OR ANY OTHER SUBLANDLORD PARTY BY SUBTENANT WILL NOT APPLY.

14.    **Representations and Warranties**.

(a)    **Sublandlord Representations.**    Sublandlord warrants and represents to Subtenant as follows:

(1)    Sublandlord is a corporation duly organized under the laws of the State of New York and has full right, power and authority to enter into this Sublease and to carry out its obligations hereunder; all limited liability company actions necessary to authorize Sublandlord to enter into this Sublease and to carry out its obligations hereunder have been taken; and the person signing this Sublease on behalf of Sublandlord is authorized to do so.

(b)    **Subtenant Representations**.    Subtenant warrants and represents to Sublandlord as follows:

(1)    Subtenant is a limited liability company duly organized under the laws of the State of New York and has full right, power and authority to enter into this Sublease and to carry out its obligations hereunder; all required limited liability company actions necessary to authorize Subtenant to enter into this Sublease and to carry out its obligations hereunder have been taken; and the person signing this Sublease on behalf of Subtenant is authorized to do so.

(2)    Subtenant has reviewed the terms of the Prime Lease.

15.    **Notices**. All notices or requests provided for hereunder shall be in writing and shall be (a) delivered by hand, (b) sent by United States registered or certified mail, return receipt requested, postage prepaid, or (c) sent by prepaid nationally recognized overnight carrier (e.g., FedEx) for next business day delivery or (d) sent by email or other electronic mail accepted by Sublandlord, to the address of the intended recipient, as follows:

if to Sublandlord:

DRAKE PETROLEUM COMPANY, INC.
800 South Street, Suite 500
Waltham, MA 02454
Attention: Peter Potter, Vice President, GDSO
Email: ppotter@globalp.com

with a copy to:

DRAKE PETROLEUM COMPANY, INC.
800 South Street, Suite 500
Waltham, MA 02454
Attention: Michael G. Lewis, Deputy General Counsel
Email: Michael.lewis@globalp.com

if to Subtenant:            SAIBABA'S ALMIGHTY, INC.
                            3522 State Street
                            Niskayuna, New York 12304
                            Attn:   Chirag Dewan, President
                            Email: chirag.dewan.d@gmail.com

with a copy to:             WILLIAMS MULLEN
                            200 South 10th Street, Suite 1600
                            P.O. Box 1350
                            Richmond, VA 23219
                            Attention:  A. Brooks Hock, Esq.
                            Email:  bhock@williamsmullen.com

Notices that are hand delivered shall be deemed received upon delivery.  Notices sent by United States mail as provided above shall be deemed received two business days after mailing.  Notice given via a nationally recognized overnight delivery service for next business day delivery shall deemed received upon delivery or attempted delivery by the overnight delivery service. Each party may from time to time change its notice address by at least five days prior written notice to the other party.

**16.     Governing Law**. This Sublease shall be governed by and construed in accordance with the laws of the State of New York.

**17.     Severability**.  In the event that any one or more of the provisions contained in this Sublease shall be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Sublease shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

**18.     Attorneys' Fees**.  If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Sublease, the prevailing party shall be entitled to recover reasonable attorneys' fees from the other party.

**19.     Survival of Obligations**.  All breaches of this Sublease by Subtenant or Sublandlord outstanding at the expiration or earlier termination of the Sublease Term shall survive such expiration or earlier termination, including, without limitation, payment obligations with respect to Rent and all obligations concerning the condition and repair of the Subleased Premises.

**20.     NO REPRESENTATIONS OR WARRANTIES.  SUBTENANT HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT SUBLANDLORD HAS NOT MADE ANY REPRESENTATIONS OR WARRANTIES TO SUBTENANT AS TO THE USE OR CONDITION OF THE SUBLEASED PREMISES OR THE SUBLEASED PREMISES OR AS TO THE ADEQUACY OF ANY EQUIPMENT (INCLUDING THE HEATING, VENTILATING OR AIR CONDITIONING EQUIPMENT), EITHER EXPRESS OR IMPLIED, AND SUBLANDLORD EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY THAT THE SUBLEASED PREMISES ARE HABITABLE, SUITABLE FOR SUBTENANT'S INTENDED PURPOSE OR FOR ANY OTHER USE.**

14

**SUBTENANT FURTHER EXPRESSLY AGREE THAT THERE ARE AND SHALL BE NO IMPLIED WARRANTIES OF MERCHANTABILITY, HABITABILITY, FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER KIND ARISING OUT OF THIS SUBLEASE OR THE SUBTENANCY CONTEMPLATED HEREBY OR THE USE OF THE SUBLEASED PREMISES AND THAT ALL EXPRESS OR IMPLIED WARRANTIES IN CONNECTION HEREWITH ARE EXPRESSLY DISCLAIMED. THE PROVISIONS OF THIS SECTION ARE A MATERIAL PART OF THE CONSIDERATION FOR SUBLANDLORD ENTERING INTO THIS SUBLEASE. EACH OF SUBTENANT AND SUBLANDLORD ACKNOWLEDGES AND AGREES THAT THIS SECTION 21 SHALL NOT ALTER THE TERMS OF THAT CERTAIN ASSET PURCHASE AGREEMENT, DATED AS OF MARCH 28, 2023, BY AND AMONG SUBLANDLORD, SUBTENANT AND LANDMARK INDUSTRIES, LLC.**

**21.    INDEPENDENT COVENANTS.    SUBTENANT EXPRESSLY ACKNOWLEDGES AND AGREES THAT SUBTENANT'S OBLIGATION TO PAY SUBLEASE BASE RENT, ADDITIONAL CHARGES AND ALL OTHER SUMS DUE HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE SUBLEASED PREMISES OR THE PERFORMANCE BY SUBLANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER (OR BY LANDLORD OF ITS DUTIES OR OBLIGATIONS UNDER THE PRIME LEASE), AND THAT SUBTENANT WILL CONTINUE TO PAY ALL SUBLEASE BASE RENT, ADDITIONAL CHARGES AND ALL OTHER SUMS PROVIDED FOR HEREIN TO BE PAID BY SUBTENANT WITHOUT ABATEMENT, SET-OFF, OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY SUBLANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER (OR BY LANDLORD OF ITS DUTIES OR OBLIGATIONS UNDER THE PRIME LEASE), EXPRESS OR IMPLIED.**

22.    **Quiet Enjoyment; Amendment or Termination of Prime Lease.**  Provided Subtenant has performed and complied with all of the terms, covenants, agreements and conditions of this Sublease, Subtenant shall peaceably and quietly hold and enjoy the Subleased Premises against Sublandlord and all persons claiming by, through or under Sublandlord, for the Sublease Term, subject to the terms and conditions of this Sublease and the Prime Lease. Sublandlord agrees that Sublandlord shall not modify or amend the Prime Lease in a manner that adversely affects Subtenant's right to use and occupy the Subleased Premises during the Sublease Term in any material respect or that increases Subtenant's obligations in any material respect without, in each instance, Subtenant's prior written consent. The foregoing shall not prohibit Sublandlord or Subtenant from exercising any termination rights expressly granted to Sublandlord under the Prime Lease (e.g., in the event of a casualty or condemnation), which rights are for the benefit of both expressly reserved and retained by Sublandlord and Subtenant and these rights may be exercised by Sublandlord or Subtenant as provided in the Prime Lease without Subtenant's consent, without the same being deemed or construed as a breach of the covenant of quiet enjoyment set forth herein or a default by Sublandlord hereunder and without any liability to Subtenant for costs, expenses or damages arising out of any such termination.

23.    **Entire Agreement; Amendments.**  This Sublease constitutes the entire agreement between Subtenant and Sublandlord and supersedes all prior agreements (whether written or otherwise) that may exist between the parties with regard to the sublease and use of the Subleased

Premises by Subtenant. This Sublease may not be modified or amended, except by an instrument in writing executed by the parties hereto.

24.    **Construction**.  Each of Subtenant and Sublandlord has been represented by legal counsel (or has been afforded the opportunity to be represented by legal counsel and has made a conscious decision not to be so represented) in connection with the negotiation of this Sublease and has reviewed this Sublease and the Prime Lease; accordingly, the normal rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Sublease.  No custom or practice which may evolve between the Subtenant and Sublandlord during the term of this Sublease shall be deemed or construed to waive or lessen the right of either of the parties hereto to insist upon strict compliance of the terms of this Sublease.

25.    **Time is of the Essence**.  Time is hereby expressly declared to be of the essence of this Sublease.

26.    **Captions**.  Captions and section headings in this Sublease are for convenience of reference and shall not affect the construction or interpretation of this Sublease.

27.    **Environmental Matters**.  Subtenant agrees that it shall not use or permit the use of any Pollutants in violation of applicable environmental laws, rules, ordinances and regulations (collectively, "Environmental Laws") in the construction, operation, maintenance or use of the Subleased Premises or use of the exterior common areas, parking areas, or Subleased Premises. In the event any Pollutants are discovered in the Subleased Premises in violation of applicable Environmental Laws, then Subtenant shall notify Sublandlord of such event and Subtenant shall assume responsibility for all costs and expenses associated with such release and remediation of the Sublease Premises (and any property affected thereby), and shall undertake, at its cost, all reasonable actions necessary to effect compliance with such applicable Environmental Laws.

28.    **Brokers**. Sublandlord and Subtenant each warrant to the other that it has not dealt with any broker or agent in connection with the negotiation or execution of this Sublease. Subtenant and Sublandlord shall each indemnify the other against all costs, expenses, attorneys' fees, and other liability for commissions or other compensation claimed by any broker or agent claiming the same by, through, or under the indemnifying party.

29.    **Signage**.  Sublandlord and Subtenant shall request approval from Landlord to permit Subtenant to have its name on the Subleased Premises. In no event shall Landlord's consent to or approval of such signage be a condition to Subtenant's obligations under this Sublease and in no event shall Subtenant have any right to terminate this Sublease if such consent or approval is not obtained. Subtenant may request permission and consent from Sublandlord directly.

30.    **Confidentiality**.  Each of Sublandlord and Subtenant agrees that this Sublease and the terms contained herein will be treated as strictly confidential and except as required by applicable laws (including without limitation, applicable securities laws) or except with the written consent of the other party, neither party shall disclose the same to any third party, except that either party may disclose the same to its partners, lenders, accountants and attorneys and prospective assignees, subtenants and financial partners or investors who have been advised of the confidentiality provisions contained herein and agree to be bound by the same.  Notwithstanding

the foregoing, Sublandlord may provide a copy of this Sublease or disclose any of the terms of this Sublease to Landlord (or any prospective purchaser, assignee or lender of Landlord) at any time without Subtenant's consent.

**31.    Counterparts**.  This Sublease may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document.  An executed counterpart transmitted by facsimile or electronic mail shall be deemed an original counterpart, the transmission of the same in such manner shall be effective as delivery of a manually executed original counterpart of this Sublease, and each party has the right to rely on any such counterpart to the same extent as if such party had received a manually executed original counterpart.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have such executed this Sublease Agreement on the date and year indicated below, to be effective on the Effective Date.

EXECUTED BY SUBLANDLORD on this the __26th__ day of September, 2023.

DRAKE PETROLEUM COMPANY, INC.

By
Name:    Mark Cosenza
Title:    SVP

EXECUTED BY SUBTENANT on this the _____ day of September, 2023.

SAIBABA'S ALMIGHTY, INC.

By:_____
Name: Chirag Dewan
Title:   President

*Signature Page to Sublease Agreement*

IN WITNESS WHEREOF, the parties hereto have such executed this Sublease Agreement on the date and year indicated below, to be effective on the Effective Date.

EXECUTED BY SUBLANDLORD on this the _____ day of September, 2023.

DRAKE PETROLEUM COMPANY, INC.

By:_____
Name:
Title:

EXECUTED BY SUBTENANT on this the __27th__ day of September, 2023.

SAIBABA'S ALMIGHTY, INC.

By:_____
Name:  Chirag Dewan
Title:   President

*Signature Page to Sublease Agreement*

## EXHIBIT A

**Legal Description of Subleased Premises**

TITLE NO. TA#05(00)844

DESCRIPTION - SCHEDULE A

All that parcel of land situate in the Town of Niskayuna, County of Schenectady and State of New York, being more particularly bounded and described as follows:

Beginning at a point in the westerly road boundary of State Street (also known as Route 5) at its intersection with the division line of lands now or formerly of Sanview Limited Partnership (Liber 1512, Page 410) to the north and lands now or formerly of Mobil Oil Corporation Liber 1175, Page 164; Liber 1175, Page 166) to the south; thence along westerly road boundary of State Street, South 27°-39'-15" East, a distance of 179.27 feet to a point located in the division line between lands now or formerly of Sixth Dunkin' Donuts Reality, Inc. (Liber 1054, Page 993) to the south and aforementioned lands to the north; thence along said division line South 60°-10'-51" West, a distance of 165.21 feet to a point located in the easterly road boundary of Albany Street; thence along easterly road boundary of Albany Street North 18°-50'-31" West, a distance of 187.60 feet to a point located in the division line between Sanview Limited Partnership to the north and Mobil Oil Corporation to the south; thence along said division line North 62°-17'-30" East, a distance of 136.35 feet to a point or Place of Beginning; containing 0.63 +/- acres more or less.

Subject to any other enforceable easements, restrictions or covenants of record that may exist.

As to Parcel I:

Being the same premises conveyed by Deed to ExxonMobil, a NY corporation, f/k/a Mobil Oil Corporation dated February 11, 1988, recorded February 11, 1988 in reel 1175 cp 164 made by Jay Frankel.

As to Parcel II:

Being the same premises conveyed by Deed to ExxonMobil, a NY corporation, f/k/a Mobil Oil Corporation dated February 11, 1988, recorded February 11, 1988 in reel 1175 cp 166 Frank Popolizio and Pasquale J. Ragozzino.

## EXHIBIT B

Prime Lease

SEE ATTACHED

Exhibit B



MA/pja  11-20-2367  08/15/11

<u>LEASE</u>

1.  <u>PARTIES</u>
    THIS INDENTURE made this **22** day of August, 2011 by and
between State Street Gas Plus, Inc., a New York corporation with
offices at 541 Clifton Park Center Road, Clifton Park, NY 12065
(hereinafter called the Lessor, which expression shall include
its successors and assigns, wherever the context so admits) of
the one part, and Drake Petroleum Company, Inc., a Massachusetts
corporation having its principal place of business at 221
Quinebaug Road, North Grosvenordale, CT 06255 (hereinafter called
the Lessee, which expression shall include its successors and
assigns, wherever the context so admits) of the other part.

2.  <u>DEMISED PREMISES</u>
    WITNESSETH, that in consideration of the rent and covenants
herein reserved and contained on the part of the Lessee to be
paid, performed and observed, the Lessor does hereby demise and
lease unto the Lessee the following described premises, together
with the buildings, improvements, equipment listed in Exhibit B,
attached hereto, and fixtures, now or hereafter placed or erected
thereon:

        Those certain premises located at 3522 State Street,
        Town of Niskayuna, County of Schenectady, State of New
        York (Tax ID # 60.19-1-3.1), being the same premises as
        approximately shown in Exhibit "A", attached hereto and
        incorporated herein by reference, hereinafter referred
        to as the "Demised Premises."

3.  <u>USE OF DEMISED PREMISES</u>
    The Demised Premises must be continually used for a
petroleum filling station, convenience store, fast food facility
and car wash, or for any lawful purpose deemed appropriate by
Lessee, with the consent of Lessor, which consent shall not be
unreasonably withheld, delayed or conditioned, provided any use
will not violate the terms of the Special Warranty Deed from
ExxonMobil Oil Corporation to Lessor (the "Deed"), hereinafter
referred to as the "Permitted Use."

4.  <u>ORIGINAL TERM</u>

    (a)  The Original Term of this Lease shall be for ten (10)
years, commencing as of _____, 2011, and ending on
_____, 2021.  The commencement of this Lease shall take
place no later than sixty (60) days from the date Lessee notifies
Lessor that all licenses, permits and authorizations for such
businesses as described in said Section 10 have been issued to
Lessee.

    (b)  The Lessee's obligations under this Lease, including
without limitation, the obligations of the Lessee to pay rent, to

insure, to pay taxes, and to repair shall commence only on the "Rent Commencement Date", which shall be the later to occur of the following dates: (i) the date Lessor delivers possession of the Demised Premises to the Lessee free and clear of all tenants and occupants, except as set forth herein; (ii) the date that Lessee obtains the licenses, permits and authorizations for such businesses as described in said Section 10, issued and outstanding free of all appeal rights, and all of such businesses are being operated according to Lessee's plans and specifications therefor as described in said Section 10.

(c)  The Lessor's obligations under this Lease, including the delivery of possession of the Demised Premises to the Lessee free and clear of all tenants and occupants, is conditioned upon Lessee entering into lease agreements with Sitterly Road Realty, LLC, Quadmo, LTD., Scotia Gas Plus, Inc, and Exit 13 Gas Plus, Inc. and taking possession of all four (4) premises which are owned/operated by said entities.

(d)  As soon as the Rent Commencement Date has been determined, memoranda in the form attached hereto as Exhibit "C" will be executed by Lessor and Lessee setting forth the actual commencement and expiration dates of the term of this Lease and certifying that Tenant is in occupancy and this Lease is in full force and effect.

5.  RENT

(a)  This a triple net Lease. The term "rent" as used herein shall include "base rent" as set forth in Section 5 (b) and additional (one time) commencement rent as set forth in Section 5 (c) together with all other taxes, assessments, levies, imposts, fees, water and sewer rents or charges and any other obligations levied against the property or arising out of or in connection with the use and operation of the property or business conducted thereon by Lessee. Lessee is responsible for all utilities including, heat and electric charges and service.

(b)  Upon the Rent Commencement Date, Lessee shall begin payment to Lessor of the following rentals:

YIELDING AND PAYING therefore during the first three (3) years of the original term an annual rental of One Hundred and Forty-Seven Thousand Four Hundred ($147,400.00) Dollars, payable in advance in equal monthly installments of Twelve Thousand Two Hundred and Eighty-Three 33/100 ($12,283.33) Dollars per month, on the first day of each and every month during said period.

During years four (4) and five (5) of the original term an annual rental of One Hundred and Fifty-Four Thousand ($154,000.00) Dollars, payable in advance in equal monthly installments of Twelve Thousand Eight Hundred and Thirty-Three

33/100 ($12,833.33) Dollars per month, on the first day of each and every month during said period.

During years six through ten (6-10) of the original term an annual rental of One Hundred and Sixty-Two Thousand Eighty Hundred ($162,800.00) Dollars, payable in advance in equal monthly installments of Thirteen Thousand Five Hundred and Sixty-Six 66/100 ($13,566.66) per month, on the first day of each and every month during said period.

(c)   On the Rent Commencement Date, Lessee agrees to pay Lessor Fifty-Five Thousand ($55,000.00) Dollars (the "Pre-Payment"). The Pre-Payment is non-refundable and is considered rent payable for all purposes of this Lease. For purposes of Section 467 of the Internal Revenue Code of 1986, as amended (the "Code"), the total rent under this Lease shall be allocated in such manner as to result in the cumulative amount of rent payable as of the close of calendar year which includes the Rent Commencement Date to exceed the cumulative amount of rent allocated as the close of the succeeding calendar year (as determined in accordance with Section 1.467-1(c) (3) (iii) of the Treasury Regulations). Lessee and Lessor hereby agree not to take any contrary position for income tax purposes with respect to the treatment of the Pre-Payment for purposes of the Code.

(d)   Base rent shall be due on the first day of each calendar month. All other items constituting rent shall be payable on the date they are due. In the event that any payment whether of base rent or any other rent obligation is more than five (5) business days late, after receipt of written notice of such late payment, it shall be subject to a late payment of five (5%) percent of the amount due which, if in the case of rent obligations such as taxes shall be in addition to any other late fees, penalties or interest due. Said late payment shall be due and payable within five (5) days after the date of said notice to Lessee. The late payment fees set forth herein shall not constitute a waiver of any other rights Lessor may have including the right to declare a breach of lease and pursue any other remedies to which it may be legally entitled.

(e)   The Pre-Payment, base rent and any late fees, interest, penalties or other payments due Lessor by Lessee shall be paid by direct deposit into an account designated by Lessor.  For all payments that are due on the first of the month, should the first of the month fall on a weekend or holiday, payment shall be made on the last business day before the weekend or holiday.

(f)   Taxes and any other municipal assessments or imposts shall be paid when due directly by Lessee to the taxing or levying authority. All bills for taxes and any other municipal assessments or imposts shall be received by Lessor and Lessor shall provide same to Lessee within five (5) business days of Lessor's receipt of same. Proof of said third party payments

3

shall be provided to Lessor within thirty (30) days of payment by Lessee. Lessee shall be responsible to pay, due to its acts or omissions, all late fees, penalties, interest, legal fees or other cost associated with any late payments. Lessee shall not be responsible to pay any late fees, penalties, interest, legal fees or other cost associated with any late payments due to the acts or omissions of Lessor.

(g)  The Lessee shall have the right to set-off against any and all Rent during the original and during any extended term or terms of this Lease, or against any other sums payable hereunder, any and all sums whatsoever owing by the Lessor to the Lessee under Sections 20 or 35 of this Lease, upon the receipt of a judgment from a court of competent jurisdiction.

6.  OPTIONS TO EXTEND
The Lessor hereby grants to Lessee four (4) options to extend the term of this Lease. Each of the aforesaid options to extend shall be deemed to have been automatically exercised unless Lessee, no later than One Hundred and Eighty (180) days prior to the expiration of the then current term, gives written notice to the Lessor of its intention not to extend or further extend the Lease.  All of the extended terms shall be subject to all of the provisions herein contained, except for rent and duration and except for the provision for additional consecutive extensions as hereinafter set forth:

(a) The first extended term hereof shall be of five (5) years duration following the expiration of the original term hereof at an annual rental of One Hundred and Seventy-Nine Thousand and Eighty ($179,080.00) Dollars payable in advance in equal monthly installments of Fourteen Thousand Nine Hundred and Twenty-Three 33/100 ($14,923.33) Dollars per month, on the first day of each and every month during said extended term and contains an option to extend for the second extended term hereof, as hereinafter set forth.

(b) The second extended term hereof shall be of five (5) years duration following the expiration of the first extended term hereof at an annual rental of One Hundred and Ninety-Six Thousand Nine Hundred and Eighty-Eight ($196,988.00) Dollars payable in advance in equal monthly installments of Sixteen Thousand Four Hundred and Fifteen 66/100 ($16,415.66) Dollars per month, on the first day of each and every month during said extended term and contains an option to extend for the third extended term hereof, as hereinafter set forth.

(c) The third extended term hereof shall be of five (5) years duration following the expiration of the second extended term hereof at an annual rental of Two Hundred and Fifteen Thousand Six Hundred and Eighty-Six ($216,686.00) Dollars payable in advance in equal monthly installments of Eighteen Thousand and Fifty-Seven 16/100 ($18,057.16) Dollars per month, on the first

4

day of each and every month during said extended term and
contains an option to extend for the fourth extended term hereof,
as hereinafter set forth.

(d) The fourth extended term hereof shall be of five (5)
years duration following the expiration of the third extended
term hereof at an annual rental of Two Hundred and Thirty-Eight
Thousand Three Hundred and Fifty-Four ($238,354.00) Dollars
payable in advance in equal monthly installments of Nineteen
Thousand Eight Hundred and Sixty-Two 83/100 ($19,862.83) Dollars
per month, on the first day of each and every month during said
extended term.

7.   PRORATION OF RENT
     If the Rent Commencement Date falls on a day other than the
first day of the month, rent for the period between such
commencement date and the first day of the following month shall
be apportioned at the annual rental rate hereinabove provided
(based on a 360 date annual basis) and shall be due and payable
on the Rent Commencement Date. The final payment hereunder shall
be the last calendar month during which this Lease is in effect.

8.   COVENANT OF QUIET ENJOYMENT; FAILURE TO PERFORM
     The Lessor covenants that the Lessee, upon paying the Rent
and performing the covenants on its part to be performed
hereunder, shall and may peaceably and quietly have, hold and
enjoy the Demised Premises during the term and any extended term
or terms hereof.

     If the Lessor fails to convey to the Lessee a leasehold
estate in the Demised Premises in accordance with the terms of
this Lease, the Lessee shall in said event be entitled to
specific performance of the Lessor's said obligations to make
said conveyance and in any proceedings by Lessee to enforce said
obligations of the Lessor, to make any of said conveyance, the
Lessee shall be entitled to an injunction, without requirement of
any bond or other security, restraining the Lessor from selling,
leasing, mortgaging, transferring or encumbering the Demised
Premises, and shall pay all Lessee's costs of such action,
including Lessee's reasonable attorneys' fees.  This right of
specific performance shall be in addition to, and not in lieu of,
the Lessee's right to recover any and all damages from Lessor,
including reasonable attorneys' fees, if Lessor fails to make any
of said conveyance.

9.   WARRANTY AS TO POSSESSION
     The Lessor warrants, covenants and represents that at the
time of the commencement of the original term of the Lease,
Lessor shall, at Lessor's sole cost and expense, deliver
possession of the Demised Premises to Lessee, free and clear of
all other lessees, tenants, renters and occupants, except for the
Dunkin' Donuts franchise tenant, which lease will be assigned to
Lessee on the Rent Commencement Date.  Lessor agrees to be solely

responsible for bringing and paying all costs of any legal action necessary to evict or eject any of such lessees, tenants, renters, or occupants, or to otherwise gain possession of the Demised Premises. The Parties acknowledge that the original term of this Lease shall not commence unless or until all of the foregoing conditions have been met.

10.  CONDITIONS PRECEDENT
       The parties hereto do hereby specifically acknowledge and agree that this Lease is subject to and materially conditioned upon Lessee's first obtaining within One Hundred and Twenty (120) Days from the date Lessor provides Lessee with the documentation specified in Section 43 of this Lease, at Lessee's sole cost and expense (the "Due Diligence Period") (and Lessee shall use all reasonable efforts to do so, but shall not be obligated to engage in any litigation or appeal with respect thereto, and if Lessee does engage in such litigation or appeal shall not be obligated to continue therewith, and may discontinue or dismiss same for any reason at all and at any time), any and all permits and any and all other authorizations, licenses, and approvals from all governmental and regulatory agencies and/or authorities allowing for the Lessee's operation of a petroleum filling station, convenience store with beer, fast food facility and car wash at the Demised Premises, and all facilities thereunto appurtenant. If for any reason whatsoever Lessee is unable to obtain any of the aforementioned permits and authorizations within the Due Diligence Period, or if Lessee does not receive or is not satisfied with the contents of the records received under Section 43 of this Lease within sixty (60) days of Lessee's receipt of such records, Lessee may, by written notice to Lessor, elect to cancel this Lease and thereupon this Lease shall terminate without further liability to either party.

11.  RIGHT OF REPLACEMENT
       Should any of the improvements, fixtures, buildings, equipment, or pumps (collectively "Improvements") at the Demised Premises become obsolete, non-compliant or unfit for the purposes intended, Lessee shall replace or repair the same as Lessee may deem necessary in order to maintain a functional filing station or convenience store, in the event the Demised Premises is then being used for that purpose, title to such Improvements shall be transferred to Lessor at the expiration or other termination of this Lease. All said Improvements shall be made in good and workmanlike manner and in compliance with all applicable laws, building codes, regulations and ordinances of governmental authorities and any board of fire underwriters.  All such Improvements shall be at the sole cost and expense of the Lessee.

12.  RIGHT TO REMODEL; IMPROVEMENTS
       Lessee shall have the right, but not the obligation, to rearrange, remodel, remove, replace and/or install, construct and maintain any non-structural improvements, curb cuts, roadways and driveways, and use sidewalks for vehicles to pass to and from the

Demised Premises. All such remodeling or improvements shall be at the sole cost of Lessee, and shall comply with all applicable laws, regulations, building codes and rules of the board of fire underwriters.  Any structural changes, demolition to the building, or the removal, replacement, installation and/or construction of curb cuts, roadways and/or driveways shall require the Lessor's written consent, which consent shall not be unreasonably withheld, delayed or conditioned.

13.  TAXES
     During the term of this Lease and any extended term hereof, the Lessee shall pay when due and payable all real estate taxes or assessments on the Demised Premises and other charges assessed on the Demised Premises, except that Lessee shall not be liable for any portion of real estate taxes prior to Rent Commencement Date, or after the expiration or other termination of the term or any extended term hereof.

14.  MAINTENANCE
     (a)  Lessee agrees at its sole expense to keep the Demised Premises in the same repair, order and condition (not including the underground storage tanks during the Original Term of this Lease) as the same are in at the commencement of the term hereof of this Lease, subject to normal wear and tear, during the term of this Lease or any extension thereof, and at the expiration or other termination of this Lease, agrees to yield up the Demised Premises in substantially such repair, order and condition as aforesaid, ordinary wear and tear, taking by, or other acts of, public authority, damage by fire and/or other casualty, and acts and omissions of the Lessor, its agents or servants excepted, Lessee acknowledging and agreeing that at the expiration or other termination of this Lease Lessee shall deliver the Demised Premises and the petroleum filling station, convenience store, fast food facility and car wash to Lessor in the same repair, order and condition as the same were in at the commencement of the Lease including environmental condition being fully operational and in compliance with all applicable laws, rules and regulations. Lessee shall also keep the sidewalks, curbs and paved areas on the Demised Premises in good and safe condition and free from snow, ice and obstruction; keep the yard area free of trash and debris; keep and maintain all landscaping and green space; and replace damaged glass. Upon the commencement of the original term of the Lease, Lessor shall complete and execute and submit to the NYS DEC a Petroleum Bulk Storage Application wherein Lessee shall be designated as operator of the facility and designated in the contact sections.

     (b)  During the Original Term of this Lease, Lessor agrees to be responsible for the repair and/or replacement of the underground storage tanks located on the Demised Premises for any defect or failure due to normal wear and tear, as required by all applicable laws, rules or regulations, except for repair and/or replacement required on account of Lessee's modification, misuse

7

or abuse thereof, which repair and replacement shall be Lessee's responsibility at its own cost and expense. Such repair or replacement would be required if a tank fails, if a tank cannot be kept in compliance, or if NYS DEC or the EPA (or other governmental or regulatory agency) mandate or dictate tank obsolescence.  Lessor agrees to be responsible for any tank testing related to tank failure.

(c)  Upon the expiration of the final term of this Lease or earlier termination of this Lease for any reason, Lessor has the right to inspect the Demised Premises to ensure that it, and the petroleum filling station, convenience store, fast food facility and car wash, is surrendered, subject to the terms of this Lease, in the same repair, order and condition as the same were in at the commencement of the Lease including environmental condition, and in the event that the property is not in the same condition, Lessee shall be responsible for all repair, maintenance and environmental remediation that may be necessary and shall hold Lessor harmless and indemnified with respect to the same, including reasonable and necessary attorneys fees, and this obligation shall survive termination of this Lease.

(d) Should Lessee refuse or neglect to repair, replace and maintain properly as required hereunder after the expiration of the Notice of Default Period as defined herein, except in the case of an emergency, Lessor may make such repairs and replacements and upon completion thereof, Lessee shall pay as additional rent Lessor's cost for making such repairs and/or replacements upon presentation of bills therefor plus five percent (5%) for overhead and supervision.  Said bills shall include interest at twelve (12%) percent on said cost from the date of completion by Lessor.  Lessor shall in no event, be liable for inconvenience, annoyance or disturbance to Lessee by reason of making such repairs or the performance of such work in the Demised Premises or on account of bringing materials, supplies and equipment in to or through the Demised Premises during the course thereof and the obligations of Lessee under this Lease shall not be thereby affected in any manner whatsoever.

(e)  The term "underground storage tank" shall mean solely the gasoline storage tanks in their condition from the factory prior to installation and specifically excludes any and all attachments, penetrations, pipes, add-ons, tank system components, gas dispensing equipment, etc., and the gasoline or other fuels stored therein.

15.  <u>INSURANCE</u>
(a) Lessee shall during the term or any extended term of this Lease keep in full force and effect the following insurance:

(1)  A policy of bodily injury liability and property damage comprehensive liability insurance, with respect to the Demised

Premises and the business(es) operated by Lessee, with a limit of
$4,000,000.00 for each occurrence and a $4,000,000.00 aggregate
limit.

(2)  Worker's Compensation Insurance with statutory limits
covering Lessee and all of Lessee's employees, contractors and/or
subcontractors working on, in or about the Demised Premises.

(3)  During any time Lessee is doing construction work on
the Demised Premises, either a builders risk insurance policy
equal to replacement value or a conventional fire and extended
coverage insurance contract with permission to complete endorsed
thereon.

(4)  Fire and casualty insurance, with extended coverage
endorsements payable to Lessee in an amount adequate to cover the
full replacement value of the Demised Premises and the values of
all trade fixtures, contents, signs, furniture, decorations and
furnishings in the event of fire or other casualty.

(b)  All insurance Lessee is required to maintain under
this Lease (and each certificate of insurance issued with the
respect thereto) shall name Lessor and any person, firm or
corporation designated by Lessor as additional insured(s) on a
Primary and Non Contributory Basis as their interest may appear
and any mortgage holder as Mortgagee and Loss Payee; shall be in
insurance companies of good credit satisfactory to Lessor; shall
contain endorsements by the insurer, without disclaimers, that
the policies will not be cancelled, materially changed, amended,
reduced or non-renewed without at least thirty (30) days prior
notice to Lessor; and shall contain endorsements by the insurer,
without disclaimers, that the act or omission of any insured will
not invalidate the policy as to any other insured.

(c)  Certificates evidencing all of the aforementioned
insurance coverage shall be delivered to Lessor within five (5)
days prior to the commencement of the Lease Term.  New or renewal
policies shall be delivered by Lessee to Lessor at least twenty
(20) days before the expiration date or sooner termination of any
existing policies.

(d)  If Lessee shall not comply with its covenants made in
this Article, Lessor may, after expiration of the Notice of
Default, (but without obligation to do so), either consider
Lessee's failure to comply a default under this Lease or may
cause such insurance as aforesaid to be issued and, in such
event, Lessee agrees to pay the premium for such insurance
promptly upon Lessor's demand as additional rent, provided that
Lessee shall pay Lessor no more than the premium paid by Lessee.

(e)  In case the Demised Premises, or any part thereof,
shall be destroyed or damaged by fire or other casualty insured
against, the Lessee agrees to substantially restore the Demised

Premises and the petroleum filling station, convenience store,
fast food facility and coffee operation to the same order and
condition as the same were in at the commencement of the Lease
including environmental condition being fully operational and in
compliance with all applicable laws, rules and regulations, to
the extent possible under then existing applicable statutes,
codes, ordinances, by-laws, or regulations in any manner
affecting construction; provided, however, that should
restoration not be possible as provided for herein through no
fault of Lessee, Lessee may at its election, in lieu of
restoration, pay all of the insurance proceeds to Lessor and any
Mortgagee and the Lease shall terminate upon payment thereof.
Lessor agrees to co-operate with Lessee during all required
construction activities associated with any casualty addressed in
this Section, included but not limited to endorsing all insurance
proceeds for the payment of the required restoration work
described herein.

16. <u>CAR WASH OPERATION AGREEMENT</u>
    Lessor and Lessee acknowledge that the operation and
maintenance of the car wash system located on the Demised
Premises shall be governed by a separate agreement between Lessor
and Lessee (hereinafter referred to as the "Operation
Agreement").  Lessor and Lessee agree that the terms and
conditions of the Operation Agreement are incorporated by
reference into this Lease and that default by Lessor or Lessee
under the Operation Agreement shall be a default under this
Lease.

17. <u>FORCE MAJEURE</u>
    The Lessor covenants and warrants that to the best of its
knowledge, information and belief there is nothing preventing the
Lessee from legally operating a petroleum filling station,
convenience store with beer, fast food facility and car wash upon
these Demised Premises and that the Demised Premises are properly
permitted for the Use and conforming as to use, or such uses, or
structures thereon, and that any structures or storage tanks on
the Demised Premises, or under it, do not encroach upon or under
any other property, and nothing is encroaching upon or under the
Demised Premises.

    If any governmental authority whatsoever at any time during
the operation of this Lease prevents or prohibits the Lessee from
using these Demised Premises for the Permitted Use, then the
Lessee shall have the right at its own option to cancel this
Lease; provided, that the Lessee shall give Lessor prompt notice
of said actions, and Lessor shall have not less than ninety (90)
days to negotiate with such governmental authorities to remove
such prohibitions.

    The Lessor shall from time to time on written request of
Lessee assign to Lessee all permits or licenses issued (excluding
alcohol, tobacco or lottery licenses), if assignable, to the

extent they are assignable, by any public authority and governing the use of the herein Demised Premises.

If, during the original term of this Lease, or any renewal or extension thereof, or any holdover hereunder, without fault of Lessee, any use or uses then made of the Demised Premises, including but not limited to, use of same for a petroleum filling station, convenience store with beer, fast food facility and car wash, or all of same, be prevented by any zoning statute, or ordinance, or any other municipal or governmental action at law, or regulation; or if any such use or uses of the Demised Premises be adversely affected or impaired by the widening, altering or improving of any streets fronting or adjoining said Demised Premises; or if the supply of gasoline to Lessee, or its assignee or sub-lessee or affiliated or subsidiary corporation or occupant or tenant of the Demised Premises, be restricted or curtailed by reason of war, strikes, political protest, consumer boycott, embargo, or any governmental action, regulation or regulation of any governmental agency, or for any other cause beyond the control of the Lessee, its assignee or sub-lessee or affiliated or subsidiary corporation or occupant or tenant of the Demised Premises, then the Lessee may at its election terminate this Lease by giving thirty (30) days written notice to the Lessor.

The Lessee's right to cancel this Lease shall be in addition to any other remedies against Lessor for breach of the covenant and warranty referred to at the beginning of this paragraph. Notwithstanding the foregoing, prior to any termination of this Lease by Lessee pursuant to this Section, Lessee shall first notify Lessor of its intention to terminate the Lease, which notice shall contain a statement of the grounds therefore, and Lessor shall have failed to correct such condition within 30 days.

18.  <u>CONDEMNATION</u>

(a) If the whole of the Demised Premises shall be lawfully taken by condemnation or in any other manner for any public or quasi-public use or purpose, this Lease and the term and estate hereby granted shall forthwith terminate as of the date of vesting of title in such condemning authority (which date is hereinafter also referred to as the date of taking), and the rents shall be prorated and adjusted as of such date.

(b) If any part of the Demised Premises shall be so taken and the remaining area of the Demised Premises shall not be reasonably sufficient (in Lessee's sole judgment) for Lessee to continue feasible operation of its business, Lessee may terminate this Lease by giving Lessor notice to that effect within ninety (90) days after the Date of the Taking.  This Lease shall terminate on the date that such notice from Lessee is given, and the rent and additional rent shall be prorated and adjusted as of such termination date.  Upon such partial taking and this Lease

11

continuing in force as to any part of the Demised Premises, the
rent and additional Rent shall be adjusted according to the
percentage of rentable area remaining.

(c) In the event of any taking, partial or whole, provided
for in this Section, all of the proceeds of any award, judgment
or settlement payable by the condemning authority shall be and
remain the sole and exclusive property of the Lessor, and Lessee
shall not be entitled to any portion of such award, judgment or
settlement received by Lessor from such condemning authority.
Lessee however, may pursue its own claim against the condemning
authority for any damage or award it sustains as a result of said
taking.

19.  ENVIRONMENTAL TESTING

(a)  Lessor agrees that this Lease is subject to the
material condition precedent of the Lessee's obtaining during the
Due Diligence Period, at Lessee's sole cost, a report by a
qualified testing company showing to the sole satisfaction of
Lessee that the Demised Premises have not been the site of a
release of Pollutants as described in this Lease, other than
those which have been reported and closed, and that the
underground storage tanks and lines test tight. Lessee shall also
inspect all other systems associated with the dispensing of
automotive fuels. If the Lessee is not satisfied with the results
of said report and said tests, Lessee has the right to cancel
this Lease upon written notice to Lessor sent within Due
Diligence Period or may terminate this Lease at any time prior to
the Commencement Date in the event of a release of Pollutants has
occurred after the expiration of the Due Diligence Period.
However, if Lessee performs said test, but does not cancel this
Lease, Lessee shall not be deemed to have waived any rights
against Lessor under any warranty, indemnity, set-off or hold
harmless agreement of the Lessor in this Lease.

(b)  During the term of this Lease or any extension thereof,
Lessee agrees that it shall be responsible for all product
reconciliation, record keeping and environmental compliance,
including routine tank testing. Lessee agrees to notify Lessor
within forty-eight (48) hours of the discovery of any release of
Pollutants or simultaneously upon providing any required
notification to the NYS DEC.

20.  WARRANTY AS TO POLLUTION; INDEMNITY
(a)    The Lessor covenants, warrants and represents that all
of the petroleum product storage tanks in, on, at, under the
ground at, and about the Demised Premises and the pipes, piping,
and lines used in connection therewith are not leaking, are in
good and sound order, condition, and repair, and that there has
been, and there is, no seepage, release, or escape of petroleum
or any Pollutants on, at, in, or under the ground at the Demised
Premises, other than those which have been reported and closed,

and Lessor agrees to protect, defend, hold harmless and indemnify the Lessee, and the successors and assigns thereof from, and against, any and all claims, demands, losses, liabilities, injury, death, damages, settlements, penalties, interest and expenses, including without limitation, attorney's fees and professional fees, and, for all expenses and costs of analysis, assessment, containment, cleanup, removal, disposal, handling, remedial work, monitoring or closure, and any costs and expenses on account of the right of any governmental or private entity or person, relating to, arising out of, or resulting from, or by reason of the presence on, at, in, or under the ground at the Demised Premises (which in this Section shall mean and include the buildings, structures, and all fixtures, and improvements on, at, in, and under the ground at the Demised Premises, and the land they are located on) of any type of oil, and/or petroleum products, and/or any waste, substance, matter, material, or thing defined as hazardous, and/or toxic, in any federal, state, or local law, ordinance, rule, or regulation, now or hereafter in effect (collectively, "Pollutants"), provided any such Pollutants are located on, at, in, or under the ground at the Demised Premises on or before the Rent Commencement Date, or appear, or are found, on or after that date, so long as such Pollutants are due to any cause, leak, seepage, escape, release, condition, state of things, pollution, contamination, or defect existing on or before said date, unless caused by the acts or omissions of Lessee.

(b)  Cleanup Operations, as described in this Lease, for any Pollutants on, at, in, and under the ground at the Demised Premises on or before the Rent Commencement Date shall be at the sole and exclusive expense of the Lessor, provided that the presence of such Pollutants did not result from the action or inaction of Lessee, and Lessor hereby indemnifies and holds Lessee harmless from all claims, demands, judgments, costs and expenses, including reasonable and necessary attorneys fees, for such Cleanup Operations for any such Pollutants, and all expenses and costs of repairing, resurfacing, filling, and otherwise restoring and preparing the Demised Premises for use as a gasoline service station and convenience store.

(c)  Lessee agrees to protect, defend, hold harmless and indemnify the Lessor and the successors and assigns thereof, from and against any and all claims, demands, losses, liabilities, judgments, injury, death, damages, settlements, penalties, interest and expenses including reasonable and necessary attorneys fees, for all expenses and costs of analysis, assessment, containment, cleanup, removal, disposal, handling, remedial work, monitoring or closure, and any costs and expenses on account of the right of any governmental or private entity or person relating to, arising out of, or resulting from, or by reason of the presence on, at, in, or under the ground at the Demised Premises of Pollutants, but this Section shall only apply to the identifiable incremental quantities of Pollutants caused

by the acts, omissions, or operations by the Lessee during the original term or any extended term of this Lease on the Demised Premises. The provisions of this Section shall survive the termination of this Lease and will be enforceable thereafter.

(d)  Lessor covenants, warrants, and represents that all laws, rules, ordinances, and regulations for the notification of federal, state, along with local agencies regarding petroleum storage tanks have been complied with, and local laws, rules, ordinances, and regulations covering petroleum storage tanks.

(e)  Lessee agrees to provide to Lessor a copy of any environmental report required to be filed by Lessee with any applicable governmental entity regarding the environmental status of the Demised Premises at such time that said report is filed with the governmental entity.

(f)  Lessor agrees to provide Lessee with a copy of any environmental reports in its possession relating to the Demised Premises within ten (10) days from the date of this Lease.

21.  CLEANUP OPERATIONS
Lessor agrees that if Lessor conducts operations to analyze, assess, contain, remove, remediate, and dispose of any Pollutants as defined in this Lease (collectively, "Cleanup Operations") on, at, in, and under the ground at the Demised Premises, Lessor will not substantially interfere with, or interrupt, hinder, block, stop, or otherwise hamper or restrict any business then being conducted on the Demised Premises.

22.  TITLE TO LEASED PREMISES
Lessor agrees that this Lease is subject to the material condition precedent of the Lessee's obtaining within the Due Diligence Period, a title abstract, or title insurance policy, or both, from a title insurance company of its selection at regular premium rates, and also a land survey, showing to the sole satisfaction of the Lessee's counsel that Lessor is the sole owner of the Demised Premises in fee simple free from all encumbrances, restrictions on use, except for those restrictions which will not in Lessee's opinion affect the marketability of the premises, or other conditions except as referred to elsewhere in this Lease, and that Lessor has the sole and exclusive right and legal capacity and authority to make this lease, and that there are no buildings, structures, or underground tanks or equipment encroaching on or under abutting land, or encroaching from abutting land on or under the Demised Premises. Lessee has the right to terminate this Lease within Due Diligence Period by written notice to Lessor if Lessor's title, or such survey, or both, are not found to be satisfactory to Lessee's counsel or may terminate this Lease at any time prior to the Commencement Date in the event an encumbrance is recorded in front of Lessee's Notice of Lease. Upon such termination Lessor shall forthwith

return to Lessee any monies paid to Lessor by Lessee under this
Lease or in connection therewith.

23.  ASSENT OF PRIOR LIENHOLDERS TO LEASE
     (a) Lessor shall use best efforts to cause any mortgagee of
record to enter into a nondisturbance and attornment agreement
with Lessor and Lessee, whereby, upon a default in any payment
due under the mortgage or upon default under any other provisions
of the mortgage, the Mortgagee shall thereupon give written
notice of such default to Lessee, before taking action to
foreclose said mortgage and the Lessee may, at its option, within
ten (10) days after receipt of said notice, pay such mortgage
payment or any other payment on said Mortgage and/or make good
such default and set off any payments or charges against the rent
obligations in this Lease; and in the event there is a default by
Lessor causing the Mortgagee to foreclosure on the Demised
Premises and provided Lessee is not in default hereunder (after
applicable cure periods), the Mortgagee will recognize the terms
and provisions of this Lease and agree not to disturb the Lessee,
and the Lessee will attorn to and recognize said mortgagee or any
other subsequent owner as Lessor under the Lease.

     (b)  The Lessor hereby stipulates and agrees that Lessee
shall not be disturbed and its rights shall not be interfered
with by any future owner of the land whether the transfer to said
owner shall be voluntary or involuntary and such future owner
shall recognize this Lease and accept the Lessee as tenant of the
Demised Premises subject to all the terms and conditions herein
contained. Lessor may accordingly assign this Lease but only
subject to the foregoing and no assignment shall relieve either
Lessor or Lessor's assignee of any obligation hereunder.

     (c) Lessor agrees as a material condition to this Lease, to
use its best efforts to obtain said agreement of any mortgagee of
record or a non-disturbance agreement from anyone holding an
encumbrance on the property recorded in front of Lessee's Notice
of Lease, to the foregoing terms and conditions, such assent to
be in form and substance as is satisfactory to Lessee's counsel.
If the Lessee is unable to obtain such agreement no later than
the Rent Commencement Date, Lessee has the right to cancel this
Lease on notice to Lessor, and thereupon Lessor shall return to
Lessee any and all monies paid to Lessor by Lessee under this
Lease, or in connection therewith.

     (d)  Preparation of documents referred to in this Section
shall be by or at the expense of Lessee.

24.  ASSIGNMENT; SUBLEASING
     (a)  The Lessee shall have the right and privilege to sublet
this Lease, in whole or in part for the whole or any part of the
term of this Lease, or any extension thereof, upon such terms as
it shall deem best. Upon any such sublet, Lessee shall remain

liable and responsible for all payments and obligations due under this Lease.

(b)  The Lessee shall have the right and privilege to assign this Lease, upon the prior written consent of Lessor, which consent shall not be unreasonably withheld, delayed or conditioned.  Lessee agrees to provide Lessor with all information reasonably required by Lender to determine whether to consent to any request to assign.

25.  DEFAULT
The following events shall each be deemed to be an event of default (an "Event of Default"):

(a)  Any failure of Lessor or Lessee to commence and diligently pursue the performance of any non-monetary term, covenant, or condition of this Lease to be observed and performed by Lessor or Lessee, as well as any failure of Lessor or Lessee to commence and pursue the performance of any term, covenant, or condition of the Operating Agreement to be observed and performed by Lessor or Lessee, for more than thirty (30) days after written notice of such default(the "Notice of Default Period"), unless the breaching party is in the process of making a good faith effort to cure such default, within a reasonable time, then Lessor or Lessee, as the case may be, at their option, may terminate this Lease with notice to the breaching party,  but such termination shall not affect the Parties right to recover damages or exercise any other right hereinafter provided.

(b)  In the event Lessee fails to pay rent after the same shall become due and payable under the terms and conditions of this Lease, and shall not cure such failure within five (5) business days after written notice thereof to Lessee, Lessor, at its option, may terminate this Lease without further notice to Lessee, but such termination shall not affect Lessor's right to recover damages or exercise any other right hereinafter provided.

(c)  In the event of an Event of Default by Lessor or Lessee of any of their respective obligations under this Lease, the Parties shall also have the right of injunction.  The special remedies to which the Parties may resort hereunder are cumulative and are not intended to be exclusive of any other remedies to which the Parties may lawfully be entitled at any time and the Parties may invoke any remedy allowed at law or in equity as if specific remedies were not provided for herein.

(d)  If Lessee shall have made three (3) or more late payments of rent within any 12-month period during the term of this Lease with a "late payment of rent" being defined as any rental payment received by the Lessor more than five (5) days after it is due, Lessor will no longer be required to give Lessee a late payment of rent default notice.

26.  WAIVERS
     In case Lessee shall be dispossessed by a judgment or by
warrant of any court or judge or repossession by Lessor or in
case of any expiration or termination of this Lease, Lessor and
Lessee, so far as permitted by law, waive and will waive trial by
jury in any action, proceeding, or counterclaim brought by either
of the parties hereto against the other on any matters whatsoever
arising out of or in any way connected with this Lease, the
relationship of Lessor and Lessee, Lessee's use or occupancy of
the Demised Premises, or any claim or injury or damage.

27.  LESSOR'S USE OF OTHER PREMISES
     Should the Lessor be or become the owner or in control of
any real property in or within a radius of one (1) mile from any
point on the Demised Premises, Lessor, for itself, its grantees,
successors and assigns, agrees that during the original term or
any extended term of this Lease, Lessor shall not use or permit
others to use such real property, or any portion thereof, in or
within said radius, for a gasoline service station and convenient
store or any other use that Lessor provides consent to Lessee, or
for the sale of motor fuels, or for any use whatsoever directly
or indirectly competitive with any use permitted hereunder then
being made of the Demised Premises, or for advertising or
promoting the sale of gasoline or other petroleum, or automotive
products. Lessee agrees that car washes and coin laundries are
excepted from this restriction. The Lessor agrees that for breach
(or breaches) of Lessor's agreements under this Section, Lessee
shall be entitled to an injunction (or injunctions) without
requirement of any bond or any security from Lessee, restraining
the Lessor from breach or breaches of said agreements, and in
addition Lessor shall reimburse Lessee for all actual damages,
and consequential damages if breach was in bad faith or
intentional, resulting from breach (or breaches) of said
agreements, and shall also pay Lessee for all costs of Lessee to
enforce Lessor's said agreements hereunder, including Lessee's
reasonable attorneys' fees.

28.  COMPLIANCE WITH LAWS
     Lessee shall, at its own cost and expense, (a) comply with
all governmental laws, ordinances, orders and regulations
affecting the Demised Premises now in force or which hereafter
may be in force; (b) comply with and execute all rules,
requirements and regulations of the Board of Fire Underwriters,
Lessee's Insurance companies and other organizations establishing
insurance rates; (c) not permit, or commit any waste or nuisance,
provided that Lessor warrants, covenants and represents, except
as otherwise referenced herein, that at the signing of this Lease
the Demised Premises fully comply with (a) and (b) above, and
that use of the Demised Premises as a retail gasoline station and
convenience store shall not be deemed to be a violation of any of
the foregoing. Lessee is obligated to procure its own licenses
for such things as tobacco, alcohol and lottery sales or any

other required license and cannot be permitted interim or
temporary use of Lessor's licenses for such purpose.

29. NOTICE OF LEASE; OTHER DOCUMENTS
    The parties shall upon execution hereof forthwith execute in
recordable form a Notice of Lease, and cause said Notice to be
recorded in the appropriate Land Records Office for the Town or
County in which the Demised Premises are situated, and also
Lessor covenants and agrees that Lessor shall execute a written
declaration in recordable form expressing the commencement and
termination dates of the term hereof as soon as such dates have
been determined and record same as aforesaid; provided that if
said Notice of Lease and/or said declaration is not executed by
and delivered from Lessor to Lessee within ten (10) days after
request therefore by Lessee, Lessor shall be deemed to have
appointed Lessee as Lessor's attorney to execute such notice
and/or declaration. Lessor also agrees to execute or obtain any
documents necessary in the reasonable opinion of Lessee's
attorneys to give Lessee a full leasehold estate in the Demised
Premises, so that all persons or entities having any interest in
the Demised Premises shall have executed this Lease to the
Lessee.

30. BROKERS; REFERRAL FEE
    (a)  Lessor and Lessee acknowledge that neither has retained
or contracted with, orally or in writing, a broker regarding the
Lease and each party agrees to indemnify, defend and hold
harmless the other against and from any and all claims, actions,
losses, liability, damages, costs and expenses, including without
limitation reasonable attorneys' fees, resulting from a breach of
this Section 30.

    (b)  Lessor and Lessee acknowledge that Angelo Pastizzo has
referred Lessor to Lessee and agree that any referral fee due to
Mr. Pastizzo shall be paid by Lessee.

31. NOTICE
Any notice, demand or request, required or agreed to be given by
either party shall be sufficiently given or served if in writing
and signed by the party giving it and mailed by certified U.S.
mail, return receipt requested, addressed to the party to be
notified as follows, or to such other addresses as Lessor and
Lessee, respectively, may from time to time designate by giving
notice thereof in writing in the manner prescribed herein.
Services shall be complete upon such mailing, except in the case
of a notice to change an address, in which case service shall not
be complete when the notice is received by the addressee.

                TO LESSOR:       STATE STREET GAS PLUS, INC.
                                 c/o Stephen Weekes
                                 541 Clifton Park Center Road
                                 Clifton Park, NY 12065

```
TO LESSEE:        DRAKE PETROLEUM COMPANY, INC.
                  221 Quinebaug Road
                  North Grosvenordale, CT 06225
```

32.  TRADE FIXTURES OF LESSEE
     Subject to Lessee's obligation to deliver at the expiration
or other termination of this Lease the Demised Premises and the
petroleum filling station, convenience store, fast food facility
and the then existing car wash to Lessor in the same repair,
order and condition as the same were in at the commencement of
the Lease including environmental condition being fully
operational and in compliance with all applicable laws, rules and
regulations, upon the date of the expiration or other termination
of this Lease, the Lessee shall remove from the Demised Premises
any of its equipment, or its trade fixtures, or any other
personal property of Lessee. Lessee shall repair any damage
caused to the Demised Premises by any such removal described in
this paragraph, within a reasonable time thereafter not to exceed
ten (10) days.

33.  HOLDOVER
     If Lessee or its subtenant, or sub-lessee, or assignee
remains in possession of the Demised Premises after the
expiration or other termination of the term or any extended term
of this Lease, except pursuant to any option to extend, such
possession shall be as a tenant from month to month only.
Notwithstanding the foregoing, by accepting any holdover rent,
Lessor does not waive any of its rights or remedies under this
Lease to recover the Demised Premises, or to seek any other
remedy or relief to which Lessor may be entitled under law or
under this Lease.

34.  ACCESS
     (a)  Any time prior to the Rent Commencement Date, Lessee's
agents, employees and contractors shall have the right to enter
the Demised Premises at reasonable hours upon twenty-four hour
prior notice to the Lessor for the purpose of inspecting the
building, equipment and mechanical systems or any other
inspections specified under the terms of this Lease.  Lessee
shall use reasonable diligent efforts to minimize any
interference with Lessor's business as a result of any such
entry. Lessee agrees not to disturb the Lessor's business
conducted on the Demised Premises during any entry under this
Section 34 and will hold harmless and indemnify the Lessor for
any such disturbance. Lessee agrees that in conducting its tests,
inspections, assessments and preliminary work, damage to the
Demised Premises shall be kept to a minimum.  Lessee further
agrees that the Demised Premises shall in all respects be
restored at the sole expense of Lessee to its former condition as
far as reasonably possible. The rights granted under this Section
34 shall survive the termination or cancellation of this Lease.

(b)   At all times during the term of this Lease, Lessor and its agents, employees and contractors shall have the right to enter the Demised Premises at reasonable hours upon twenty-four hour prior notice to the Lessee for the purpose of inspecting the building, equipment and mechanical systems.  Lessor shall use reasonable diligent efforts to minimize any interference with Lessee's business as a result of any such entry. Lessor agrees not to disturb the Lessee's business conducted on the Demised Premises during any entry under this Section 34 and will hold harmless and indemnify the Lessee for any such disturbance. Lessor agrees to repair any damage caused to the Demised Premises as a result of such activities.

(c)   Prior to the Lessor or its respective employees, contractors and/or agents entering upon the Demised Premises for any reason under the terms of this Lease, Lessor agrees, as a condition to said entry, to deliver to Lessee the following certificates of insurance:  (i) certificate of liability insurance of not less than $3,000,000 per occurrence; and (ii) certificate of property damage insurance of not less than $500,000; and (iii) a certificate of workers compensation insurance with statutory minimum amounts required in the State of New York. Each of said certificates of insurance, except for the workers compensation policy, shall name Lessee as an additional insured and shall contain a severability of interest clause, whereby Lessee's right to recover as an additional insured shall not be affected by any acts or omissions of Lessor or its respective employees, contractors and/or agents.

35.  LESSOR'S WARRANTIES
(a)   In addition to any express warranties, covenants, and agreements of Lessor contained herein, the following constitute representations of Lessor which are true and correct to the best of Lessor's Knowledge, information and belief as of the date hereof and which shall be true and correct as of the Rent Commencement Date and the truth and accuracy of which shall constitute conditions precedent to Lessee's obligations under this Lease:

(i)   There is presently no claim, law suit, litigation, injunction, proceeding, or governmental investigation pending, or threatened against, or relating to, the Demised Premises (which means and includes the buildings, structures, fixtures, inventory, and improvements on the Demised Premises and the land upon and under which the same are located).

(ii) No notice of violation of any applicable zoning regulations or ordinances or other laws, orders, ordinances, codes, permits, rules, regulations or requirements, or any covenants, conditions or restrictions affecting or relating to the use or occupancy of the Demised Premises and/or any part of it has been given to Lessor (or the agents or tenants thereof) by

20

any governmental agency having jurisdiction or by any other
person entitled to enforce the same.

(iii) The Demised Premises conforms to all applicable
ordinances and other codes, laws, orders, ordinances, permits,
rules, regulations and requirements, and conforms to all
covenants, conditions and restrictions affecting or relating to
the use or occupancy of said property.

(iv) There is presently no pending, contemplated or
threatened condemnation of the Demised Premises or any part
thereof, and there is presently no pending, contemplated or
threatened rent controls affecting the Demised Premises.

(v)  There are presently no intended public
improvements which will result in any charge being levied or

assessed against the Demised Premises or the creation of any lien
thereon.

(vi) Consummation of the transactions contemplated by
this Lease will not constitute or result in any default or event
that would be a default, breach or violation of any supply
agreement, lease, mortgage, deed, trust, covenant or other
agreement, instrument or arrangement by which Lessor or any of
the property demised hereunder are bound, or any event which
would permit any party to accelerate the maturity of any
indebtedness or obligations thereunder.

(vii) The buildings, fixtures, heating and air
conditioning systems, and all other improvements located on the
Demised Premises are in good working order as of the commencement
of this Lease.

(b)  All representations made herein by the parties shall
survive any investigation by the parties, and the execution and
delivery of the Lease.

36.  RIGHT TO CANCEL
(a)  Lessee shall have the right to cancel this Agreement by
written notice to Lessor if at any time during the Due Diligence
Period, the Buyer determines that the use of the Demised Premises
for a petroleum filling station, convenience store with beer,
fast food facility and car wash, may be substantially interfered
with, prevented or restricted by any occurrence, situation, or
condition whatsoever it may be, including but not limited to the
following: (1) any defect or poor condition of the buildings
located on the Demised Premises, equipment, or systems (heating or
air conditioning); (2) any rules, regulations, ordinances, codes,
statutes, laws, or by-laws; (3) any disputes involving Seller
pending before any court or administrative body; (4) or any
matters relating to the boundaries of the Demised Premises.  The
aforementioned notice shall include the specific reason or reasons

for the cancellation of this Agreement, and this Agreement shall be null and void without recourse to the parties upon receipt of said notice.

(b) Lessor shall have the right to cancel this Agreement by written notice to Lessee within fifteen (15) days from the date of this Lease if Lessor is unable to enter into a termination agreement with its existing fuel supplier regarding the existing gasoline supply contract for the Demised Premises.  Upon Lessee receipt of such notice from Lessor, this Agreement shall be null and void without recourse to the parties.

37.   TENANT'S ACCEPTANCE OF DEMISED PREMISES
Neither Lessor nor Lessor's agents have made any representations or promises with respect to the condition of the Building, the Demised Premises, the land upon which the Building is constructed, or any other matter or thing affecting or related to the Building or the Demised Premises, except as herein expressly set forth in this Lease.  Nothing in this paragraph shall have any affect or any warranty, representation, agreement, or covenant of Lessor elsewhere in the Lease as to the condition of the Demised Premises.

38.   INTERPRETATION
If any provisions of this Lease or any application thereof shall be invalid or unenforceable, the remainder of this Lease and any other application of such provision shall not be affected thereby.  This Lease shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto, including but not limited to the heirs, executors, administrators, trustees, and other legal representatives of said parties.  The paragraph headings of this Lease are for convenience of reference only and shall not limit or otherwise affect the meaning or the contents of such paragraphs.  This Lease shall be governed by and construed in accordance with the laws of the State of New York. The venue of any action or proceeding involving the interpretation or enforcement of this Lease shall be in the County of Saratoga, New York.

39.   ENTIRE AGREEMENT
Execution of this Lease by Lessor constitutes an offer which shall not be deemed accepted by Lessee until Lessee has executed this Lease and delivered a duplicate original thereof to Lessor. This Lease and the Operating Agreement represent the entire agreement between the Parties hereto and there are no collateral or oral agreements or understandings.  All additions, variations or modifications of this Lease shall be void and ineffective unless they are in writing and signed by the Parties.

40.   LEASE TERMS DEPENDENT
(a)  Every provision hereof imposing an obligation on Lessor and/or any covenant or warranty of Lessor is a material

inducement and consideration for the execution of this Lease by Lessee and any breach, violation or failure with respect thereto by Lessor shall entitle Lessee to terminate this Lease forthwith by giving Lessor written notice of such termination.

(b) Every provision hereof imposing an obligation on Lessee and/or any covenant or warranty of Lessee is a material inducement and consideration for the execution of this Lease by Lessee and any breach, violation or failure with respect thereto by Lessee shall entitle Lessor to terminate this Lease forthwith by giving Lessee written notice of such termination.

41. NON-GRATUITY REPRESENTATION
Each party hereto represents and warrants to the other that it has neither offered, received, nor is aware of any offer or receipt of any consideration, gift, promise, reimbursement of any expenses, prepayment or promise to pay any expense or obligation or receive any remuneration or gratuity of any nature or sort in connection with the negotiation, execution and anticipated performance of this Lease other than has been set forth herein.

42. NO OPTION
This Lease is transmitted for examination only and does not constitute an offer to lease, and this Lease shall become effective only upon the execution and unconditional delivery thereof by both parties hereto.

43. OPERATION RECORDS
Lessee's obligations under the terms of this Lease are contingent on Lessor supplying to the Lessee (Lessee having the right to verify all information supplied) the following documentation regarding the Demised Premises within ten (10) days from the date of this Lease:

(a) The environmental compliance records for the last five (5) years;

(b) The gasoline and convenience store sales figures for the past two (2) years; and

44. INVENTORY
Lessee agrees to purchase from Lessor on the Rent Commencement Date all of the following merchantable inventories located on the Demised Premises:

(a) Refined petroleum products and cigarettes owned by Lessor at Lessor's cost; and

(b) Convenience store merchandise owned by Lessor (not to include consigned inventory) at Lessor's retail price less thirty-three percent (33%).

      (c)  Beer owned by Lessor at Lessor's retail price less twenty-two percent (22%).

45.  <u>COUNSEL FEES</u>
     In the event of a breach of this Lease by either the Lessor or Lessee, the non-breaching party shall be entitled to collect all counsel fees and expenses as a result of the breach upon application to the Court of competent jurisdiction as to reasonableness.

46.  <u>HOLD HARMLESS AND INDEMNIFICATION</u>

     (a)  Lessee will protect, indemnify, defend and save harmless Lessor and Lessor's affiliates and their respective members, partners, stockholders, directors, officers, employees and/or agents, from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation, attorneys' fees and expenses) imposed upon or incurred by or asserted against Lessor by reason of the following:

     (1)  Payment by Lessee of any rent or any other sum due hereunder;

     (2)  Any failure on the part of Lessee to perform or comply with any terms or provisions of this Lease;

     (3)  The construction, maintenance, use and/or operation of the Demised Premises by Lessee;

     (4)  Loss of life, personal injury and/or damage to property arising from or out of any occurrence or condition in, on or about the Demised Premises, or the occupancy or use of the Demised Premises or any part thereof by Lessee and/or its agents, guests, invitees, contractors, employees, servants, lessees or concessionaires, and/or occasioned wholly or in part by any act or omission of Lessee, its agents, guests,

        invitees, contractors, employees, servants, lessees or concessionaires; and/or

     (5)  Environmental, casualty, liability, contract or governmental and regulatory compliance issues.

     (b)  Lessor will protect, indemnify, defend and save harmless Lessee and Lessee's affiliates and their respective members, partners, stockholders, directors, officers, employees and/or agents, from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation, attorneys' fees and expenses) imposed upon or incurred by or asserted against Lessee by reason of the following:

24

(1)  Any failure on the part of Lessor to perform or comply
     with any terms or provisions of this Lease;

(2)  The use and/or operation of the Demised Premises by
     Lessor prior to the Rent Commencement Date;

(3)  Loss of life, personal injury and/or damage to property
     arising from or out of any occurrence or condition in,
     on or about the Demised Premises, or the occupancy or
     use of the Demised Premises or any part thereof by
     Lessor and/or its agents, guests, invitees,
     contractors, employees, servants, lessees or
     concessionaires, prior to the Rent Commencement Date;

(4)  Environmental, casualty, liability, contract or
     governmental and regulatory compliance issues; and/or

(5)  Occasioned wholly or in part by any act or omission of
     Lessor, its agents, guests, invitees, contractors,
     employees, servants, lessees or concessionaires.

47.  SURVIVAL OF OBLIGATIONS
     All obligations for payment of rent, additional rent or
other obligations for maintenance, repairs and hold harmless and
indemnification provisions arising out of all causes, including
without limitation, environmental, shall survive termination of
this Lease and remain enforceable until all obligations accruing
under the Lease shall have been fully discharged and satisfied.

48.  TAX AND OTHER ADJUSTMENTS
     The following, if any, shall be apportioned so that Lessee
is assuming the expenses of the property and income from the
property as of the Rent Commencement Date:

     (a)  rents and security deposits;
     (b)  taxes, sewer, and water rents;
     (c)  municipal assessment yearly installments; and
     (d)  fuel, based upon fair market value as of the Rent
          Commencement Date as confirmed by a certification
          provided by Lessor's supplier.

49.  FIRST REFUSAL TO PURCHASE
     Lessee shall have the right of first refusal to purchase the
Demised Premises, as hereinafter set forth in this Section. If at
any time during the original term, or any extended term hereof,
Lessor shall receive a bona fide offer from a third person for
the purchase of the Demised Premises, which offer Lessor shall
accept if Lessee declines to exercise its rights to purchase
under this Section, Lessor shall promptly deliver to Lessee a
copy of such offer, and Lessee may, within thirty (30) days after
receipt thereof, elect to purchase the Demised Premises on the
same terms as those set forth in such offer, excepting that
Lessee shall be credited, against the purchase price to be paid

by the Lessee, with a sum equal to the amount of any brokerage
commission, finder's fee, or any similar such compensation if
any, which Lessor shall save by a sale to Lessee. If Lessor shall
receive an offer for the purchase of the Demised Premises, which
is not consummated by delivering a deed to the offeror, the
Lessee's right of first refusal shall remain applicable to
subsequent offers. If Lessor shall sell the Demised Premises
after a failure of Lessee to exercise its right of first refusal,
such sale shall be subject to this Lease, and the right of first
refusal shall continue and shall be applicable to subsequent
sales of the Demised Premises.

        If the Demised Premises shall be conveyed to the Lessee
under this right of first refusal, any prepaid rent shall be
apportioned and applied on account of the purchase price. If
Lessee or its nominee fails to exercise this right of first
refusal, Lessor may, within thirty (30) days after receipt of
such written notice and offer by Lessee, sell such property but
only for a price and upon terms of payment and upon other terms
which are substantially similar to those set forth in the notice
to Lessee.  Lessee agrees to notify Lessor in writing of any
nominee designated for the purpose of this section, and warrants
that such nominee will be financially responsible.

50.   FINANCIAL RECORDS
        Lessee agrees to provide to Lessor a financial statement for
the last two (2) years of its operation within ten (10) days from
the date of this Lease. Lessor have the right to terminate this
Lease within fourteen (14) days after receipt of Lessee's
financial statement in the event Lessor reasonably deems the
financial status unsatisfactory compared to a similar corporation
in the petroleum industry. At the expiration of said fourteen
(14) days, Lessor's right to terminate shall expire.

51.   NO NEGATIVE INFERENCE
        This Lease is the result of extensive negotiations between
the parties, both of whom are represented by counsel and each of
whom shall be deemed to have drawn this Lease.  No negative
inference or interpretation shall be drawn against the preparer
of this Lease.

52.   LIENS
        Lessee shall not do or permit to be done anything which
creates a lien upon the Demised Premises. In the event Lessee is
responsible for a lien to be recorded against the Demised
Premises, Lessee agrees to bond against or discharge any such
lien within thirty (30) days after written request by Lessor. The
failure of Lessee to bond or discharge such a lien shall be a
default hereunder.

53.   STRICT PERFORMANCE
        The failure of Lessor or Lessee to insist upon a strict
performance of any of the terms, conditions and covenants herein

shall not be deemed a waiver of any subsequent breach or default in the terms, conditions and covenants herein contained.

54. ENFORCEABILITY
If any term covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

55. BRANDING
Lessee agrees to keep the Demised Premise branded Sunoco for a two (2) year period to commence upon the commencement of this

Lease and the obligation shall expire twenty-four (24) months thereafter.

IN WITNESS WHEREOF the parties hereto have set their hands and seals to this Lease on the day and year first above written in Section 1 of this Lease.

Signed, sealed and delivered in the presence of:

WITNESSES:                          **STATE STREET GAS PLUS, INC.**
                                    (LESSOR)

By: _____
    Peter Rosenfeld, Its Vice-
    President


                                    **DRAKE PETROLEUM COMPANY, INC.**
                                    (LESSEE)

By: _____
    David M. Preble, Its
    President

27

STATE OF NEW YORK    }
                     }SS.:
COUNTY OF SARATOGA   }


        On August __18__, 2011, before me, the undersigned, personally
appeared Peter Rosenfeld, personally known to me or proved to me
on the basis of satisfactory evidence to be the individual whose
name is subscribed to the within instrument and acknowledged to
me that he executed the same in his capacity, and that by his
signature on the instrument, the individual, or the person on
behalf of which the individual acted, executed the instrument.

                                  _____
                                  Notary Public
                                  My Commission Expires:


                                       EDWARD KOWALEWSKI JR
                                       Notary Public, State of New York
STATE OF CONNECTICUT}                  Qualified in Saratoga County
                    }SS.: N. Grossmordale    # 4982911
COUNTY OF Windham   }                  Commission Expires 6-10-2015



        On August __22nd__, 2011, before me, the undersigned, personally
appeared David M. Preble, personally known to me or proved to me
on the basis of satisfactory evidence to be the individual whose
name is subscribed to the within instrument and acknowledged to
me that he executed the same in his capacity, and that by his
signature on the instrument, the individual, or the person on
behalf of which the individual acted, executed the instrument.

                                  _____
                                  Notary Public
                                  My Commission Expires: May 31, 2013

**EXHIBIT A**
(property description)



STATE STREET (ROUTE 5)

(A.K.A. ALBANY SCHENECTADY TURNPIKE)
(VARIABLE WIDTH RIGHT-OF-WAY)

**NISKAYUNA NY - 3522 STATE STREET**

**EXHIBIT A**

**EXHIBIT B**
(equipment list)

# **EXHIBIT B** - Equipment List

State Street Gas Plus Inc.
3522 State Street
Schenectady NY

Outside
- (4) Metal Price signs on top pumps
- (7) light poles
- (1) ID Sign – Sunoco / Car Wash / Price Chopper Advantage / 1 tier price / 1 tier price / ATM
- (1) Sunoco Mart Logo attached to building
- Fire suppression system installed in canopy
- Canopy with Sunoco Logo and Sunoco rainbow wrap and lights

Inside
- ATM –Money Tree Brand
- 16 Camera security system with multiplexer, Screen, Audio, vcr
- Nucleus Cash register – 1 Server and 2 terminals with cash drawer, 3 printers, etc
- (2) cash register scanner
- (2) customer Credit Card terminals
- (3) battery backup for register system
- Walk in cooler 10 doors with complete shelving
- IdentaScan ID machine with printer
- NKL D8 – autobank drop safe with coin dispenser
- Intercom system to outside gas pumps
- Overnight Pass-thru Drawer
- Steel display gondolas on sales floor
- (2) overhead cig racks
- 8' Cig Floor Racks

Fuel Related
Complete Fuel Storage and Delivery system which includes but is not limited to the following:
- TLS 350 Veeder Root with (2) 3 wire and (1) 2 wire interface boards, printer
- (9) Veeder 350 discriminating sensors
- (4) 2 wire interstitial Double wall air filled sensors
- (3) Veeder root electronic line leak detectors
- (3) Red jacket submersible pumps
- (3) drop tubes with overfill flapper valves
- (4) 10,000 double wall air filled fiberglass underground tanks.
- (2) DW Ovations 3+ gas pumps – single hose – with Sunoco  Valance
- (2) DW Ovation  3+ Diesel pumps – single hose – with Sunoco Valance
- All underground fuel, vapor, electrical and communication line/conduits.

<u>Car Wash</u>

- (2) PDQ Access units with c/c / cash acceptors / color screens
- (2) PDQ Laserwash M5 Units – 3x foam / gattling guns / pump benches
- (2) PDQ 6 producer stand alone dryer units
- (1) Purclean r/o system
- Wash World water softener system – 2 tanks
- (2) Air compressors
- (1) Air Dryer unit
- (1) 16 color camera DVR recording system
- (2) Renai Hot water heaters
- (1) ceiling heater
- (2) Munchkin Radiant heat system with controls
- (1) 2 pump waste water station
- (1) Car Wash Code Generator computer
- (1) Dell computer with monitor for car wash control

**EXHIBIT C**

CONFIRMATION OF LEASE

THIS AGREEMENT, made the _____ day of _____, 2011, by and between State street Gas Plus, Inc., a New York corporation with offices at 541 Clifton Park Center Road, Clifton Park, NY 12065 (hereinafter called the Lessor), and Drake Petroleum Company, Inc., a Massachusetts corporation having its principal place of business at 221 Quinebaug Road, North Grosvenordale, CT 06255(hereinafter called the "Lessee".

W I T N E S S E T H:

WHEREAS, by Lease dated as of the _____ day of _____ 2011, between the parties hereto (the "Lease"), the Lessor leased to Lessee and Lessee leased and took from Lessor, for the term and upon the terms and conditions therein set forth, certain premises located at 3522 State Street, Niskayuna, New York;

WHEREAS, the Lease provides that the parties shall executed a confirmation of the actual commencement and expiration dates of the Lease, when such dates have been determined:

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby agree that the term of the Lease commenced on the _____ day of _____, 2011, and shall end on the _____ day of _____, 2021, at midnight, unless sooner terminated or extended as therein provided.

The undersigned Lessee is in possession and occupation of the premises demised to it pursuant to the terms of the Lease and further states that it commenced paying rent on the _____ day of _____, 2011.  The Lease is in full force and effect and has not been assigned, modified or supplemented in any way; the Lessee is not in default thereof; the premises as erected, as completed, are accepted by Lessee as being in accordance with the terms of the Lease; there are no existing defenses or offsets which Lessee has against the enforcement of the Lease by Lessor; no rent has been paid more than one month in advance; and current rental according to the terms of the Lease has been paid.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement of Lease to be duly executed the day and year first above written.

31

LANDLORD:                        LESSEE:

STATE STEET GAS PLUS, INC.       DRAKE PETROLEUM COMPANY, INC.

By: _____      By: _____
    Peter Rosenfeld, Vice-              David M. Preble, President
    President


STATE OF NEW YORK        )
                        )ss.:
COUNTY OF SARATOGA       )

    On _____, 2011, before me, the undersigned,
personally appeared Peter Rosenfeld, personally known to me or
proved to me on the basis of satisfactory evidence to be the
individual whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his capacity, and
that by his signature on the instrument, the individual, or the
person on behalf of which the individual acted, executed the
instrument.


_____
Notary Public


STATE OF CONNECTICUT     )
                        )ss.:
COUNTY OF                )

    On _____, 2011, before me, the undersigned,
personally appeared David M. Preble, personally known to me or
proved to me on the basis of satisfactory evidence to be the
individual whose name is subscribed to the within instrument and
acknowledged to me that she executed the same in her capacity,
and that by her signature on the instrument, the individual, or
the person on behalf of which the individual acted, executed the
instrument.


_____
Notary Public


Empire (Niskayuna) Gas Lease

<u>FIRST AMENDMENT TO LEASE</u>

<u>3522 State Street, Niskayuna, NY</u>

This First Amendment to Lease ("Amendment") is entered into and effective as of the 9th day of January, 2019 by and between **State Street Gas Plus, Inc.**, a corporation organized and existing under the laws of the State of New York and having an office and mailing address of 541 Clifton Park Center Road, Clifton Park, NY 12065 (the "**Lessor**") and **Drake Petroleum Company, Inc.**, a corporation organized and existing under the laws of the Commonwealth of Massachusetts and having an office and mailing address of 800 South Street, Suite 500, Waltham, Massachusetts 02454 (the "**Lessee**").

WITNESSETH:

**WHEREAS**, Lessor and Lessee entered into that certain Lease dated August 22, 2011 (the "Lease") for the leased premises situated at 3522 State Street, Niskayuna, New York as more particularly described in the Lease.

**WHEREAS**, the parties desire to amend certain terms of the Lease.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and for other good and valuable consideration, the sufficiency and receipt whereof is hereby acknowledged, the parties hereto agree as follows:

1. The beginning of Section 6 of the Lease is hereby deleted and replaced with the following:

6.    OPTIONS TO EXTEND
The Lessor hereby grants to Lessee four (4) options to extend the term of this Lease. Each of the aforesaid options to extend shall be deemed to have been automatically exercised unless Lessee, no later than Three Hundred Sixty Five (365) days prior to the expiration of the then current term, gives written notice to the Lessor of its intention not to extend or further extend the Lease.  All of the extended terms shall be subject to all of the provisions herein contained, except for rent and duration and except for the provision for additional consecutive extensions as hereinafter set forth:

2.    This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns, and, if there be more than one person named as Lessor, each of the covenants and agreements of Lessor shall be deemed joint and several.

3.    Except as herein modified, all of the other terms, provisions, conditions and agreements contained in the Lease shall remain in full force and effect, it being the intention of the parties to amend only the specific terms, provisions and conditions referred to herein.

4.     This Amendment may be executed in separate counterparts, each of which shall be an original and all of which when taken together shall constitute one and the same instrument.

5.     Capitalized terms used in this Amendment and not otherwise defined herein shall have the meaning as defined in the Lease (such meanings to be equally applicable to both singular and plural forms of the terms defined).

Witness Whereof, the parties hereto have executed and delivered this instrument the day and year first above written.

STATE STREET GAS PLUS, INC.

By:

Name: Peter Rosenfeld

Title: Vice President

DRAKE PETROLEUM COMPANY, INC.

By:

Name: Dino mbo Thamo

Title: SVP q Retail Development

STATE OF NEW YORK                    )
                                     ) ss.:
COUNTY OF   SARATOGA   )

On the 9th day of January, 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared   Peter Rosenfeld  , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

Notary Public

EDWARD KOWALEWSKI, JR.
Notary Public, State of New York
No. 02KO4982911
Qualified in Saratoga County
Commission Expires June 10, 2023

COMMONWEALTH OF MASSACHUSETTS     )
                                  ) ss.:
COUNTY OF Middlesex               )

On the 7th day of January, 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared Rus DeThomas, Senior Vice President, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

Notary Public

JARED WILLIAM OTTE
MY COMM. EXPIRES
JANUARY 10, 2025
NOTARY PUBLIC
COMMONWEALTH OF
MASSACHUSETTS



800 South Street  P.O. Box 9161  Waltham, MA 02454-9161  ph: 781-894-8800  fx: 781-398-9000

October 27, 2020

State Street Gas Plus, Inc.
c/o Stephen Weekes
541 Clifton Park Center Road
Clifton Park, NY 12065

**VIA FEDERAL EXPRESS AND CERTIFIED MAIL RETURN
RECEIPT REQUESTED**

RE:    Lease Renewal, Site #10041, 3522 State Street, Niskayuna, NY 12304

Dear Landlord:

Reference is made to that certain Lease dated August 22, 2011, as amended by that certain First Amendment to Lease dated January 9, 2020 (collectively, the "Lease"), between State Street Gas Plus, Inc., as Landlord, and Drake Petroleum Company, Inc., as Tenant, covering the service station premises located at 3522 State Street, Niskayuna, New York as more particularly described therein.

Pursuant to the provisions of Section 6 of the Lease, Tenant hereby notifies you that Tenant elects to and does extend said Lease for an additional period of five (5) years commencing November 1, 2021 through October 31, 2026, upon the same terms and conditions except the rent which will be Fourteen Thousand Nine Hundred and Twenty-Three and 33/100 ($14,923.33) Dollars in accordance with Section 6(a) of the Lease.

Sincerely,

Stacey Hickey
Senior Associate General Counsel

cc: Legal File
    Mark Cosenza
    Dino DeThomas
    Rick Woolverton

# EXHIBIT H

## MANAGEMENT SERVICES AGREEMENT

MANAGEMENT SERVICES AGREEMENT ("Agreement") made and entered into as of the 25th day of September 2023 (the "Effective Date"), by and between DRAKE PETROLEUM COMPANY, INC., a New York Corporation ("Drake"), and SAIBABA'S ALMIGHTY, INC. a New York corporation ("SAI") (each a "Party" and together, the "Parties").

### W I T N E S S E T H :

WHEREAS, Drake leases the premises located at 3522 State Street, Niskayuna, New York 12304 (the "Premises"), pursuant to that certain Lease dated August 22, 2011, as amended (the "Prime Lease") between Drake, as Tenant and State Street Gas Plus, Inc. as Landlord ("Prime Landlord" or "Owner");

WHEREAS, Drake operates a car wash at a portion of the Premises (the "Car Wash") and Owner provides certain maintenance, repairs and supplies for the Car Wash, pursuant to that certain Agreement dated August 22, 2011, as amended (the "Car Wash Agreement") between Drake and Owner, a copy of which is attached hereto as Exhibit A;

WHEREAS, SAI subleases the Premises, pursuant a Sublease commencing October 16, 2023, between Drake, as sublandlord and SAI, as subtenant (the "Sublease"), where it operates a petroleum filling station, convenience store, and fast food facility;

WHEREAS, Alliance Energy LLC and SAI have entered into a Dealer Sales Agreement (the "DSA"), which governs the supply of motor fuel and diesel to SAI for resale at the Premises;

WHEREAS, the term of the DSA shall commence on October 16, 2023;

WHEREAS, Drake desires to engage SAI to act as its manager in supervising, administering and managing the Car Wash during the term of this Agreement;

WHEREAS, SAI desires to furnish those services subject to the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration, receipt, and sufficiency of which are hereby acknowledged, Drake and SAI, intending to be legally bound, agree as follows:

1.    Appointment of SAI.

      a.    Drake hereby appoints SAI as its sole and exclusive manager to supervise, administer and manage the Car Wash upon the conditions and for the term and compensation set forth herein.

      b.    This Agreement is not one of agency by Drake and SAI, but one with SAI engaged as an independent contractor. This Agreement shall not be construed as creating a

partnership agreement between the Parties. This Agreement is not intended to and shall not create a fiduciary relationship between the parties. The relationship between the Parties is not intended to and does not constitute a franchise under the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, *et seq.* or any law of the State of New York.

          c.     SAI acknowledges that Drake is the Operator under the Car Wash Agreement.

          d.     Capitalized terms not defined herein shall have the meaning in the Car Wash Agreement, Sublease and/or DSA.

      2.    <u>Term.</u> The term of this Agreement shall commence on October 16, 2023 and shall terminate at the expiration of the Car Wash Agreement (the "Term"). Notwithstanding anything to the contrary, an Event of Default under the Sublease or DSA, shall be considered an Event of Default under this Agreement; such Event of Default, if not cured after any applicable notice and cure period, shall be grounds to terminate this Agreement.

      3.    <u>Duties of SAI.</u> SAI shall perform the following duties during the Term:

          a.     <u>General Operation of the Car Wash</u>. SAI shall be responsible for the operation of the Car Wash in the same manner as is customary and usual in the operation of comparable car washes and in full compliance with all terms and conditions to be performed by Drake as Operator under the Car Wash Agreement.

          b.     <u>Expenses</u>. SAI shall be responsible for all costs incurred in the operation of the Car Wash, unless such costs are the responsibility of the Owner under the terms of the Car Wash Agreement.

          c.     <u>Employees; Independent Contractor.</u> All matters pertaining to the employment, supervision, compensation, promotion and discharge of employees of SAI during the Term of this Agreement are the responsibility of SAI, which in all respects shall be the employer of said employees during the Term. The parties acknowledge that **Chirag Dewan** is a key employee of SAI and is integral to the successful performance of the services by SAI under this Agreement. It is acknowledged by the SAI that **Chirag Dewan** will act as a primary point of contact and will be available to Drake to address management issues, unless the parties otherwise consents in writing.

          d.     <u>Gross Sales</u>. SAI shall deposit all sums charged for goods, merchandise or services sold at or from the car wash (hereinafter "Gross Sales") in a separate Depository Account (defined below).

          e.     <u>Service Agreements.</u> SAI shall be responsible for payment of all service and other contracts reasonably necessary or desirable in connection with the operation of the car wash in the usual course of business (the "Service Agreements").

          f.     <u>Inventory, Etc.</u> SAI shall be responsible for purchasing any

merchandise, provisions, uniforms supplies, tools and equipment (collectively, the "Inventory"), during the Term of this Agreement in order to properly maintain and operate the Car Wash (collectively, the "Inventory"), except to the extent such Inventory is provided by Owner under the terms of the Car Wash Agreement.

        g.      Compliance With Laws, Etc. During the Term, SAI shall be responsible for full compliance with federal, state and municipal laws, ordinances, regulations and orders relating to the operation of the car wash and all other operations at the Premises. SAI shall promptly notify Drake of any violation of any law, ordinance, rule, regulation or order that comes to its attention.

        h.      Repairs.    All repairs and alterations for the proper maintenance and operation the Car Wash shall be made by SAI, to the extent not performed by Owner under the Car Wash Agreement.

      4.   Disposition of Funds from Operations.

        a.      Separate Depository Account; Account Access.  All funds received in the operation of the car wash shall be segregated and deposited by SAI in a separate bank account (the "Depository Account").

        b.      Monthly Management Fees.  As compensation for its management services, SAI shall be entitled to retain all Gross Sales received in the operation of the Car Wash, less the Monthly Remittances to Drake (set forth below).

        c.      Monthly Remittances to Drake.

          i.  Drake shall provide to SAI on a monthly basis a copy of the Owner's billing statement (the "Monthly Statements"), provided for in Section 4(b) of the Car Wash Agreement.

          ii.  SAI shall pay Drake within five (5) days from receipt of the Monthly Statements, the following:

            1.   all amounts owed by Operator to Owner under Sections 2(c) and (d) of the Car Wash Agreement, for each car washed at the Car Wash; and

            2.   all amounts owed by Operator under 3(b) of the Car Wash Agreement, for each Car Wash Code Package sold by SAI (collectively, the "Monthly Remittances to Drake").

        d.      Car Wash Code Packages.  SAI shall offer Car Wash Code Packages for sale, pursuant to Section 3 of the Car Wash Agreement.

        e.      Upstate Laser Car Wash Codes.  SAI shall honor all Upstate Laser

Car Wash Codes and offer for sale Upstate Laser Car Wash Code Packages, pursuant to Section 4 of the Car Wash Agreement. SAI shall be entitled to a credit against the Monthly Remittances to Drake for SAI's sale of Upstate Laser Car Wash Code Packages, described under Section 4 of the Car Wash Agreement. Said credit shall be reflected on the Monthly Statements.

    f. <u>ACH Authorization</u> - SAI agrees to establish an arrangement for electronic funds transfer to Drake, or electronic deposit to Drake of any payments required under this Agreement. Among other things, to implement this provision, SAI agrees to sign and return to Drake current form of an EFT Agreement (and any replacements to that form that Drake deems to be needed to implement this Section 4(f)), and SAI agrees to comply with the payment and reporting procedures that Drake may specify in writing.

    5. <u>Operating Expenses</u>. Everything done by SAI in the performance of its obligations under this Agreement and all operating expenses incurred by it under this Agreement shall be for and on behalf of SAI and paid solely by SAI.

    6. <u>Taxes</u>. SAI shall be responsible for the filing and payment of all taxes related to its Gross Sales and compensation under this Agreement.

    7. <u>Accounts and Reporting, Etc.</u>

    a. <u>Inspection; Retention</u>. All books, accounts and records maintained for the operation of the car wash shall be open at all reasonable hours for inspection and audit by Drake or any of its territory sales managers, internal auditors, accountants and inventory counting and audit service firms selected by Drake for that purpose. SAI shall retain said books and records for the period normally required by Drake for its own accounting and tax purposes, and in no event less than seven (7) years.

    b. <u>Books and Accounts</u>. SAI, in the conduct of its responsibilities to Drake, shall maintain adequate and separate books and records for the car wash and SAI shall ensure control over accounting and financial transactions as is reasonably required to protect from theft, error, or fraudulent activity on the part of SAI's employees or other agents. Losses arising from these instances are to be borne by SAI.

    c. <u>Reports</u>. SAI shall furnish reports each month of all transactions occurring from the first day of the prior month to the last day of the prior month. Reports are to be received by no later than 5 calendar days after the end of the month and must show all Gross Sales, collections, uncollectible items, and other matters pertaining to the management, operation, and maintenance of the Car Wash.

    d. <u>Electronic Records</u>. SAI shall provide authorized representatives of Drake (and to the extent required by the Car Wash Agreement, Owner) with access to all electronic computer systems maintained by SAI for the management, operation and maintenance of the car wash.

    8. <u>SAI's Insurance.</u> During the term of this Agreement, SAI shall (1) maintain all

insurance required to be maintained by the Tenant under the Prime Lease in the amounts stated in the Prime Lease, insuring the Car Wash, and naming as additional insured all parties required to be named under the Prime Lease, including Owner and Drake, together with their parents, subsidiaries, affiliates, successors and assigns, and (2) furnish to Drake, on or before the commencement of the Term of this Agreement and at any time thereafter upon request, certificates of such insurance and other evidence satisfactory to Drake of the maintenance of all insurance coverage required hereunder.

        9.   <u>Indemnification by SAI</u>.  SAI shall indemnify, defend and hold Drake and Owner, together with their parents, subsidiaries, affiliates, stockholders, directors, officers, employees and/or agents (collectively, the "Indemnified Parties"), harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including attorneys' fees and court costs, sustained or incurred by or asserted against Indemnified Parties by reason of or arising out of SAI's (or its employees' or agents') breach of this Agreement, negligence in performing or failing to perform the duties and obligations required by this Agreement to be performed by it, or SAI's other operations at the Premises.

        10. <u>Confidential Information</u>.  SAI acknowledges that Drake, its affiliates and their respective employees, contractors and agents will be disclosing and transmitting to SAI certain confidential and proprietary information ("Confidential Information") in connection with this Agreement.  Accordingly, during and after the Term of this Agreement, SAI shall:  (i) treat and maintain Confidential Information as confidential; (ii) use Confidential Information only for the management services under this Agreement; and (iii) restrict disclosure of Confidential Information to only those of its employees, contractors or agents who are directly connected with the performance of work requiring knowledge of the Confidential information and who have agreed in writing to maintain the confidentiality of the Confidential information.

        11. <u>Notices</u>.  All notices, requests, instructions, documents, and other communications provided for herein or given hereunder shall be in writing, shall be sent by (a) by hand delivery; (b) United States certified or registered mail, postage prepaid, or (c) commercial courier service (such as Express Mail or Federal Express) promising next business day delivery, and shall be deemed to be given on the same day if delivered by hand, five (5) days after deposited in the mail or the next business day if sent by commercial courier service, and all such notices shall be addressed as follows:

        If to Drake:        Drake Petroleum Company, Inc.
                                    800 South Street, Suite 500
                                    Waltham, MA 02453
                                    Attn:  Michael G. Lewis, Deputy General Counsel

        If to SAI:        Saibaba's Almighty, Inc.
                                    3522 State Street
                                    Niskayuna, New York 12304
                                    Attn: Chirag Dewan, President

        13. <u>Enforceability</u>.    If any provision of this Agreement or the application of any provision to any person or circumstances is held invalid or unenforceable, the remainder of the

Agreement and the application of the provision to other persons or circumstances shall remain valid and enforceable.

14. Intentionally omitted.

15. <u>Binding Effect; Assignment</u>. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns. This Agreement and the respective rights, duties and obligations of the parties hereunder shall not be assignable, or delegable, as the case may be, without the written consent of the parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed. Drake acknowledges that it may not condition approval of an assignment on a new Dealer Sales Agreement, following the Initial Term of the DSA. If SAI requests that Drake consent to the assignment of this Agreement and the Sublease to the same assignee, Drake agrees to process both assignments simultaneously.

16. <u>Entire Agreement; Amendments; Waivers</u>. This Agreement (including the Exhibits and Schedules referred to herein) contains the entire understanding of the parties hereto with respect to the subject matter contained herein and there are no restrictions, promises, representations, warranties, covenants, agreements or undertakings other than those expressly set forth herein. No amendment, supplement, modification, waiver or termination of this Agreement shall be implied or be binding, (including, without limitation, any alleged waiver based on a parties' knowledge of any inaccuracy and any representation or warranty contained herein) unless it is in writing and signed by the party against which such amendment, supplement, modification, waiver or termination is asserted. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), SAI shall such waiver constitute a continuing waiver unless otherwise expressly therein provided.

17. <u>Captions; Gender; Certain Terms</u>. All section headings contained herein are for the convenience of reference only and are not intended to be used in any respect in the construction or interpretation of this Agreement. Whenever used in this Agreement, the singular shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders. The term "person," as used in this Agreement, means an individual, a corporation, a partnership, a joint venture, a trust or unincorporated organization, a joint stock company or other similar organization, a government or any political subdivision thereof, or any association or other legal entity.

18. <u>Further Assurances.</u> Prior to and following the Effective Date, for no further consideration, each Party shall perform such other acts and shall execute, acknowledge and deliver such additional documents as the other Party may reasonably request to carry out the provisions of this Agreement and to protect Drake's rights under the Car Wash Agreement.

19. <u>Counterparts</u>. This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

**[Signature Page to Management Services Agreement]**

IN WITNESS WHEREOF, the parties hereto have executed this Management Services Agreement as of the date and year first above written.

SAIBABA'S ALMIGHTY, INC.

By:_____
Name:  Chirag Dewan
Title:  President

DRAKE PETROLEUM
COMPANY, INC.

By:_____
Name:_____
Title:  _____

IN WITNESS WHEREOF, the parties hereto have executed this Management Services Agreement as of the date and year first above written.

SAIBABA'S ALMIGHTY, INC.

By:_____
Name:  Chirag Dewan
Title:  President

DRAKE PETROLEUM
COMPANY, INC.

By:_____
Name: _____
Title: _____

# EXHIBIT A

CAR WASH AGREEMENT



AGREEMENT

THIS AGREEMENT made this _22_ day of August, 2011 by and between State Street Gas Plus, Inc., a New York corporation with offices at 541 Clifton Park Center Road, Clifton Park, NY 12065 (hereinafter, the "Owner"), and Drake Petroleum Company, Inc., a Massachusetts corporation having its principal place of business at 221 Quinebaug Road, North Grosvenordale, CT 06255 (hereinafter, the "Operator").

WITNESSETH

WHEREAS, Owner is the owner of that certain real property, together with the buildings, improvements, equipment, and fixtures erected thereon, which are situated on that certain premises located at 3522 State Street, Town of Niskayuna, County of Schenectady, State of New York (Tax ID # 60.19-1-3.1) (hereinafter, the "Premises"); and

WHEREAS, Owner operates on the Premises a petroleum filling station, convenience store, fast food facility and car wash (hereinafter, the "Operation"); and

WHEREAS, Owner, as part of the Operation, offers to Owner's customers options to purchase car washes at certain car wash facilities known as Upstate Laser Wash, including the car wash facility located on the Premises (hereinafter, "Upstate Laser Wash Facilities"); and

WHEREAS, Owner and Operator have entered into a written Lease (hereinafter, the "Lease"), whereby Operator has leased from Owner the Premises and will operate the Premises under the terms of the Lease; and

WHEREAS, Owner and Operator desire that the Operator's customers continue to have the option to purchase car washes from Owner for use at the Upstate Laser Wash Facilities; and

WHEREAS, Owner and Operator desire that Owner provide certain maintenance and marketing services to Operator relative to the car wash portion of the Operation ("Car Wash");

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, the parties agree as follows:

1.   OPERATION

    a.   Operator shall be responsible for the operation of the Car Wash.

    b.   Operator shall offer to its customers the sale of car washes at the pumps on the Premises and at the register inside the convenience store on the Premises by providing a code for each wash sold ("Car Wash Codes").

    c.   The prices of the Car Wash Codes shall be at the current retail prices for all Upstate Laser Wash Facilities.

    d.   Operator shall collect all applicable New York State sales taxes on the sale of a Car Wash Code, shall remit all sales taxes collected to New York State, and shall prepare and file all required sales tax returns. Operator shall provide to Owner a New York State sales tax re-sale form on a yearly basis.

2.   MAINTENANCE, REPAIRS AND SUPPLIES

    a.   Owner shall be responsible for the maintenance and repair of the Car Wash and for supplying certain materials required for the operation of the Car Wash as follows:

    (1)   Perform remote monitoring of Car Wash equipment;

    (2)   Perform routine maintenance and replacement of Car Wash equipment, supply and replace all parts required due to normal wear and tear, and change all oils as needed (pumps, air compressor, etc.). Car wash equipment shall be defined as all apparatus involved in the operation of washing vehicles including but not limited to the mechanical car wash machinery, lines, hoses, tires, nozzles, motors, belts, cables, hot and cold water systems, electrical, compressed air systems, autoteller, and mechanical doors actuated by car wash for ingress in and egress from the car wash bays;

    (3)   Perform preventative maintenance on Car Wash equipment on a monthly basis. Preventative maintenance shall include but not be limited to the interval scheduling of equipment grease, oil, adjustment, checking all operating functions, checking tolerances and checking for early problems to minimize potential downtime ;

(4)   Perform pressure washing of Car Wash bays on a quarterly basis;

(5)   Pump out the settling pits located at the Car Wash at least two (2) times per year and pump out the waste water pump lift station located at the Car wash at least one (1) time per year. Owner agrees to be present during both of the referenced pump outs.  Owner's service is to include removal of all grates for access to pits and will pump off excess water from each pit prior to vacuum truck arriving. As part of Owner's monthly statement to Operator as provided for in Section 4.b., Owner shall bill Operator for the vacuum trucks removal of sediments from the pits. Performance of these pit pump outs and disposal of the contents shall be done in accordance with NYSDEC regulations;

(6)   Monitor radiant heat system for Car Wash and the parking areas and front porch of the convenience store located on the Premises;

(7)   Train Operator's employees on operation of Car Wash;

(8)   Monitor, supply and fill all soaps and polishes as needed;

(9)   Monitor, supply and fill salt for water softener as needed;

(10) Monitor, supply, and install filters and carbon for R/O system (spot free rinse);

(11) Pay for internet connection required for operation of Car Wash;

(12) Provide, maintain, repair and replace if necessary the Car Wash Code generator (computer) as required which is connected to the register inside the convenience store on the Premises, and autoteller as required, and will train Operator's employees in the operation of same; and

(13) Provide all software upgrades for Car Wash equipment.

b.   Operator shall be responsible for the maintenance and repair of the Car Wash as follows:

(1)   Perform all maintenance, repairs and replacements

required due to other than normal wear and tear, including, but not limited to, damage caused by vandalism, improper use of the Car Wash, etc. If maintenance, repairs and replacements under this section are performed by owner, operator must approve pricing for such work in advance. Owner shall bill Operator on a monthly basis as part of Owner's monthly statement to Operator as provided for in Section 4.b. below;

    (2)  Perform daily sweeping and/or hosing out of Car Wash bays; and

    (3)  Perform maintenance and repair of Car Wash building (walls, roof, doors (except mechanical doors actuated by car wash for ingress in and egress from the car wash bays)as referenced in Section 2.A.(2), lights, radiant heat system, etc.).

    c.   In consideration of Owner furnishing the maintenance, repair and supplies as provided for in Section 2.a. above, Operator shall pay to Owner the amount of $ $3.75 for each car washed at the Car Wash.  Owner shall bill Operator on a monthly basis as part of Owner's monthly statement to Operator as provided for in Section 4.b below.

    d.   Owner and Operator acknowledge and agree that amount paid by Operator to Owner for each car washed at the Car Wash in consideration of the maintenance and marketing performed by Owner is beneficial to both parties and that over time said amount may need to be adjusted.  Owner and Operator agree to use their best efforts to maintain this program and make adjustments which are mutually beneficial.

3.   <u>CAR WASH CODE PACKAGES</u>

    a.   Operator shall offer for sale multi Car Wash Codes at the register inside the convenience store on the Premises, which packages are good at all Upstate Laser Wash Facilities ("Car Wash Code Packages").
    b.   Owner shall deliver the Car Wash Code Packages to Operator as needed. For each Upstate Laser Wash Car Wash Code Package purchased by a customer at the autoteller, Operator shall pay to Owner the price paid by the customer.  On a monthly basis, Owner shall provide to Operator a statement setting forth the number, type and price of the Upstate Laser Car Wash Code Packages purchased and the total cost thereof.  Owner shall bill Operator on a monthly basis as part of Owner's monthly statement

4

to Operator as provided for in Section 4.b. below.

4.   UPSTATE LASER WASH CAR WASH CODES

a.   Operator agrees to honor all car wash codes issued by Upstate Laser Wash which are internet generated ("Upstate Laser Wash Car Wash Code").

b.   For each Upstate Laser Wash Car Wash Code redeemed by a customer, Owner shall pay to Operator the car wash price paid by customer for the Upstate Laser Wash Car Wash Code. On a monthly basis, Owner shall provide to Operator a statement setting forth the number, type and price of the Upstate Laser Car Wash Codes redeemed and the total cost thereof.

c.   Operator shall offer for sale multi Upstate Laser Wash Car Wash Codes and the re-charge of Car Wash Code Packages at the Car Wash access/autoteller ("Upstate Laser Wash Car Wash Code Packages") which is maintained by owner.  The prices of the Upstate Laser Wash Car Wash Codes Packages shall be Owner's current retail prices as set by Owner.

d.   Owner shall offer for sale to Operator's customers via the internet the purchase of car wash codes on the Upstate Laser Wash website and Owner agrees to provide the following services in relation thereto:

(1)  Maintenance of website;

(2)  Payment of all monthly internet fees relating to all web site transactions;

(3)  Addressing calls and e-mails from website customers;

(4)  Maintenance of web site advertising at the pumps and in the convenience store located on the Premises; and

(5)  Collect all applicable New York State sales taxes on the sale of Upstate Laser Car Wash Codes, remit all sales taxes collected to New York State, and prepare and file all required sales tax returns.

5.   ADVERTISING

a.   Operator will allow Owner to advertise the sale of Upstate Laser Wash Car Wash Codes on the Premises with the prior

approval of the size and locations of said advertising by Operator, which approval shall not be unreasonably withheld, delayed or conditioned.

    b.   Operator hereby consents to the placement of the existing two (2) POP signs on the pump islands and signage at the register counter and in the windows inside the convenience store on the Premises.

6.   <u>SALES CONTESTS</u>

    Operator shall allow Owner to run Upstate Laser Wash Car Wash Code Packages sale incentive contests for Operator's employees with the prior consent of Operator, which consent shall not be unreasonably withheld, delayed or conditioned. Owner shall be solely responsible for all costs of such sale incentive contests.

7.   <u>PAYMENTS</u>

    All payments due by Operator or Owner pursuant to this Agreement shall be paid by direct deposit into an account designated by Owner/Operator. All payments are due within ten (10) days from receipt of the settlement statement. Operator and Owner agree that for all payments not made within thirty (30) days of the date when due, it shall pay interest thereon at the rate of eighteen percent (18%) per annum from the date due until payment in full.

8.   <u>TERM</u>

    The Term of this Agreement shall commence on the commencement of the Original Term as provided for in the Lease and shall continue for so long as the Lease is in full force and effect, or should Operator purchase the Premises as provided for in the Lease, this Agreement shall continue for a ten (10) year term to commence on the date of sale unless terminated by Owner and Operator pursuant to written agreement signed by both parties. Notwithstanding the foregoing, in the event the Operator's sale of Car Wash Codes under the terms of this Agreement is no longer profitable to Operator, Owner and Operator agree to renegotiate this Agreement and amend the terms so that Operator shall make a profit selling car washes as specified in this Agreement.

9.   DEFUALT UNDER LEASE

     Owner and Operator acknowledge and agree that default by
Owner or Operator under this Agreement shall be a default under
the Lease.

10.  FORCE MAJEURE

     If any governmental authority whatsoever at any time during
the operation of this Agreement prevents or prohibits the
Operator from selling Car Wash Codes and/or Car Wash Code
Packages, then Operator shall have the right at its own option
to cancel this Agreement; provided, that the Operator shall give
Owner prompt notice of said actions, and Owner shall have not
less than ninety (90) days to negotiate with such governmental
authorities to remove such prohibitions.

11.  ASSIGNMENT

     The parties shall have the right and privilege to assign
this Agreement, upon the prior written consent of the other
party, which consent shall not be unreasonably withheld, delayed
or conditioned.  The party requesting the assignment agrees to
provide the other party with all information reasonably required
by such party to determine whether to consent to any request to
assign. In the event of an assignment of the Lease, this
Agreement will automatically be assigned to the approved
assignee.

12.  DEFAULT

     The following events shall each be deemed to be an event of
default (an "Event of Default"):

     a.   Any failure of Owner or Operator to commence and
diligently pursue the performance of any non-monetary term,
covenant, or condition of this Agreement to be observed and
performed by Owner or Operator for more than thirty (30) days
after written notice of such default(the "Notice of Default
Period"), unless the breaching party is in the process of making
a good faith effort to cure such default, within a reasonable
time, then Owner or Operator, as the case may be, at their
option, may terminate this Agreement with notice to the
breaching party,  but such termination shall not affect the
Parties right to recover damages or exercise any other right
hereinafter provided.

b.   In the event Operator or Owner fail to make any payment after the same shall become due and payable under the terms and conditions of this Agreement, and shall not cure such failure within five (5) business days after written notice thereof to the breaching party, the non-breaching party, at its option, may terminate this Agreement without further notice to the other, but such termination shall not affect non-breaching party's rights to recover damages or exercise any other right hereinafter provided.

13.   <u>WAIVERS</u>

Owner and Operator, so far as permitted by law, waive and will waive trial by jury in any action, proceeding, or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Agreement, the relationship of Owner and Operator, or any claim or injury or damage.

14.   <u>NOTICE</u>

Any notice, demand or request, required or agreed to be given by either party shall be sufficiently given or served if in writing and signed by the party giving it and mailed by certified U.S. mail, return receipt requested, addressed to the party to be notified as follows, or to such other addresses as Owner and Operator, respectively, may from time to time designate by giving notice thereof in writing in the manner prescribed herein.  Services shall be complete upon such mailing, except in the case of a notice to change an address, in which case service shall not be complete when the notice is received by the addressee.

        TO OWNER:     STATE STREET GAS PLUS, INC.
                      c/o Stephen Weekes
                      541 Clifton Park Center Road
                      Clifton Park, NY 12065

        TO OPERATOR:  DRAKE PETROLEUM COMPANY, INC.
                      221 Quinebaug Road
                      North Grosvenordale, CT 06255

15.  ACCESS

a.    At all times during the term of this Agreement, Owner
and its agents, employees and contractors shall have the right
to enter the Premises for the purpose of performing its
obligations hereunder.  Owner shall use reasonable diligent
efforts to minimize any interference with Operator's business as
a result of any such entry. Owner agrees not to disturb the
Operator's business conducted on the Premises during any entry
under this Section 15 and will hold harmless and indemnify the
Operator for any such disturbance. Owner agrees to repair any
damage caused to the Premises as a result of such activities.

b.    Prior to the Owner or its respective employees,
contractors and/or agents entering upon the Premises for any
reason under the terms of this Agreement, Owner agrees, as a
condition to said entry, to deliver to Operator the following
certificates of insurance:  (a) certificate of liability insurance
of not less than $3,000,000 per occurrence; and (b) certificate of
property damage insurance of not less than $500,000; and (c) a
certificate of workers compensation insurance with statutory
minimum amounts required in the State of New York. Each of said
certificates of insurance, except for the workers compensation
policy, shall name Operator as an additional insured and shall
contain a severability of interest clause, whereby Operator's
right to recover as an additional insured shall not be affected by
any acts or omissions of Owner or its respective employees,
contractors and/or agents.

16.  INTERPRETATION

If any provisions of this Agreement or any application
thereof shall be invalid or unenforceable, the remainder of this
Agreement and any other application of such provision shall not
be affected thereby.  This Agreement shall be binding upon and
inure to the benefit of and be enforceable by the respective
successors and assigns of the parties hereto, including but not
limited to the heirs, executors, administrators, trustees, and
other legal representatives of said parties.  The paragraph
headings of this Agreement are for convenience of reference only
and shall not limit or otherwise affect the meaning or the
contents of such paragraphs.  This Agreement shall be governed
by and construed in accordance with the laws of the State of New
York. The venue of any action or proceeding involving the
interpretation or enforcement of this Agreement shall be in the
County of Saratoga, New York.

17.  ENTIRE AGREEMENT

This Agreement represents the entire agreement between the Parties hereto and there are no collateral or oral agreements or understandings.  All additions, variations or modifications of this Agreement shall be void and ineffective unless they are in writing and signed by the Parties.

18.  AGREEMENT TERMS DEPENDENT

a.  Every provision hereof imposing an obligation on Owner and/or any covenant or warranty of Owner is a material inducement and consideration for the execution of this Agreement by Operator and any breach, violation or failure with respect thereto by Owner shall entitle Operator to terminate this Agreement forthwith by giving Owner written notice of such termination.

b.  Every provision hereof imposing an obligation on Operator and/or any covenant or warranty of Operator is a material inducement and consideration for the execution of this Agreement by Operator and any breach, violation or failure with respect thereto by Operator shall entitle Owner to terminate this Agreement forthwith by giving Operator written notice of such termination.

19.  NON-GRATUITY REPRESENTATION

Each party hereto represents and warrants to the other that it has neither offered, received, nor is aware of any offer or receipt of any consideration, gift, promise, reimbursement of any expenses, prepayment or promise to pay any expense or obligation or receive any remuneration or gratuity of any nature or sort in connection with the negotiation, execution and anticipated performance of this Agreement other than has been set forth herein.

20.  COUNSEL FEES

In the event of a breach of this Lease by either the Owner or Operator, the non-breaching party shall be entitled to collect all counsel fees and expenses as a result of the breach upon application to the Court of competent jurisdiction as to reasonableness.

21.  HOLD HARMLESS AND INDEMNIFICATION

    a.    Operator will protect, indemnify, defend and save harmless Owner and Owner's affiliates and their respective members, partners, stockholders, directors, officers, employees and/or agents, from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation, attorneys' fees and expenses) imposed upon or incurred by or asserted against Owner by reason of the following:

    (1)  Payment by Operator of any sum due hereunder;

    (2)  Any failure on the part of Operator to perform or comply with any terms or provisions of this Agreement; and/or

    (3)  Occasioned wholly or in part by any act or omission of Operator, its agents, guests, invitees, contractors, employees, servants or concessionaires.

    b.    Owner will protect, indemnify, defend and save harmless Operator and Operator's affiliates and their respective members, partners, stockholders, directors, officers, employees and/or agents, from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation, attorneys' fees and expenses) imposed upon or incurred by or asserted against Operator by reason of the following:

    (1)  Payment by Owner of any sum due hereunder;

    (2)  Any failure on the part of Owner to perform or comply with any terms or provisions of this Agreement; and/or

    (3)  Occasioned wholly or in part by any act or omission of Owner, its agents, guests, invitees, contractors, employees, servants or concessionaires.

22.  SURVIVAL OF OBLIGATIONS

    All obligations for payment of all sums due hereunder and hold harmless and indemnification provisions arising out of all causes shall survive termination of this Agreement and remain enforceable until all obligations accruing under the Agreement shall have been fully discharged and satisfied.

23. <u>NO NEGATIVE INFERENCE</u>

This Agreement is the result of extensive negotiations between the parties, both of whom are represented by counsel and each of whom shall be deemed to have drawn this Agreement. No negative inference or interpretation shall be drawn against the preparer of this Agreement.

24. <u>STRICT PERFORMANCE</u>

The failure of Owner or Operator to insist upon a strict performance of any of the terms, conditions and covenants herein shall not be deemed a waiver of any subsequent breach or default in the terms, conditions and covenants herein contained.

25. <u>ENFORCEABILITY</u>

If any term covenant or condition of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

   IN WITNESS WHEREOF the parties hereto have set their hands and seals to this Agreement on the day and year first above written.

Signed, sealed and delivered in the presence of:

WITNESSES:                        **STATE STREET GAS PLUS, INC.**
                                  (OWNER)

                                  By: _____
                                      Peter Rosenfeld, Its
                                      Vice President


                                  **DRAKE PETROLEUM COMPANY, INC.**
                                  (OPERATOR)

                                  By: _____
                                      David M. Preble, Its
                                      President

**STATE OF NEW YORK      }**
                        **}SS.:**
**COUNTY OF SARATOGA }**


On August **18**, 2011, before me, the undersigned, personally appeared Peter Rosenfeld, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

Notary Public
My Commission Expires:


**STATE OF CONNECTICUT}**
                      **}SS.:**
**COUNTY OF Windham }**


On August **22nd**, 2011, before me, the undersigned, personally appeared David M. Preble, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

Notary Public
My Commission Expires: May 31, 2013

**State Street**

**Monthley Car Wash settlement form:**

**Month :**
* Number in Blue are made up to test the spreadsheet.

| Operating Agreement P 3.b. | **Package Sales - Retail @ C'store** | **Price** | **Total Delivered** | **Total price** |
|---|---|---|---|---|
| | Regular Package | $32 | 8 | $256.00 |
| | Deluxe Package | $39 | 12 | $468.00 |
| | Ultimate Package | $48 | 10 | $480.00 |
| | Total package sales Due Derived From Delivery slips to Drake | | 30 | $1,204.00 |

| P 4.b. | **Internet wash codes redeemed** | **qty** | **retail** | **25% discounted retail** | **Total reimbursement** |
|---|---|---|---|---|---|
| | Regular | 118 | $8 | $6.00 | $708.00 |
| | Deluxe | 129 | $10 | $7.50 | $967.50 |
| | Ultimate | 108 | $12 | $9.00 | $972.00 |
| | Total Credit Derived from Daily Access Reports | 355 | | | ($2,647.50) |

| P 2.c. | **Per car Service Charge** | **qty** | **price each** | | **Total** |
|---|---|---|---|---|---|
| | Total cars washed Derived from Daily Access Reports | 1829 | $3.75 | | $6,858.75 |
| | Sales tax | | | 8.00% | $548.70 |
| | Total Due | | | | $7,407.45 |

| P 4.d. | **Access Package Sales and Replenish** | | | | |
|---|---|---|---|---|---|
| | access sales & recharge Due Derived from Daily Access Reports | | | | $683.00 |

## Grand Total Due to State

$6,646.95